David R. Fox (NV Bar No. 16536)
Christopher D. Dodge (*pro hac vice forthcoming*)
Marisa A. O'Gara (*pro hac vice forthcoming*)
**Elias Law Group LLP**
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
(202) 968-4490
dfox@elias.law
cdodge@elias.law
mogara@elias.law

Bradley S. Schrager (NV Bar No. 10217)
Daniel Bravo (NV Bar No. 13078)
**Bravo Schrager LLP**
6675 South Tenaya Way, Suite 200
Las Vegas, NV 89113
(702) 996-1724
bradley@bravoschrager.com
daniel@bravoschrager.com

*Attorneys for Intervenor-Defendants*
*Rise Action Fund, Institute for a Progressive Nevada,*
*and Nevada Alliance for Retired Americans*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE, NEVADA REPUBLICAN PARTY, and SCOTT JOHNSTON, | Case No. 2:24-cv-00518-CDS-MDC |
| Plaintiffs, | |
| v. | **MOTION TO INTERVENE AS DEFENDANTS** |
| FRANCISCO AGUILAR, in his official capacity as Nevada Secretary of State; LORENA PORTILLO, in her official capacity as the Registrar of Voters for Clark County; WILLIAM "SCOTT" HOEN, AMY BURGANS, STACI LINDBERG, and JIM HINDLE, in their official capacities as County Clerks, | |
| Defendants. | |

MOTION TO INTERVENE AS
DEFENDANTS

**INTRODUCTION**

The National Voter Registration Act is a federal law enacted to make it *easier* for qualified voters to register and *remain* registered. By filing this suit, Plaintiffs have chosen instead to weaponize the NVRA against the very voters the law is meant to protect, seeking a rushed and unlawful purge of the voter rolls as the November general election approaches. This suit does not come out of the blue; it is part of an emerging and dangerous national trend that seeks to enlist federal courts in a coordinated effort to purge qualified voters across the country, based on little more than spurious tales of voter fraud. Indeed, three substantively identical suits have been filed in other states just this month, including one by the lead Plaintiff here.[1] Although similar efforts have uniformly failed in recent years, Plaintiffs—the Republican National Committee, the Nevada Republican Party, and a register Republican Voter—now bring this troubling effort to Nevada.

Rise Action Fund, the Institute for a Progressive Nevada, and the Nevada Alliance for Retired Americans ("Proposed Intervenors") seek to intervene in this case to protect the significant—indeed, constitutionally-protected—rights of their members and constituents, as well as their own interests as organizations. They are entitled to do so as of right under Federal Rule of Procedure 24(a) because this suit threatens to impair those interests as a practical matter. The relief Plaintiffs seek—a rushed purge of Nevada's voter rolls—creates an intolerable risk of disenfranchising Proposed Intervenors' members and constituents, including younger people, college students, and retirees. Granting the relief Plaintiffs seek would also force each group to divert its spare resources towards stanching the harm from Plaintiffs' demanded purge. Given the stakes, Proposed Intervenors cannot reasonably rely upon the named Defendants to adequately represent their interests. As public officers, the named Defendants have distinct, and potentially conflicting, objectives than Proposed Intervenors. Proposed Intervenors have moved swiftly to intervene in this litigation—mere days after the complaint was filed—and their participation poses

---

[1] *See Republican Nat'l Comm., et al. v. Benson, et al.*, Case No. 1:24-cv-262, ECF No. 1 (E.D. Mich. Mar. 13, 2024); *Pub. Int. Legal Found. v. Knapp*, Case No. 3:24-cv-1276-JFA, ECF No. 1 (D.S.C. Mar. 14, 2024); *Jud. Watch, Inc., et al. v. Ill. State Bd. of Elections, et al.*, Case No. 24-cv-1867, ECF No. 1 (N.D. Ill. Mar. 5, 2024).

1  no risk of prejudice or delay to the existing parties. Their motion should be granted.

2  **BACKGROUND**

3  **I.    Nevada's Obligation Under the National Voter Registration Act**

4  The National Voter Registration Act of 1993 ("NVRA") is a federal law the requires states

5  to provide simplified, voter-friendly systems for registering to vote. In enacting the NVRA,

6  Congress aimed expressly to *increase* access to the franchise, by establishing "procedures that will

7  increase the number of eligible citizens who register to vote in elections for Federal office" and by

8  making it "possible for Federal, State, and local governments to implement [the NVRA] in a

9  manner that enhances the participation of eligible citizens as voters in elections for Federal office."

10  52 U.S.C. § 20501(b)(1)–(2). Congress also made a finding in the NVRA that "discriminatory and

11  unfair registration laws and procedures can have a direct and damaging effect on voter

12  participation . . . and disproportionately harm voter participation by various groups, including

13  racial minorities." *Id.* § 20501(a)(3).

14  To further those pro-voter purposes, the NVRA imposes strict restrictions on whether,

15  when, and how a state may remove a voter from its registration rolls. *See* 52 U.S.C. § 20507(a)(3)–

16  (4), (b)–(d). A state may immediately remove a voter from the rolls in only rare circumstances,

17  such as when a registrant requests to be deregistered or is convicted of a disenfranchising felony.

18  *See id.* § 20507(a)(3)(A)–(B). Otherwise, a state may not remove voters from the rolls without first

19  complying with prescribed procedural minimums that Congress has mandated to protect qualified

20  voters' access to the franchise and minimize the risk of erroneous deregistration. *See id.* §

21  20507(a)(3)(C), (c), (d). For instance, a registrant may be removed from the rolls by reason of

22  change of residence, in most cases, only after failing to respond to a notice and failing to appear

23  to vote for two general elections following that notice. *Id.* § 20507(d)(1).

24  Thus, by design "the NVRA does not require states to immediately remove every voter

25  who may have become ineligible." *Pub. Int. Legal Found. v. Benson*, No. 1:21-CV-929, 2024 WL

26  1128565, at *11 (W.D. Mich. Mar. 1, 2024) ("*PILF*"). Rather, Congress has made the policy

27  determination that some delay in the removal of voters from the rolls is worthwhile because that

28

1    delay minimizes the risk that qualified voters will be wrongly deregistered. As a result of these

2    Congressionally-crafted safeguards against immediate purging of a voter, a single "snapshot" of a

3    county's voter rolls can "in no way be taken as a definitive picture of what a county's registration

4    rate is." *Bellitto v. Snipes*, 935 F.3d 1192, 1208 (11th Cir. 2019). !

5            The RNC's lawsuit largely ignores these mandatory safeguards and focuses instead on the

6    NVRA's affirmative list-maintenance obligations. Those obligations, however, are very limited.

7    The NVRA requires only that each state make "a reasonable effort to remove the names of

8    ineligible voters from the official lists of eligible voters by reason of [] the death of the registrant;

9    or [] a change in the residence of the registrant." 52 U.S.C. § 20507(a)(4)(A). In other words,

10    "Congress did not establish a specific program for states to follow for removing ineligible voters,"

11    *PILF*, 2024 WL 1128565 at *10, it just required reasonable measures, and only with respect to

12    voters who move or die. The NVRA also includes an optional safe-harbor procedure: states are

13    deemed to meet their list maintenance obligations if they use U.S. Postal Service data to identify

14    voters who may have moved and then follow a specified notice procedure to confirm the change

15    of residence and eventually remove the voter. *See* 52 U.S.C. § 20507(c)(1).

16    **II.    Plaintiffs' Suit**

17            Plaintiffs—the Republican National Committee; the Nevada Republican Party; and Scott

18    Johnston, a registered Republican voter—filed suit on March 18, 2024, against Secretary of State

19    Aguilar; Lorena Portillo, the Registrar of Voters for Clark County; William "Scott" Hoen, the

20    Clerk for Carson City, as well as Amy Burgans, Staci Lindberg, and Jim Hindle, the County Clerks

21    for Douglas County, Lyon County, and Storey County, respectively. *See* Complaint, ECF No. 1.

22    The complaint lodges a single claim that the Defendants violated their list-maintenance obligations

23    under Section 8 of the NVRA. *See id.* ¶¶ 93-97 (citing 52 U.S.C. §20507(a)(4)). Plaintiffs demand

24    far-ranging relief. In addition to a declaratory judgment that Defendants are violating Section 8,

25    and an injunction barring them from further such violations, they also request: "An order

26    instructing Defendants to develop and implement reasonable and effective registration list-

27

28

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

- 3 -

MOTION TO INTERVENE AS DEFENDANTS

maintenance programs to cure their failure to comply with section 8 of the NVRA and to ensure that ineligible registrants are not on the voter rolls." *Id.* at 18 (Prayer for Relief).

The gravamen of Plaintiffs' complaint is that Defendants *must* be violating the NVRA because, they allege, several Nevada counties presently have improbably high voter registration rates. *See id.* ¶¶ 48-78. But nowhere do Plaintiffs identify a specific deficiency with Nevada's current practices, nor do they identify any specific, presently registered voter whose presence on the rolls violates the NVRA. The complaint instead relies upon a single snapshot of the voter rolls in a few Nevada counties, nowhere accounting for the fact that the NVRA *by Congressional design* requires only reasonable list-maintenance efforts, not perfect ones, and necessarily requires states to delay for years before removing many potentially ineligible voters, in order to avoid the overzealous removal of eligible voters. *See supra* at 2-3. Other federal courts have warned against just such reliance a "snapshot," which can "in no way be taken as a definitive picture of what a county's registration rate is, 'much less any indication of whether list maintenance is going on and whether it's . . . reasonable." *Bellitto*, 935 F.3d at 1208 (affirming trial court's ruling that Florida's list-maintenance procedures were "reasonable" under the NVRA). Yet Plaintiffs rely upon just that, and nothing else, to support the inference of an NVRA violation.

## III.   Proposed Intervenors

*Rise.* Rise is a student-led 501(c)(4) nonprofit organization that runs student-focused statewide advocacy and voter mobilization programs in Nevada, among other states. To advance its mission of fighting for free public higher education and ending homelessness, housing insecurity, and food insecurity among college students, Rise is committed to empowering and mobilizing students in the political process and has recently focused a significant portion of its efforts on students in Nevada. Declaration of Christian Solomon ("Solomon Decl.") ¶¶ 5, 9. Recognizing that Nevada had few, if any, statewide organizations committed specifically to promoting the interests of young people and students between the ages of 18 and 27, Rise expanded to the state in 2023 and hired a State Director to build out the organization's operations. *Id.* ¶ 6. Within its first year, Rise's Nevada chapter held a training at UNLV, hired and trained several

MOTION TO INTERVENE AS DEFENDANTS

organizers devoted to engaging UNLV students, and recruited several campus fellows. *Id.* ¶ 8. Rise anticipates recruiting and training additional lead campus organizers at other Nevada campuses this year, including at UNR. *Id.* It also plans to hire a Deputy Director to further build upon the group's work in the state. *Id.*

While Rise's Nevada chapter shares the organization's broader national mission, it also strives to be responsive to the concerns of its student constituents within Nevada. Rise's first training at UNLV coincided with the December 6, 2023, mass shooting on the UNLV campus, forcing Rise's employees and student attendees into lockdown. *Id.* ¶¶ 5, 10. In response, the Nevada chapter has made organizing students around gun safety issues a top goal. *Id.* ¶ 10. The Nevada chapter also has made student debt relief and financial assistance a policy focus, and is in the process of recruiting volunteers and organizers to hold phone banks educating Nevada college students about the Biden Administration's SAVE Plan,[2] which offers affordable repayment plans to students, but which many students lack sufficient awareness of. *Id.* ¶ 9.

To build political support for these policy goals, Rise plans to make organizing and education its student constituents about the 2024 general election a major priority. *Id.* ¶ 11. It is planning extensive efforts to register students on campus, and also to ensure that already-registered students *stay* registered. *Id.* Rise's goal is to have its organizers and volunteers reach each student at UNLV three to five times, whether through phone banking or direct conversation, ahead of the 2024 general election, and it has also adopted specific goals for student voter registration and turnout. *Id.* This election-focused work is important to Rise's mission, which hinges on its ability to build political power with the student population. *Id.* ¶¶ 5-7, 11, 13.

Plaintiffs' suit particularly threatens to harm the student population that Rise advocates for and seeks to serve. *Id.* ¶ 13. Many college students live away from their family homes or places of

---

[2] *See generally* The White House, Fact Sheet: The Biden-Harris Administration Launches the SAVE Plan, the Most Affordable Student Loan Repayment Plan Ever to Lower Monthly Payments for Millions of Borrowers (Aug. 22, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/08/22/fact-sheet-the-biden-harris-administration-launches-the-save-plan-the-most-affordable-student-loan-repayment-plan-ever-to-lower-monthly-payments-for-millions-of-borrowers/.

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

MOTION TO INTERVENE AS DEFENDANTS

residence for long periods of time while at school, often changing temporary places of residence repeatedly without abandoning their permanent residence, but without immediate access to mailed notices sent to their permanent addresses that might advise them that their registration is at risk of cancellation. *Id.* Other college students establish permanent residences in their new college communities, but may move frequently—every year, or even every semester—within the same small geographic area. *Id.* Students in both categories are particularly at risk for disenfranchisement in a rushed purging process in the months ahead of a major general election of the sort that Plaintiffs seek here. Plaintiffs' suit is therefore a direct attack on the very voters Rise seeks to organize, empower, and advocate for. And if Plaintiffs' suit is successful, Rise will have to retool its efforts in Nevada to focus on assisting students in determining their registration status, and re-registering if they are in fact purged. *Id.* ¶¶ 13, 15. Such retooling will disrupt Rise's pre-election planning and also come at the expense of work on its other mission-critical goals. *Id.* ¶ 14. In particular, Rise expects that it will have to focus its volunteer phone banking efforts on educating students about the purge and informing them about how to confirm their registration status. *Id.*. This volunteer-intensive effort would diminish Rise's plan to phone bank on other mission-critical efforts, such as informing students about the SAVE Plan and other financial assistance and loan repayment programs. *Id.* ¶ 9, 14.

***Institute for a Progressive Nevada.*** The Institute for a Progressive Nevada ("IPN") is a progressive, non-partisan, and non-profit organization that educates, empowers, and engages Nevadans to build a state where everyone has a fair opportunity to succeed. Its core mission is to ensure that every Nevadan knows how to vote and how to do so confidently. Declaration of Shelbie Swartz ("Swartz Decl.") ¶ 4. As part of its civic education and voting rights work, IPN publishes a non-partisan voter guide every election cycle. *Id.* ¶ 4. This guide includes comprehensive instructions on how to register and how to vote in Nevada. *Id.* IPN also hosts its own voter registration platform—RegisterNevada.Org—that it promotes across the state to encourage voter registration. *Id.* The organization also engages in targeted advertising campaigns—chiefly through

1   social media and radio—to educate citizens about its core policy areas. The organization presently

2   has a dozen employees but would like to hire more. *Id.* ¶¶ 3, 4.

3       Plaintiffs' suit is a direct affront to IPN's mission to empower all Nevadans to vote, in

4   effect asking for a rushed purge process that would result in eligible voters being tossed off the

5   rolls. *Id.* ¶¶ 4, 5. IPN would need to take several major steps in response. First, the organization

6   would have to retool its voter guide to educate the public about the purge and add material

7   informing voters about how to confirm their registration status. *Id.* ¶ 5. Second, it would have to

8   refocus its limited advertising to spread awareness about the purge to alert people to the need to

9   check their registration. *Id.* Such a campaign would eat into IPN's limited financial resources,

10  likely delaying the hiring of new employees and making it more difficult to meet payroll for

11  existing employees. *Id.* And it would also reduce IPN's ability to advertise about other issues,

12  including spreading awareness of different voting methods within Nevada. *Id.* Nonetheless, given

13  the centrality of voting to its mission, IPN strongly believes it would have to commit these

14  resources to such an advertising campaign, even at the expense of other objectives. *Id.*

15      ***The Alliance.*** The Alliance for Retired Americans is a nonpartisan 501(c)(4) membership

16  organization with over 4.4. million members nationwide. Declaration of Thomas Bird ("Bird

17  Decl.") ¶ 3. Its mission is to ensure the social and economic justice and full civil rights that retirees

18  have earned after a lifetime of work, with a particular emphasis on safeguarding the right to vote.

19  *Id.* ¶ 4. The Alliance's Nevada chapter, the Nevada Alliance for Retired Americans, has roughly

20  20,000 members comprising retirees from numerous public and private sector unions, members of

21  community organizations, and individual activists. *Id.* ¶ 3. It works with 20 affiliated chapters—

22  comprised of other union and community groups—across Nevada. *Id.* ¶ 9. A major focus of the

23  Alliance's work is attending these chapter meetings to speak with members about key policy goals,

24  such as preserving Social Security and Medicare. *Id.* ¶ 10.

25      Because Alliance members are, overwhelmingly, retirees, and are registered to vote at

26  extremely high rates, they are disproportionately vulnerable when voting rolls are purged. *Id.* ¶ 6.

27  In particular, retirees are disproportionately burdened by voter purges because many retirees move

28

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

MOTION TO INTERVENE AS DEFENDANTS

within Nevada after retiring, and because retirees often travel out of state for long periods, when they forward their mail or miss and fail to return a mailed notice regarding their registration status. *Id.* ¶ 5. As a consequence, moving and traveling increase a voter's risk of wrongful deregistration. *Id.* ¶ 6. For instance, a retiree who spends a lengthy period of time caring for grandchildren at another family member's home, or enjoying retirement at a second home, may miss a crucial notice of cancellation if that notice is sent only to the retiree's home address. *Id.* ¶ 5. Beyond that, the Alliance's sheer size gives it a substantial stake in this case: Given the Alliance's roughly 20,000 members, it is all but certain that a rushed purge process would put many of those members' voter registrations in jeopardy.

A purge of Nevada's election rolls would also require the Alliance to refocus its efforts on educating its members about registration issues, an area it does not traditionally focus on since most of its members are long-registered voters. *Id.* ¶ 7–9. In a presidential year such as 2024, the Alliance has a wide range of organizational goals to achieve: getting out the vote, educating its members and constituents about where candidates stand on the Alliance's key issues, and organizing around those issues. *Id.* ¶ 10. A purge would undermine those efforts in several ways. *Id.* Alliance leadership would need to devote time and effort to preparing materials and presentations about the purge, and would then need to use scare presentation and organizing time at chapter meetings to walk members through how to confirm their registrations, as well as to answer members' questions. *Id.*. Alliance leadership and volunteers would also need to assist any members who were deregistered. *Id.* ¶ 8. All this would divert the Alliance's resources from other essential organizing tasks, and thereby frustrate its mission.

## STANDARD OF LAW

"Rule 24 traditionally receives liberal construction in favor of applicants for intervention." *Arkaki v. Cayetano*, 324 F.3d 1078, 1083 (9th Cir. 2003); *see also W. Expl. LLC v. U.S. Dep't of Interior*, No. 3:15-cv-00491-MMD-VPC, 2016 WL 355122, at *2 (D. Nev. Jan. 28, 2016) (noting Rule 24's liberal construction and "focus[] on practical considerations rather than technical

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

MOTION TO INTERVENE AS DEFENDANTS

distinctions").

The Ninth Circuit "require[s] applicants for intervention as of right pursuant to Rule 24(a)(2) to meet a four-part test":

> (1) the motion must be timely; (2) the applicant must claim a "significantly protectable" interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the parties to the action.

*United States v. Aerojet Gen. Corp.*, 606 F.3d 1142, 1148 (9th Cir. 2010) (quoting *Cal. ex rel. Lockyer v. United States*, 450 F.3d 436, 440 (9th Cir. 2006)).

"Rule 24(b) permits the Court to allow anyone to intervene who submits a timely motion and 'has a claim or defense that shares with the main action a common question of law or fact.'" *Nevada v. United States*, No. 3:18-cv-569-MMD-CBC, 2019 WL 718825, at *2 (D. Nev. Jan. 14, 2019) (quoting Fed. R. Civ. P. 24(b)(1)(B)). In addition to a common question of law or fact, permissive intervention under Rule 24(b) also requires (1) a timely motion and (2) an independent basis for the court's jurisdiction. *See Donnelly v. Glickman*, 159 F.3d 405, 412 (9th Cir. 1998).

Finally, Rule 24(c) requires that a motion to intervene "be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c).[3]

## ARGUMENT

### I. Proposed Intervenors are entitled to intervene as a matter of right.

#### A. The motion is timely.

The instant motion is indisputably timely, filed mere days after Plaintiffs initiated this suit and before any Defendant has appeared in the case or any substantive activity has occurred.

"In determining whether a motion for intervention is timely, [courts in this Circuit] consider three factors: (1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *League of United*

---

[3] In compliance with Rule 24(c), Proposed Intervenors attach a proposed Answer to this motion. Proposed Intervenors believe, however, that the Complaint should be dismissed under Federal Rule of Civil Procedure 12(b), and intend to file a Rule 12(b) motion by no later than the named Defendants' deadline to respond to the Complaint.

*Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1302 (9th Cir. 1997). Each of these considerations supports a finding of timeliness here.

*First*, these proceedings are truly at their earliest stages. Plaintiffs filed their complaint on March 18, 2024; this motion follows just three days later. Plaintiffs have not yet filed proof of service; Defendants have not yet appeared or filed a responsive pleading; and no case schedule has been set. *See, e.g.*, *Nevada v. United States*, No. 3:18-CV-569-MMD-CBC, 2019 WL 718825, at *2 (D. Nev. Jan. 14, 2019) (granting motion to intervene filed several weeks after action commenced); *W. Expl. LLC v. U.S. Dep't of the Interior*, No. 3:15-CV-00491-MMD-VPC; *W. Expl.*, 2016 WL 355122, at *2 (granting motion to intervene filed nearly two months after action commenced).

*Second*, given the early stage of proceedings, permitting Proposed Intervenors to participate poses no risk of prejudice or delay to the existing parties. Proposed Intervenors will agree to any schedule stipulated to by the principal parties and, of course, will abide by all deadlines and schedules set by the Court. *See, e.g.*, *Portfolio FB-Idaho, LLC v. Fed. Deposit Ins. Corp. as Receiver for First Bank of Idaho*, No. 1:10-CV-377-BLW, 2010 WL 5391442, at *4 (D. Idaho Dec. 17, 2010) (finding no risk of prejudice where "discovery has yet to commence, no original deadlines have expired, and [intervenor] represents that it can quickly file a responsive brief"). Proposed Intervenors will therefore not be the cause of any delay in this case.

*Finally*, "the reason for and length of the delay" has no relevance here because there has been no delay whatsoever. *See, e.g.*, *W. States Trucking Ass'n v. Schoorl*, No. 2:18-CV-1989-MCE-KJN, 2018 WL 5920148, at *1 (E.D. Cal. Nov. 13, 2018) (finding there had "been no delay" where party "sought to intervene [at] the very outset of litigation").

Proposed Intervenors' motion thus satisfies the first requirement for intervention as of right: it is timely.

**B.      Proposed Intervenors have substantial threatened interests.**

Proposed Intervenors have significant protectable interests that might be impaired by Plaintiffs' suit, satisfying the second and third elements of Rule 24(a). Consistent with the liberal

standard in favor of intervention, Proposed Intervenors need not show that impairment is "an absolute certainty." *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 900 (9th Cir. 2011). Rather, their interests need only be "'substantially affected in a practical sense by the determination made in an action.'" *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 822 (9th Cir. 2001) (quoting Fed. R. Civ. P. 24 advisory committee note to 1966 amendment). In conducting this "practical, threshold inquiry . . . [n]o specific legal or equitable interest need be established" by Proposed Intervenors. *Id.* at 897 (quoting *Greene v. United States*, 996 F.2d 973, 976 (9th Cir. 1993)). Rule 24(a)'s interest requirement is less stringent than Article III's standing requirements, and accordingly the threatened impairment of Proposed Intervenors' practical interests in the case need not rise to the level of an injury-in-fact. *See Yniguez v. State of Ariz.*, 939 F.2d 727, 735 (9th Cir. 1991). Generally, after determining the applicant has a protectable interest, courts have "little difficulty concluding," the disposition of the case may affect such interest. *Lockyer*, 450 F.3d at 442 (citing *Berg*, 268 F.3d at 822).

Proposed Intervenors each have at least two significantly protectable interests that Plaintiffs' lawsuit threatens to impair. *First*, Proposed Intervenors have a substantial interest in ensuring that their members and constituents are able to register to vote, remain registered to vote, and successfully participate in the upcoming general election. *See* Solomon Decl. ¶¶ 12-15; Bird Decl. ¶¶ 7–10. Numerous courts have recognized this as a well-established basis for intervening in NVRA Section 8 cases that seek to have voters purged from the rolls. *See Bellitto v. Snipes*, No. 16-cv-61474, 2016 WL 5118568, at *2 (S.D. Fla. Sept. 21, 2016) (granting organization intervention of right in Section 8 case); *see also Pub. Int. Legal Found., Inc. v. Winfrey*, 463 F. Supp. 3d 795, 799 (E.D. Mich. 2020) (granting organization permissive intervention in Section 8 case); Order, *Daunt v. Benson*, 1:20-cv-522 (W.D. Mich. Sept. 28, 2020), ECF No. 30 (same); Order, *Voter Integrity Proj. NC, Inc. v. Wake Cnty. Bd. of Elections*, No. 5:16-cv-683 (E.D.N.C. Dec. 1, 2016), ECF No. 26 (granting voters permissive intervention in Section 8 case). In *Bellitto*, for example, the district court permitted a union with tens of thousands of members in Florida to intervene because "the interests of its members would be threatened by [any] court-ordered 'voter

MOTION TO INTERVENE AS DEFENDANTS

list maintenance' sought by Plaintiffs," a "potential harm" the court found "particularly great in light of the upcoming 2016 General Election." *Bellitto*, 2016 WL 5118568, at *2. That is precisely what the Alliance seeks to do here on behalf of its nearly 20,000 retiree members in Nevada, most of whom are union workers, Bird Decl. ¶ 3, and what Rise seeks to do on behalf of its discrete constituency of politically marginalized students, Solomon Decl. ¶¶ 5-6, 13, 15; *cf. Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1096–97 (9th Cir. 2021) (holding that organizations may sue on behalf of non-member constituents even under the more-demanding Article III test).

The NVRA itself reflects Proposed Intervenors' interest here. The law creates a cause of action to challenge improper removal of registered voters. 52 U.S.C. § 20510(b). And organizations like Proposed Intervenors often bring successful claims under that provision to *prevent* the very sort of statewide voter purge Plaintiffs here seek to *compel*. *See, e.g.*, *Common Cause/N.Y. v. Brehm*, 344 F. Supp. 3d 542, 558–59 (S.D.N.Y. 2018) (holding that plaintiff adequately alleged as-applied NVRA Section 8 claim challenging New York's registration removal policy); *Common Cause Ind. v. Lawson*, 327 F. Supp. 3d 1139, 1156 (S.D. Ind. 2018) (similar). Congress, by creating such a cause of action in the NVRA itself, recognized the very interest that the Proposed Intervenors seek to vindicate here through intervention—preventing improper removal of their members from Nevada's voter rolls.[4] And courts within this Circuit have recognized an organization's interest in protecting its members voting rights satisfies the "more stringent" requirement of Article III, which "compels the conclusion that they have an adequate interest" for purposes of Rule 24. *Yniguez*, 939 F.2d at 735; *see also Mi Familia Vota v. Fontes*, No. CV-22-00509-PHX-SRB, 2024 WL 862406, at *29-32 (D. Ariz. Feb. 29, 2024) (finding organizations had standing to protect members' voting rights); *March for Our Lives Idaho v. McGrane*, No. 1:23-CV-00107-AKB, 2023 WL 6623631, at *7 (D. Idaho Oct. 11, 2023) (similar).

---

[4] Given the timing of Plaintiffs' suit, Proposed Intervenors would likely lack sufficient time to file their own NVRA Section 8 suit in response to any improper purging of the voter rolls attributable to this suit. Moreover, the *stare decisis* effect of Plaintiffs' suit might preclude such a claim to begin with, leaving Proposed Intervenors no choice but to seek to intervene now. That "[P]roposed [I]ntervenors here have no alternative forum where they can" protect against Plaintiffs' desired purge further supports their intervention. *Lockyer*, 450 F.3d at 442. !

ELIAS LAW GROUP LLP
ATTORNEYS AT LAW
WASHINGTON, DC

MOTION TO INTERVENE AS DEFENDANTS

1    Proposed Intervenors' interest on this front is particularly significant because they

2    represent members and constituencies that face acute risk from any court-ordered purge. As

3    explained, *supra* at 5-6, younger voters, and college students in particular, are disproportionately

4    likely to be purged because they move frequently and are often away from their voting residence

5    for prolonged periods of time. *See* Solomon Decl. ¶ 13. Plaintiffs' requested relief therefore

6    threatens the significant—indeed, constitutionally-protected—interests of the student constituents

7    that Rise seeks to organize, empower, and turn out to vote. *See id.* ¶¶ 13, 15. Any

8    disenfranchisement of student voters impairs Rise's ability to organize such voters as a political

9    force in pursuit of Rise's student-oriented mission. *Id.*. Similarly, the Alliance's approximately

10   20,000 members also face challenges that increases their likelihood of being purged, as many of

11   their members move or travel frequently, and spend long periods away from their residence. Bird

12   Decl. ¶¶ 3, 5–6. And IPN seeks to empower *all* Nevadans to know how to vote and to be able to

13   vote with confidence, a goal frustrated by the rushed purge Plaintiffs seek. Swartz Decl. ¶ 4.

14   The sheer scope and immediacy of the relief Plaintiffs seek further reinforces why this case

15   impairs Proposed Intervenors' significant interests. As one Court of Appeals has put "a maximum

16   effort at purging voter lists could minimize the number of ineligible voters, but those same efforts

17   might also remove eligible voters." *Bellitto*, 935 F.3d at 1198. Such a "maximum effort" is

18   precisely what Plaintiffs seek here, and Proposed Intervenors have a stark interest in ensuring the

19   "eligible voters" they represent are not illegally removed.

20   Plaintiffs' requested relief also threatens to impair a second interest held by each Proposed

21   Intervenor. The purge sought by Plaintiffs would require each Proposed Intervenor to divert time

22   and resources away from other essential election-year activities, harming their missions in the

23   process. For example, IPN's mission to empower all Nevadans to vote would require it to take

24   prophylactic measures in response to the far-ranging purge Plaintiffs seek. In particular, it would

25   have to retool and update its non-partisan voter guide, which instructs Nevadans on how to

26   navigate the registration and voting process. Swartz Decl. ¶ 5. This task would require diverting

27   the time of IPN's small number of employees away from other mission-critical tasks ahead of the

28

election. *Id.* ¶ 5. Moreover, because empowering people to vote is at the core of IPN's mission, the organization anticipates allocating its limited financial resources to sponsor an advertising campaign educating voters about the purge and instructing them on how to confirm their registration status. *Id.* ¶ 5. Given the organization's modest resources, this campaign would restrict IPN's ability to hire new employees, and also limit its ability to launch other planned advertising campaigns, including one focusing on educating Nevadans about different methods of voting. *Id.* These costs harm IPN's ability to pursue its mission. *Id.*

Both Rise and the Alliance would suffer similar harms. As explained, Rise plans to organize volunteer phone banks to educate students about their various options for loan repayment assistance and other college aid plans, including the recently announced SAVE Plan. *See* Solomon Decl. ¶¶ 9, 14. If Plaintiffs prevail, however, Rise will have to redirect some of these efforts towards educating students about the purge and how to confirm their registration status. *Id.* That severely harms Rise's mission, which includes helping its student constituents pay for their education. *Id.* ¶¶ 5, 14-15. Granting Plaintiffs' relief will there "substantially affect[]" Rise "in a practical sense." *Berg*, 268 F.3d at 822. Similarly, the Alliance will have to use its limited volunteer resources to prepare materials educating its members about how to confirm their registration status, and then distribute these materials to members through social media channels, email, and at chapter meetings. Bird Decl. ¶ 7–10. This effort will reduce the Alliance's ability to speak to its members about other key policy goals, including protecting social security and Medicare. *Id.*

Like their interest in protecting their members and constituents' right to vote, Proposed Intervenors' interest in protecting their own organizational missions and resources can suffice to provide Article III standing. *See, e.g.*, *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021) ("[A]n organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose."). This second interest therefore provides a more than sufficient independent basis for granting intervention under Rule 24. *See Yniguez*, 939 F.2d at 735.

MOTION TO INTERVENE AS DEFENDANTS

C.      Defendants do not adequately represent Proposed Intervenors.

Proposed Intervenors will not be assured adequate representation in this matter if they are denied intervention. "[T]he requirement of inadequacy of representation is satisfied if the applicant shows that representation of its interests '*may b*e' inadequate," and therefore "the burden of making this showing is minimal." *W. Expl.*, 2016 WL 355122, at *3 (quoting *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 528 (9th Cir. 1983)) (emphasis added); *see also Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972). Accordingly, courts are "liberal in finding" this requirement to be met because "there is good reason in most cases to suppose that the applicant is the best judge of the representation of the applicant's own interests." 7C Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Civ.* § 1909 (3d ed.). And the Ninth Circuit "stress[es] that intervention of right does not require an absolute certainty . . . that existing parties will not adequately represent [an intervenor's] interests." *Citizens for Balanced Use*, 647 F.3d at 900. Here, neither Plaintiffs nor Defendants are assured to adequately represent Proposed Intervenors' interests. As to Plaintiffs, little needs to be said: Plaintiffs seek a rushed purge of Nevada's voter rolls in a presidential election year. Proposed Intervenors strongly oppose that result.

While the Secretary of State and various county official defendants may oppose relief, it does not follow that they will necessarily represent Proposed Intervenors adequately. Courts have "often concluded that governmental entities do not adequately represent the interests of aspiring intervenors." *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736 (D.C. Cir. 2003); *accord Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 899 (9th Cir. 2011) ("[T]he government's representation of the public interest may not be 'identical to the individual parochial interest' of a particular group just because 'both entities occupy the same posture in the litigation.'" (quoting *WildEarth Guardians v. U.S. Forest Serv.*, 573 F.3d 992, 996 (10th Cir. 2009))). Courts within this District have often reached the same conclusion in election cases. *See, e.g.*, *Donald J. Trump for President, Inc. v. Cegavske*, No. 2:20-CV-1445 JCM (VCF), 2020 WL 5229116, at *1 (D. Nev. Aug. 21, 2020) (granting intervention as of right because Secretary of State did not adequately represent partisan organization's interests, despite both wishing to defend against suit);

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

MOTION TO INTERVENE AS DEFENDANTS

*Paher v. Cegavske*, No. 3:20-CV-00243-MMD-WGC, 2020 WL 2042365, at *3 (D. Nev. Apr. 28, 2020) (similar, even where intervenors and named Defendant "presumably share[d] the goal of protecting the all-mail election provisions . . . being challenged"); *Fair Maps Nevada v. Cegavske*, No. 3:20-CV-00271-MMD-WGC, 2020 WL 8188427, at *3 (D. Nev. May 20, 2020) (similar).

This divergence of interests is particularly true in the context of NVRA claims. Secretary Aguilar and the named county officials are charged with pursing the NVRA's "twin objectives -- easing barriers to registration and voting, while at the same time protecting electoral integrity and the maintenance of accurate voter rolls." *Bellitto*, 935 F.3d at 1198. These competing goals "naturally create some tension." *Id.* In contrast, as another district court recognized in a similar context, groups like Proposed Intervenors have "[t]he mission and interest . . . explicitly to pursue the second of the expressly recognized interests that motivated Congress to enact [the NVRA]," *Winfrey*, 463 F. Supp. 3d at 801, *i.e.*, to eliminate "barriers to registration and voting," *Bellitto*, 935 F.3d at 1198. As a result, Defendants' representation of Proposed Intervenors cannot be presumed to be adequate. Indeed, recent history has shown that state officials sometimes try to resolve suits like this one through settlement. *See, e.g.*, Stipulation of Dismissal, *Daunt v. Benson*, No. 1:20-cv-522-RJJ-RSK (W.D. Mich. Feb. 16, 2021) (ECF No. 58). Any such settlement here jeopardizes Proposed Intervenors' interests. That potential conflict in litigation objectives further supports a finding that Defendants will not adequately represent Proposed Intervenors. *See Citizens for Balanced Use*, 647 F.3d at 900.

The Supreme Court itself has recently emphasized that executive officials will not often be adequate representatives for partisan or private actors who seek to intervene under Rule 24. *See Berger v. N.C. State Conf. of the NAACP*, 142 S. Ct. 2191, 2203–04 (2022). In *Berger*, the Supreme Court reiterated its longstanding instruction that even when state agents pursue "related" interests to political actors, those interests are not properly considered "identical." *Id.* at 2204 (quoting *Trbovich*, 404 U.S. at 538–39). The Court then explained that "[w]here 'the absentee's interest is similar to, but not identical with, that of one of the parties,' that normally is not enough to trigger a presumption of adequate representation." *Id.* (quoting 7C Wright & Miller, *Fed. Prac. & Proc.*

MOTION TO INTERVENE AS DEFENDANTS

1    *Civ.* § 1909). In particular, the Court stressed that whereas actors like the named Defendants must

2    "bear in mind broader public-policy implications," *id.*, such as maintaining the NVRA's various

3    policy goals, Proposed Intervenors' sole interest rests in protecting the registration status of their

4    members and constituents. *See, e.g.*, Solomon Decl. ¶¶ 5, 11, 14; Bird Decl. ¶ 7; Swartz Decl. ¶ 5.

5    **II.    Proposed Intervenors satisfy Rule 24(b)'s requirements for permissive intervention.**

6         Proposed Intervenors also easily satisfy the requirements for permissive intervention under

7    Rule 24(b), which grants this Court broad discretion "to allow anyone to intervene who submits a

8    timely motion and 'has a claim or defense that shares with the main action a common question of

9    law or fact.'" *Nevada*, 2019 WL 718825, at *2 (quoting Fed. R. Civ. P. 24(b)(1)(B)). "Because a

10   court has discretion in deciding whether to permit intervention, it should consider whether

11   intervention will cause undue delay or prejudice to the original parties, whether the applicant's

12   interests are adequately represented by the existing parties, and whether judicial economy favors

13   intervention." *Id.* (citing *Venegas v. Skaggs*, 867 F.2d 530–31 (9th Cir. 1989)).

14        For the reasons discussed in Part I *supra*, Proposed Intervenors' motion is timely, and they

15   cannot rely on Defendants to adequately protect their interests. Moreover, as the proposed answer

16   filed with this motion shows, Proposed Intervenors also have defenses to Plaintiffs' claims that

17   share common questions of law and fact, including that Plaintiffs lack Article III standing and have

18   failed to state a claim under the NVRA.

19                                   **CONCLUSION**

20        For the reasons stated above, Proposed Intervenors respectfully request that the Court grant

21   their motion to intervene as a matter of right under Rule 24(a)(2) or, in the alternative, permit them

22   to intervene under Rule 24(b).

23   / / /

24   / / /

25   / / /

26   / / /

27

28

1

Dated: March 21, 2024                    Respectfully submitted,

2
                                          **ELIAS LAW GROUP LLP**

3

4
                                          By: */s/ David R. Fox*

5
                                          David R. Fox (NV Bar No. 16536)
6                                          Christopher D. Dodge (*pro hac vice
                                          forthcoming*)
7                                          Marisa A. O'Gara (*pro hac vice
                                          forthcoming*)
8                                          **Elias Law Group LLP**
                                          250 Massachusetts Ave NW, Suite 400
9                                          Washington, DC 20001
                                          (202) 968-4490
10                                         dfox@elias.law
                                          cdodge@elias.law
11                                         mogara@elias.law

12                                         Bradley S. Schrager (NV Bar No. 10217)
                                          Daniel Bravo (NV Bar No. 13078)
13                                         **Bravo Schrager LLP**
                                          6675 South Tenaya Way, Suite 200
14                                         Las Vegas, NV 89113
                                          (702) 996-1724
15                                         bradley@bravoschrager.com
                                          daniel@bravoschrager.com

16

17                                         *Attorneys for Proposed Intervenor-
                                          Defendants*

18

19

20

21

22

23

24

25

26

27

28

- 18 -
MOTION TO INTERVENE AS DEFENDANTS

1

## <u>CERTIFICATE OF SERVICE</u>

2

3        I hereby certify that on this 21st day of March, 2024 a true and correct copy of Proposed

4    Intervenors Motion to Intervene as Defendants was served via the United States District Court's

5    CM/ECF system on all parties or persons requiring notice.

6

7                                    By:  */s/ David R. Fox*
                                          David R. Fox

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

- 19 -
MOTION TO INTERVENE AS DEFENDANTS

1

Index of Exhibits

| Exhibit | Description | No. of Pages |
|---------|-------------|--------------|
| 1 | [Proposed] Answer to Complaint | 11 |
| 2 | Declaration of Christian Solomon | 4 |
| 3 | Declaration of Shelbie Swartz | 2 |
| 4 | Declaration of Thomas Bird | 3 |

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28