AARON D. FORD
  Attorney General
LAENA ST-JULES (Bar No. 15156)
  Senior Deputy Attorney General
Office of the Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717
T: (775) 684-1100
E: lstjules@ag.nv.gov

*Attorneys for Secretary of State*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE, NEVADA REPUBLICAN PARTY, and SCOTT JOHNSTON,<br><br>              Plaintiffs,<br><br>vs.<br><br>FRANCISCO AGUILAR, in his official capacity as Nevada Secretary of State; LORENA PORTILLO, in her official capacity as the Registrar of Voters for Clark County; WILLIAM "SCOTT" HOEN, AMY BURGANS, STACI LINDBERG, and JIM HINDLE, in their official capacities as County Clerks,<br><br>              Defendants. | Case No. 2:24-cv-00518-CDS-MDC<br><br>**DEFENDANT SECRETARY OF STATE'S MOTION TO DISMISS** |

Defendant Francisco Aguilar, in his official capacity as Nevada Secretary of State ("Secretary of State"), moves to dismiss Plaintiffs Republican National Committee ("RNC"), Nevada Republican Party ("NVGOP"), and Scott Johnston's (together, "Plaintiffs") Complaint for Declaratory and Injunctive Relief ("Complaint") (ECF No. 1) pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject-matter jurisdiction and Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

## I.    INTRODUCTION

The National Voter Registration Act of 1993 ("NVRA") "was intended as a shield to protect the right to vote, not as a sword to pierce it." *Am. Civil Rights Union v. Philadelphia City Comm'rs*, 872 F.3d 175, 182 (3d Cir. 2017). Yet Plaintiffs, through this lawsuit, are

attempting to use it exactly as a sword to pierce Nevadans' right to vote.  Plaintiffs claim, based on mismatched, cherrypicked, and outdated data, that Nevada and certain counties are failing to make reasonable efforts to remove voters from voter rolls as required by the NVRA. This is part of a troubling trend of similar lawsuits[1] before what is likely to be the most hotly contested Presidential election of our lifetimes and appears to be an attempt to fan the flames of mis- and distrust in the election process.

The suspect nature of this lawsuit is underscored by Plaintiffs' inability to establish Article III standing.  Plaintiffs assert theories of injury that have been rejected by U.S. District of Nevada Courts and are hypothetical and based on mere speculation.  Plaintiffs also seemingly recognize the weakness of their case and have resorted to attempted sandbagging.  Under the NVRA, Plaintiffs were required to provide the Secretary of State with written notice before initiating suit to afford the Secretary of State an opportunity to correct any violation.  *See Scott v. Schedler*, 771 F.3d 831, 836 (5th Cir. 2014); 52 U.S.C. § 20510(b).  But rather than put all the data contained in the Complaint in their notice letter, Plaintiffs withheld data until it would be too late for the Secretary of State to act on it.  Such gamesmanship should not be countenanced.

In any event, the data Plaintiffs rely on, on its face, does not raise any plausible right to relief.  Instead, the best available comparable data, which data is subject to judicial notice, confirms that Plaintiffs' calculations do not state any claim for relief. Nevada is a leader in list maintenance, and Plaintiffs fail to plausibly allege that Nevada is not in compliance with the NVRA's requirements.  The Secretary of State is committed to ensuring secure, accessible, and transparent elections.  The Complaint should be dismissed.

///

///

///

---

[1] *See, e.g.*, Complaint, *Republican Nat'l Comm'n v. Benson*, Case No. 1:24-cv-00262, ECF No. 1 (E.D. Mich Mar. 13, 2024); Complaint, *Jud. Watch, Inc. v. Ill. State Bd. of Elections*, Case No. 1:24-cv-01867, ECF No. 1 (N.D. Ill. Mar. 5, 2024).

## II. BACKGROUND

### A. The NVRA

Under the NVRA, states may only remove voters (1) at the voter's request; (2) if a voter becomes ineligible under state law "by reason of criminal conviction or mental incapacity"; (3) if the voter died; or (4) if the voter changed residence. 52 U.S.C. § 20507(a)(3)–(4). While states are permitted to remove registrants "at the request of the voter, by reason of criminal conviction or mental incapacity as provided in state law, or because of death or change of residence," the NVRA only requires states "to conduct a general program that makes a reasonable effort to remove the name of voters who have become ineligible on account of death or change of address." *Bellitto v. Snipes*, 935 F.3d 1192, 1199 (11th Cir. 2019); 52 U.S.C. § 20507(a)(4). Any general program to remove voters must be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965," and may not be based solely on a voter's failure to vote. 52 U.S.C. § 20507(b)(1)–(2).

For the general program to remove voters based on a change of address, the NVRA imposes limitations on immediate removal. If a registrant moves outside of the jurisdiction, a registrar will send a notice to the registrant for the registrant to respond to. 52 U.S.C. § 20507(d)(1)(B), (d)(2). Only if the registrant does not respond to the notice and does not appear to vote in the next two federal general elections can a registrar remove the name of the registrant. 52 U.S.C. § 20507(d)(1)(B).

The NVRA also requires states to make available for public inspection records on their general programs to remove ineligible voters for at least two years. 52 U.S.C. § 20507(h)(i). Members of the public can therefore obtain, without any lawsuit or discovery, the names and addresses of all persons to whom address confirmation notices were sent based on potential changes of address; information on the responses to such confirmation notices; and records on how a state implements its general programs. *Id.*

///

///

///

**B.**   **Nevada's General List Maintenance Program for Voters Who Change Residence**

Nevada's counties ensure maintenance of their respective voter lists when a voter changes residence pursuant to NRS 293.530.  Counties can "use any reliable and reasonable means . . . to determine whether a registered voter's current residence is other than that indicated on the voter's application to register to vote."  NRS 293.530(1).  After identifying voters whose residences may have changed, the counties will then mail those voters a written notice with a postage guaranteed return postcard that has a space for the voter to write in his or her new address.  NRS 293.530(1)(c)(1)–(2).  If a voter returns the postcard with updated information, the county will correct the voter registration list.  NRS 293.530(f).  However, if a voter does not return the postcard within 33 days of its mailing, the county will designate the voter as inactive.  NRS 293.530(1)(d), (g).  And if an inactive voter fails to vote for two general elections after the mailing of the notice and postcard and the voter's registration information is not updated as specified in statute during that time, the county will cancel the voter's registration.  NRS 293.530(1)(c)(4)–(5).

**C.**   **Nevada's Safeguards Against Voter Fraud**

Nevada has in place laws that safeguard against voter fraud.  First, votes cast by mail ballot and in person are subject to signature verification.  NRS 293.269927(1) (mail ballots), 293.3075(1)(c) (ballots cast in person on election day), 293.3585(1)(c) (ballots cast early in person).  Second, inactive voters are not sent mail ballots.  *See* NRS 293.269911(1); Compl. ¶ 41.  Third, voter fraud is criminalized, NRS 293.775 (category D felony for voting or attempting to vote when not qualified or using another person's name), 293.780 (category D felony for voting or attempting to vote twice at same election), and as Plaintiffs note, is prosecuted in Nevada, Compl. ¶ 40.

**D.**   **This Lawsuit**

On December 4, 2023, Plaintiffs sent the Secretary of State a letter claiming that Nevada was in violation of the NVRA.  Compl. Ex. A, ECF No. 1-1.  Plaintiffs did not request any of the publicly available records relating to Nevada's general programs to remove

ineligible voters. *Id.* Instead, the basis for the letter's claim was a comparison of reported active registrations in eight Nevada counties against the U.S. Census Bureau's 5-Year Citizen Voting Age Population ("CVAP") data for 2017–2021, and a comparison of alleged registration rates against the U.S. Census Bureau's Current Population Survey ("CPS"). *Id.* at 2–3.

The Secretary of State responded to the letter. *See* Compl. ¶ 22. After "hav[ing] researched statements made by [the Secretary of State] in [his] correspondence," *id.*, but without contacting the Secretary of State further, Plaintiffs filed this lawsuit claiming Defendants have failed to comply with the NVRA's list maintenance requirements. In their Complaint, Plaintiffs impermissibly add new allegations, including citing new data sources, that were not included in the letter to the Secretary of State. *Compare* Compl. Ex. A *with* Compl. ¶¶ 49, 60–70.

## III.   LEGAL STANDARDS

### A.   Lack of Subject-Matter Jurisdiction

Article III, § 2 of the U.S. Constitution limits federal court jurisdiction to "Cases" and "Controversies." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016). "'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (citations omitted). "[L]ack of Article III standing requires dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)." *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011) (citation and emphasis omitted). "[T]he subject matter jurisdiction of the district court is not a waivable matter and may be raised at anytime by one of the parties, by motion or in the responsive pleadings, or *sua sponte* by the trial or reviewing court." *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1194 n.2 (9th Cir. 1988) (citations omitted).

### B.   Failure to State a Claim

Fed. R. Civ. P. 12(b)(6) provides for dismissal of a complaint for failure to state a claim upon which relief may be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   "Factual allegations must be enough to raise a right to relief above the speculative level" and "nudge[] [plaintiffs'] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 570 (citation omitted).   Factual allegations that "do not permit the court to infer more than the mere possibility of misconduct," and that do not actually "show[]" that the defendant acted unlawfully, cannot sustain a claim. *Iqbal*, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)).   Accordingly, an "obvious alternate explanation" left unrebutted by the factual allegations will doom a complaint. *Twombly*, 550 U.S. at 566-68.

Plaintiffs rely in their Complaint on U.S. Census Bureau data, Secretary of State registration data, Nevada voter roll data, and data from the U.S. Election Assistance Commission ("EAC") to purport to support their claim. *See, e.g.*, *id.* ¶¶ 49–56, 60–68.   This data, as well as additional data and documentation from the same government agencies (i.e., the U.S. Census Bureau, the Secretary of State, and the EAC), is cited below.   This data is all appropriate for judicial notice, and where relied on in the Complaint to form a basis of Plaintiffs' claims, is incorporated by reference, and can be considered in this motion to dismiss without converting it to a motion for summary judgment. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) ("[A] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment."); *id.* at 1002 ("[I]ncorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself.   The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims."); Fed. R. Evid. 201(b)(1)-(2).

Agency reports are "generally susceptible to judicial notice," and there can be no reasonable dispute as to what the data and documentation cited below establish.  *See Khoja*, 899 F.3d at 1001 (citation omitted).   This is particularly true here where Plaintiffs rely on similar data from the very same agencies to support their claim, thereby

1   acknowledging the agencies' data is not subject to reasonable dispute. *See United States v.*

2   *Esquivel*, 88 F.3d 722, 726-27 (9th Cir. 1996) (taking judicial notice of U.S. Census Bureau

3   documents because they met the requirements of Fed. R. Evid. 201(b) and were "of the

4   same type and taken from the same source" as the defendant's own data).  The Court should

5   therefore take judicial notice of data cited below.  *See* Fed. R. Evid. 201(c).

6   **IV.   ARGUMENT**

7        **A.   Plaintiffs Do Not Have Standing to Bring Their Claim**

8        To establish the irreducible constitutional minimum of standing, "[t]he plaintiff

9   must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct

10  of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."

11  *Spokeo, Inc.*, 578 U.S. at 338 (citations omitted).  The injury in fact must be "'an invasion

12  of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent,

13  not conjectural or hypothetical.'"  *Id.* at 339 (citation omitted).  And because "[i]njury in fact

14  is  a  constitutional  requirement, . . .  Congress  cannot  erase  Article III's  standing

15  requirements by statutorily granting the right to sue to a plaintiff who would not otherwise

16  have standing."  *Id.* (internal quotation marks and citations omitted).

17       Plaintiffs' allegations purporting to establish standing are all insufficient.

18       1.   Vote Dilution.  Plaintiffs allege that they fear or are concerned that ineligible

19  voters will vote and cause vote dilution.  *See* Compl. ¶¶ 13, 17, 19, 90.  But "a plaintiff

20  raising only a generally available grievance about government—claiming only harm to his

21  and every citizen's interest in proper application of the Constitution and laws, and seeking

22  relief that no more directly and tangibly benefits him than it does the public at large—does

23  not state an Article III case or controversy."  *Lance v. Coffman*, 549 U.S. 437, 439 (2007)

24  (citations omitted).

25       As U.S. District of Nevada Courts have recognized, vote dilution is just such a

26  generalized grievance.  *Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d

27  993, 1000 (D. Nev. 2020) ("Plaintiffs' alleged injury of vote dilution is impermissibly

28  'generalized' and 'speculative' at this juncture.");  *Paher v. Cegavske*, 457 F.Supp.3d 919,

926 (D. Nev. 2020) ("Plaintiffs' purported injury of having their votes diluted due to ostensible election fraud may be conceivably raised by any Nevada voter. Such claimed injury therefore does not satisfy the requirement that Plaintiffs must state a concrete and particularized injury."); *see also Wood v. Raffensperger*, 981 F.3d 1307, 1314–15 (11th Cir. 2020) (vote dilution where "'no single voter is specifically disadvantaged' if a vote is counted improperly" is a "paradigmatic generalized grievance that cannot support standing").

Vote dilution is also impermissibly speculative as an injury. *See Donald J. Trump for President, Inc.*, 488 F.Supp.3d at 1000. Plaintiffs only claim that they fear or are concerned ineligible voters will vote, *see* Compl. ¶¶ 13, 17, 19, 90; they do not allege that supposedly inaccurate voter rolls have led to any voter fraud and consequent vote dilution. The Complaint at most merely insinuates that voter fraud *could* happen, *id.* ¶ 38, not that it is "certainly impending" or that there is a "substantial risk" that it would happen as a result of inaccurate voter rolls, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). There is significant attenuation in Plaintiffs' assertion of vote dilution: (1) an ineligible voter will be offered the opportunity to commit fraud; (2) the ineligible voter will in fact commit fraud; and (3) the fraud will not be prevented. Nevada has checks in place to deter and prevent voter fraud, including signature verification requirements, NRS 293.269927(1), 293.3075(1)(c), 293.3585(1)(c), not providing mail ballots to inactive voters, NRS 293.269911(1), and providing criminal penalties for voter fraud, NRS 293.775, 293.780, and Plaintiffs offer nothing to establish that vote dilution as a result of inaccurate voter rolls is anything more than speculative.

2. <u>Election Confidence, Democratic Participation, and Statutory Rights</u>. Plaintiffs claim that inaccurate voter rolls undermine confidence in the integrity of Nevada elections, discourage participation in the democratic process, and infringe on statutory rights. Compl. ¶¶ 13, 17, 19, 90, 91. These are, again, impermissibly generalized grievances.

Plaintiffs do not state explicitly why supposedly inaccurate voter rolls undermine confidence in the integrity of Nevada elections and discourage participation, *see* Compl. ¶¶

19, 31, 90, but the only plausible explanation is that this follows from a generalized fear of vote dilution. These supposed injuries are therefore also "precisely the kind of undifferentiated, generalized grievance about the conduct of government" that does not support standing. *See Lance*, 549 U.S. at 442 (citation omitted). Indeed, Plaintiffs acknowledge as much, citing "public confidence in elections." Compl. ¶ 31. The confidence is *public* and is therefore a generalized grievance that applies to all voters. And participation in the democratic process in elections that comply with statutes is a general right applicable to all voters. Voters who have no greater stake in a lawsuit than any other citizen cannot establish a particularized injury. *See Drake v. Obama*, 664 F.3d 774, 782 (9th Cir. 2011) (in case challenging Barack Obama's eligibility to be President, holding because the plaintiff "has no greater stake in this lawsuit than any other United States citizen[, t]he harm he alleges is . . . too generalized to confer standing."). There is no way to differentiate a voter's "interest in compliance with . . . election laws . . . from that of any other person"; any voter could bring an identical lawsuit and the alleged grievances are thus too generalized to support standing. *See Wood*, 981 F.3d at 1314.

3. <u>Determining How to Use Resources</u>. The RNC and NVGOP claim that if voter rolls (in general, not specific to Nevada) are inaccurate, they *may* spend or misallocate resources in contacting voters who should no longer be on the rolls. Compl. ¶¶ 14, 17. The Secretary of State has no authority over independent chief election officers in other jurisdictions, and alleged harm from inaccurate voter rolls across the country is not fairly traceable to him. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]he injury has to be 'fairly . . . trace[able] to the challenged action of the defendant and not . . . th[e] result [of] the independent action of some third party not before the court."). Moreover, this is precisely the type of "conjectural or hypothetical" harm that cannot support standing. *Id.* (internal quotation marks omitted). The RNC and NVGOP fail to allege that this threatened injury is "certainly impending" or that there is a "substantial risk" it will occur. *Driehaus*, 573 U.S. at 158 (citation omitted).

///

4. <u>Costs to Respond</u>.  Plaintiffs claim that because of supposedly inaccurate voter rolls, they will have to spend more time and resources monitoring Nevada elections, mobilizing voters, educating the public, and persuading elected officials to improve list maintenance.  Compl. ¶ 21.  They further claim that they have had to speak with "concerned members." *Id.* ¶ 22.  But, as discussed above, Plaintiffs have not alleged that the supposed future harm that they purport to need to respond to—fraudulent voting based on inaccurate voter rolls—is certainly impending and not hypothetical.  Plaintiffs "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 402.

5. <u>Costs of Litigation</u>.  Plaintiffs allege that they have had to expend substantial time and resources to investigate Defendants' supposed list-maintenance failures, including communicating with Nevada officials and researching Defendants' statements in correspondence.  Compl. ¶ 22.  They claim that but for Defendants' failure to comply with their list-maintenance obligations, they would not have had to divert their scarce resources. *Id.* ¶ 23.  "But 'standing must be established independent of the lawsuit filed by the plaintiff.'" *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (citation omitted).

Organizations cannot "manufacture the injury by incurring litigation costs." *Rodriguez v. City of San Jose*, 930 F.3d 1123, 1134 (9th Cir. 2019) (citation omitted).  As discussed further below, Plaintiffs were statutorily required to communicate with the Secretary of State before initiating this lawsuit; it was a necessary part of litigation for Plaintiffs' claim.  52 U.S.C. § 20510(b).  The RNC and NVGOP's communication with the Secretary of State and any investigation and research stemming from that communication to bring this lawsuit cannot support standing.  The same is true for Johnston.  Allowing litigation costs to confer standing "would nullify the limits created under Article III." *Ward v. Nat'l Patient Acct. Servs. Sols., Inc.*, 9 F.4th 357, 363 (6th Cir. 2021) (citation omitted).  Notably, even though Plaintiffs are seeking costs and attorneys' fees, Compl. at 18, that also does not confer standing, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998)

1  ("[A] plaintiff cannot achieve standing to litigate a substantive issue by bringing suit for
2  the cost of bringing suit.").

3       6.   <u>Associational Standing.</u>   The RNC and NVGOP do not have associational
4  standing here to bring suit on behalf of their members.  *See* Compl. ¶¶ 12, 17.  The RNC
5  and NVGOP would have to have members who "would otherwise have standing to sue in
6  their own right."  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).
7  But for the same reasons Johnston does not have standing, the RNC and NVGOP do not
8  have associational standing.

9       **B.   Plaintiffs Do Not State a Claim**

10       Plaintiffs' Complaint must be dismissed because they did not satisfy the NVRA's
11  notice requirement, and they fail to plausibly allege any NVRA violation.  Plaintiffs' notice
12  contained minimal and implausible allegations of noncompliance, and new allegations in
13  the Complaint should not be considered in determining whether the notice was adequate.
14  Regardless, Plaintiffs' allegations in the notice and the new allegations in the Complaint
15  do not permit inference of anything more than an insufficient mere possibility of
16  misconduct, and do not show the Secretary of State acted unlawfully.  Plaintiffs' claim lacks
17  plausibility.

18       **1.   Plaintiffs Failed to Comply with the NVRA's Notice**
19           **Requirement**

20       Separate from Article III standing, statutory standing exists when "a particular
21  plaintiff has been granted a right to sue by the specific statute under which he or she brings
22  suit."  *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1175 (9th Cir. 2004) (citation omitted).  A
23  lack of statutory standing "requires dismissal for failure to state a claim."  *Maya*, 658 F.3d
24  at 1067 (citations omitted).  Before bringing their lawsuit under the NVRA, Plaintiffs were
25  required to provide written notice of the violation to the chief election official of the state
26  involved.[2]  52 U.S.C. § 20510(b).

27  _____
28       [2] There is an exception to the notice requirement "[i]f the violation occurred within 30 days before the
     date of an election for Federal office," 52 U.S.C. § 20510(b)(3), but that does not apply here.  Plaintiffs
     challenge Defendants' efforts to conduct voter-list maintenance under 52 U.S.C. § 20507(a)(4), and in

The notice requirement is to provide states "an opportunity to attempt compliance before facing litigation." *Scott*, 771 F.3d at 836 (citation omitted). It is therefore unsurprising that the Ninth Circuit has indicated that an NVRA notice letter should "plausibly allege" a violation. *See Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1044 (9th Cir. 2015). Threadbare or vague allegations in a notice letter would not give a defendant a sufficient opportunity to comply. *See Scott*, 771 F.3d at 836.

Plaintiffs sent a notice letter to the Secretary of State on December 4, 2023 with limited allegations of noncompliance. *See* Compl. Ex. A. Plaintiffs only cited to active registration rates of eight counties, relying on the 2022 CPS data and 2017–2021 CVAP data. *Id.* at 2–3. As explained below, Plaintiffs' allegations in their notice letter do not plausibly allege any violation, and Plaintiffs lack statutory standing. New allegations included in the Complaint relating to inactive voter registration rates are improperly included in this Complaint, and in addition to being subject to dismissal for lack of notice, should not be considered in determining whether Plaintiffs' notice was sufficient.

>           **2.    The Complaint Does Not Plausibly Allege a Violation of the NVRA**

Because Plaintiffs newly add allegations purporting to show noncompliance in their Complaint that were not in their notice letter, the Secretary of State addresses the two categories of allegations separately.

>           **A.    Plaintiffs' Active Voter Registration Rate Calculations Are Misleading and Insufficient**

Plaintiffs' theory that active voter registration rates can support their claim of an NVRA violation is fatally flawed.

///

///

---

particular, Nevada's maintenance efforts relating to voters who have changed residence. Compl. ¶¶ 59, 94. Defendants, however, could not have violated any requirement to conduct a general list maintenance program relating to residents who changed residence 30 days before an election because such a list maintenance program is not allowed during that period; it must be completed "not later than 90 days prior to the date of a primary or general election for Federal office." 52 U.S.C. § 20507(c)(2).

**(1)** **Active Voter Registration Rates Do Not Plausibly Suggest Non-Compliance with the NVRA**

Key purposes of the NVRA include "establish[ing] procedures that will increase the number of eligible citizens who register to vote in elections for Federal office" and "mak[ing] it possible for Federal, State, and local government to implement [the NVRA] in a manner that enhances the participation of eligible citizens as voters in elections for Federal office." 52 U.S.C. § 20501(b)(1)-(2).  In light of these purposes, there is nothing nefarious about a state encouraging and having high active registration rates.  While the NVRA requires states to conduct a general program that makes a reasonable effort to remove voters who become ineligible based on death or change of residence, the NVRA does not provide a numerical threshold to establish compliance or lack thereof.  Use of registration rates alone does not demonstrate a failure to comply with the NVRA; registration rates may far exceed the eligible voting pool without any violation.  This is true for several reasons.

First, the NVRA creates a safe harbor for states who use U.S. Postal Service information to identify individuals who have become ineligible based on a change of residence address.  *Bellitto*, 935 F.3d at 1205.  If a state uses that process, it meets the NVRA's minimum statutory requirements with respect to voters who have moved.  *Id.*  This process is sufficient even though it may not lead to the removal of some ineligible voters.  In fact, "[a]s many as 40 percent of people who move do not inform the Postal Service." *Id.* at 1204 (quoting *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 765 (2018)).  Thus, the NVRA itself establishes that it is acceptable for a substantial number of voters who have moved out of the jurisdiction to properly remain on the voter rolls.

Second, the NVRA only requires states to remove voters based on a change of address or death.  *Bellitto*, 935 F.3d at 1195; 52 U.S.C. § 20507(a)(4).  Under the NVRA, therefore, voters who are ineligible may properly remain on the voter rolls, resulting in higher registration numbers.  The NVRA itself is, in fact, "partly responsible" for high voter registration rates.  *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 192 (2008).  This is ///

consistent with the conclusion that Congress recognized that the risk of voter fraud would not be significantly increased if ineligible voters remained on voter rolls.

Third, the NVRA prohibits a state from taking action in connection with certain ineligible voters through its general removal program during the 90-day period before a federal primary and general election. 52 U.S.C. § 20507(c)(2)(A). This can result in higher registration numbers because a state would be unable to systematically act on certain voters through its general programs, while new voters are still able to register. *See Bellitto*, 935 F.3d at 1208. Plaintiffs filed their Complaint on March 18, 2024, basing their allegations on "the most up-to-date count of registered active voters available from the Nevada Secretary of State." Compl. ¶ 49. This would be the numbers from March 1, 2024[3] and would reflect numbers that could not have been reduced through Nevada's general program to inactivate voters who changed residences for nearly four months, since November 8, 2023. Nevada had a presidential preference primary election on February 6, 2024, NRS 298.650(1), which triggered the 90-day period when a state is prohibited from systematically taking action on such voters, 52. U.S.C. § 20507(c)(2)(A); 52 U.S.C. § 20502(1); 52 U.S.C. § 30101(1)(D), and under Nevada law, voters cannot be inactivated for 33 days after the mailing of a confirmation notice, NRS 293.530(1)(d), (g).

Taken together, the NVRA's statutory scheme reflects that active registration rates may properly be significantly higher than the actual pool of eligible voters. There is an "obvious alternate explanation" for supposedly high active voter registration rates that does not involve a violation of the NVRA; the NVRA's design allows for—and indeed encourages—high registration rates, even ones that exceed the number of eligible voters. *See Twombly*, 550 U.S. at 566-68. Plaintiffs' allegations are insufficient because they do not permit the court to do more than "infer . . . the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679 (citation omitted). Plaintiffs' cited active voter registration rates therefore do not plausibly suggest a violation of the NVRA.

---

[3] Office of Nevada Secretary of State, Voter Registration Statistics 03/01/2024 Active Voters by County & Party, https://tinyurl.com/28a5jee8.

**(2)     Plaintiffs' Active Registration Rate Calculations Do Not Reflect Current Reality**

Even if active registration rates could support their claim, Plaintiffs' allegations do not plausibly suggest any NVRA violation. Plaintiffs rely on the 2017–2021 CVAP data[4] in their notice letter and the 2018–2022 CVAP data[5] in their Complaint to claim certain counties' registration rates are supposedly too high. Compl. ¶ 49; Compl. Ex. A at 2. The CVAP data is derived from the U.S. Census Bureau's American Community Survey ("ACS").[6] But registration rates calculated using ACS data, and specifically the ACS citizen population averages, have been found to be misleading and inaccurate, and insufficient to prove an NVRA violation, even when registration rates calculated using citizen population averages from the ACS exceeded 100% for a county. *Bellitto*, 935 F.3d at 1207–08.

The ACS population data "significantly underestimate[s] the population." *See id.* at 1208. For instance, the ACS data excludes many individuals who may be eligible voters but do not reside in a county for the entire year, such as military personnel and college students. *Id.* Furthermore, it "takes data drawn from the preceding five years and estimates the midpoint of that data." *Id.* The 2021 five-year data, therefore, estimates the population at the middle of 2019, and the 2022 five-year data estimates the population at the middle of 2020. *See id.* Plaintiffs offer nothing to support their comparison of active registration numbers from 2023 and 2024 against population estimates for time periods that are roughly *four years* earlier. This mismatch in comparison periods alone shows that dismissal is warranted; Plaintiffs' factual allegations, on their face, have no grounding in current reality and therefore do not "show[]" any present NVRA violation. *See Iqbal*, 556 U.S. at 679 (citation omitted).

---

[4] U.S. Census Bureau, Citizen Voting Age Population (CVAP) Special Tabulation from the 2017–2021 5-Year American Community Survey, County Spreadsheet, https://tinyurl.com/mth2dwdy.

[5] U.S. Census Bureau, Citizen Voting Age Population (CVAP) Special Tabulation from the 2018–2022 5-Year American Community Survey, County Spreadsheet, https://tinyurl.com/y63a252y.

[6] U.S. Census Bureau, Citizen Voting Age Population (CVAP) Special Tabulation From the 2017–2021 5-Year American Community Survey (ACS), https://tinyurl.com/3rbmcm8t, at 1; U.S. Census Bureau, Citizen Voting Age Population (CVAP) Special Tabulation From the 2018–2022 5-Year American Community Survey (ACS), https://tinyurl.com/5xd32exy at 1; *see also* Compl. ¶ 49.

Mixing and matching snapshots in time, as Plaintiffs do, paints a highly misleading picture. Nevada has a substantially growing population,[7] and it is therefore inappropriate to compare active registration numbers from 2023 and 2024 against voting population estimates for 2019 and 2020. The "obvious alternate explanation" here is that Plaintiffs' numbers fail to account for growth in Nevada's population. *Twombly*, 550 U.S. at 566–68. "When faced with two possible explanations, only one of which can be true and only one of which results in liability, . . . [s]omething more is needed, such as facts tending to exclude the possibility that the alternative explanation is true . . . in order to render plaintiffs' allegations plausible within the meaning of *Iqbal* and *Twombly*." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (citations omitted). The Complaint is devoid of any allegation that would suggest population growth does not explain the allegedly high registration rates.

Comparing active registration rates from the midpoints of 2019 and 2020 as opposed to 2023 and 2024 illustrates the problem with Plaintiffs' allegations. Comparing the December 1, 2023 active registrations in Nevada (1,907,794)[8] against the 2017–2021 CVAP data for Nevada (2,099,150)[9] yields a **90.88%** active registration rate. But comparing the midpoint of 2019's active registration in Nevada (1,564,814)[10] against the midpoint in 2019 that the 2017–2021 CVAP data estimates yields instead a **74.55%** active registration rate. The story is the same for the numbers used in the Complaint. Comparing the March 1, 2024 active registrations in Nevada (1,937,225)[11] against the 2018–2022 CVAP data for Nevada

///

---

[7] *Compare*, *e.g.*, U.S. Census Bureau, Nevada 2019 Citizen, Voting-Age Population, https://tinyurl.com/4k3jxcn3 (estimating Nevada's voting population to be 2,111,932 in 2019) *with* U.S. Census Bureau, Nevada 2022 Citizen, Voting-Age Population, https://tinyurl.com/2p8x5b7j (estimating Nevada's voting population to be 2,227,239 in 2022).

[8] Office of Nevada Secretary of State, Voter Registration Statistics, 12/01/2023, Active Voters by County & Party, https://tinyurl.com/5yctauc8.

[9] U.S. Census Bureau, Citizen Voting Age Population (CVAP) Special Tabulation from the 2017–2021 5-Year American Community Survey, County Spreadsheet at cells K22726, K22739, K22752, K22765, K22778, K22791, K22804, K22817, K22830, K22843, K22856, K22869, K22882, K22895, K22908, K22921, K22934, https://tinyurl.com/mth2dwdy.

[10] Office of Nevada Secretary of State Barbara K. Cegavske, July 2019 Voter Registration Statistics, Active Voters by County and Party, https://tinyurl.com/fx6728hp.

[11] Office of Nevada Secretary of State, Voter Registration Statistics 03/01/2024 Active Voters by County & Party, https://tinyurl.com/28a5jee8.

(2,150,290)[12] yields a **90.09%** active registration rate.  But comparing the midpoint of 2020's active registration in Nevada (1,645,590)[13] against the midpoint in 2020 that the 2018–2022 CVAP data estimates yields instead a **76.53%** active registration rate.  Plaintiffs' attempted statistical sleight of hand does not plausibly allege any NVRA violation.

Notably, comparing the July 1, 2020 active registration numbers against the 2018–2022 CVAP data puts all counties but one below Plaintiffs' arbitrary 90% cutoff.  *See* Compl. ¶¶ 50–51; *Jud. Watch, Inc. v. Pennsylvania*, 524 F.Supp.3d 399, 408 (M.D. Pa. 2021) (finding that registration rates below 100 percent, without more, do not permit the inference that that there is a list-maintenance problem).  But that county has only 0.16% of Nevada's total citizen voting age population identified in the 2018–2022 CVAP data, and hardly reflects any current failure to reasonably maintain voter rolls, especially because the CVAP data "significantly underestimate[s] the population," *see Bellitto*, 935 F.3d at 1208, and is already four years out of date.

Far from suggesting any failure to maintain voter rolls, Nevada has in reality consistently maintained an active registration rate below national averages based on 1-year CVAP data, as shown in the EAC's Election Administration and Voting Survey 2022 Comprehensive Report from June 2023 that Plaintiffs rely on in their Complaint, Compl. ¶¶ 60–61, 63–64, 66, 68.[14]  In 2022, Nevada's active registration rate compared against 1-year CVAP data was 83.9% versus the national average of 85.4%; in 2020, Nevada's rate was 86.9% versus the national average of 88.1%; and in 2018, Nevada's rate was 77.0% versus the national average of 82.5%.[15]

///

---

[12] U.S. Census Bureau, Citizen Voting Age Population (CVAP) Special Tabulation from the 2018-2022 5-Year American Community Survey, County Spreadsheet at cells K22739, K22752, K22765, K22778, K22791, K22804, K22817, K22830, K22843, K22856, K22869, K22882, K22895, K22908, K22921, K22934, K22947, https://tinyurl.com/y63a252y.

[13] Office of Nevada Secretary of State Barbara K. Cegavske, Voter Registration Statistics, July 2020, Active Voters by County and Party, https://tinyurl.com/52t55vy3.

[14] EAC, Election Administration and Voting Survey 2022 Comprehensive Report, https://tinyurl.com/nhx86v7k at 164, 166.  The EAC uses 1-year CVAP estimates for its calculations as opposed to 5-year CVAP estimates.  *See id.* at 166.

[15] *Id.* at 164, 166.

Plaintiffs also cite voter registration rates estimated by the U.S. Census Bureau in the CPS.[16]  Compl. ¶¶ 53–56; Compl. Ex. A at 3.  There is no reason to treat this data as a reliable indicator of actual voter registration rates.  For one, comparing nationwide CPS registration rates for 2020 (72.7%) and 2022 (69.1%) against active voter registration rates reported by the EAC for the same years reveals that only one single state had an active voter registration rate below the national CPS average in 2022, and only three states had active voter registration rates below the national CPS average in 2020.[17]  The CPS data is flatly untethered to reality.  Still, it is notable that, as discussed above, comparing Nevada's active registration in the middle of 2020 against the 2018–2022 CVAP data shows a 76.53% active registration rate, which is close to the nationwide CPS rates for 2020 (72.7%).

More critically, however, the CPS voter registration rates are crude estimates based on historical recall, obtained through personal or telephone interviews.[18]  As if relying on self-report and memory were not bad enough, survey respondents generally also reported on the registration status of other members of the household.[19]  The accuracy of this data relies on individuals correctly reporting the registration status of every member of their household.  Adding to this, the survey data is obtained from approximately 54,000 households *nationwide*.[20]  The "obvious alternate explanation" is that the CPS data is not suitable for determining actual or precise state- or county-level registration rates.  *Twombly*, 550 U.S. at 566–68.  The Complaint contains no allegations that suggest the CPS data can plausibly support an NVRA violation claim.  Nor does the Complaint explain why the CPS data can be properly compared against ACS data.

*///*

---

[16] U.S. Census Bureau, Voting and Registration in the Election of November 2022, https://tinyurl.com/3h2cpfk6; U.S. Census Bureau, Voting and Registration in the Election of November 2020, https://tinyurl.com/mwukep9h.

[17] *Compare* Compl. ¶¶ 53-54 *with* EAC, Election Administration and Voting Survey 2022 Comprehensive Report, https://tinyurl.com/nhx86v7k at 162-65.

[18] U.S. Census Bureau, Methodology, https://www.census.gov/programs-surveys/cps/technical-documentation/methodology.html.

[19] *Id.*

[20] U.S. Census Bureau, Current Population Survey, November 2022 Voting Supplement File, Technical Documentation CPS-22, https://www2.census.gov/programs-surveys/cps/techdocs/cpsnov22.pdf at 2-1.

In short, Plaintiffs do not plausibly allege an NVRA violation based on a grab bag of incompatible data; there is no basis "to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679 (citation omitted).  Plaintiffs' facts are, at absolute best, "merely consistent with" liability and therefore "stop[] short of the line between possibility and plausibility of 'entitlement of relief.'" *Id.* at 678 (citation omitted).  Because the notice letter was premised exclusively on these allegations, the Court should decline to consider the remaining allegations in the Complaint.  However, even if the Court were to consider them, they are equally meritless.

## B.     New Allegation Not in Notice Letter: Plaintiffs' Inactive Voter Registration Allegations Are Meritless

Plaintiffs' new allegations are paradoxical and in fact undermine their claim.  While, as described above, Plaintiffs claim that Nevada has too many active registered voters, they also appear to claim that Nevada and certain counties are *too aggressive* in inactivating voters because they have inactivation rates "well above" the national and state inactivation averages.  *See* Compl. ¶¶ 65–66, 68.  That Nevada and certain counties have inactivation rates "well above" national and state averages only further establishes that Nevada is in fact meeting its obligations under the NVRA.  There is an "obvious alternate explanation" for Nevada's high inactivation numbers other than the one asserted by Plaintiffs:  Nevada's robust compliance with its NVRA's obligations.  *See Twombly*, 550 U.S. at 566–68.  With such an obvious alternate explanation, noncompliance with the NVRA is not a plausible conclusion.  *See id.*

Plaintiffs appear to try to confuse this issue by claiming that they have identified over 5,000 inactive registrations that should have been removed after the 2022 election.  Compl. ¶ 67.  But that is out of 363,977 inactive registrations as of March 1, 2024,[21] meaning less than 1.5% of inactive voters, which is too insignificant an amount to detract from Nevada's position as a leader in inactivation rates.  Rather than suggesting some

---

[21] Office of Nevada Secretary of State, Voter Registration Statistics 03/01/2024 Active Voters by County & Party, https://tinyurl.com/28a5jee8.

failure to remove inactive voters from the rolls, the high inactivation numbers follow instead from the fact that Nevada is consistently above the national average for sending confirmation notices to active voters. From the 2020 general election to the month before the 2022 general election, Nevada sent 22.0% of active voters a confirmation notice compared to the national average of 13.7%; for 2018–2020, those numbers are 19.7% (Nevada) versus 14.3% (nationwide); and for 2016–2018, those numbers are 16.6% (Nevada) versus 11.6% (nationwide).[22]

The approximately 5,000 inactive registrations Plaintiffs allege should have been removed also cannot support Plaintiffs' claim for relief. Plaintiffs did not raise them, or any issues relating to inactive voters whatsoever, in their notice letter and should not be permitted to rely on them. As explained, the notice requirement is meant to provide a state "an opportunity to attempt compliance before facing litigation." *Scott*, 771 F.3d at 836. If Plaintiffs had alerted the Secretary of State to these inactive registrations in their notice letter, the Secretary of State would have been able to investigate and act on them as needed between the February 6, 2024 presidential preference primary, NRS 298.650(1), and the June 11, 2024 primary election, NRS 293.175(1). However, by waiting to raise them for the first time in their Complaint, filed March 18, 2024, Plaintiffs denied the Secretary of State any opportunity to take action. The 90-day period during which Nevada is prohibited from systematically acting on voters who have changed residence before the June 11, 2024 primary election began on March 13, 2024. *See* 52 U.S.C. § 20507(c)(2).

Even still, the alleged approximately 5,000 inactive voters do not plausibly support a claim that Nevada is not using reasonable efforts to remove ineligible voters. 5,000 voters represent a mere 0.22% of all voters, active or inactive, as of March 1, 2024 (2,307,306).[23] "[T]he NVRA requires only a 'reasonable effort,' not a perfect effort, to remove registrants

---

[22] EAC, Election Administration and Voting Survey 2022 Comprehensive Report, https://tinyurl.com/nhx86v7k at 158, 182–83; EAC, Election Administration and Voting Survey 2020 Comprehensive Report, https://tinyurl.com/y95rcm95 at 134, 159–60; EAC, Election Administration and Voting Survey 2018 Comprehensive Report, https://tinyurl.com/49bpuzym at 52, 79.

[23] Office of Nevada Secretary of State, Voter Registration Statistics, 03/01/2024, All Voters by County & Party, https://tinyurl.com/56j7mwn8.

. . . ." *See Pub. Int. Legal Found. v. Benson*, Case No. 1:21-cv-929, 2024 WL 1128565, at * 11 (W.D. Mich. Mar. 1, 2024) (hereinafter "*PILF*"). Furthermore, "[t]he NVRA does not require states to immediately remove every voter who may have become ineligible." *Id.* In *PILF*, the court concluded that even if 0.3% of the total number of registered voters in Michigan were ineligible and subject to removal, having them still registered would not be unreasonable under the NVRA. *See id.* at 10. This was especially true where, as here, federally collected data shows that a state is among the most active in removing ineligible individuals. *See id.*

The most recent federally collected data relied on by Plaintiffs, Compl. ¶¶ 60–61, 63–64, 66, 68, shows that Nevada is among the most active in removing voters. In fact, only two states and one territory reported higher removal rates than Nevada.[24] From the close of registration for the 2020 general election to the close of registration for the 2022 general election, Nevada removed 18.0% of registered voters versus the national removal rate of 8.5%.[25] And the proportion of those voters removed after inactivation (i.e., for failure to return confirmation notices and vote in two federal general elections) far exceeded the national average as well: for 2020–2022, 41.3% of removals in Nevada were based on failure to return a confirmation notice versus 25.4% nationwide.[26] 5,000 inactive voters who allegedly should have been removed amid removal rates that high, do not "show[]" any unlawful act. *Iqbal*, 556 U.S. at 679 (citation omitted).

### C. New Allegation Not in Notice Letter: Relocation Rates Cannot Be Meaningfully Compared to Removal Rates

Finally, Plaintiffs cite relocation rates compared to removal rates. Compl. ¶¶ 62–64. Again, Plaintiffs at no point raised in their notice letter concerns about removal following inactivation and only purported to allege an NVRA violation based on supposedly too-high active registration numbers. Compl. Ex. A. at 2–3. Further, relocations do not

---

[24] EAC, Election Administration and Voting Survey 2022 Comprehensive Report, https://tinyurl.com/nhx86v7k at 188–89.

[25] *Id.* at 159, 188–89.

[26] *Id.* at 188.

account for individuals who might have moved within the state, or county, and who properly remain on Nevada's voter rolls.  And individuals who relocated outside of the state may have been removed from voter rolls other than through the inactivation and cancelation process; for instance, they could have requested removal or confirmed a change of residence.  *See Jud. Watch, Inc.*, 524 F.Supp.3d at 407 (finding implausible the theory of failure to comply with the NVRA based on removal rates not matching or approaching estimated change-of-residence rate).

Moreover, cherrypicked snapshots from years ago say little about any supposed current NVRA violation.  *See* Order, *Bellitto v. Snipes*, Case No. 16-cv-61474-BLOOM/Valle, ECF No. 244, at 24 (S.D. Fla. March 30, 2018) (explaining no removal of inactive voters for two years did not paint full picture and finding sufficient evidence to demonstrate ongoing list-maintenance program), *affirmed*, 935 F.3d 1192 (11th Cir. 2019).  In any event, each of the counties cited have inactive voters,[27] and actively removed many voters over the same period.[28]  Plaintiffs' allegations are insufficient and do not "show[]" that the Secretary of State has violated the NVRA.  *Iqbal*, 556 U.S. at 679 (citation omitted).

### D.   The Complaint Lacks Plausible Substance Plaintiffs Could Have Easily Obtained

Plaintiffs' Complaint is perhaps most notable for what it does not allege.  Under the NVRA, Plaintiffs were entitled to inspect Nevada's records on its general programs to remove ineligible voters for at least the past two years.  52 U.S.C. § 20507(h)(i).  This includes the names and addresses of all persons to whom address confirmation notices were sent based on potential changes of address and information on recipients' responses, and records concerning how Nevada implements its general programs.  *Id.*

///

---

[27] Office of Nevada Secretary of State, Voter Registration Statistics, 03/01/2024, Inactive Voters by County & Party, https://tinyurl.com/mpd6sxwx.

[28] EAC, EAVS Dataset Version 1.1 (released December 18, 2023), https://tinyurl.com/bdh6s3uh.  Rows 2709–2725 contain Nevada's information.  Removal data is in columns CU through DG, and the explanation of how to understand the removal data is on page 191 of EAC, Election Administration and Voting Survey 2022 Comprehensive Report, https://tinyurl.com/nhx86v7k.

Plaintiffs did not request these records from the Secretary of State before bringing this lawsuit, and the Complaint contains no allegations that, for instance, counties' methodologies for determining who to send confirmation notices to were insufficient or counties were not sending enough confirmation notices.   This is the precise type of information that courts ultimately rely on in deciding whether a county or state has failed to reasonably maintain voter rolls, rather than registration rates.   *See Bellitto*, 935 F.3d at 1206-07; *PILF*, 2024 WL 1128565, at *10–12.   There is, in short, nothing in Plaintiffs' Complaint that plausibly suggests that Nevada and its counties failed to use reasonable efforts to maintain voter rolls.

## V.   CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint.

DATED this 15th day of April 2024.

AARON D. FORD
Attorney General

By: */s/ Laena St-Jules*
LAENA ST-JULES (Bar No. 15156)
 Senior Deputy Attorney General
Office of the Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717
T: (775) 684-1100
E: lstjules@ag.nv.gov

*Attorneys for Secretary of State*