Jeffrey F. Barr (NV Bar No. 7269)
8275 South Eastern Avenue, Suite 200
Las Vegas, NV 89123
(702) 631-4755
barrj@ashcraftbarr.com

Thomas R. McCarthy* (VA Bar No. 47145)
Gilbert C. Dickey* (VA Bar No. 98858)
Conor D. Woodfin* (VA Bar No. 98937)
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
gilbert@consovoymccarthy.com
conor@consovoymccarthy.com

Sigal Chattah (NV Bar No. 8264)
5875 S. Rainbow Blvd #204
Las Vegas, NV 89118
(702) 360-6200
sigal@thegoodlawyerlv.com

*Pro hac vice application pending

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

REPUBLICAN NATIONAL COMMITTEE, NEVADA REPUBLICAN PARTY, and SCOTT JOHNSTON,

Plaintiffs,

v.

FRANCISCO AGUILAR, *in his official capacity as Nevada Secretary of State*; LORENA PORTILLO, *in her official capacity as the Registrar of Voters for Clark County*; WILLIAM "SCOTT" HOEN, AMY BURGANS, STACI LINDBERG, and JIM HINDLE, *in their official capacities as County Clerks*,

Defendants.

No. 2:24-cv-00518-CDS-MDC

**RESPONSE IN OPPOSITION TO MOTION TO DISMISS [ECF NO.26]**

1

## **INTRODUCTION**

2          The arguments in the Secretary's motion to dismiss are often raised, and equally

3     often rejected. Most recently, the Western District of North Carolina denied a motion

4     to dismiss NVRA claims brought by voters in *Green v. Bell*, 2023 WL 2572210, at *7

5     (W.D.N.C. Mar. 20, 2023). Before that, the Western District of Michigan denied mo-

6     tions to dismiss in two different cases. *See Pub. Int. Legal Found. v. Benson* [*PILF*], 2022

7     WL 21295936, at *13 (W.D. Mich. Aug. 25, 2022); *Daunt v. Benson*, Doc. 376 at 19, No.

8     1:20-cv-522 (W.D. Mich. Nov. 3, 2020) (oral opinion, attached as Ex. A). And these

9     recent cases rest on a body of precedent discussed in this brief. The *Green* case was for

10    North Carolina what the *Daunt* case was for Michigan, and what this case is for Nevada.

11         All of these cases involved similar plaintiffs, raising a similar claim, based on sim-

12    ilar evidence, in a similar complaint, following similar pre-suit notice. When North Car-

13    olina's and Michigan's chief election officials moved to dismiss on the three grounds

14    raised here—lack of pre-suit notice, lack of Article III standing, and failure to state a

15    claim—the district courts denied the motions in full. Instead of stopping this case before

16    it starts, this Court should follow the well-established caselaw before it, deny the Secre-

17    tary's motion to dismiss, and allow this case to proceed.

18

## **BACKGROUND**

19         Nevada has stopped maintaining clean and accurate voter rolls. Five of Nevada's

20    seventeen counties have registration rates over 90%. Compl. (Doc. 1) ¶¶50-51. Although

21    registering 90% of eligible voters is a laudable goal, registration rates across the State

22    and nation are closer to 70%. ¶¶53-56. Inflated rolls like these are a telltale sign that

23    officials are failing to remove voters who have become ineligible. ¶57. In fact, three of

24    the five counties with inflated rolls have registration rates over 100%—a mathematical

25

impossibility. ¶50. The Justice Department and others have sued jurisdictions with similarly inflated registration rates, and those jurisdictions quickly admitted liability or agreed to clean up their rolls. ¶¶73-78.

The impossibly high registration rates are not the only indicators that Nevada is failing to maintain its rolls. Several counties have experienced high rates of residency changes in recent years, but they failed to remove voters for residency changes during that period. Compl. ¶63. Some counties removed none at all. ¶64. In addition, the State as a whole reports far more inactive voters than the national average, suggesting that Nevada is keeping inactive voters on the rolls rather than removing them. ¶66. Individual counties have rates of inactive voters that are double or triple the national and state averages, which is strong evidence that they are not making a reasonable effort to remove outdated registrations. ¶¶65, 68-69. In fact, 5,000 inactive registrations currently listed have been on the rolls for two full election cycles, which means they should have been removed after the 2022 election. ¶¶67. They weren't removed, which is direct evidence that Nevada is failing to fulfill its obligations under the NVRA.

Nevada is violating federal law. One of the NVRA's "main objectives" is to force States to "remov[e] ineligible persons from [their] voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1838 (2018). According to the bipartisan Carter-Baker Commission, inaccurate rolls are "the root" cause of "most problems encountered in U.S. elections." Compl. ¶38. Bloated rolls invite unlawful voting, dilute lawful votes, and decrease voters' confidence in elections. ¶¶38-41. Fraud, in particular, "is a real risk" that "has had serious consequences" in various States. *Brnovich v. DNC*, 141 S. Ct. 2321, 2348 (2021). The NVRA thus requires States to "conduct" a program that makes a "reasonable effort" to "remove the names of ineligible voters" who move or die from the

2

1  rolls. 52 U.S.C. §20507(a)(4). Congress created a private right of action that allows indi-

2  viduals who serve a pre-suit notice to sue States that violate the NVRA. *Id.* §20510(b).

3  According to Congress, this scheme "ensure[s] that accurate and current voter registra-

4  tion rolls are maintained," which safeguards both the "fundamental right" to vote and

5  the "integrity of the electoral process." *Id.* §20501(a)(1), (b)(3)-(4).

6      Plaintiffs—the Republican National Committee, the Nevada Republican Party,

7  and Scott Johnston—brought this suit to remedy Nevada's violations. The RNC is the

8  national committee of the Republican Party and represents over 30 million registered

9  Republicans throughout the country. Compl. ¶¶9-10. The Republican Party of Nevada

10  is a political party in Nevada that represents over 550,000 registered Republicans in the

11  State. ¶¶15-16. Together, the RNC and the NVGOP represent the interests of the Re-

12  publican Party and its members throughout the country and the State. They rely on voter

13  rolls daily. Inflated rolls cause the party to waste resources recruiting and communicating

14  with ineligible voters, which diverts resources from other mission-critical activities.

15  ¶¶13-14. And to fulfill its mission, the Republican Party must monitor States to ensure

16  they are properly maintaining their voter rolls. ¶13. When States such as Nevada fail to

17  maintain their rolls, the RNC is forced to divert resources to combat the presence of

18  ineligible voters on the registration lists. ¶¶12-13, 21-23.

19      The RNC and NVGOP are joined in this suit by Scott Johnston, a registered

20  voter in Washoe County. Compl. ¶18. Mr. Johnston is a resident of Nevada who votes

21  in local and statewide elections. ¶¶18-19. He is also active in electoral politics and has

22  held various leadership roles in the Republican Party. ¶20. Nevada's sloppy list mainte-

23  nance undermines Plaintiffs' confidence in elections and risks diluting the votes of their

24  members and individual voters such as Mr. Johnston. To redress their injuries, Plaintiffs

25

3

1  sued the Secretary of State—the chief election official responsible for list maintenance

2  in Nevada. Compl. ¶24. Plaintiffs also sued the registrars and clerks of five counties with

3  particularly problematic voter rolls. Compl. ¶¶25-29. Those county officials play a direct

4  role in maintaining accurate voter registration records. ¶¶25-29.

5         Before suing, Plaintiffs served the Secretary with a pre-suit notice. Compl. ¶¶79-

6  82. The notice was fairly detailed. *See* Notice (Doc. 1-1). It identified the RNC, the

7  NVGOP, and Mr. Johnston by name. *Id.* at 1. It reminded the Secretary that the NVRA

8  obligates Nevada "'to conduct a general program that makes a reasonable effort to re-

9  move the names of ineligible voters from the official lists of eligible voters' due to death

10  or change of residence." *Id.* (quoting 52 U.S.C. §20507(a)(4)). It offered a wide range of

11  statistics, including U.S. census data, to show that voter registration rates in many coun-

12  ties are abnormally or impossibly high. *Id.* at 3. It identified those counties by name and

13  alleged that, as a result, Nevada is "violating Section 8 of the NVRA." *Id.* at 2. It ad-

14  dressed "the curative steps needed to bring the state into compliance" and warned that

15  doing so was needed to "avoid litigation." *Id.* The Secretary responded one month later,

16  denying any liability under the NVRA. Compl. ¶22. When Nevada failed to remedy its

17  violation within the statutory timeframe, Plaintiffs filed this lawsuit. The Secretary now

18  moves to dismiss this case under Rules 12(b)(6) and 12(b)(1). *See* Mot. (Doc. 26).

19  **LEGAL STANDARDS**

20         A motion to dismiss under Rule 12(b)(6) "tests" whether the complaint satisfies

21  Rule 8. *Thomson v. Caesars Holdings Inc.*, 661 F. Supp. 3d 1043, 1052 (D. Nev. 2023) (Silva,

22  J.). Rule 8 in turn requires only "a short and plain statement of the claim showing that

23  the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Specific facts are not necessary;

24  the statement need only give the defendant fair notice of what the claim is and the

25

Opposition to Motion to Dismiss

grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (cleaned up). This standard is "liberal." *Id.* at 94. Courts must accept the complaint's factual allegations as true, allow all reasonable inferences from those allegations, and construe the complaint in the light most favorable to the plaintiff. *Edwards v. Signify Health, Inc.*, No. 2:22-cv-95, 2023 WL 3467558, at *2 (D. Nev. May 12, 2023) (Silva, J.).

After drawing all those inference in Plaintiffs' favor, the question is whether the complaint states a claim that is "'plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausible means a "reasonable inference that the defendant is liable." *Id.* It does not mean that liability is "probable," *id.*, or even that Plaintiffs are "likely to succeed," *Produce Pay, Inc. v. Izguerra Produce, Inc.*, 39 F.4th 1158, 1166 (9th Cir. 2022). "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). To the extent the "parties proffer evidence" in their filings, "the court may not weigh [that] evidence in deciding a motion to dismiss." *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1151 (C.D. Cal. 2003) (collecting cases).

When assessing a claim's plausibility, courts generally "'may not consider any material beyond the pleadings.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). Courts can consider "'the face of the complaint [and] materials incorporated into the complaint by reference,'" such as Plaintiffs' pre-suit notice. *See In re Sorrento Therapeutics, Inc. Sec. Litig.*, 97 F.4th 634, 641 (9th Cir. 2024). Courts also can take judicial notice of official documents for their "existence," but not for their "truth." *Lee*, 250 F.3d at 690. And in no event can the court take "judicial notice of *disputed* facts," *id.*, or use outside materials to contradict the factual allegations or inferences in the complaint. *Khoja v.*

5

1   *Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003, 1014 (9th Cir. 2018). An outside document

2   that "merely creates a defense to the well-pled allegations in the complaint" cannot "de-

3   feat otherwise cognizable claims." *Id.*

4   The same rules apply to the Rule 12(b)(1) motion. "When 'standing is challenged

5   on the basis of the pleadings,'" the Court "must 'accept as true all material allegations of

6   the complaint' and 'construe the complaint in favor of the complaining party.'" *Cal. Rest.*

7   *Ass'n v. City of Berkeley*, 89 F.4th 1094, 1100 (9th Cir. 2024) (amended op.) (quoting *Pennell*

8   *v. City of San Jose*, 485 U.S. 1, 7 (1988)). At this stage, "general factual allegations of injury

9   resulting from the defendant's conduct may suffice," because the court must "presume

10  that general allegations embrace those specific facts that are necessary to support the

11  claim." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up).

12  <u>**ARGUMENT**</u>

13  **I.   Plaintiffs Provided Pre-Suit Notice.**

14  The NVRA allows individuals to sue once the State's chief election official re-

15  ceives "written notice of the violation." 52 U.S.C. §20510(b)(1)-(2). No one disputes

16  that, before filing this lawsuit, Plaintiffs gave the Secretary written notice of the violation.

17  The Secretary says that pre-suit notice did not "plausibly allege any violation." Mot. 11-

18  12. But the "[n]otice is an 'announcement,'" not a pleading. *Green*, 2023 WL 2572210, at

19  *3. No court requires the notice letter to satisfy a Rule 8 pleading standard. "Plaintiffs'

20  pre-suit notice announces a violation of the NVRA, so it satisfies the statute's notice

21  requirement." *Id.*

22  Plaintiffs' notice satisfied the NVRA. It expressly put the Secretary on "statutory

23  notice" that litigation was forthcoming. Notice 1, 4, 5. It identified the three plaintiffs

24  here by name. *Id.* at 1. It identified the exact provision of the NVRA that the State is

25

6

1    violating: section 8's requirement to conduct a program that reasonably removes ineli-

2    gible voters who have moved or died. *Id.* at 1, 2. The notice identified counties by name

3    that had unusually or impossibly high registration rates. *Id.* And it explained what data

4    Plaintiffs used—a comparison of U.S. Census data to the State's list of registered vot-

5    ers—to make that determination. *Id.*

6         Courts have consistently upheld notices nearly identical to Plaintiffs'. In *Green*,

7    Plaintiffs' counsel filed a virtually identical notice for voters in North Carolina. *Compare*

8    Notice, *with Green v. Bell*, Doc. 1-1, No. 3:21-cv-493 (W.D.N.C. Sept. 17, 2021) (attached

9    as Ex. B). When the defendants moved to dismiss for insufficient notice, the district

10   court denied the motion. *Green*, 2023 WL 2572210, at *3. The court emphasized that

11   "the statute requires notice of 'the *violation*,'" and "does not require notice of the viola-

12   tion's *cause*." *Id.* (quoting 52 U.S.C. §20510(b)(1)). In Michigan, the court in *Daunt*

13   reached the same conclusion for a nearly identical letter. Doc. 44, No. 1:20-cv-522 (W.D.

14   Mich. Oct. 28, 2020). And in *PILF v. Benson*, a different Michigan judge explained in

15   detail why the Secretary's arguments here are wrong. 2022 WL 21295936, at *6-9. There,

16   as here, the Secretary "challenge[d] the *quality* of the notice," which the court rejected

17   because the notice "set forth the manner in which" the Secretary "failed to comply with

18   the NVRA's list maintenance requirements" and stated that the plaintiffs "would com-

19   mence litigation if the purported violation was not timely addressed." *Id.* at *7, 9.

20        Yet another court upheld a notice that simply identified "the provision of section

21   8 that the Defendant was allegedly violating," cited "evidence" for that violation (that

22   one county's rolls had more registered voters than eligible voters), and "warn[ed] that

23   the failure" to remedy this violation "could result in a lawsuit." *ACRU v. Martinez-Rivera*,

24   166 F. Supp. 3d 779, 795 (W.D. Tex. 2015). Plaintiffs did at least that much here. As the

25

7

1  Secretary admits, the NVRA requires him to make "a reasonable effort to remove voters

2  who become ineligible based on death or change of residence," but it "does not provide

3  a numerical threshold." Mot. 13. It is thus "not surprising" when a letter "does not

4  contain any detailed allegations, inasmuch as the NVRA provision at issue does not

5  contain any detailed requirements; it simply requires 'reasonable effort' on the part of

6  the State." *Jud. Watch, Inc. v. King*, 993 F. Supp. 2d 919, 922 (S.D. Ind. 2012).

7       The Secretary suggests that the information in the notice letter must satisfy a Rule

8  8 pleading standard, Mot. 12, but neither Congress nor any court requires such a high

9  bar. The one case the Secretary cites undercuts his argument. *See Nat'l Council of La Raza*

10  *v. Cegavske*, 800 F.3d 1032 (9th Cir. 2015). In *La Raza*, the Ninth Circuit reversed the

11  dismissal of NVRA claims because the district court imposed too high a bar on the

12  notice letter. *Id.* at 1043. That the plaintiffs could have notified the Secretary of "some

13  of the violations [they] uncovered" earlier did not defeat the "reasonable possibility"

14  that "the violations were continuing" at the time of the complaint. *Id.* at 1044. The Sec-

15  retary seizes on dicta that "[a] plaintiff *can satisfy* the NVRA's notice provision by plau-

16  sibly alleging" an "ongoing, systematic violation," *id.* (emphasis added), but nothing

17  about that brief sentence *requires* a plaintiff to meet a Rule 8 pleading standard in the

18  notice letter. *See Brown v. Davenport*, 596 U.S. 118, 141 (2022) ("This Court has long

19  stressed that 'the language of an opinion is not always to be parsed as though we were

20  dealing with [the] language of a statute.'").

21       A pre-suit notice need only state the "general requirement" that the State is vio-

22  lating and the basic "reasons" for that conclusion. *King*, 993 F. Supp. 2d at 922. Courts

23  consistently reject calls for more. *E.g.*, *La Raza*, 800 F.3d at 1044 (notice need not "spec-

24  ify that the violation has been actually observed" or identify a "'discrete violation'");

25

8

Opposition to Motion to Dismiss

*Action NC v. Strach*, 216 F. Supp. 3d 597, 619-20 (M.D.N.C. 2016) (rejecting the State's argument that a pre-suit notice must contain "'sufficiently particularized information'"); *Voter Integrity Proj. NC, Inc. v. Wake Cty. Bd. of Elections*, 301 F. Supp. 3d 612, 617-18 (E.D.N.C. 2017) (similar); *Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Scales*, 150 F. Supp. 2d 845, 852 (D. Md. 2001) (conclusory allegation that a public assistance office "failed to provide voter registration services to its clients" was sufficient notice under the NVRA). The Secretary does not cite a single case deeming a notice like Plaintiffs' insufficient.

As for the statistics, the Secretary's criticisms of that data are irrelevant. Plaintiffs' statistics are enough to state a plausible claim under the Federal Rules, *see infra* Section III.A, so they are "more than sufficient" to provide pre-suit notice under the NVRA, *Ga. State Conf. of NAACP v. Kemp*, 841 F. Supp. 2d 1320, 1334 (N.D. Ga. 2012). Notice is given even if the State disputes that "the information offered" suggests a violation of the NVRA, and even if the State believes the notice does not provide "'an adequate basis upon which to investigate possible violations.'" *Id.* The NVRA does not require Plaintiffs to win their case—before it is even filed—in a battle of letters with the State.

## II. Plaintiffs have plausibly alleged Article III standing.

Standing requires injury, causation, and redressability. Importantly, Congress created a private right of action for violations of the NVRA, including section 8's list-maintenance requirement. *See* 52 U.S.C. §20510(b). Courts evaluating Article III standing "must afford due respect to Congress's decision." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340-41 (2016)). Congress's judgment is "instructive and important" because the legislature is "well positioned to identify intangible harms that meet minimum Article III requirements." *Spokeo*,

9

578 U.S. at 341. In fact, Congress can "'articulate chains of causation that will give rise to a case or controversy where none existed before.'" *Id.* And Congress can "'elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *TransUnion*, 141 S. Ct. at 2204-05. Because all Plaintiffs here seek the same relief under the same claim, "the Article III injury requirement is met if only one plaintiff has suffered concrete harm." *Juliana v. United States*, 947 F.3d 1159, 1168 (9th Cir. 2020). Plaintiffs have standing under a variety of theories, any one of which is sufficient to deny the Secretary's motion.

### A.   The RNC and the NVGOP have organizational standing.

There is ordinarily little question that political parties have standing to challenge a State's failure to comply with federal election laws. *Fair Fight Action, Inc. v. Raffensperger*, 413 F. Supp. 3d 1251, 1266 (N.D. Ga. 2019) (holding that the "need to divert resources from general voting initiatives or other missions of the organization" establishes standing "[i]n election law cases"). The complaint alleges that Defendants' violation of the NVRA inflates the voter rolls and causes Plaintiffs to divert their resources to address the fallout. Compl. ¶¶13-14, 17, 21-23 "[T]here can be no question" that diversions of resources are an "injury in fact." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). The diversion injures Plaintiff because they "would have spent" their resources on "some other aspect" of their mission had the defendant "complied with the NVRA." *La Raza*, 800 F.3d at 1040. It is therefore "sufficient to confer standing" that a defendant's misconduct causes the plaintiff to, for example, spend resources registering additional voters. *Id.*; *Action NC*, 216 F. Supp. 3d at 616-18. In these circumstances, courts "have no difficulty concluding that Plaintiffs have adequately alleged that the injury they suffer is attributable to the State." *La Raza*, 800 F.3d at 1041.

Opposition to Motion to Dismiss

The Secretary's counterarguments are unavailing. The Secretary first argues that the resource-diversion allegations are "general, not specific to Nevada." Mot. 9. That misreads the complaint, which explicitly alleges that Plaintiffs "would have expended" their resources "on other activities," "[w]ere it not for *Defendants' failure* to comply with their list-maintenance obligations." Compl. ¶23 (emphasis added); *id.* ¶¶21-22. Regardless, "even when it is 'broadly alleged,'" a diversion-of-resources injury is sufficient "at the pleading stage." *La Raza*, 800 F.3d at 1041; *PILF*, 2022 WL 21295936, at *6 (allegations that the plaintiff organization "diverted resources that could have been expended in other states to address Michigan's alleged voter roll deficiencies" were sufficient); *League of Women Voters of Ariz. v. Reagan*, 2018 WL 4467891, at *4 (D. Ariz. Sept. 18) (allegation that plaintiffs "diverted resources to register voters rather than … other activities … due to Defendant's alleged noncompliance with the NVRA" was "sufficiently plausible to meet the low bar" of alleging standing at the pleading stage (cleaned up)); *Nat'l Press Photographers Ass'n v. McCraw*, 504 F. Supp. 3d 568, 581 (W.D. Tex. 2020) (explaining that the complaint need not identify "man-hours expended or specific activities resources were diverted away from" at the pleading stage (cleaned up)).

Though unnecessary at the pleading stage, the complaint provides significant detail on how Defendants' violations affect Plaintiffs' scarce resources. Plaintiffs use "voter registration lists to determine [their] plans and budgets" and to "estimate voter turnout." Compl. ¶14. Political parties rely on accurate registration records to determine "the number of staff" and the "number of volunteers" needed "in a given jurisdiction," as well as how much they "will spend on paid voter contacts." ¶14. Bloated voter rolls cause political parties to "misallocate their scarce resources" in ways that damage their mission. ¶92. In addition, Plaintiffs must divert additional resources to educating voters,

11

1  increasing confidence in the election, monitoring Nevada's elections for fraud and

2  abuse, persuading election officials to improve list maintenance, and other activities.

3  ¶¶22-23. These allegations show "that it is plausible" that Plaintiffs have "suffered injury

4  because of the Defendants' alleged failure to comply with the NVRA and therefore

5  [have] standing to bring [their] List Maintenance Claim." *King*, 993 F. Supp. 2d at 925.

6       The Secretary also argues that "costs of litigation" are insufficient to support

7  standing, but the argument is a strawman. Mot. 10-11. Nothing in the complaint cites

8  litigation costs as an injury. The Secretary misconstrues other costs as litigation costs,

9  but courts have rejected that bait-and-switch. *See ACRU*, 166 F. Supp. 3d at 790 ("De-

10 fendant remains free to present evidence" that certain monitoring and compliance ac-

11 tivities "merely amount to 'litigation costs' … on a motion for summary judgment," but

12 "such an argument on a motion to dismiss is premature"). Here, Plaintiffs' costs moni-

13 toring voter rolls and communicating with election officials are a consequence of De-

14 fendants violating the NVRA, not of Plaintiffs filing this lawsuit. These costs are "paired

15 with an allegation that such costs are fairly traceable to the defendant's conduct," *id.* at

16 788, and thus sufficient to allege standing. *See PILF*, 2022 WL 21295936, at *5 (costs

17 incurred "reviewing and analyzing Michigan's voter roll, investigating Defendant's list

18 maintenance practices, and purchasing copies of the [voter files] and analyzing them

19 against verifiable death records" satisfied organizational standing).

20      Defendants' NVRA violations also directly harm Plaintiffs' mission. This as an

21 independent injury in NVRA cases. *Id.* at *6 (allegation that the Secretary's "failure to

22 comply with the NVRA impairs [plaintiff's] essential and core mission of fostering com-

23 pliance with federal election laws and promoting election integrity"). Plaintiffs' core mis-

24 sion includes electing Republican candidates, representing the interests of Republican

25

Opposition to Motion to Dismiss

1   voters, and maintaining confidence in the integrity of elections. Compl. ¶¶12-13. Ensur-

2   ing States have clean voter rolls is essential to those goals. ¶¶19, 21, 31, 38. At "this

3   stage," a "plausible allegation" that Plaintiffs' "ability to carry out [their] mission of

4   cleaning up voter registration rolls has been 'perceptibly impaired' by the Defendants'

5   alleged statutory violation" is sufficient to plead standing. *King*, 993 F. Supp. 2d at 925.

6   **B.    Voters have standing under the NVRA.**

7        Mr. Johnston and Republican voters also have independent bases for standing.

8        ***First***, Defendants' violations undermine their "confidence in the integrity of Ne-

9   vada elections." Compl. ¶¶19, 90. Voter confidence has "'independent significance'" ac-

10  cording to the Supreme Court because it "'encourages citizen participation in the dem-

11  ocratic process.'" *Jud. Watch, Inc. v. Griswold*, 554 F. Supp. 3d 1091, 1104 (D. Col. 2021)

12  (quoting *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 197 (2008) (op. of Stevens, J.));

13  *accord Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). Undermining voter confidence thus bur-

14  dens the right to vote, and "[t]here can be no question that a plaintiff who alleges that

15  his right to vote has been burdened by state action has standing to bring suit to redress

16  that injury." *King*, 993 F. Supp. 2d at 924.

17       Courts have repeatedly recognized this injury as a basis for standing in section 8

18  cases. *E.g.*, *Green*, 2023 WL 2572210, at *4; *Daunt*, Ex. A at 18-21; *Griswold*, 2021 WL

19  3631309, at *7; *King*, 993 F. Supp. 2d at 924. This injury is not "generalized" because

20  "there is no indication that undermined confidence and discouraged participation are

21  'common to all members of the public.'" *Griswold*, 2021 WL 3631309, at *7 (quoting

22  *Lance v. Coffman*, 549 U.S. 437, 440 (2007)). Mr. Johnston is a registered voter in Nevada

23  who votes in the very local and statewide elections that are suffering from bloated rolls.

24  *See* Compl. ¶¶18, 20, 63, 68. The RNC and the NVGOP represent hundreds of

25

13

1    thousands of voters like him. ¶10, 16. Their injuries are not "speculative or hypothet-

2    ical": they "already exist[]" because their "confidence is undermined now." *Griswold*,

3    2021 WL 3631309, at *7.

4         If there were any doubt that these injuries are sufficient, this Court should defer

5    to Congress's judgment that inflated rolls undermine the "integrity of the electoral pro-

6    cess." 52 U.S.C. §20501(b)(3)-(4). "When Congress 'elevates intangible harms into con-

7    crete injuries,' a plaintiff need not allege 'any additional harm beyond the one Congress

8    has identified.'" *PILF v. Boockvar*, 370 F. Supp. 3d 449, 455 (M.D. Pa. 2019) (quoting

9    *Spokeo*, 578 U.S. at 341; *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625,

10   633 (3d Cir. 2017)). Courts have thus found these congressionally designated injuries

11   sufficient to satisfy Article III.

12        **Second**, Defendants' violations injure Plaintiffs by risking the dilution of their

13   right to vote. Burdens on the right to vote are concrete, particularized injuries that sup-

14   port standing. *King*, 993 F. Supp. 2d at 924. That right "'can be denied by a debasement

15   or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting

16   the free exercise of the franchise.'" *Id.* (quoting *Purcell*, 549 U.S. at 4). Courts thus rec-

17   ognize that "vote dilution can be a basis for standing." *Wood v. Raffensperger*, 981 F.3d

18   1307, 1314 (11th Cir. 2020). Bloated voter rolls dilute the votes of eligible voters by

19   facilitating fraudulent or otherwise ineligible votes. Compl. ¶¶19, 90. This injury is not a

20   generalized grievance, *contra* Mot. 7-8, even though it's suffered by many Nevada voters,

21   and even though the amount of dilution might be relatively slight. *See Baker v. Carr*, 369

22   U.S. 186, 208 (1962); *Spokeo*, 578 U.S. at 339 ("The fact that an injury may be suffered

23   by a large number of people does not of itself make that injury a nonjusticiable general-

24   ized grievance."). And their injuries are "particularized because the Plaintiffs allege that

25

14

*their* votes are being diluted." *Green*, 2023 WL 2572210, at *4. The "harm of vote dilution is concrete and actual or imminent, not conjectural or hypothetical." *Kravitz v. Dep't of Com.*, 336 F. Supp. 3d 545, 558 (D. Md. 2018) (cleaned up).

This injury is also not "speculative." Mot. 8. While the Secretary focuses on intentional voter fraud, Mot. 8, bloated voter rolls invite all kinds of ineligible voting—fraudulent, intentional, accidental, and innocent—all of which dilute Plaintiffs' lawful votes. Nor is the link between inflated rolls and voter fraud overly speculative. It has been observed by the Carter-Baker Commission, Compl. ¶38, a well-respected authority relied on by the Supreme Court. *E.g.*, *Brnovich*, 141 S. Ct. at 2347-48; *Crawford*, 553 U.S. at 193-94, 197 (op. of Stevens, J.). Regardless, Plaintiffs are seeking "forward-looking, injunctive relief," so Article III allows them to sue over not just actual fraud, but also the "risk of" fraud. *TransUnion*, 594 U.S. at 435. "Fraud is a real risk" in Nevada and elsewhere, as courts have reiterated many times. *Brnovich*, 141 S. Ct. at 2348; *see* Compl. ¶¶38-39 (collecting cases). The complaint even details specific, recent instances of voter fraud in Nevada. Compl. ¶40. The link between inflated voter rolls and increased risks of illegal voting is not attenuated. *Contra* Mot. 8. It is obvious and well established.

Even if these events would be too speculative in a vacuum, "'Congress has the power'" to make it satisfy Article III, as it did here by enacting a private right of action for violations of the NVRA. *Spokeo*, 578 U.S. at 341. The Secretary relies on other, non-NVRA cases questioning vote dilution as "'speculative' at this juncture." Mot. 7 (quoting *Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993, 1000 (D. Nev. 2020)). But those cases did not "arise under a situation like the National Voter Registration Act where Congress has articulated the private right of action." *Daunt*, Ex. A at 20. Congress's judgment warrants respect, especially because harm to voters under the NVRA

15

bears "a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Green*, 2023 WL 2572210, at *4 (quoting *TransUnion*, 141 S. Ct. at 2213). Plaintiffs "are asserting 'a plain, direct and adequate interest in maintaining the effectiveness of their votes,' not merely a claim of 'the right possessed by every citizen to require that the government be administered according to law.'" *Baker*, 369 U.S. at 208 (quoting *Coleman v. Miller*, 307 U.S. 433, 438 (1939)). Courts have long recognized that vote dilution and losses of voter confidence burden the right to vote. And burdens on constitutional rights are classic examples of "intangible injuries" that satisfy Article III. *Spokeo*, 578 U.S. at 340.

*      *      *

Any of these theories demonstrates standing at the pleading stage. Plaintiffs' allegations are even stronger in light of Congress's creation of a private right of action for violations of the NVRA. So long as the Court finds that at least one Plaintiff "has standing," it "need not consider whether the [other parties] also have standing to do so." *Horne v. Flores*, 557 U.S. 433, 446 (2009). Courts confronting similar NVRA claims have approved every theory of injury suffered by Plaintiffs here. This Court likewise should recognize that at least one of these injuries is adequately pleaded and proceed to the merits.

### III. Plaintiffs have plausibly alleged NVRA violations.

Section 8 of the NVRA "requires States to 'conduct a general program that makes a reasonable effort to remove the names' of voters who are ineligible 'by reason of' death or change in residence." *Husted*, 138 S. Ct. at 1838 (quoting 52 U.S.C. §20507(a)(4)). The law makes the removal of dead or relocated voters "mandatory." *Id.* at 1842. Plaintiffs plausibly alleged that Nevada is not complying with this duty.

Opposition to Motion to Dismiss

**A.    Courts have held that inordinately high active voter registration rates plausibly suggest an NVRA violation.**

The allegations regarding high registration rates alone raise a reasonable inference of liability. The complaint alleges that at least five counties have registration rates that are abnormally or impossibly high compared to the rest of the State and the rest of the country. Compl. ¶¶3-5, 50-56. These "unreasonably high registration rate[s]" create a "strong inference of a violation of the NVRA" that is "sufficient," on its own, to survive a motion to dismiss. *ACRU*, 166 F. Supp. 3d at 805. "Other courts" agree that "a registration rate in excess of 100%" indicates that a jurisdiction is "not making a reasonable effort to conduct a voter list maintenance program in accordance with the NVRA." *Griswold*, 2021 WL 3631309, at *10; *e.g.*, *Voter Integrity Proj. NC*, 301 F. Supp. 3d at 620; *Green*, 2023 WL 2572210, at *5; *ACRU*, 166 F. Supp. 3d at 793; *Daunt*, Ex. A at 16.

The Secretary deems these allegations insufficient for three main reasons. First, he claims that the NVRA permits States to rely on the U.S. Postal Service's change-of-address information as a "safe harbor." Mot. 13. Second, the Secretary claims that, instead of poor list maintenance, the inflated rolls could be caused by population growth or the NVRA's limits on how fast voters can be removed. Mot. 13-14. And third, the Secretary disputes the data. Mot. 15-19. None of these arguments are a reason to dismiss a complaint at the pleading stage. Notably, the Secretary's primary authority for why Defendants haven't violated the NVRA is a case that was decided *at trial*, after the court received "extensive expert testimony." *Bellito v. Snipes*, 935 F.3d 1192, 1207-08 (11th Cir. 2019). Earlier in the litigation, the district court *denied* the defendant's motion to dismiss, rejecting the same arguments the Secretary makes here. *Bellitto v. Snipes*, 221 F. Supp. 3d 1354, 1365 (S.D. Fla. 2016).

17

Opposition to Motion to Dismiss

1          ***First***, the so-called "safe harbor" for USPS data is not a reason to dismiss the

2    complaint. The NVRA allows a State to "meet the requirement of subsection (a)(4)" by

3    relying on "change-of-address information supplied by the Postal Service." 52 U.S.C.

4    §20507(c)(1). The Secretary suggests the USPS data may be inaccurate, Mot. 13, but

5    courts have found that argument "unconvincing" at this early stage. *ACRU*, 166 F. Supp.

6    3d at 793-94. If the USPS data were the sole cause of inflated rolls, the counties named

7    in the complaint would not be outliers among the rest of the State. Compl. ¶¶55-57.

8    Rather, "it is more likely that the Defendant's failure to maintain the voter rolls caused

9    the registration rate to climb," which raises a "'strong inference'" that "is adequate to

10   survive a motion to dismiss." *ACRU*, 166 F. Supp. 3d at 794.

11         Even if the argument were sound, the Secretary doesn't back it up with evidence.

12   The Secretary doesn't even claim that the State or counties actually rely on USPS infor-

13   mation. *See* Nev. Rev. Stat. §293.530(1) (counties may "use any reliable and reasonable

14   means" to determine whether a voter has moved residences). And even if the Secretary

15   were to introduce new evidence in reply showing that some counties use USPS data, that

16   would not prove that the Defendants consistently and accurately apply that data, or that

17   they follow through in removing voters. The USPS data is meaningless unless States

18   actually *use* it, and ensure that county officials are using it, too. *See* 52 U.S.C.

19   §20507(c)(1)(A) (requiring that the change-of-address information "is used"). Whether

20   the State is complying with "subsection (c)(1)" and whether that compliance "defeats

21   Plaintiff[s'] claims" is a "fact-based argument more properly addressed at a later stage of

22   the proceedings." *Bellitto*, 221 F. Supp. 3d at 1366; *accord Voter Integrity Proj. NC*, 301 F.

23   Supp. 3d at 620 (similar); *Griswold*, 2021 WL 3631309, at *11 (similar).

24

25

      Opposition to Motion to Dismiss

The provision is also not a "safe harbor," at least not in the way that the Secretary means. The NVRA requires States to remove voters who have moved, 52 U.S.C. §20507(a)(4)(B), and restricts how States can remove those voters, *id.* §20507(d). The process in subsection (c)(1) is thus a "permissible" way to satisfy these "mandates and accompanying constraints." *A. Philip Randolph Inst. v. Husted*, 838 F.3d 699, 707 (6th Cir. 2016), *rev'd*, 138 S. Ct. 1833. It is not a *sufficient* way to satisfy section 8's list-maintenance requirements. A process that admittedly permits "a substantial number of voters who have moved out of the jurisdiction" to remain on the rolls and fails to reach "40 percent of people who move," Mot. 13, is hardly a "reasonable effort" to conduct list mainte-nance, 52 U.S.C. §20507(a)(4)(B). Even if the provision were a safe harbor, it only per-tains to a States' "obligations regarding change of address." *Bellitto*, 935 F.3d at 1210. Section 8 also requires States to remove voters who become ineligible due to "death," 52 U.S.C. §20507(a)(4)(A), and USPS data does not ensure Defendants are complying with that separate duty. *Bellitto v. Snipes*, 302 F. Supp. 3d 1335, 1356-57 (S.D. Fla. 2017).

**Second**, Plaintiffs do not have to disprove possible alternative explanations for Nevada's inflated rolls at this stage. *See Starr*, 652 F.3d at 1216. The Secretary argues that Plaintiffs must rebut "the possibility that the alternative explanation is true," Mot. 16, but he relies on a case in which "only one" of two "possible explanations" could be true, and "only one of which results in liability," *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013). But the allegations here are "plausible," not merely "possi-ble," and this case does not present two alternative scenarios, "only one of which can be true." *Id.* Even if the NVRA or population growth were responsible for some infla-tion of the rolls—and the Secretary does not say how much—that does not *exclude* the plausibility that deficient list-maintenance is responsible for the rest. To the extent there

19

Opposition to Motion to Dismiss

is "a potentially reasonable explanation for the high registration rate, … the validity of

that explanation is not appropriate for determination at this early stage of the litigation,

where the court views the factual allegations and inferences drawn therefrom in favor

of [Plaintiffs]." *Voter Integrity Proj. NC*, 301 F. Supp. 3d at 619. The Secretary's alternative

explanations are especially unpersuasive because they are contradictory. On one hand,

he claims that the rolls *are* inflated because the NVRA does not allow counties to quickly

remove ineligible voters. Mot. 14. On the other hand, he claims that the rolls *are not*

inflated because he reads the data differently. Mot. 15-18. These theories cannot render

Plaintiffs' contrary inference of "substandard list maintenance" implausible. Compl. ¶57.

**Third**, the Secretary's criticisms of Plaintiffs' data are irrelevant. Again relying on

the post-trial *Bellitto* case, he argues that census data is "insufficient to prove an NVRA

violation." Mot. 15 (citing *Bellitto*, 935 F.3d at 1207-08). But at this stage, Plaintiffs don't

need to "prove" anything. Even if the evidentiary disputes could be considered at this

stage, they are unpersuasive. The Secretary disputes the census data, Mot. 15-18, but the

U.S. Election Assistance Commission uses the census numbers to estimate voter turnout

and registration "because of its availability for the majority of jurisdictions … and be-

cause it provides a more accurate picture of the population covered by the [survey]."

U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2022 Compre-*

*hensive Report* 7 (June 2023), perma.cc/28SQ-T24L; *see also* Compl. ¶¶60-63.

The Secretary next quibbles with Plaintiffs' use of the five-year census estimate

instead of the one-year estimate. Mot. 16-17. But the Census Bureau says that five-year

estimate is the "[m]ost reliable" of the American Community Surveys.[1] In contrast, the

one-year estimate is more "current" but "[l]ess reliable," and it only has "[d]ata for areas

---

[1] U.S. Census Bureau, *When to Use 1-year or 5-year Estimates* (Sept. 2020), perma.cc/LJ8K-WJYQ

Opposition to Motion to Dismiss

with populations of 65,000+," *id.*, which excludes *all but two* of Nevada's counties.[2] Next, the Secretary's use of old registration rates from 2019 and 2020 is self-defeating. Mot. 16.-17. Plaintiffs challenge the registration practices of today, not those of five years ago. To the extent there is disagreement about which data best measures those practices, "the fact-intensive dispute about the accuracy and significance of the Plaintiffs' statistics must be resolved at the summary-judgment stage or at trial." *Green*, 2023 WL 2572210, at *5.

Plaintiffs' methodology has been repeatedly upheld. Their "census data is reliable," *ACRU*, 166 F. Supp. 3d at 791, especially since Plaintiffs used "the most recent census data available at the time of the filing of [their] complaint," *Voter Integrity Proj. NC*, 301 F. Supp. 3d at 619. Regardless, this Court cannot dismiss the complaint even if it suspects that the "registration numbers may not be unreasonably high in context or there may be a reasonable explanation for them." *Griswold*, 2021 WL 3631309, at *11. At "the motion to dismiss stage, the Court does not 'weigh potential evidence that the parties might present'" in this manner. *Id.* The Secretary's disputes about "the reliability" and "significance" of "Plaintiffs' statistics" thus cannot defeat "a 'reasonable inference' that the defendant is liable." *Green*, 2023 WL 2572210, at *5.

### B.   The many other allegations in the complaint plausibly allege an NVRA violation.

Although courts have held that Plaintiffs' voter-registration data states a claim, the complaint here does not rest on those numbers alone. The complaint documents examples of six jurisdictions with similarly high registration rates who, after they were sued, essentially agreed that their rolls were inflated. *See* Compl. ¶¶73-78. The complaint also rules out alternative explanations for these inflated rolls. ¶¶57-58. And it details

---

[2] Nev. Legislature Research Div., *Population of Counties in Nevada* (Aug. 2021), perma.cc/NY8M-RFP6.

Opposition to Motion to Dismiss

even more data demonstrating that certain counties are not keeping up with residency changes, ¶¶59-64, and not removing voters even after marking them inactive, ¶¶65-69.

Start with residency changes. The Secretary says little about this data, but courts have recognized that it alleges an NVRA violation. *Compare Griswold*, 554 F. Supp. 3d at 1108 ("the 2018 EAC Report shows that 30 Colorado counties reported removing fewer than 3% of voters," even though "18% of Coloradans were not living in the same house as a year ago"), *with* Compl. ¶¶62-63 (the 2020-2022 EAC Report shows that two counties "reported removing less than 2% of their registration lists for residency changes" even though "more than 15% of Nevada's residents were not living in the same house as a year ago"). The Secretary obfuscates by changing the words of the statute: he claims the State can't "systematically act" on residence changes in the 90 days before an election. Mot. 14. That's false. The provision he cites says that the State cannot "systematically *remove*" voters from the rolls 90 days before an election. 52 U.S.C. §20507(c)(2)(A). Nothing in the NVRA prohibits Defendants from moving voters to inactive status before an election. In any event, these alternative explanations are irrelevant, and even the Secretary can't explain why some counties removed *no voters* for failing to respond to an address-confirmation notice. Compl. ¶64. The complaint contrasts a highly mobile population with unusually stagnant list-maintenance for those moves. ¶¶62-64. That data raises a plausible inference of a violation. *Griswold*, 554 F. Supp. 3d at 1108.

Even if Nevada had a "reasonable program" to maintain its rolls, how Nevada treats the inactive registrations on the rolls shows that it is not *implementing* that program. The complaint alleges that Nevada's rate of inactive registrations (16%) is much higher than the national average (11%). Compl. ¶65-66. The Secretary argues that shows Nevada is aggressively canceling registrations, Mot. 20-21, but that makes no sense. At

Opposition to Motion to Dismiss

most, it shows that Nevada is effective at *almost* canceling registrations but fails to actually remove those voters from the rolls. In other words, a "high 'inactive registration rate'" is evidence that, even if the State is "availing itself of the NVRA's safe harbor," it may "not actually be implementing it." *Griswold*, 554 F. Supp. 3d at 1097, 1108.

That inference must be drawn in Plaintiffs' favor, but the inference isn't even necessary: the complaint identifies some 5,000 inactive voters currently on the rolls that were listed in the June 10, 2019 voter file. Compl. ¶67. The Secretary compares these registrations to the total number of inactive voters, but that misses the point. Mot. 19-20. These 5,000 voters have been listed as inactive for two federal election cycles, which means that even by the Secretary's own data, these registrations should have been cancelled after the 2022 election. 52 U.S.C. §20507(b)(2). The NVRA requires States to "conduct" a list-maintenance program, not to simply *have* a list-maintenance program. *Id.* §20507(a)(4); *see Bellitto*, 935 F.3d at 1205-06 (defendants must demonstrate as a "factual" matter that they "reasonably used [the enacted] process"). Nevada's treatment of inactive registrations demonstrates it is failing to remove ineligible voters from the rolls.

In a final attempt to avoid plausible allegations, the Secretary demands the Court close its eyes to data that was not included in the notice letter. Mot. 19-21. But no court has held that the letter freezes the evidence or arguments that plaintiffs can rely on in a lawsuit. The Secretary cites a case in which the court declined to allow one plaintiff to "piggyback" on the notice provided by another plaintiff, *Scott v. Schedler*, 771 F.3d 831, 836 (5th Cir. 2014), but all Plaintiffs here were named in the notice. The NVRA requires only "written notice" of "the violation." 52 U.S.C. §20510(b)(1). Here, both the letter and the complaint allege a violation of section 8's requirement that States remove the names of ineligible voters. *Id.* §20507(4)(A)-(B). The notice need only state "[t]he general

23

1   proposition" that a State is "not complying with the mandates of the NVRA"; the "sta-

2   tistics … simply serve as factual support for that general proposition." *Ga. NAACP*,

3   841 F. Supp. 2d at 1334. Regardless, because the NVRA's notice provision "is not juris-

4   dictional," *ACRU v. Phil. City Comm'rs*, 2016 WL 4721118, at *4 (E.D. Pa. Sept. 9), courts

5   can and have excused the requirement even in cases where the plaintiff provided no

6   notice at all. *E.g.*, *ACORN v. Miller*, 129 F.3d 833, 838 (6th Cir. 1997). The Secretary can

7   show no prejudice from more data, particularly where he continues to maintain that *none*

8   of the data—no matter when he learned of it—amounts to a violation. Mot. 19-20.

9       Citing nothing, the Secretary concludes by arguing that Plaintiffs should have re-

10  quested records from the Secretary of State that could have shed light on why Nevada's

11  voter rolls are deficient. Mot. 22-23. Neither Congress nor the courts have imposed such

12  a requirement. The NVRA requires pre-suit notice, not pre-suit exhaustion. In fact, re-

13  questing records is a *separate claim* under the NVRA that is independent of the claim for

14  failure to conduct list maintenance. *See* 52 U.S.C. § 20507(h)(i). Plaintiffs sometimes

15  bring both claims, *PILF*, 2022 WL 21295936, at *1, but often they bring just the list-

16  maintenance claim, *Green*, 2023 WL 2572210, at *6. Tying together a motion that dis-

17  putes the facts, the Secretary cites *Bellitto*, the post-trial case, one final time for the prop-

18  osition that "courts ultimately rely" on details about "counties' methodologies" to de-

19  termine whether the State has violated the NVRA. Mot. 23. But whatever evidence this

20  Court "ultimately" relies on is not what governs this motion. Plaintiffs plausibly state a

21  claim with a plethora of allegations approved by numerous courts.

22                    **<u>CONCLUSION</u>**

23      The court should deny the motion to dismiss. If the Court grants the motion, it

24  should also grant leave to amend. *Harris v. Amgen*, 573 F.3d 728, 737 (9th Cir. 2009).

25

24

Opposition to Motion to Dismiss

Dated: April 29, 2024                    Respectfully submitted,

                                         /s/ Jeffrey F. Barr

Thomas R. McCarthy*                      Jeffrey F. Barr
   VA Bar No. 47145                         NV Bar No. 7269
Gilbert C. Dickey*                       ASHCRAFT & BARR LLP
   VA Bar No. 98858                      8275 South Eastern Avenue
Conor D. Woodfin*                        Suite 200
   VA Bar No. 98937                      Las Vegas, NV 89123
CONSOVOY MCCARTHY PLLC                   (702) 631-4755
1600 Wilson Boulevard, Suite 700         barrj@ashcraftbarr.com
Arlington, VA 22209
(703) 243-9423                           Counsel for the Republican National
tom@consovoymccarthy.com                 Committee and Scott Johnston
gilbert@consovoymccarthy.com
conor@consovoymccarthy.com               /s/ Sigal Chattah

*pro hac vice application pending        Sigal Chattah
                                            NV Bar No. 8264
Counsel for Plaintiffs                   CHATTAH LAW GROUP
                                         5875 S. Rainbow Blvd #204
                                         Las Vegas, NV 89118
                                         (702) 360-6200
                                         sigal@thegoodlawyerlv.com

                                         Counsel for the Nevada Republican
                                         Party

25

Opposition to Motion to Dismiss