AARON D. FORD
  Attorney General
LAENA ST-JULES (Bar No. 15156)
  Senior Deputy Attorney General
Office of the Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717
T: (775) 684-1100
E:  lstjules@ag.nv.gov

*Attorneys for Secretary of State*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE, NEVADA REPUBLICAN PARTY, and SCOTT JOHNSTON,<br><br>               Plaintiffs,<br><br>vs.<br><br>FRANCISCO AGUILAR, in his official capacity as Nevada Secretary of State; LORENA PORTILLO, in her official capacity as the Registrar of Voters for Clark County; WILLIAM "SCOTT" HOEN, AMY BURGANS, STACI LINDBERG, and JIM HINDLE, in their official capacities as County Clerks,<br><br>             Defendants. | Case No. 2:24-cv-00518-CDS-MDC<br><br>**DEFENDANT SECRETARY OF STATE'S REPLY IN SUPPORT OF MOTION TO DISMISS** |

Defendant the Secretary of State[1] replies here to Plaintiffs' Response in Opposition to Motion to Dismiss [ECF No. 26], ECF Nos. 40 & 41 ("Opposition").[2]

**I.  INTRODUCTION**

Plaintiffs fundamentally fail in their Opposition to grapple with binding Supreme Court and Ninth Circuit precedent.  Their theories of individual standing cannot be squared with the requirements that an injury must not be generalized or speculative, and their theories of organizational standing reflect no cognizable diversion of resources. Plaintiffs also fail to allege facts that plausibly state an NVRA violation; the inferences

---

[1] Defined terms have the same meanings as set forth in the Secretary of State's Motion to Dismiss, ECF No. 26.

[2] Plaintiffs appear to have duplicated their Opposition filing at ECF Nos. 40 and 41.

they ask the Court to draw are unwarranted, unreasonable, and implausible. The Secretary of State's arguments that Nevada is a leader in list maintenance are left with no response.

Plaintiffs' conduct and allegations reinforce the conclusion that they are attempting to use the judicial system to sow mistrust in the electoral process. They withheld bases for their claim of an NVRA violation, despite the requirement that they provide notice before filing suit. And they chose not to obtain data that would have actually been relevant to their claim that Nevada is not making a reasonable effort to remove ineligible voters.

At bottom, Plaintiffs are asking the Court to ignore basic pleading requirements in favor of following non-binding decisions of out-of-circuit district courts. The Court should decline to do so and should dismiss the Complaint.

## II.     ARGUMENT

### A.     Plaintiffs Do Not Have Standing to Bring Their Claim

#### 1.     Plaintiffs Only Assert Generalized and Speculative Theories of Individual Voter Injury

##### a.     Undermined Voter Confidence Is Generalized and Speculative

Plaintiffs argue that undermined voter confidence is not a generalized injury. *See* Opp. at 13–14. The question of generalization centers on whether all citizens possess the same alleged right and whether relief would benefit the plaintiff more than the public at large. *See Lance v. Coffman*, 549 U.S. 437, 439 (2007) ("[A] plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy."); *Perry v. Newsom*, 18 F.4th 622, 634 (9th Cir. 2021) (in holding harm to "the sanctity of the judicial process" was generalized, explaining "[a] purported injury is an impermissible 'generalized grievance' when the interest of the party asserting it 'is plainly undifferentiated and common to all members of the public'"). "[A]ssertion of a

right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirements of [Article] III without draining those requirements of meaning." *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 483 (1982).

Whether some voters may not have undermined confidence and discouraged participation, *see* Opp. at 13 (quoting *Jud. Watch, Inc. v. Griswold*, 554 F. Supp. 3d 1091, 1103-04 (D. Colo. 2021)), is therefore irrelevant. And tellingly, Plaintiffs have not so much as alleged that this supposed harm is not shared among the public. *Cf.* Compl. ¶ 10 ("The RNC represents over 30 million registered Republicans . . . ."); *id.* ¶ 13 ("The RNC and its members are concerned that Defendants' failure to comply with the NVRA's voter-list maintenance obligations undermines the integrity of elections . . . ."). What matters here is that every citizen has the same alleged right and relief would no more benefit Plaintiffs than the public at large.

Plaintiffs also argue, incorrectly, that their alleged injury is concrete. *See* Opp. at 14. Plaintiffs try to define their injury as a burden on their right to vote based on undermined confidence, *see id.*, but that supposed burden is ultimately premised on a subjective fear that inaccurate voter rolls will lead to vote dilution, *see* Compl. ¶ 13. When a theory of injury is based on a subjective fear, that theory fails if the fear is too speculative. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013) ("[Respondents'] subjective fear of surveillance does not give rise to standing."); *Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015) (Plaintiff's "deterrence from seeking employment is ultimately based on his fear of an injury that we have already determined is too speculative to confer standing."). As discussed below, the risk of vote dilution here is too speculative to confer standing. And thus, the claimed injury to voter confidence is also too speculative. *See Thielman v. Fagan*, Case No. 3:22-cv-01516-SB, 2023 WL 4267434, at *4 (D. Or. June 29, 2023) ("The Court finds that Plaintiffs' lack of confidence in Oregon's voting systems is a generalized grievance not particularized to the plaintiffs in this litigation and too speculative to qualify as a concrete injury."), *aff'd sub nom. Thielman v. Griffin-Valade*, No. 23-35452, 2023

WL 8594389, at *1 (9th Cir. Dec. 12, 2023) ("Plaintiffs allege that they are injured by 'a lack of confidence in the integrity of the election system.' But that alleged injury represents nothing more than the 'kind of speculation that stretches the concept of imminence beyond its purpose.'"). Were it otherwise, any person could challenge any law based on an irrational, unfounded subjective fear of harm. That is not the law.

Plaintiffs' reliance on the NVRA's purposes to attempt to establish concreteness, Opp. at 14, is also misplaced. "As [the NVRA's] text makes clear, [it] was intended as a shield to protect the right to vote, not as a sword to pierce it." *Am. Civil Rights Union v. Philadelphia City Comm'rs*, 872 F.3d 175, 182 (3d Cir. 2017). It sharply limits a state's ability to remove voters from its rolls, and it does not require removal of all ineligible voters. *See* 52 U.S.C. § 20507(a)(3)-(4), (d); *Bellitto v. Snipes*, 935 F.3d 1192, 1199 (11th Cir. 2019). It also identifies as purposes increasing voter registration and participation, 52 U.S.C. § 20501(b)(1)-(2); *see also id.* § 20501(a)(2)-(3), not allaying generalized, subjective fears about voter fraud. As the Secretary of State explained in his Motion to Dismiss, the NVRA's design is "consistent with the conclusion that Congress recognized that the risk of voter fraud would not be significantly increased if ineligible voters remained on voter rolls."[3] Mot. at 13–14. Plaintiffs therefore fail to establish that Congress intended to elevate a speculative, subjective fear of vote dilution to a concrete injury. Even if Congress did, however, Plaintiffs would still need to allege "a degree of risk sufficient to meet the concreteness requirement." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 342–43 (2016). But Plaintiffs offer nothing to support any risk of vote dilution.

### b. The Risk of Vote Dilution Is Generalized and Speculative

To support their argument of standing based on a theory of vote dilution, Opp. at 14–16, Plaintiffs quote *Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020) for the

---

[3] Plaintiffs take issue with the Secretary of State's explanation of factors that show Congress did not consider the risk of voter fraud would be meaningfully increased if ineligible voters remained on the voter rolls. Opp. at 19. They claim that using U.S. Postal Service information to identify individuals who are ineligible based on a change of residence (the "NCOA Process") does not create a "safe harbor" because it is not a sufficient way to satisfy the NVRA's requirements. *Id.* Wrong. "As a safe harbor, the NCOA Process, at a minimum, constitutes a reasonable effort at identifying voters who have changed their addresses." *Bellitto*, 935 F.3d at 1204–05.

1 proposition that "vote dilution can be a basis for standing," Opp. at 14. They omit, however,
2 that the *Wood* court held that vote dilution where "'no single voter is specifically
3 disadvantaged' if a vote is counted improperly . . . is a 'paradigmatic generalized grievance
4 that cannot support standing.'"[4] *Wood*, 981 F.3d at 1314–15 (citations omitted); *see also*
5 *Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993, 1000 (D. Nev. 2020);
6 *Paher v. Cegavske*, 457 F. Supp. 3d 919, 926 (D. Nev. 2020). That is the exact kind of vote
7 dilution Plaintiffs allege here. For the same reasons undermined confidence is a
8 generalized grievance, vote dilution is a generalized grievance that cannot support
9 standing.

10 Plaintiffs also fail to adequately allege that vote dilution is not speculative. Plaintiffs
11 nakedly claim that "'[f]raud is a real risk' in Nevada." Opp. at 15 (quoting *Brnovich v.*
12 *DNC*, 141 S. Ct. 2321, 2348 (2021) (addressing "risk that accompanies mail-in-voting")).
13 They do not tie any of the cases they cite, Compl. ¶¶ 38–39,[5] or either of their cited guilty
14 pleas, *id*. ¶ 40,[6] to improper list maintenance. The nearly twenty-year-old Carter-Baker
15 Commission Report also merely indicates that voter fraud *could* happen because of
16 inaccurate voter rolls, not that it has happened or is even likely to happen. *See id*. ¶ 38.
17 Instead, Plaintiffs try to claim that the possibility of vote dilution is not attenuated because
18 an improper vote could be accidental or innocent, not just fraudulent. Opp. at 15. That
19 does not lessen the "highly attenuated chain of possibilities," which still relies on
20 "independent decisionmakers" voting when they should not. *See Clapper*, 568 U.S. at 410,
21 413. And formulating the alleged injury as a "risk of" vote dilution, Opp. at 15, does not
22 change that that risk must still be "sufficiently imminent and substantial," *TransUnion*
23 *LLC v. Ramirez*, 594 U.S. 413, 435 (2021) (citing *Spokeo, Inc.*, 578 U.S. at 341–42), which

---

[4] Plaintiffs also cite *Baker v. Carr*, 369 U.S. 186, 208 (1962) to suggest that they can claim injury based on an "interest in maintaining the effectiveness of their votes." Opp. at 16. But that case addressed vote dilution in the context of a classification that disfavored voters in specific counties, *Baker*, 369 U.S. at 207–08, not vote dilution that, as alleged here, affects all voters equally.

[5] *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) (voter identification); *Tex. Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020) (voting by mail); *Griffin v. Roupas*, 385 F.3d 1128 (7th Cir. 2004) (absentee ballots); *Veasey v. Perry*, 71 F. Supp. 3d 627 (S.D. Tex. 2014) (voter identification).

[6] Neither cited guilty plea references Nevada's list maintenance in any capacity.

the risk of vote dilution is not. Plaintiffs even acknowledge as much in alleging that there is no evidence the defendant counties have "experienced above-average voter participation compared to the rest of the country or State." *See* Compl. ¶ 57.

Finally, Plaintiffs' argument about the NVRA's private right of action, Opp. at 15–16, is again misplaced as described above. Plaintiffs do not establish that Congress intended to elevate a generalized, speculative risk of vote dilution to a concrete injury by enacting the NVRA, nor do Plaintiffs adequately allege that "this case entail[s] a degree of risk sufficient to meet the concreteness requirement."[7] *Spokeo, Inc.*, 578 U.S. at 342–43.

### 2. Plaintiffs Fail to Adequately Allege Organizational Standing

Plaintiffs claim organizational standing based on different theories of diversion of resources. First, Plaintiffs claim that they will have to take steps to address Nevada's supposedly inaccurate voter rolls. Compl. ¶ 21. But as noted, Mot. at 10, Plaintiffs must demonstrate that the harm they are purporting to respond to is certainly impending and not hypothetical, *Clapper*, 568 U.S. at 402. This is true even where an organization is claiming diversion of resources as a basis for standing; Plaintiffs are required to allege they "would have suffered some other injury if [they] had not diverted resources to counteracting the problem." *See La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010). It is no answer that a diversion of resources injury can be "broadly alleged" at the pleading stage. *See* Opp. at 11 (quoting *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015)). Plaintiffs must still support each element of federal jurisdiction with adequate factual allegations. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *see also United Poultry Concerns v. Chabad of Irvine*, 743 F. App'x 130, 131 (9th Cir. 2018) (dismissal warranted, on a motion to dismiss, for lack of organizational standing based on inadequate theory of diversion of resources); *La Asosciacion de Trabajadores*, 624 F.3d at 1089 (recognizing that a Complaint must contain

---

[7] This is not to say that no person could ever challenge a state's list maintenance activities. For instance, an individual who was improperly removed from the voter rolls likely would have a cognizable injury. But in any event, "[t]he assumption that if [Plaintiffs] have no standing to sue, no one would have standing, is not a reason to find standing." *Clapper*, 568 U.S. at 420 (citations omitted).

1 sufficient allegations of a diversion of resources). And notably absent from Plaintiffs' allegations is any non-hypothetical future harm that is certainly impending that Plaintiffs must divert resources to counteract.

Next, Plaintiffs attempt to disguise that they are improperly alleging diversion of resources based on litigation costs. *See* Opp. at 12; Compl. ¶ 22. Just because Plaintiffs did not use the label "litigation costs" in their Complaint, it does not transform the work they did to bring this lawsuit into something else. Even if it did, Plaintiffs are not diverting resources to monitor Nevada's compliance with the NVRA; Plaintiffs already "monitor[] state and local election officials' compliance with their NVRA list maintenance obligations through publicly available records from jurisdictions across the nation." Compl. ¶ 13.

Finally, Plaintiffs allege they *may* divert resources based on inaccurate information in voter registration lists. Compl. ¶¶ 14, 17. Contrary to Plaintiffs' attempt to improperly amend their Complaint through briefing, *see* Opp. at 11; *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013), that allegation in the Complaint relates to voter registration lists in general, not just Nevada's voter registration lists. *See* Compl. ¶ 14 ("[T]he RNC may spend more resources on mailers, knocking on doors, and otherwise trying to contact voters, or it may misallocate its scarce resources *among different jurisdictions*." (emphasis added)). As the Secretary of State has explained, Plaintiffs' allegations relating to supposed injury premised on how they *may* choose to use resources based on nationwide voter registration lists both are not traceable to the Secretary of State and are conjectural and hypothetical. Mot. at 9.

Plaintiffs also assert that harm to their mission constitutes an independent injury, citing a district court decision from Michigan (which does not so hold). *See* Opp. at 12 (citing *Pub. Int. Legal Found. v. Benson*, Case No. 1:21-cv-929, 2022 WL 21295936, at *6 (W.D. Mich. Aug. 25, 2022)). Under binding Ninth Circuit precedent, an organization can establish injury only if it demonstrates "(1) frustration of its organizational mission; *and* (2) diversion of its resources to combat the particular [injurious behavior] in question." *Rodriguez v. City of San Jose*, 930 F.3d 1123, 1134 (9th Cir. 2019) (emphasis added).

**B.     Plaintiffs Fail to State a Claim**

**1.     Plaintiffs' Active Voter Registration Calculations Do Not Plausibly Allege an NVRA Violation**

Plaintiffs do not dispute that they are comparing 2020 citizen voting age population estimates against 2024 active registration numbers. From this comparison of vastly different snapshots in time, they claim that certain counties are not adequately maintaining voter rolls. But inferring that Plaintiffs' comparison reflects current reality and plausibly suggests an NVRA violation is the exact type of "unwarranted deduction[] of fact" and "unreasonable inference[]" that need not be accepted as true. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010); *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 681 (9th Cir. 2009) ("We take a plaintiff's allegations in the complaint as true, but we are 'not required to indulge unwarranted inferences.'"). Factual content in a complaint must allow a "court to draw the *reasonable* inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added and citation omitted).

As the Secretary of State explained, there are many reasons why active registration numbers may exceed citizen voting age population estimates without an NVRA violation. Mot. at 13–14. Simply, high active registration rates are not a reasonable indicator of an NVRA violation. Layered on top of Plaintiffs' unreasonable inference that active registration rates indicate NVRA compliance, Plaintiffs also ask the Court to draw unreasonable inferences based on active registration rates that are not grounded in current reality. The Secretary of State has explained that Nevada (1) has consistently maintained active registration rates below national averages and has a 76.53% active registration rate when comparing the 2020 population estimates against 2020 active registration numbers, *id.* at 17; (2) has a substantially growing population, *id.* at 16; and (3) has inactivation rates well above the national average, *id.* at 19. Plaintiffs do not dispute this.

Yet Plaintiffs claim that the inference of an NVRA violation is not merely "possible," but "plausible." Opp. at 19. "In assessing the plausibility of an inference, [courts] draw on

[their] judicial experience and common sense and consider obvious alternative explanations." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1057 (9th Cir. 2011) (cleaned up); *see also Iqbal*, 556 U.S. at 679. Between Nevada's consistent track record of active registration rates below the national average, Nevada's high inactivation rates, and the obvious alternative explanation that population growth accounts for Plaintiffs' alleged increase in active registration rates, Mot. at 16–17, 19, common sense dictates that Plaintiffs' inference of an NVRA violation based on a statistical comparison from two very different times and data sources is unreasonable and implausible. It is far more likely that population growth explains Plaintiffs' numbers. "[G]iven [the] more likely explanation[], [Plaintiffs] do not plausibly establish" an NVRA violation. *See Iqbal*, 556 U.S. at 681.

Plaintiffs' suggestion that the Secretary of State was required to quantify the impact of population growth, Opp. at 19, mistakes the Secretary of State's obligations on a motion to dismiss. They cite nothing to support that the Secretary of State must provide facts to quantify the impact of an obvious alternative explanation; indeed, providing such facts would be inappropriate on a motion to dismiss. Instead, because Plaintiffs' allegations are not plausible, they should have included facts "tending to exclude the possibility that the alternative explanation is true." *See In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013). They easily could have done so. As explained, the NVRA authorizes Plaintiffs to obtain, without discovery, Nevada's records on its general programs to remove ineligible voters. Mot. at 22. They chose not to. They apparently prefer to rely on implausible data to embroil the defendants in a lawsuit that serves only to heighten mistrust in elections. Information that is actually relevant to a claim of a deficiency in list maintenance is readily available to Plaintiffs, and yet they blithely forego it.[8] Plaintiffs' choice not to obtain information that could actually potentially buttress their claim also

///

---

[8] Plaintiffs complain that the Secretary of State did not cite anything requiring them to request Nevada's records. *See* Opp. at 24. The Secretary of State is happy to oblige: under Fed. R. Civ. P. 11(b), Plaintiffs' attorneys certified their belief, "formed after an inquiry reasonable under the circumstances," that the factual contentions in the Complaint have evidentiary support. A reasonable inquiry under the circumstances would include requesting actually relevant, openly available records before initiating suit.

supports the common-sense conclusion that their allegations are implausible. No case brought on similar allegations has ever succeeded on the merits.

Finally, Plaintiffs cite cases where motions to dismiss were denied based on alleged registration rates. Opp. at 21. But of course, they ignore the similar cases where motions to dismiss were granted. *See Jud. Watch, Inc. v. Pennsylvania*, 524 F. Supp. 3d 399, 408 (M.D. Pa. 2021) ("Judicial Watch fails to plead a plausible Section 8(a)(4) claim based on high registration rates."); Order, *Va. Voter's All., Inc. v. Leider*, Case No. 1:16-cv-00394, ECF No. 25 (E.D. Va. June 17, 2016) (dismissing complaint with similar allegations and allowing plaintiffs to amend "only after conducting an appropriate pre-filing investigation"). With such a split in authorities, Plaintiffs' citations are not persuasive.

### 2. Plaintiffs' Allegations Relating to Inactive Registrations and Relocation Rates Were Not Properly Noticed and Are Not Plausible

Plaintiffs do not dispute that their pre-litigation notice letter contained no allegation relating to inactive registrations or rates of removal based on change of address. Nor do they dispute that the pre-litigation notice requirement is meant to provide states "an opportunity to attempt compliance before facing litigation." *See Scott v. Schedler*, 771 F.3d 831, 836 (5th Cir. 2014) (citation omitted). Yet, they argue that their notice was sufficient to encompass newly raised allegations relating to a supposed NVRA violation based on inactive registrations and relocation/removal rates. Opp. at 23–24.

Plaintiffs cite *Georgia State Conference of N.A.A.C.P. v. Kemp*, 841 F. Supp. 2d 1320, 1334 (N.D. Ga. Jan. 30, 2012) to argue that they need only allege the "general proposition" that a State is "not complying with the mandates of the NVRA." Opp. at 23–24. In that case, however, the court identified that the notice letter set out that Georgia did not comply with the NVRA "especially with respect to providing voter registration services at public assistance offices and having in place policies to limit any services actually provided to in-person transactions." *Kemp*, 841 F. Supp 2d at 1334. The defendants did not argue, as here, that the plaintiffs failed to allege *entire bases of supposed violations*. *Kemp* is

1 therefore entirely unlike this case. Plaintiffs' reliance on *Association of Community Organizations for Reform Now v. Miller*, 129 F.3d 833, 838 (6th Cir. 1997) ("*ACORN*"), Opp. at 24, is also unavailing. There, Michigan had received notice from one of the plaintiffs, and the court addressed whether separate plaintiffs needed to provide notice as well since Michigan had already refused compliance. *Id.* Not only did the *Scott* court come to the opposite conclusion on the same issue, 771 F.3d at 836, but *ACORN* does not say that notice is not required, as Plaintiffs suggest, *see* Opp. at 24.

The NVRA provides a plaintiff alleging a list-maintenance claim the tools to identify supposed failings with specificity; a plaintiff has wide-ranging access to a state's records on its general removal programs. Mot. at 22. With this backdrop, it strains credulity for Plaintiffs to suggest that no notice, or incomplete notice, is sufficient. Instead, together with the purpose of giving a state an opportunity to correct any deficiency, it makes sense that the notice requirement demands plausible allegations of a violation. *See Nat'l Council of La Raza*, 800 F.3d at 1044. And it makes even more sense that a plaintiff, at a bare minimum, must identify their reasons for a list-maintenance claim. *See Scott*, 771 F.3d at 836 (holding that notice was too vague to provide the defendant an opportunity to attempt compliance). Plaintiffs seem to recognize as much (despite arguing that failure to provide notice is excusable); they explain that "[a] pre-suit notice need only state . . . the basic 'reasons'" for the conclusion that the State is violating an NVRA requirement. Opp. at 8 (quoting *Jud. Watch, Inc. v. King*, 993 F. Supp. 2d 919, 922 (S.D. Ind. 2012)).

Failing to provide adequate notice is no mere formality here. The Secretary of State has explained that Plaintiffs denied him the opportunity to investigate and address allegations relating to inactive registrations and relocation/removal rates by failing to include those allegations in the notice letter.[9] *See* Mot. at 20–21. That Plaintiffs would

---

[9] Plaintiffs claim the Secretary of State is incorrect that Nevada cannot "'systematically act' on residence changes in the 90 days before an election." Opp. at 22. Not so. The NVRA requires states to "complete, not later than 90 days" before an election for federal office, "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2). Nevada's program is set out in NRS 293.530 and requires inactivating voters who do not respond to a confirmation notice. Thus, under the NVRA, Nevada cannot implement the program in NRS 293.530 and inactivate voters during the 90 days before an election.

Case 2:24-cv-00518-CDS-MDC   Document 60   Filed 05/17/24   Page 12 of 13

add alleged reasons for an NVRA violation in their Complaint is ugly gamesmanship, especially in light of their decision to premise this lawsuit on implausible inferences from weak data rather than relevant information that is one simple request away. Plaintiffs would deprive the notice requirement of all meaning and deny a state a chance to cure, and their attempt to do so is a further indication that Plaintiffs' true purpose here likely does not relate to ensuring compliance with the NVRA. Plaintiffs' NVRA notice requirement arguments should be rejected, as should their new allegations based on inactive registrations and relocation/removal rates.

Even if Plaintiffs had provided proper notice, Plaintiffs' arguments about inactive registrations and relocation/removal rates are implausible. Plaintiffs, by their own allegations, acknowledge that Nevada is a leader in inactivation rates. *See* Compl. ¶¶ 65–66, 68. They also do not dispute that Nevada is a leader in sending out confirmation notices, Mot. at 20, and in removing voters following inactivation, *id.* at 21. The only datapoint they cite to support that inactive registration numbers are too high (despite Nevada sending out confirmation notices and accordingly canceling registrations following inactivation far more aggressively than the national average) is the alleged approximately 5,000 voters that should have been canceled from the inactivation list. *See* Opp. at 23. The inference of an NVRA violation is unwarranted.

First, Plaintiffs allege these 5,000 or so voters were on the inactive registration list as of June 10, 2019, and also on the inactive list after the 2022 general election. *See* Compl. ¶ 67. A person could, for instance, have been placed on the inactive list before 2019, then taken steps that would place them on the active list in 2020, and then been placed on the inactive list again in 2021, which would mean their registration could not be canceled until after the 2024 general election. Plaintiffs do not allege that the 5,000 or so inactive voters were inactive for all times between June 2019 and November 2022. Second, approximately 5,000 voters that should have been removed, in a pool of 2,307,306 registered voters, does not plausibly suggest a lack of "reasonable effort" to remove voters. Mot. at 20-21; 52 U.S.C.

///

Page **12** of **13**

§ 20507(a)(4). This is especially true given Nevada's high rates of inactivation and cancelation following inactivation.

Finally, Plaintiffs do not address the fact that change of residence alone does not mean that a voter should have their registration inactivated and subsequently canceled. As the Secretary of State explained, a voter could have changed residence within the state, or county, and properly remain on Nevada's voter rolls. *See* Mot. at 21–22. Just changing residence does not suggest a voter is ineligible to be on a state's voter rolls. Additionally, a voter who relocated outside of the state may have been removed at their own request or after confirming a change of residence. *Id.* at 22. Plaintiffs offer nothing to support that relocation rates can be tied in any plausible way to removal rates based on Nevada's general program to remove voters who have changed address. *See Jud. Watch, Inc.*, 524 F. Supp. 3d at 407.

### III. CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint.

DATED this 17th day of May 2024.

        AARON D. FORD
        Attorney General

        By: */s/ Laena St-Jules*
           LAENA ST-JULES (Bar No. 15156)
            Senior Deputy Attorney General
           Office of the Attorney General
           100 North Carson Street
           Carson City, Nevada 89701-4717
           T: (775) 684-1100
           E: lstjules@ag.nv.gov

        *Attorneys for Secretary of State*