David R. Fox (NV Bar No. 16536)
Christopher D. Dodge (*pro hac vice*)
Marisa A. O'Gara (*pro hac vice*)
**Elias Law Group LLP**
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
(202) 968-4490
dfox@elias.law
cdodge@elias.law
mogara@elias.law

Bradley S. Schrager (NV Bar No. 10207)
Daniel Bravo (NV Bar No. 13078)
**Bravo Schrager LLP**
6675 South Tenaya Way, Suite 200
Las Vegas, NV 89113
(702) 996-1724
bradley@bravoschrager.com
daniel@bravoschrager.com

*Attorneys for Proposed Intervenor-Defendants Rise Action Fund, Institute for a Progressive Nevada, and Nevada Alliance for Retired Americans*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>FRANCISCO V. AGUILAR, in his official capacity as the Nevada Secretary of State, *et al.*,<br><br>    Defendants. | Case No. 2:24-cv-00518-CDS-MDC<br><br>**PROPOSED INTERVENORS' RESPONSE TO PLAINTIFFS' OBJECTIONS TO REPORT AND RECOMMENDATION ON MOTION TO INTERVENE** |

## INTRODUCTION

The National Voter Registration Act is a federal law enacted to make it *easier* for qualified voters to register and *remain* registered. By filing this suit, Plaintiffs have chosen instead to weaponize the NVRA against the very voters the law is meant to protect, seeking a rushed and unlawful purge of the voter rolls ahead of the November general election. As Judge Couvillier's

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

well-reasoned report and recommendation explains, the relief Plaintiffs seek threatens to impair important interests held by Rise Action Fund, the Institute for a Progressive Nevada, and the Nevada Alliance for Retired Americans ("Proposed Intervenors"), groups committed to registering voters and protecting the right to vote in Nevada. Judge Couvillier therefore recommended that Proposed Intervenors be granted intervention both as of right under Rule 24(a) and permissively under Rule 24(b). This Court should now adopt the report and recommendation.

As Judge Couvillier explained, Proposed Intervenors readily satisfy the requirements for intervention. To start, each has a strong interest in protecting their members' and constituents' abilities to register to vote and remain registered. Plaintiffs' suit threatens that important, constitutionally-protected right by seeking a rushed purge of Nevada's voter rolls. Such relief creates an intolerable risk of disenfranchising Proposed Intervenors' members and constituents, including younger people, college students, and retirees. Granting the relief Plaintiffs seek would also force each of the Proposed Intervenor organizations to divert its limited resources towards stanching the harm from Plaintiffs' demanded purge. Plaintiffs' objection that these interests are speculative ignores reality. Nowhere do Plaintiffs dispute the well-documented fact that voter purges—particularly rushed ones in the months leading up to a major election—often remove eligible voters, and particularly the sort of voters represented by Proposed Intervenors. Equally deficient is Plaintiffs' argument that Proposed Intervenors may just rely on the existing parties to protect their interests. As Judge Couvillier found, the NVRA establishes statutorily-prescribed objectives for the existing defendants—all of whom are Nevada election officials tasked with enforcing the NVRA—that Proposed Intervenors simply do not share. Plaintiffs offer no good reason to reject Judge Couvillier's finding under Rule 24(a).

Plaintiffs' objections to the report's recommendation that intervention be granted under Rule 24(b) are equally meritless. Plaintiffs do not even meaningfully dispute that Proposed Intervenors satisfy the actual requirements for Rule 24(b)—that their motion to intervene was "timely" and they raise defenses "that share[] with the main action a common question of law or fact." Fed. R. Civ. P. 24(b). Both requirements are plainly met here.

Plaintiffs baselessly suggest that Proposed Intervenors' participation would delay the case. But Plaintiffs are obviously in no hurry. It took them over a month to properly complete pro hac vice motions, missing a court-ordered deadline in the process. *See* ECF Nos. 19, 33, 49, 56, 69–71. They stipulated to extend the deadline for filing a discovery plan and case management order. ECF No. 79. And, just four days before a hearing on the State Defendants' motion to dismiss that had been set more than a week earlier, they asked the Court to postpone the hearing for no better reason than a handful of other briefing obligations. ECF No. 81. Moreover, when Proposed Intervenors filed a proposed motion to dismiss on April 15 to ensure that Plaintiffs could respond to their arguments on the same timeline as the State Defendants' motion to dismiss, Plaintiffs opted to ignore it, pointedly responding only to the motion filed by the State Defendants. ECF No. 41.

In contrast, Proposed Intervenors have moved with noteworthy speed at every step: they moved to intervene just three days after suit was filed, have promised to follow any schedule set by the Court, promptly filed a proposed motion to dismiss, and now file this response a full week before its deadline to ensure briefing is complete before the upcoming June 18 motion to dismiss hearing. That effort reflects Proposed Intervenors' strong stake in promptly resolving this case and ensuring that Plaintiffs do not obtain the harmful and baseless relief they seek.

The Court should adopt the report and recommendation; accept Proposed Intervenors' proposed motion to dismiss (ECF No. 21); and permit this case to proceed promptly to resolution.

## BACKGROUND

### I.     Nevada's Obligations Under the National Voter Registration Act

The National Voter Registration Act of 1993 ("NVRA") is a federal law the requires states to provide simplified, voter-friendly systems for registering to vote. In enacting the NVRA, Congress expressly intended to establish "procedures that will increase the number of eligible citizens who register to vote in elections for Federal office" and by making it "possible for Federal, State, and local governments to implement [the NVRA] in a manner that enhances the participation of eligible citizens as voters in elections for Federal office." 52 U.S.C. § 20501(b)(1)–(2) (emphasis added). This purpose was consistent with the finding made by Congress, also in the

PROPOSED INTERVENORS' RESP. TO PLS.' OBJECTIONS TO R&R ON MOTION TO INTERVENE

NVRA, that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation . . . and disproportionately harm voter participation by various groups, including racial minorities." *Id.* § 20501(a)(3).

To further those pro-voter purposes, the NVRA imposes strict restrictions on whether, when, and how a state may remove a voter from its registration rolls. *See* 52 U.S.C. § 20507(a)(3)–(4), (b)–(d). A state may immediately remove a voter from the rolls in only rare circumstances, such as when a registrant requests to be deregistered or is convicted of a disenfranchising felony. *See id.* § 20507(a)(3)(A)–(B). Otherwise, a state may not remove voters from the rolls without first complying with prescribed procedural minimums that Congress has mandated to protect qualified voters' access to the franchise and minimize the risk of erroneous deregistration. *See id.* § 20507(a)(3)(C), (c), (d). For instance, a registrant may be removed from the rolls by reason of change of residence, in most cases, only after failing to respond to a notice and failing to appear to vote for two general elections following that notice. *Id.* § 20507(d)(1).

Thus, by design "the NVRA does not require states to immediately remove every voter who may have become ineligible." *Pub. Int. Legal Found. v. Benson*, No. 1:21-CV-929, 2024 WL 1128565, at *11 (W.D. Mich. Mar. 1, 2024) ("*PILF*"). Rather, Congress determined that some delay in the removal of voters from the rolls is worthwhile because it minimizes the risk that voters will be wrongly deregistered. As a result of these safeguards against immediate purging of a voter, a single "snapshot" of a county's voter rolls can "in no way be taken as a definitive picture of what a county's registration rate is." *Bellitto v. Snipes*, 935 F.3d 1192, 1208 (11th Cir. 2019).

Plaintiffs' lawsuit largely ignores these congressionally-mandated safeguards and focuses instead on the NVRA's affirmative list-maintenance obligations. Those obligations, however, are very limited. The NVRA requires only that each state make "a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of [] the death of the registrant; or [] a change in the residence of the registrant." 52 U.S.C. § 20507(a)(4). In other words, "Congress did not establish a specific program for states to follow for removing ineligible

PROPOSED INTERVENORS' RESP. TO PLS.' OBJECTIONS TO R&R ON MOTION TO INTERVENE

1   voters," *PILF*, 2024 WL 1128565, at *10, it just required reasonable measures, and only with

2   respect to voters who move or die.

3   **II.    Plaintiffs' Suit**

4          Plaintiffs—the Republican National Committee; the Nevada Republican Party; and Scott

5   Johnston, a registered Republican voter—filed suit on March 18th against Secretary of State

6   Aguilar; Lorena Portillo, the Registrar of Voters for Clark County; William "Scott" Hoen, the

7   Clerk for Carson City, as well as Amy Burgans, Staci Lindberg, and Jim Hindle, the County Clerks

8   for Douglas County, Lyon County, and Storey County, respectively. *See* Complaint, ECF No. 1.

9          The complaint lodges a single claim that the Defendants violated their list-maintenance

10  obligations under Section 8 of the NVRA. *See id.* ¶¶ 93–97 (citing 52 U.S.C. §20507(a)(4)). In

11  addition to a declaratory judgment that Defendants are violating Section 8, and an injunction

12  barring them from further such violations, they also request: "An order instructing Defendants to

13  develop and implement reasonable and effective registration list-maintenance programs to cure

14  their failure to comply with section 8 of the NVRA and to ensure that ineligible registrants are not

15  on the voter rolls." *Id.* at 18 (Prayer for Relief).

16         The gravamen of Plaintiffs' complaint is that Defendants *must* be violating the NVRA

17  because, they allege, several Nevada counties presently have improbably high voter registration

18  rates. *See id.* ¶¶ 48–78. But nowhere do Plaintiffs identify a specific deficiency with Nevada's

19  current practices, nor do they identify any specific, presently registered voter whose presence on

20  the rolls violates the NVRA. The complaint instead relies upon a single snapshot of the voter rolls

21  in a few Nevada counties, nowhere accounting for the fact that the NVRA *by congressional design*

22  requires only reasonable list-maintenance efforts, not perfect ones, and necessarily requires states

23  to delay for years before removing many potentially ineligible voters, in order to avoid the

24  overzealous removal of eligible voters. Other federal courts have warned against just such reliance

25  on a "snapshot," which can "in no way be taken as a definitive picture of what a county's

26  registration rate is, 'much less any indication of whether list maintenance is going on and whether

27

28

PROPOSED INTERVENORS' RESP. TO PLS.' OBJECTIONS TO R&R ON MOTION TO INTERVENE

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

it's . . . reasonable.'" *Bellitto*, 935 F.3d at 1208 (affirming trial court's ruling that Florida's list-maintenance procedures were "reasonable" under the NVRA).

In view of these and other pleading deficiencies, Proposed Intervenors filed a proposed motion to dismiss on April 15, *see* ECF No. 21, while the Secretary of State filed his own motion to dismiss later the same day, *see* ECF No. 26. The various county defendants joined in the Secretary's motion. *See* ECF Nos. 27–28, 30–31, 38. Plaintiffs opted to respond only to the Secretary of State's motion. ECF Nos. 40, 41. The Court initially scheduled a hearing on the Secretary's motion to dismiss for June 7, 2024. *See* ECF No. 67. After Plaintiffs requested a continuance, *see* ECF No. 81, the Court moved the hearing to June 18, 2024. *See* ECF No. 83.

## III.    Proposed Intervenors and their Interests in This Case

*Rise.* Rise is a student-led 501(c)(4) nonprofit organization that runs student-focused statewide advocacy and voter mobilization programs in Nevada, among other states. To advance its mission of fighting for free public higher education and ending homelessness, housing insecurity, and food insecurity among college students, Rise is committed to empowering and mobilizing students in the political process and has recently focused a significant portion of its efforts on students in Nevada. *See* ECF No. 7-2, Declaration of Christian Solomon ("Solomon Decl.") ¶¶ 5, 9. Recognizing that Nevada had few, if any, statewide organizations committed specifically to promoting the interests of young people and students between the ages of 18 and 27, Rise expanded to the state in 2023 and hired a State Director to build out the organization's operations. *Id.* ¶ 6. Within its first year, Rise's Nevada chapter held a training at UNLV, hired and trained several organizers devoted to engaging UNLV students, and recruited several campus fellows. *Id.* ¶ 8. Rise anticipates recruiting and training additional lead campus organizers at other Nevada campuses this year, including at UNR. *Id.* It also plans to hire a Deputy Director to further build upon the group's work in the state. *Id*.

While Rise's Nevada chapter shares the organization's broader national mission, it also strives to be responsive to the concerns of its student constituents within Nevada. Rise's first training at UNLV coincided with the December 6, 2023, mass shooting on the UNLV campus,

forcing Rise's employees and student attendees into lockdown. *Id.* ¶¶ 5, 10. In response, the Nevada chapter has made organizing students around gun safety issues a top goal. *Id.* ¶ 10. The Nevada chapter also has made student debt relief and financial assistance a policy focus, and is in the process of recruiting volunteers and organizers to hold phone banks educating Nevada college students about the Biden Administration's SAVE Plan,[1] which offers affordable repayment plans to students, but which many students lack sufficient awareness of. *Id.* ¶ 9.

To build political support for these policy goals, Rise plans to make organizing and educating its student constituents about the 2024 general election a major priority. *Id.* ¶ 11. It is planning extensive efforts to register students on campus, and also to ensure that already-registered students *stay* registered. *Id.* Rise's goal is to have its organizers and volunteers reach each student at UNLV three to five times, whether through phone banking or direct conversation, ahead of the 2024 general election, and it has also adopted specific goals for student voter registration and turnout. *Id.* This election-focused work is important to Rise's mission, which hinges on its ability to build political power with the student population. *Id.* ¶ 5–7, 11, 13.

Plaintiffs' suit particularly threatens to harm the student population that Rise advocates for and seeks to serve. *Id.* ¶ 13. Many college students live away from their family homes or places of residence for long periods of time while at school, often changing temporary places of residence repeatedly without abandoning their permanent residence, but without immediate access to mailed notices sent to their permanent addresses that might advise them that their registration is at risk of cancellation. *Id.* Other college students establish permanent residences in their new college communities, but may move frequently—every year, or even every semester—within the same small geographic area. *Id.* Students in both categories are particularly at risk for disenfranchisement in a rushed purging process in the months ahead of a major general election of the sort that Plaintiffs seek here. Plaintiffs' suit is therefore a direct attack on the very voters Rise

---

[1] *See generally* The White House, Fact Sheet: The Biden-Harris Administration Launches the SAVE Plan, the Most Affordable Student Loan Repayment Plan Ever to Lower Monthly Payments for Millions of Borrowers (Aug. 22, 2023), https://perma.cc/6WKP-M2ER.

PROPOSED INTERVENORS' RESP. TO PLS.' OBJECTIONS TO R&R ON MOTION TO INTERVENE

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

seeks to organize, empower, and advocate for. And if Plaintiffs' suit is successful, Rise will have to retool its efforts in Nevada to focus on assisting students in determining their registration status, and re-registering if they are in fact purged. *Id.* ¶¶ 13, 15. Such retooling will disrupt Rise's preelection planning and also come at the expense of work on its other mission-critical goals. *Id.* 14. In particular, Rise expects that it will have to focus its volunteer phone banking efforts on educating students about the purge and informing them about how to confirm their registration status. *Id.* This volunteer-intensive effort would diminish Rise's plan to phonebank on other mission-critical efforts, such as informing students about the SAVE Plan and other financial assistance and loan repayment programs. *Id.* ¶¶ 9, 14.

**Institute for a Progressive Nevada.** The Institute for a Progressive Nevada ("IPN") is a progressive, non-partisan, and non-profit organization that educates, empowers, and engages Nevadans to build a state where everyone has a fair opportunity to succeed. Its core mission is to ensure that every Nevadan knows how to vote and how to do so confidently. *See* ECF No. 7-3, Declaration of Shelbie Swartz ("Swartz Decl.") ¶ 4. As part of its civic education and voting rights work, IPN publishes a non-partisan voter guide every election cycle. *Id.* This guide includes comprehensive instructions on how to register and how to vote in Nevada. *Id.* IPN also hosts its own voter registration platform. *Id.* The organization also engages in targeted advertising campaigns—chiefly through social media and radio—to educate citizens about its core policy areas. The organization presently has a dozen employees. *Id.* ¶¶ 3, 4.

Plaintiffs' suit is a direct affront to IPN's mission to empower all Nevadans to vote, in effect asking for a rushed purge process that would result in eligible voters being tossed off the rolls. *Id.* ¶¶ 4, 5. IPN would need to take several major steps in response. First, the organization would have to retool its voter guide to educate the public about the purge and add material informing voters about how to confirm their registration status. *Id.* ¶ 5. Second, it would have to refocus its limited advertising to spread awareness about the purge to alert people to the need to check their registration. *Id.* Such a campaign would eat into IPN's limited financial resources, likely delaying the hiring of new employees and making it more difficult to meet payroll for

existing employees. *Id.* And it would also reduce IPN's ability to advertise about other issues, including spreading awareness of different voting methods within Nevada. *Id.* Nonetheless, given the centrality of voting to its mission, IPN strongly believes it would have to commit these resources to such an advertising campaign, even at the expense of other objectives. *Id.*

**The Alliance.** The Alliance for Retired Americans is a nonpartisan 501(c)(4) membership organization with over 4.4. million members nationwide. *See* ECF No. 7-4, Declaration of Thomas Bird ("Bird Decl.") ¶ 3. Its mission is to ensure the social and economic justice and full civil rights that retirees have earned after a lifetime of work, with a particular emphasis on safeguarding the right to vote. *Id.* ¶ 4. The Alliance's Nevada chapter, the Nevada Alliance for Retired Americans, has roughly 20,000 members comprising retirees from numerous public and private sector unions, members of community organizations, and individual activists. *Id.* ¶ 3. It works with 20 affiliated chapters—comprised of other union and community groups—across Nevada. *Id.* ¶ 9. A major focus of the Alliance's work is attending these chapter meetings to speak with members about key policy goals, such as preserving Social Security and Medicare. *Id.* ¶ 10.

Because Alliance members are mostly retirees, and are registered to vote at very high rates, they are disproportionately vulnerable when voting rolls are aggressively purged. *Id.* ¶ 6. Other characteristics of this group also contribute to making them particularly vulnerable to wrongful removal from the rolls in hurried or uncareful purges, including that many retirees move within Nevada after retiring and many travel out of state for long periods. *Id.* ¶ 5. Both of these scenarios make it more likely that a voter will either miss a notice or fail to receive it in time, increasing the voter's risk of wrongful deregistration. *Id.* ¶ 6. For instance, a retiree who spends a lengthy period of time caring for grandchildren at another family member's home, or enjoying retirement at a second home, may miss a crucial notice of cancellation if that notice is sent only to the retiree's home address. *Id.* ¶ 5. Beyond that, the Alliance's sheer size gives it a substantial stake in this case: Given the Alliance's roughly 20,000 members, it is all but certain that a rushed purge would put many of those members' voter registrations in jeopardy.

PROPOSED INTERVENORS' RESP. TO PLS.' OBJECTIONS TO R&R ON MOTION TO INTERVENE

ELIAS LAW GROUP LLP
ATTORNEYS AT LAW
WASHINGTON, DC

A purge of Nevada's election rolls would also require the Alliance to refocus its efforts on educating its members about registration issues, an area it does not traditionally focus on since most of its members are long-registered voters. *Id.* ¶¶ 7–9. In a presidential year such as 2024, the Alliance has a wide range of organizational goals to achieve: getting out the vote, educating its members and constituents about where candidates stand on the Alliance's key issues, and organizing around those issues. *Id.* ¶ 10. A purge would undermine those efforts in several ways. *Id.* Alliance leadership would need to devote time and effort to preparing materials and presentations about the purge, and would then need to use scarce presentation and organizing time at chapter meetings to walk members through how to confirm their registrations, as well as to answer members' questions. *Id.* ¶¶ 9, 10. Alliance leadership and volunteers would also need to assist any members who were deregistered. *Id.* ¶ 8. All this would divert the Alliance's resources from other essential organizing tasks, and thereby frustrate its mission.

## IV. Judge Couvillier's Recommendation to Grant Intervention

In view of their interests above, Proposed Intervenors moved swiftly to intervene in this case once it was filed. Proposed Intervenors filed their motion to intervene on March 21—a mere three days after the complaint was filed. *See* ECF No. 7. The motion became fully briefed on April 11. *See* ECF No. 20. On May 24, Judge Couvillier issued a report recommending that the motion be granted under both Rule 24(a) and 24(b). *See* ECF No. 68 ("R&R").

Beginning with intervention as of right under Rule 24(a), Judge Couvillier found that Proposed Intervenors' motion was indisputably timely, as it was filed "only a few days after the Plaintiffs filed their Complaint on March 18, 2024." R&R at 3. Given that promptness, Judge Couvillier found "[t]here is no prejudice" to the existing parties and no delay on the part of Proposed Intervenors. *Id.* Judge Couvillier next concluded that Proposed Intervenors "have sufficient protectable interests" in this case. *Id.* at 4–5. Specifically, Judge Couvillier found that Proposed Intervenors had at least two discrete interests at stake here: (1) a need to protect their own members and constituents from the voter roll purge demanded by Plaintiffs in their complaint; and (2) a need to guard against being "forced to divert their resources" as a response to any relief

PROPOSED INTERVENORS' RESP. TO PLS.' OBJECTIONS TO R&R ON MOTION TO INTERVENE

granted in this case. *Id.* at 4–6. Judge Couvillier recognized that those two interests are at risk of impairment given the relief sought in the complaint. *Id.* at 5. Finally, Judge Couvillier determined that the existing defendants may not adequately represent Proposed Intervenors because of their duty to balance the NVRA's competing "twin objectives" of "easing barriers to registration and voting, while at the same time protecting the electoral integrity and the maintenance of accurate voter rolls." *Id.* at 6; *accord Bellitto*, 935 F.3d at 1198 (same). Judge Couvillier thus found Proposed Intervenors satisfied Rule 24(a).

Judge Couvillier also found that Proposed Intervenors satisfied Rule 24(b). *See* R&R at 7–8. He reemphasized the timeliness of Proposed Intervenors' motion and noted—as Plaintiffs nowhere dispute—that Proposed Intervenors raise arguments and defenses in common with the main action. *Id.* at 7. Judge Couvillier rejected Plaintiffs' argument that Proposed Intervenors were required to identify an independent basis for jurisdiction, correctly recognizing that requirement is unnecessary in federal question cases such as this one. *Id.* at 7 (citing *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 844 (9th Cir. 2011)). Finding no risk of undue delay or prejudice from Proposed Intervenors' involvement in this case, Judge Couvillier concluded that permissive intervention was appropriate under Rule 24(b).

On June 7, Plaintiffs filed objections to Judge Couvillier's report and recommendation. *See* ECF No. 85 ("Pls.' Objections"). While Proposed Intervenors' deadline to respond to the objections is June 21, they file this response ahead of time to ensure that the matter is fully briefed ahead of the June 18 hearing presently scheduled on the Secretary's motion to dismiss.

## LEGAL STANDARD

The district court reviews *de novo* those portions of the magistrate judge's report and recommendation that have been properly objected to. *See* Fed. R. Civ. P. 72(b)(3). Those portions not properly objected to are reviewed for clear error. *See McDonnell Douglas Corp. v. Commodore Bus. Mach. Inc.*, 656 F.2d 1309, 1313 (9th Cir. 1981).

With respect to intervention, "Rule 24 traditionally receives liberal construction in favor of applicants for intervention." *Arkaki v. Cayetano*, 324 F.3d 1078, 1083 (9th Cir. 2003); *see also*

*W. Expl. LLC v. U.S. Dep't of Interior*, No. 3:15-cv-00491-MMD-VPC, 2016 WL 355122, at *2 (D. Nev. Jan. 28, 2016) (noting Rule 24's liberal construction and "focus[] on practical considerations rather than technical distinctions").

The Ninth Circuit "require[s] applicants for intervention as of right pursuant to Rule 24(a)(2) to meet a four-part test":

> (1) the motion must be timely; (2) the applicant must claim a "significantly protectable" interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the parties to the action.

*United States v. Aerojet Gen. Corp.*, 606 F.3d 1142, 1148 (9th Cir. 2010) (quoting *Cal. ex rel. Lockyer v. United States*, 450 F.3d 436, 440 (9th Cir. 2006)).

"Rule 24(b) permits the Court to allow anyone to intervene who submits a timely motion and 'has a claim or defense that shares with the main action a common question of law or fact.'" *Nevada v. United States*, No. 3:18-cv-569-MMD-CBC, 2019 WL 718825, at *2 (D. Nev. Jan. 14, 2019) (quoting Fed. R. Civ. P. 24(b)(1)(B)).

## ARGUMENT

I.  **Judge Couvillier correctly determined Proposed Intervenors may intervene as of right under Rule 24(a).**

Judge Couvillier appropriately applied controlling law to the facts of this case in determining that Proposed Intervenors are entitled to intervene as of right under Rule 24(a). Plaintiffs' objections offer no basis to reject his conclusions, and accordingly the Court should adopt Judge Couvillier's well-supported report.

### A.  **Proposed Intervenors have significantly protectable interests that may be impaired by this case.**

As Judge Couvillier recognized, Proposed Intervenors "have sufficient protectable interests" at risk here to satisfy Rule 24(a). *See* R&R at 5; *see generally supra* Background § III. Proposed Intervenors' burden on this score is modest—they need not show that impairment is "an absolute certainty." *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 900 (9th Cir. 2011). Rather, in keeping with Rule 24's liberal construction in favor of intervention, their

1    interests need only be "'substantially affected in a practical sense by the determination made in an

2    action.'" *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 822 (9th Cir. 2001) (quoting Fed.

3    R. Civ. P. 24 advisory committee note to 1966 amendment). As Judge Couvillier explained, this

4    is a "practical, threshold inquiry, and [n]o specific legal or equitable interest need be established,"

5    R&R at 5 (quoting *Citizens for Balanced Use*, 647 F.3d at 897), and the standard is more lenient

6    than Article III's standing requirements. *See Yniguez v. Arizona*, 939 F.2d 727, 735 (9th Cir. 1991).

7    After determining the applicant has a protectable interest, courts typically have "little difficulty

8    concluding," the disposition of the case may affect such interest. *Lockyer*, 450 F.3d at 442 (citing

9    *Berg*, 268 F.3d at 822). As the report sets out, Proposed Intervenors have at least two protectable

10   interests at risk of impairment here. *See* R&R at 5.

11        *First*, Proposed Intervenors have a substantial interest in ensuring that their members and

12   constituents are able to register to vote, remain registered to vote, and successfully participate in

13   the upcoming general election. *See* Solomon Decl. ¶¶ 12–15; Bird Decl. ¶¶ 4, 7–10. As Judge

14   Couvillier noted, the relief sought by Plaintiffs creates a substantial risk that eligible voters—

15   including Proposed Intervenors' members and constituents—will be removed from the rolls. *See*

16   R&R at 5. Numerous courts have recognized this risk as a well-established basis for intervening

17   in NVRA Section 8 cases that seek to have voters purged from the rolls. *See Bellitto v. Snipes*, No.

18   16-cv-61474, 2016 WL 5118568, at *2–3 (S.D. Fla. Sept. 21, 2016) (granting organization

19   intervention of right in Section 8 case); *see also Pub. Int. Legal Found., Inc. v. Winfrey*, 463 F.

20   Supp. 3d 795, 799 (E.D. Mich. 2020) (granting organization permissive intervention in Section 8

21   case); Order, *Daunt v. Benson*, 1:20-cv-522 (W.D. Mich. Sept. 28, 2020), ECF No. 30 (same);

22   Order, *Voter Integrity Proj. NC, Inc. v. Wake Cnty. Bd. of Elections*, No. 5:16-cv-683 (E.D.N.C.

23   Dec. 1, 2016), ECF No. 26 (granting voters permissive intervention in Section 8 case). In *Bellitto*,

24   for example, the district court permitted a union with tens of thousands of members in Florida to

25   intervene because "the interests of its members would be threatened by [any] court-ordered 'voter

26   list maintenance' sought by Plaintiffs," a "potential harm" the court found "particularly great in

27   light of the upcoming 2016 General Election." *Bellitto*, 2016 WL 5118568, at *2. That is precisely

28

what the Alliance seeks to do here on behalf of its nearly 20,000 members in Nevada, most of whom are retired union workers, Bird Decl. ¶ 3, and what Rise seeks to do on behalf of politically marginalized students, Solomon Decl. ¶¶ 5–6, 13, 15; *cf. Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1096–97 (9th Cir. 2021) (holding organizations may sue on behalf of non-member constituents even under the more-demanding Article III test).

The NVRA itself reflects Proposed Intervenors' interest here. The law creates a cause of action to challenge improper removal of registered voters. 52 U.S.C. § 20510(b). And organizations like Proposed Intervenors often bring successful claims under that provision to *prevent* the very sort of statewide voter purge Plaintiffs here seek to *compel*. *See, e.g.*, *Common Cause/N.Y. v. Brehm*, 344 F. Supp. 3d 542, 558–59 (S.D.N.Y. 2018) (holding that plaintiff adequately alleged as-applied NVRA Section 8 claim challenging New York's registration removal policy); *Common Cause Ind. v. Lawson*, 327 F. Supp. 3d 1139, 1156 (S.D. Ind. 2018) (similar). Congress, by creating such a cause of action in the NVRA itself, recognized the very interest that the Proposed Intervenors seek to vindicate here through intervention—preventing improper removal of their members from Nevada's voter rolls. And courts within this Circuit have recognized an organization's interest in protecting its members voting rights satisfies the "more stringent" requirement of Article III, which "compels the conclusion that they have an adequate interest" for purposes of Rule 24. *Yniguez*, 939 F.2d at 735; *see also Mi Familia Vota v. Fontes*, No. CV-22-00509-PHX-SRB, 2024 WL 862406, at *29–32 (D. Ariz. Feb. 29, 2024) (finding organizations had standing to protect members' voting rights); *March for Our Lives Idaho v. McGrane*, No. 1:23-CV-00107-AKB, 2023 WL 6623631, at *7 (D. Idaho Oct. 11, 2023) (similar).

In their objections, Plaintiffs insist that the risk of removing eligible voters from the rolls is too speculative to supply Proposed Intervenors with an interest in this case. *See* Pls.' Objections at 6. But as the Eleventh Circuit explained in another NVRA case, while "a maximum effort at purging voter lists could minimize the number of ineligible voters . . . those same efforts might also remove eligible voters." *Bellitto*, 935 F.3d at 1198; *see also Winfrey*, 463 F. Supp. 3d at 801–02 (similar, and granting intervention). Such a "maximum effort" is precisely what Plaintiffs seek

here. And it is well-established that "voter purges have often had the effect of clearing eligible voters from state registration lists and in a manner that tends to discriminate by race and nationality." Lydia Hardy, *Voter Suppression Post-Shelby: Impacts and Issues of Voter Purge and Voter ID Laws*, 71 Mercer L. Rev. 857, 866 (2020).[2] Indeed, just several months ago, a county clerk in Michigan improperly removed over 1,000 voters from the rolls, including an active-duty Air Force officer, at the demand of conservative organizations.[3]

The risk of errant removal of Proposed Intervenors' members and constituents is particularly acute here because they represent people who face heightened risk from any court-ordered purge. As explained, younger voters, and students in particular, are disproportionately likely to be purged because they move frequently and are often away from their voting residence for prolonged periods of time. *See* Solomon Decl. ¶ 13. Plaintiffs' requested relief therefore threatens the significant—indeed, constitutionally-protected—interests of the student constituents that Rise seeks to organize, empower, and turn out to vote. *See id.* ¶¶ 13, 15. Any disenfranchisement of student voters impairs Rise's ability to organize such voters as a political force in pursuit of Rise's student-oriented mission. *Id.* Similarly, the Alliance's approximately 20,000 members also face challenges that increase their likelihood of being purged, as many of their members move or travel frequently, and spend long periods away from their residence. Bird Decl. ¶¶ 3, 5–6. And IPN seeks to empower *all* Nevadans to know how to vote and to be able to vote with confidence, a goal frustrated by the rushed purge Plaintiffs seek. Swartz Decl. ¶¶ 4, 5. Plaintiffs' demand for a rushed and far-ranging purge therefore creates an intolerable risk of harm to each of the Proposed Intervenors. As Judge Couvillier recognized, it is irrelevant that Proposed

---

[2] *See also* ECF No. 20 at 3 n.1 (collecting additional authority on the risk voter purges pose to eligible voters).

[3] Alexandra Berzon & Nick Corasaniti, *Trump's Allies Ramp Up Campaign Targeting Voter Rolls*, N.Y. Times (Mar. 3, 2024), https://www.nytimes.com/2024/03/03/us/politics/trump-voter-rolls.html; Peg McNichol, *Voter rolls targeted in run-up to November election, highlighted by recent efforts in Waterford*, The Oakland Press (Mar. 18, 2024), https://www.theoaklandpress.com/2024/03/18/voter-rolls-targeted-in-run-in-up-to-november-election/.

PROPOSED INTERVENORS' RESP. TO PLS.' OBJECTIONS TO R&R ON MOTION TO INTERVENE

1   Intervenors do not know with "absolute certainty" which of their members or constituents will be

2   harmed. R&R at 5. Rule 24 imposes no such requirement. *See Citizens for Balanced Use*, 647 F.3d

3   at 900 ("stress[ing]" that Rule 24 "does not require an absolute certainty that a party's interests

4   will be impaired").

5        It is also no answer, as Plaintiffs suggest, to say that Proposed Intervenors may "litigate

6   the potential improper removal of their members once they have been" removed. Pls.' Objections

7   at 8. Given the timing of Plaintiffs' suit, Proposed Intervenors would likely lack sufficient time to

8   file their own NVRA Section 8 suit in response to any improper purging of the voter rolls

9   attributable to this suit. Moreover, the *stare decisis* effect of Plaintiffs' suit might preclude such a

10   claim to begin with, leaving Proposed Intervenors no choice but to seek to intervene now. That

11   "[P]roposed [I]ntervenors here have no alternative forum where they can" protect their interests

12   further supports their intervention. *Lockyer*, 450 F.3d at 442. And common sense dictates that any

13   dispute over Nevada's voter rolls be resolved in one civil action rather than several.

14        Judge Couvillier also found that Proposed Intervenors have a second protectable interest at

15   stake in this case. *See* R&R at 5. Specifically, granting Plaintiffs their requested relief here would

16   "force[] [Proposed Intervenors] to divert their resources in order to combat" the consequences of

17   such relief. *Id.* This conclusion was amply supported by unrefuted declaration testimony from

18   Proposed Intervenors. For example, IPN's mission to empower all Nevadans to vote would require

19   it to take prophylactic measures in response to the far-ranging purge Plaintiffs seek. In particular,

20   it would have to retool and update its non-partisan voter guide, which instructs Nevadans on how

21   to navigate the registration and voting process. Swartz Decl. ¶ 5. This task would require diverting

22   the time of IPN's small number of employees away from other mission-critical tasks ahead of the

23   election. *Id.* Moreover, because empowering people to vote is at the core of IPN's mission, the

24   organization anticipates allocating its limited financial resources to sponsor an advertising

25   campaign educating voters about the purge and instructing them on how to confirm their

26   registration status. *Id.* Given the organization's modest resources, this campaign would restrict

27   IPN's ability to make payroll, and also limit its ability to launch other planned advertising

28

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

campaigns, including one focusing on educating Nevadans about different methods of voting. *Id.* These costs harm IPN's ability to pursue its mission. *Id.*

Unrefuted declaration testimony confirms that both Rise and the Alliance would suffer similar harms. As explained, Rise plans to organize volunteer phone banks to educate students about their various options for loan repayment assistance and other college aid plans, including the recently announced SAVE Plan. *See* Solomon Decl. ¶¶ 9, 14. If Plaintiffs prevail, however, Rise will have to redirect some of these efforts towards educating students about the purge and how to confirm their registration status. *Id.* That severely harms Rise's mission, which includes helping its student constituents pay for their education. *Id.* ¶¶ 5, 14–15. Granting Plaintiffs' relief will therefore "substantially affect[]" Rise "in a practical sense." *Berg*, 268 F.3d at 822. Similarly, the Alliance will have to use its limited volunteer resources to prepare materials educating its members about how to confirm their registration status, and then distribute these materials to members through social media channels, email, and at chapter meetings. Bird Decl. ¶¶ 7–10. This effort will reduce the Alliance's ability to speak to its members about other key policy goals, including protecting social security and Medicare. *Id.*

Like their interest in protecting their members and constituents' right to vote, Proposed Intervenors' interest in protecting their own organizational missions and resources can suffice to provide Article III standing. *See, e.g.*, *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021) ("[A]n organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose."). This second interest therefore provides a more than sufficient independent basis for granting intervention under Rule 24. *See Yniguez*, 939 F.2d at 735.

Plaintiffs' only response to this second interest in their objections is to again claim that it is too speculative. *See* Pls.' Objections at 8–9. But nowhere do Plaintiffs refute the well-established fact that rushed and last-minute voter purges—the sort sought here—often toss eligible voters from the rolls. *See supra* § I(A), n.2. It is therefore not speculative at all that, in the event of any court-sanctioned purge, Proposed Intervenors will each have to divert resources to educating their

members about how to confirm their registration status and assisting those who were removed. *See, e.g.*, Solomon Decl. ¶ 14 (explaining Rise would have to "refocus [its] volunteer phone banking efforts towards educating students about the purge and how to confirm their registration status"); Bird Decl. ¶ 8 (similar for the Alliance); *see also* Swartz Decl. ¶ 5 (explaining IPN would have to divert resources to launch a paid advertising campaign educating voters about the purge and how to confirm their registration status). Plaintiffs have no answer to this unrefuted testimony, which makes clear that Proposed Intervenors would each divert resources as a matter of course if Plaintiffs prevail. Judge Couvillier therefore rightly concluded that Proposed Intervenors' interest in avoiding this risk provides its own sufficient basis for intervention.

### B. Existing parties may not adequately represent Proposed Intervenors.

"[T]he requirement of inadequacy of representation is satisfied if the applicant shows that representation of its interests '*may be*' inadequate." *W. Expl.*, 2016 WL 355122, at *3 (quoting *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 528 (9th Cir. 1983)) (emphasis added); *see also Trbovich*, 404 U.S. 528, 538 n.10 (1972). That is precisely what Judge Couvillier found, *see* R&R at 5–6, and with good reason.

Under the NVRA, state election officials must "establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office and "enhance[] the participation of eligible citizens as voters in elections for Federal office." 52 U.S.C. § 20501(b)(1)–(2). But, at the same time, the NVRA requires them "to protect the integrity of the electoral process" and "to ensure that accurate and current voter registration rolls are maintained." *Id.* § 20501(b)(3)–(4). As the Eleventh Circuit observed, "[t]hese twin objectives—easing barriers to registration and voting, while at the same time protecting electoral integrity and the maintenance of accurate voter rolls—naturally create some tension." *Bellitto*, 935 F.3d at 1198; *see also Winfrey*, 463 F. Supp. 3d at 801 (similar). In adopting these twin objectives, Congress has required state and local election officials—including the existing defendants—to "balance [] competing interests." *Bellitto*, 935 F.3d at 1198.

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

In contrast, Proposed Intervenors do not need to balance any "competing interests"—their interest in this litigation is in ensuring that their members and constituents are not purged from the voter rolls, and in maximizing access to the franchise across Nevada. Bird Decl. ¶ 7; Swartz Decl. ¶ 5; Solomon Decl. ¶ 14. For that reason, several courts have found in NVRA cases that civic organizations are not adequately represented by State Defendants who must balance the NVRA's twin statutory objectives. *See e.g., Bellitto*, 2016 WL 5118568, at *2; *Winfrey*, 463 F. Supp. 3d at 801; *cf. Kobach v. U.S. Election Assistance Comm'n*, No. 13-CV-4095-EFM-DJW, 2013 WL 6511874, at *4 (D. Kan. Dec. 12, 2013) (explaining in NVRA litigation "that the existing government Defendants have a duty to represent the public interest, which may diverge from the private interest of Applicants"). And that is a particularly appropriate conclusion here in view of the Ninth Circuit's admonition that "intervention of right does not require an absolute certainty . . . that existing parties will not adequately represent [an intervenor's] interests." *Citizens for Balanced Use*, 647 F.3d at 900. In view of the clearly distinct interests held by Proposed Intervenors and State Defendants, Judge Couvillier properly found that Proposed Intervenors satisfied their "minimal" burden on this factor. *W. Expl.*, 2016 WL 355122, at *3 (quoting *Watt*, 713 F.2d at 528); *accord* 7C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1909 (3d ed. 2024) (explaining that "in most cases" the "applicant is the best judge of the representation of the applicant's own interests").

Plaintiffs' response is to insist that the NVRA's twin objectives in fact *confirm* the State Defendants will adequately represent the Proposed Intervenors. *See* Pls.' Objections at 11. But that makes little sense in view of the NVRA's own text, and requires this Court to "simply ignore[] the second—equally weighty—express legislative purpose of the [National Voter Registration] Act." *Winfrey*, 463 F. Supp.3d at 801 (granting intervention in NVRA case). That dooms Plaintiffs' argument on this factor because they nowhere grapple with the fact that Proposed Intervenors will litigate this case without the "tension" and need for "balance" the NVRA imposes on the other defendants. *Id.* (quoting *Bellitto*, 935 F.3d at 1198). At bottom, "while intervenors' principal interest is in ensuring that all eligible voters are allowed to vote," the elected officials must balance

competing public policy interests that Proposed Intervenors are not ultimately responsible for. *Kasper v. Hayes*, 651 F. Supp. 1311, 1313 (N.D. Ill.), *aff'd sub nom. Kasper v. Bd. of Election Comm'rs*, 810 F.2d 1167 (7th Cir. 1987).

Because they cannot evade the discrete interests the NVRA itself creates for the State Defendants, Plaintiffs attempt to crank up the standard Proposed Intervenors must satisfy. Specifically, they suggest the Court must presume Proposed Intervenors are adequately represented by the existing defendants because they share the same "ultimate objective." *See* Appeal at 10. But that is wrong for several reasons.

To start, the "ultimate objective" standard does not apply here. That doctrine—to the extent it survived recent Supreme Court case law, *see infra*—applies only when putative intervenors share "identical" interests with an existing party. *Citizens for Balanced Use*, 647 F.3d at 899; *see also Arakaki v. Cayetano*, 324 F.3d 1078, 1086–87 (9th Cir. 2003) (applying presumption where proposed intervenor's interest is "identical to that of one of the present parties" but not where "the intervenors' interests are narrower than that of the government and therefore may not be adequately represented"). As Judge Couvillier recognized, *see* R&R at 6, that is by *definition* not the case here because the NVRA prescribes "competing interests," *Bellitto*, 935 F.3d at 1198, to the State Defendants that Proposed Intervenors do not share. And while Plaintiffs half-heartedly try to distinguish it, *see* Pls.' Objections at 12–13, the Ninth Circuit's decision in *Citizens for Balanced Use* is illustrative. In that case, various environmental organizations sought to intervene to defend a U.S. Forest Service order governing the use of motor vehicles in a national forest. *See* 647 F.3d at 899. The Forest Service was already defending its order as "statutorily mandated" by federal law. *Id.* But the proposed intervenors wanted to promote the "broadest possible restrictions on recreational uses" in the forest. *Id.* That sufficed for intervention because the divergent interests and views "represent[ed] more than a mere difference in litigation strategy"—they reflected "fundamentally differing points of view between Applicants and the Forest Service on the litigation as a whole." *Id.* The same is true here—the State Defendants have an interest in showing that Nevada's list-maintenance procedures "suffice to comply with [the state's] statutory mandate"

PROPOSED INTERVENORS' RESP. TO PLS.' OBJECTIONS TO R&R ON MOTION TO INTERVENE

under the NVRA. *Id.* Proposed Intervenors, in contrast, seek the "broadest possible" reading of the NVRA's removal protections to ensure maximum protection for voters under the law. *Id.*

Despite the discrete interests held by Proposed Intervenors and the State Defendants, Plaintiffs suggest the presumption still should apply because the State Defendants and Proposed Intervenors each seek "dismissal of the suit." Pls.' Objections at 12. But the Ninth Circuit has squarely rejected that notion: "[T]he government's representation of the public interest may not be 'identical to the individual parochial interest' of a particular group just because 'both entities occupy the same posture in the litigation.'" *Citizens for Balanced Use*, 647 F.3d at 899 (quoting *WildEarth Guardians v. U.S. Forest Serv.*, 573 F.3d 992, 996 (10th Cir. 2009)).

There is also good reason to doubt the continued viability of the "presumption" relied upon by Plaintiffs. In *Berger v. North Carolina State Conference of the NAACP*, the Supreme Court reiterated its view that even when state parties pursue "related" interests to political actors, those interests are not properly considered "identical." 597 U.S. 179, 196 (2022) (quoting *Trbovich*, 404 U.S. at 538–39). The Court explained that "[w]here 'the absentee's interest is similar to, but not identical with, that of one of the parties,' that normally is not enough to trigger a presumption of adequate representation." *Id.* (quoting 7C Wright & Miller, *Federal Practice & Procedure* § 1909 (3d ed. 2022)). The Court stressed this standard will rarely be met where the existing parties are state officials because such parties must "bear in mind broader public-policy implications," *id.*, such as balancing the NVRA's policy goals. *Berger* thus "calls into question whether the application of such [an ultimate objective] presumption is appropriate." *Callahan v. Brookdale Senior Living Cmtys., Inc.*, 42 F.4th 1013, 1021 n.5 (9th Cir. 2022) (declining to apply test and "offer[ing] no opinion as to whether it remains good law in light of *Berger*").

Plaintiffs urge this Court to simply set aside *Berger* (and *Callahan*) on the basis that the purported intervenors there were state legislators, rather than private parties. *See* Pls.' Objections at 11–12. But they ignore that *Berger* rooted its holding in *Trbovich*, a case in which the Supreme Court "addressed a request to intervene by a *private party* who asserted a related interest to that of an existing government party." *Berger*, 597 U.S. at 195 (citing *Trbovich*, 404 U.S. 528) (emphasis

added). *Trbovich* concerned a union member who sought to intervene in a lawsuit brought by the Secretary of Labor concerning a union election. *Id.* at 195–96. The overlap in interests there was far greater than in this case; the Supreme Court went so far as to say that, under Title IV, "'the Secretary . . . in effect [was] the union member's lawyer' for the purpose of enforcing [his] rights" against his union. *Trbovich*, 404 U.S. at 539. "Even so," the Supreme Court rejected the notion that the union member was adequately represented by the Secretary. *Berger*, 597 U.S. at 196. "The Court acknowledged that the Secretary's and the union member's interests were 'related,' but it emphasized that the interests were not 'identical'—the union member sought relief against his union, full stop; meanwhile, the Secretary also had to bear in mind broader public-policy implications." *Id.* (quoting *Trbovich*, 404 U.S. at 538–39). Thus, *Berger* recognized that longstanding Supreme Court case law has refused to "endorse a presumption of adequacy"—even in cases involving *private* intervenors with highly similar interests to an existing governmental party—and instead "held that a movant's burden in circumstances like these 'should be treated as minimal,'" *id.* (quoting *Trbovich*, 404 U.S. at 538 n.10). Plaintiffs' cramped view of *Berger* fails to account for any of this analysis and ignores *Trbovich* altogether.

Plaintiffs also criticize Proposed Intervenors for not "com[ing] forward with any evidence" that their interests are distinct from the State Defendants, Pls.' Objections at 13, but it is not Proposed Intervenors' "burden at this stage in the litigation to anticipate" such "specific differences." *Berg*, 268 F.3d at 824; *see also Wineries of the Old Mission Peninsula Ass'n v. Township of Peninsula*, 41 F.4th 767, 774 (6th Cir. 2022) ("In assessing whether a proposed intervenor has fulfilled this [inadequacy of representation] requirement, courts must remember that certainty about future events is not required."). Moreover, here, the NVRA itself provides ample evidence of the risk of inadequate representation. The cases that Plaintiffs also point to where courts have denied intervention in NVRA involved very different facts. *See* Pls.' Objections at 14. For example, in *Green v. Bell*, No. 3:21-cv-00493-RJC-DCK, 2023 WL 2572210 (W.D.N.C. Mar. 20, 2023), the court denied intervention where it was sought two months after the complaint was filed. Similarly, *Pub. Int. Legal Found. v. Benson*, No. 1:21-CV-929, 2022 WL 21295936, at *1

PROPOSED INTERVENORS' RESP. TO PLS.' OBJECTIONS TO R&R ON MOTION TO INTERVENE

1   (W.D. Mich. Aug. 25, 2022), the motion was "arguably untimely" when it was "filed while the
2   parties were already briefing their motion to dismiss." In contrast, Judge Couvillier here repeatedly
3   stressed the timely nature of Proposed Intervenors' efforts to intervene. *See* R&R at 3, 7. These
4   factually distinct cases offer no reason to set aside Judge Couvillier's sound finding on this factor.

5   **II.     Judge Couvillier correctly determined Proposed Intervenors may intervene permissively under Rule 24(b).**

6          Judge Couvillier further recommended that Proposed Intervenors be granted permissive
7   intervention under Rule 24(b). *See* R&R at 7–8. As he explained, Proposed Intervenors have
8   consistently acted in a timely manner; their participation poses no risk of prejudice or undue delay;
9   and Proposed Intervenors' raise common arguments and defenses with the main action. *Id.*

10         Plaintiffs do not meaningfully dispute these findings. Nor could they—permissive
11  intervention is discretionary, and Judge Couvillier had ample basis to conclude permissive
12  intervention is appropriate. The few objections Plaintiffs do raise simply rehash earlier flawed
13  arguments and offer this Court no reason to depart from Judge Couvillier's sound report.

14         *First*, Plaintiffs repeat their claim that the State Defendants adequately represent Proposed
15  Intervenors. *See* Pls.' Objections at 15. But as explained, the existing Defendants' duty under the
16  NVRA to balance the statute's competing twin goals means that these officials do not share the
17  same interests as Proposed Intervenors. *See supra* § I(B). Regardless, Proposed Intervenors need
18  not meet all the requirements for intervention of right for permissive intervention to be warranted.
19  *See Planned Parenthood of Wis., Inc. v. Kaul*, 942 F.3d 793, 804 (7th Cir. 2019).

20         *Second*, Plaintiffs repeat their baseless assertion that Proposed Intervenors will delay the
21  case, a claim entirely at odds with proceedings to date. *See* Pls.' Objections at 16. In reality,
22  Plaintiffs are the only parties to cause delay thus far, having—in the mere three months this case
23  has been pending—already missed a court-ordered deadline, ECF No. 33, moved to extend the
24  time for filing a case schedule and discovery plan, ECF No. 79, and moved to continue a hearing
25  on the State Defendants' pending motion to dismiss, ECF No. 81. Proposed Intervenors have, in
26  contrast, moved with alacrity, including by filing this response far ahead of its deadline to ensure
27  the matter is fully briefed ahead of the June 18 hearing.
28

*Third*, Plaintiffs claim that Proposed Intervenors have not raised sufficiently distinct arguments from the State Defendants, *see* Pls.' Objections at 17, but this argument is misplaced. Tellingly, they cite no authority suggesting this is a basis for denying permissive intervention, but they also ignore that Proposed Intervenors' briefing dedicates significantly more attention to certain issues only briefly touched upon by State Defendants. *Compare, e.g.*, ECF No. 21 at 12–13 (discussing Plaintiffs' alleged diversion of resources injury, *with* ECF No. 26 at 9 (more limited argument on this point). They also ignore that Proposed Intervenors filed their proposed motion to dismiss *before* the State Defendants filed their own; Proposed Intervenors had no obligation to guess at what arguments the State Defendants might separately raise in their own motion to dismiss. Finally, this litigation is in its earliest stages and that—given the diverging interests Proposed Intervenors and State Defendants have under the NVRA, *supra* § I(B)—it is far too early to determine categorically that Proposed Intervenors will not raise distinct arguments and viewpoints moving forward. *Cf. Coastkeeper v. Santa Maria Valley Water Conservation Dist.*, No. CV-19-08696-AB-LPRX, 2020 WL 1139217, at *2 (C.D. Cal. Jan. 15, 2020) (recognizing that a public entity's "different legal obligations could constrain [it] from taking certain positions or require them to take positions contrary to the Intervenor's interests"); *see also Cal. Valley Miwok Tribe v. Salazar*, 281 F.R.D. 43, 47 (D.D.C. 2012) (explaining that government defendant's "unique obligations to the serve general public" raised doubts it could "be found to adequately represent the interests of potential intervenors"). !

In sum, Plaintiffs offer no good reason to reject Judge Couvillier's well-founded recommendation that Proposed Intervenors be granted intervention under Rule 24(b), and they notably fail to make any argument that adopting Judge Couvillier's recommendation under Rule 24(b) would constitute abuse of discretion. *See Perry*, 587 F.3d at 955.

## CONCLUSION

For the reasons above, the Court should adopt Judge Couvillier's report and recommendation and grant Proposed Intervenors' motion to intervene.

PROPOSED INTERVENORS' RESP. TO PLS.' OBJECTIONS TO R&R ON MOTION TO INTERVENE

1    Dated: June 13, 2024                    Respectfully submitted,

2                                            **ELIAS LAW GROUP LLP**

3

4                                            By: */s/ Bradley S. Schrager*
                                             ───────────────────────────
5                                            David R. Fox (NV Bar No. 16536)
                                             Christopher D. Dodge (*pro hac vice*)
6                                            Marisa A. O'Gara (*pro hac vice*)
                                             **Elias Law Group LLP**
7                                            250 Massachusetts Ave NW, Suite 400
                                             Washington, DC 20001
8                                            (202) 968-4490
                                             dfox@elias.law
9                                            cdodge@elias.law
                                             mogara@elias.law
10
                                             Bradley S. Schrager (NV Bar No. 10207)
11                                           Daniel Bravo (NV Bar No. 13078)
                                             **Bravo Schrager LLP**
12                                           6675 South Tenaya Way, Suite 200
                                             Las Vegas, NV 89113
13                                           (702) 996-1724
                                             bradley@bravoschrager.com
14                                           daniel@bravoschrager.com

15                                           *Attorneys for Proposed Intervenor-*
                                             *Defendants*
16

17

18

19

20

21

22

23

24

25

26

27

28

- 25 -
PROPOSED INTERVENORS' RESP. TO PLS.' OBJECTIONS TO R&R ON MOTION TO INTERVENE

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of June, 2024 a true and correct copy of the forgoing PROPOSED INTERVENORS' RESPONSE TO PLAINTIFFS' OBJECTIONS TO REPORT AND RECOMMENDATION ON MOTION TO INTERVENE was served via the United States District Court's CM/ECF system on all parties or persons requiring notice.

By: _/s/ Dannielle Fresquez_
Dannielle Fresquez, an Employee of
Bravo Schrager LLP

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC