AARON D. FORD
  Attorney General
LAENA ST-JULES (Bar No. 15156)
  Senior Deputy Attorney General
Office of the Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717
T: (775) 684-1100
E: lstjules@ag.nv.gov

*Attorneys for Secretary of State*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

REPUBLICAN NATIONAL COMMITTEE,
NEVADA REPUBLICAN PARTY, and
SCOTT JOHNSTON,

    Plaintiffs,

vs.

FRANCISCO AGUILAR, in his official
capacity as Nevada Secretary of State;
LORENA PORTILLO, in her official capacity
as the Registrar of Voters for Clark County;
WILLIAM "SCOTT" HOEN, AMY
BURGANS, STACI LINDBERG, and JIM
HINDLE, in their official capacities as
County Clerks,

    Defendants.

Case No. 2:24-cv-00518-CDS-MDC

**DEFENDANT SECRETARY OF
STATE'S MOTION TO DISMISS
FIRST AMENDED COMPLAINT**

   Defendant Francisco Aguilar, in his official capacity as Nevada Secretary of State ("Secretary of State"), moves to dismiss Plaintiffs Republican National Committee ("RNC"), Nevada Republican Party (together with the RNC, the "Organizational Plaintiffs"), and Scott Johnston's (together with the Organizational Plaintiffs, "Plaintiffs") First Amended Complaint for Declaratory and Injunctive Relief ("FAC") (ECF No. 98) pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject-matter jurisdiction and Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

## I.  INTRODUCTION

   The National Voter Registration Act of 1993 ("NVRA") "was intended as a shield to protect the right to vote, not as a sword to pierce it." *Am. Civil Rights Union v. Philadelphia*

*City Comm'rs*, 872 F.3d 175, 182 (3d Cir. 2017).  Yet Plaintiffs, through this lawsuit, are attempting to use it as a sword to pierce Nevadans' right to vote.  Plaintiffs claim, based on mismatched, cherrypicked, and outdated data, that Nevada and certain counties are failing to make reasonable efforts to remove voters from voter rolls as required by the NVRA.

The Court dismissed Plaintiffs' initial Complaint for Declaratory and Injunctive Relief ("Complaint"), ECF No. 1, because Plaintiffs had failed to establish standing and because the case was not prudentially ripe.  *See* Reporter's Transcript of Proceedings, ECF No. 96 at 23:2–4, 72:17–73:23 ("Hr'g Tr.").  Plaintiffs amended their Complaint, but their amendments do not save their claim from dismissal.

The individual plaintiffs' alleged injuries of undermined confidence in elections and vote dilution based on voter fraud remain too generalized and speculative to confer standing. The RNC similarly cannot premise standing on expenditures to combat the risk of voter fraud because that risk is speculative.  And the Organizational Plaintiffs cannot invoke the NVRA's cause of action because their alleged injuries do not fall within the NVRA's zone of interests. Further, Plaintiffs fail to allege facts that plausibly state an NVRA violation.  The inferences they ask the Court to draw based on misleading data are unwarranted, unreasonable, and implausible in the face of judicially noticeable data that shows that Nevada is a leader in list maintenance.  The case also remains prudentially unripe.  The FAC should be dismissed.

## II.   BACKGROUND

### A.   List Maintenance Under the NVRA

Under the NVRA, states may only remove voters (1) at the voter's request; (2) if a voter becomes ineligible under state law "by reason of criminal conviction or mental incapacity"; (3) if the voter died; or (4) if the voter changed residence.  52 U.S.C. § 20507(a)(3)-(4).  While states are permitted to remove registrants "at the request of the voter, by reason of criminal conviction or mental incapacity as provided in state law, or because of death or change of residence," the NVRA only requires states "to conduct a general program that makes a reasonable effort to remove the names of voters who have become ineligible on account of death or change of address."  *Bellitto v. Snipes*, 935 F.3d 1192, 1199 (11th Cir. 2019); 52 U.S.C.

§ 20507(a)(4). Any general program to remove voters must be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965," and may not be based solely on a voter's failure to vote. 52 U.S.C. § 20507(b)(1)-(2).

For the general program to remove voters based on a change of address, the NVRA imposes limitations on immediate removal. If a registrant moves outside of the jurisdiction, a registrar will send a notice to the registrant for the registrant to respond to. 52 U.S.C. § 20507(d)(1)(B), (d)(2). A registrar cannot immediately remove a voter who does not respond to the notice; instead the registrar can only remove a non-responsive registrant if the registrant does not appear to vote in the next two federal general elections. 52 U.S.C. § 20507(d)(1)(B).

**B.    Nevada's General List Maintenance Program for Voters Who Change Residence**

Nevada's counties ensure maintenance of their respective voter lists when a voter changes residence pursuant to NRS 293.530. Counties can "use any reliable and reasonable means . . . to determine whether a registered voter's current residence is other than that indicated on the voter's application to register to vote." NRS 293.530(1). After identifying voters whose residences may have changed, the counties will then mail those voters a written notice with a postage guaranteed return postcard that has a space for the voter to write in his or her new address. NRS 293.530(1)(c)(1)-(2). If a voter returns the postcard with updated information, the county will correct the voter registration list. NRS 293.530(f). However, if a voter does not return the postcard within 33 days of its mailing, the county will designate the voter as inactive. NRS 293.530(1)(d), (g). And if an inactive voter fails to vote for two general elections after the mailing of the notice and postcard and the voter's registration information is not updated as specified in statute during that time, the county will cancel the voter's registration. NRS 293.530(1)(c)(4)-(5).

**C.    Nevada's Safeguards Against Voter Fraud**

Nevada has in place laws that safeguard against voter fraud, including, among others, the following five categories. First, votes cast by mail ballot and in person are

subject to signature verification.  NRS 293.269927(1) (mail ballots), 293.3075(1)(c) (ballots cast in person on election day), 293.3585(1)(c) (ballots cast early in person).  Second, inactive voters are not sent mail ballots.  *See* NRS 293.269911(1).  Third, voter fraud is criminalized, NRS 293.775 (category D felony for voting or attempting to vote when not qualified or using another person's name), 293.780 (category D felony for voting or attempting to vote twice at same election), and as Plaintiffs note, is prosecuted in Nevada, FAC ¶¶ 47–49.  Fourth, the results of each election are subject to risk-limiting audits designed to limit the risk of certifying incorrect election outcomes.  NRS 293.394(2)–(3).  And fifth, registered voters can, based on personal knowledge, challenge other voters' ability to cast votes or remain on the voter rolls.  *See* NRS 293.303(1), 293.547.

## D.   This Lawsuit

On December 4, 2023, Plaintiffs sent the Secretary of State a letter claiming that Nevada was in violation of the NVRA.  FAC. Ex. A, ECF No. 98-1.  Plaintiffs did not request any of the publicly available records relating to Nevada's general programs to remove ineligible voters.  *Id.*  Instead, the basis for the letter's claim was a comparison of reported active registrations in eight Nevada counties against the U.S. Census Bureau's 5-Year Citizen Voting Age Population ("CVAP") data for 2017–2021, and a comparison of alleged registration rates against the U.S. Census Bureau's Current Population Survey ("CPS").  *Id.* at 2–3.

Plaintiffs commenced this action on March 18, 2024, and the Secretary of State moved to dismiss the Complaint on April 15, 2024.  The Court held a hearing on the motion to dismiss on June 18, 2024 and dismissed the Complaint because the Plaintiffs lacked standing.  *See* Hr'g Tr. at 73:24–25.  The Court found that the individual plaintiff lacked standing because "[h]is bas[e]s for alleging standing are far too generalized and speculative to confer standing." *Id.* at 23:2–4.  The Court also found that the Organizational Plaintiffs lacked standing because their alleged injury could not be redressed at the time the Complaint was filed and because the case was not prudentially ripe.  *See id.* at 72:17–73:23. ///

1  Plaintiffs were granted leave to amend, *id.* at 75:2, and they filed their FAC on July
2  2, 2024.

3  **III.   LEGAL STANDARDS**

4      **A.   Lack of Subject-Matter Jurisdiction**

5      Article III, § 2 of the U.S. Constitution limits federal court jurisdiction to "Cases"
6  and "Controversies." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016). "'One element of the
7  case-or-controversy requirement' is that plaintiffs 'must establish that they have standing
8  to sue.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (citations omitted).  To
9  establish the irreducible constitutional minimum of standing, "[t]he plaintiff must have
10  (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the
11  defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo,
12  Inc.*, 578 U.S. at 338 (citations omitted).  The injury in fact must be "'an invasion of a legally
13  protected interest' that is 'concrete and particularized' and 'actual or imminent, not
14  conjectural or hypothetical.'" *Id.* at 339 (citation omitted).  And because "[i]njury in fact is
15  a constitutional requirement, . . . Congress cannot erase Article III's standing requirements
16  by statutorily granting the right to sue to a plaintiff who would not otherwise have
17  standing." *Id.* (internal quotation marks and citations omitted).

18      **B.   Failure to State a Claim**

19      Fed. R. Civ. P. 12(b)(6) provides for dismissal of a complaint for failure to state a
20  claim upon which relief may be granted.  "To survive a motion to dismiss, a complaint must
21  contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible
22  on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*,
23  550 U.S. 544, 570 (2007)).  It must also contain "more than labels and conclusions, and a
24  formulaic recitation of a cause of action's elements." *Twombly*, 550 U.S. at 555.  "Factual
25  allegations must be enough to raise a right to relief above the speculative level" and
26  "nudge[] [a plaintiff's] claims across the line from conceivable to plausible." *Id.* at 555, 570
27  (citations omitted).  Factual allegations that "do not permit the court to infer more than the
28  mere possibility of misconduct," and that do not actually "show[]" that the defendant acted

unlawfully, cannot sustain a claim. *Iqbal*, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)). Accordingly, an "obvious alternative explanation" left unrebutted by the factual allegations will doom a complaint. *See Twombly*, 550 U.S. at 567–69.

## IV.   ARGUMENT

### A.   Plaintiffs Have Failed to Allege an Adequate Theory of Injury

Plaintiffs claim several purported injuries.  The individual plaintiff claims vote dilution based on voter fraud and undermined confidence in elections as injuries.  FAC ¶¶ 28, 104–05.  The Organizational Plaintiffs allege direct organizational standing based on diversions of resources to combat the risk of voter fraud and claim purported inaccuracies on voter rolls make it more expensive and burdensome for them to ensure election of Republican candidates. *Id.* ¶¶ 13–20, 24–26.  Finally, the Organizational Plaintiffs further claim associational standing on behalf of their members. *Id.* ¶¶ 12, 23.  These theories of injury are insufficient as they do not each establish standing and a right to invoke the NVRA's cause of action.

#### 1.   The Individual Plaintiff Does Not Have Standing

The Court previously found that Plaintiff Johnston did not have standing because "[h]is bas[e]s for alleging standing are far too generalized and speculative to confer standing."  Hr'g Tr. at 23:2–4.  Plaintiffs have not added any allegations in their FAC that would change this law of the case in this second motion to dismiss. *See United States v. Jingles*, 702 F.3d 494, 499 (9th Cir. 2012) ("Under the 'law of the case' doctrine, a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case.").  As in the Complaint, Johnston's alleged injuries in the FAC are again (1) vote dilution premised on voter fraud, and (2) undermined confidence in elections. *Compare* Compl. ¶¶ 19, 90–91 *with* FAC ¶¶ 28, 104–05.

##### a.   Vote Dilution Is Generalized and Speculative

The Court held that Johnston's "injury of vote dilution is impermissibly generalized and speculative."  Hr'g Tr. at 24:2–18 (citing *Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993 (D. Nev. 2020); *Wood v. Raffensperger*, 981 F.3d 1307 (11th

Cir. 2020)).  There is no basis to revisit this holding.  The only additions to the FAC that could conceivably relate to alleged vote dilution are the same types of allegations that were already included in the Complaint.  *See* Compl. ¶ 40 (citing voter fraud prosecutions).  Plaintiffs add new allegations of prosecutions and criminal referrals, but they again fail to tie any of those allegations to list maintenance under the NVRA.  *See* FAC ¶¶ 47, 49 (citing criminal prosecution referrals and prosecutions for registering under a false name).  The new allegations, like the old ones, do not even suggest, must less establish, that voter fraud and consequent vote dilution caused by improper list maintenance is "certainly impending," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014), or that the risk of such voter fraud and vote dilution is "sufficiently imminent and substantial," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021) (citation omitted).

### b.   Undermined Confidence Is Generalized and Speculative

The Court also held that "a loss of confidence in the electoral system . . . is too general" and "too speculative."  Hr'g Tr. at 23:6–25.  Nothing in the FAC rehabilitates Plaintiffs' theory of injury based on undermined confidence.  Because undermined confidence is premised on the subjective fear of vote dilution, *see* FAC ¶ 18, and because that fear is too speculative, it cannot support standing, *see Clapper*, 568 U.S. at 418 ("[Respondents'] subjective fear of surveillance does not give rise to standing."); *Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015) (Plaintiff's "deterrence from seeking employment is ultimately based on his fear of an injury that we have already determined is too speculative to confer standing.").  The claimed injury to voter confidence is therefore inadequate.  *See Thielman v. Fagan*, Case No. 3:22-cv-01516-SB, 2023 WL 4267434, at *4 (D. Or. June 29, 2023) ("The Court finds that Plaintiffs' lack of confidence in Oregon's voting systems is a generalized grievance not particularized to the plaintiffs in this litigation and too speculative to qualify as a concrete injury."), *aff'd sub nom. Thielman v. Griffin-Valade*, No. 23-35452, 2023 WL 8594389, at *1 (9th Cir. Dec. 12, 2023) ("Plaintiffs allege that they are injured by 'a lack of confidence in the integrity of the election system.'  But that alleged injury represents nothing more than the 'kind of speculation that stretches the concept of

imminence beyond its purpose.'"); *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 803 (W.D. Tex. 2015) ("[C]omplaints of undermined confidence and potential vote dilution are nothing but a generalized grievance about government, complaining that an official should be required to follow the law.").

> **2.**     **The RNC's Expenditures Based on the Alleged Risk of Voter Fraud Do Not Confer Standing**

Plaintiffs claim that improper list maintenance increases the risk of voter fraud and thereby impacts the RNC's "core electoral missions." FAC ¶ 18. They further allege that based on the defendants' failure to maintain voter rolls, the RNC must divert resources to counteract the risk of fraud. *See id.* ¶¶ 19–20. These allegations do not establish standing.

An organizational plaintiff cannot base an Article III injury on the "intensity of [its] interest" or by simply "expending money to gather information and advocate against the defendant's action[s]." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) (citation omitted). Instead, to establish standing, an organizational plaintiff's core business activities must be "directly" and "perceptibly impaired" by the defendant's actions. *See id.* at 395 (citation omitted). There is no such direct effect or interference with the RNC's core activities here.

"[O]]rganizations must satisfy the usual standards for injury in fact . . . that apply to individuals." *Id.* at 393–94 (citation omitted). And as the Supreme Court held in *Clapper*, plaintiffs do not "have standing because they incur[] certain costs as a reasonable reaction to a risk of harm" if that harm "is not certainly impending." 568 U.S. at 416 (citation omitted); *see also La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (Organization must "show that it would have suffered some other injury if it had not diverted resources to counteracting the problem."). The alleged harm to the RNC here is the speculative risk of voter fraud based on inaccurate voter rolls that supposedly impacts its core mission of electing Republican candidates. Because voter fraud resulting from improperly maintained voter rolls is speculative, as discussed above, there is no "direct[]" or "perceptibl[e] impair[ment]" to the RNC's core

mission.  *See FDA*, 602 U.S. at 395 (citation omitted).  The "links in the chain of causation" are "too speculative" to confer standing.  *Id.* at 383 (citations omitted).

### 3.   The Organizational Plaintiffs' Injuries Do Not Fall Within the NVRA's Zone of Interests

The Organizational Plaintiffs claim injury to their core business objectives of electing Republican candidates and turning out Republican votes.  FAC ¶¶ 13–14, 18, 25.  This set of allegations is insufficient for the independent reason that it does not fall within the NVRA's zone of interests.  In addition to their voter fraud allegations, Plaintiffs further allege that the Organizational Plaintiffs rely on voter rolls for voter contact, staffing, forming electoral strategies, chasing ballots, and advising candidates, and inaccurate voter rolls cause them to waste effort and resources.  *Id.* ¶¶ 13–17, 24–26.  But the Organizational Plaintiffs are asserting a statutory cause of action based on the NVRA, and their interests must therefore "fall within the zone of interests protected by the law invoked."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (citation omitted).  There must also be "a sufficiently close connection" between Plaintiffs' alleged injuries and "the conduct the statute prohibits"—otherwise there is no proximate causation.  *Id.* at 133.

"[T]he breadth of the zone of interests varies according to the provisions of law at issue . . . ."  *Id.* at 130 (citation omitted).  Identifying the interests protected by the NVRA "requires no guesswork" because they are clearly defined in the NVRA itself.  *See id.* at 131.  The NVRA's stated purposes are:

> (1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;
> (2) to make it possible for Federal State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;
> (3) to protect the integrity of the electoral process; and
> (4) to ensure that accurate and current voter registration rolls are maintained.

52 U.S.C. § 20501(b).

Each of these purposes fundamentally concerns the process of non-partisan, public participation in federal election—in service of the public interest at large, not any private

or partisan entity.  Moreover, as discussed in Section IV.B.2, *infra*, 52 U.S.C. § 20507's design allows for voter rolls to include a substantial number of voters who are no longer eligible, demonstrating that the purpose was not to give a private, partisan party a roadmap to who to reach out to for electoral support.  The Organizational Plaintiffs' use of voter rolls to advance their private purposes is entirely outside the zone of interests protected by the NVRA and any alleged injuries lack connection to the conduct the NVRA prohibits.  It is explicitly a private, partisan aim accruing to the benefit of a private, partisan entity.

Even if the Organizational Plaintiffs' injuries constituted an Article III injury, that would not be enough because "the injury that supplies constitutional standing must be the same as the injury within the requisite 'zone of interests.'"  *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996); *see also Oberdorfer v. Jewkes*, 583 F. App'x 770, 773 (9th Cir. 2014) ("Western Radio could not file suit under the National Environmental Protection Act (NEPA) because its asserted injuries either cannot establish standing under Article III or do not fall within NEPA's zone of interests . . . ."); *Triumvirate, LLC v. Zinke*, Case No. 3:18-cv-0091-HRH, 2018 WL 2770634, at *5 (D. Ala. June 8, 2018) ("Article III standing and the NEPA zone of interests test must be satisfied by the same injury."); *Nw. Immigrant Rts. Project v. USCIS*, 325 F.R.D. 671, 687 (W.D. Wash. 2016) ("[T]he Ninth Circuit and several district courts therein equate a party's 'interests' with the 'injuries' that confer constitutional standing upon that party."); *Yount v. Salazar*, Nos. CV11-8171 PCT-DGC, CV12-8038 PCT DGC, CV12-8042 PCT DGC, CV12-8075 PCT DGC, 2014 WL 4904423, at *6 (D. Ariz. Sept. 30, 2014) ("Article III standing and the NEPA zone of interests test must be satisfied by the same injury.").

Because the Organizational Plaintiffs' alleged injuries do not fall within the NVRA's zone of interests, they may not "invoke the [NVRA's] cause of action."  *Lexmark*, 572 U.S. at 130.

///

///

4.      **The Organizational Plaintiffs Cannot Establish Associational Standing**

The Organizational Plaintiffs do not have associational standing here to bring suit on behalf of their members.  *See* FAC ¶¶ 12, 23.  They would have to have members who "would otherwise have standing to sue in their own right."  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  But for the same reasons Johnston does not have standing, the Organizational Plaintiffs do not have associational standing.

B.      **Plaintiffs Do Not State a Claim**

Plaintiffs' FAC lacks plausible allegations of an NVRA violation.[1]

1.      **The Court Can Consider the Data Cited in This Motion**

Plaintiffs rely in their FAC on U.S. Census Bureau data, Secretary of State voter registration and voter roll data, and data from the U.S. Election Assistance Commission ("EAC") to purport to support their claim.  *See* FAC ¶¶ 58–65, 69–73, 75–77, 79.  This same data, as well as additional data and documentation from the same government agencies (i.e., the U.S. Census Bureau, the Secretary of State, and the EAC), is cited below.  This data is all appropriate for judicial notice, and where relied on in the FAC to form a basis of Plaintiffs' claims, is incorporated by reference, and can be considered on this motion to dismiss without converting it to a motion for summary judgment.  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) ("[A] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment."); *id.* at 1002 ("[I]ncorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself.  The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims."); Fed. R. Evid. 201(b)(1)-(2).

---

[1] The Court previously denied the Secretary of State's motion to dismiss the Complaint based on the argument that Plaintiffs' pre-litigation notice was deficient.  *See* Hr'g Tr. at 71:5–13.  Because that holding is law of the case at this stage, *see Jingles*, 702 F.3d at 499, the Secretary of State does not re-raise the notice's sufficiency here but preserves the issue on any appeal.

Agency reports are "generally susceptible to judicial notice," and there can be no reasonable dispute as to what the data and documentation cited below establish. *See Khoja*, 899 F.3d at 1001 (citation omitted). This is particularly true here where Plaintiffs rely on similar data from the very same agencies to support their claim, thereby acknowledging the agencies' data is not subject to reasonable dispute. *See United States v. Esquivel*, 88 F.3d 722, 726–27 (9th Cir. 1996) (taking judicial notice of U.S. Census Bureau documents because they met the requirements of Fed. R. Evid. 201(b) and were "of the same type and taken from the same source" as the defendant's own data). The Court should therefore take judicial notice of data cited below. *See* Fed. R. Evid. 201(c).

### 2.     Active Voter Registration Rates Do Not Plausibly Suggest Non-Compliance with the NVRA

Key purposes of the NVRA include "establish[ing] procedures that will increase the number of eligible citizens who register to vote in elections for Federal office" and "mak[ing] it possible for Federal, State, and local government to implement [the NVRA] in a manner that enhances the participation of eligible citizens as voters in elections for Federal office." 52 U.S.C. § 20501(b)(1)-(2); *see also* 52 U.S.C. § 20501(a)(1)-(2) ("The Congress finds that the right of citizens of the United States to vote is a fundamental right" and "it is the duty of the Federal, State, and local governments to promote the exercise of that right . . . .").

In light of the NVRA's purposes, there is nothing nefarious about a state encouraging and having high active registration rates. While the NVRA requires states to conduct a general program that makes a reasonable effort to remove voters who become ineligible based on death or change of residence, the NVRA does not provide a numerical threshold to establish compliance or lack thereof. Use of active registration rates alone does not demonstrate a failure to comply with the NVRA; registration rates may far exceed the eligible voting pool without any violation. This is true for several reasons.

First, the NVRA creates a safe harbor for states who use U.S. Postal Service information to identify individuals who have become ineligible based on a change of residence address (the "NCOA Process"). *Bellitto*, 935 F.3d at 1205. If a state uses the NCOA Process,

it meets the NVRA's minimum statutory requirements with respect to voters who have moved. *Id.* This process is sufficient even though it may not lead to the removal of some ineligible voters. In fact, "[a]s many as 40 percent of people who move do not inform the Postal Service." *Id.* at 1204 (quoting *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 765 (2018)). Thus, the NVRA itself establishes that it is acceptable for a substantial number of voters who have moved out of the jurisdiction to properly remain on the voter rolls.

Second, the NVRA only requires states to remove voters based on a change of address or death. *Bellitto*, 935 F.3d at 1195; 52 U.S.C. § 20507(a)(4). Under the NVRA, therefore, voters who are ineligible may properly remain on the voter rolls, resulting in higher registration numbers. The NVRA itself is, in fact, "partly responsible" for high voter registration rates. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 192 (2008).

Third, the NVRA prohibits a state from taking action in connection with certain ineligible voters through its general removal program during the 90-day period before a federal primary and general election. 52 U.S.C. § 20507(c)(2)(A). This can result in higher registration numbers because a state would be unable to systematically act on certain voters through its general programs, while new voters are still able to register. *See Bellitto*, 935 F.3d at 1208. The ballooning effect of the 90-day restriction period is plain to see in this case.

Nevada had a presidential preference primary election on February 6, 2024, NRS 298.650(1), and a primary election on June 11, 2024, NRS 293.175(1). Under Nevada law, voters who may have changed residence cannot be inactivated for 33 days after the mailing of a confirmation notice. NRS 293.530(1)(d), (g). This means that, under Nevada law and the NVRA, Nevada has been unable to practicably implement its general program to remove voters from the active rolls since November 8, 2023. At the time Plaintiffs sent their pre-litigation notice letter, they relied on active registration numbers from December 1, 2023, *see* FAC Ex. A at 2, when there were 1,907,794 active registered voters.[2] By the time Plaintiffs filed their original complaint, they were relying on active registration numbers from March

---

[2] Nev. Sec'y of State, Voter Registration Statistics, 12/01/2023, Active Voters by County & Party, https://tinyurl.com/5yctauc8.

1, 2024, *see* Compl. ¶ 49, when there were 1,937,225 active registered voters.[3]  And now in their FAC, Plaintiffs are using the active registration numbers from June 1, 2024.  *See* FAC ¶ 58.  As of June 1, 2024, there were 1,997,473 active registered voters.[4]  In the seven months since Nevada has been unable to reduce its active registered voters through its general program for voters who have changed residence, Nevada saw an increase of approximately 90,000 voters.

Taken together, the NVRA's statutory scheme reflects that active registration rates may properly be significantly higher than the actual pool of eligible voters.  It is also consistent with the conclusion that Congress recognized that the risk of voter fraud would not be materially increased if ineligible voters remained on voter rolls.  A violation of the NVRA based on high registration rates is therefore an "unreasonable inference" and need not be accepted as true.  *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (citation omitted); *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 681 (9th Cir. 2009) ("We take a plaintiff's allegations in the complaint as true, but we are 'not required to indulge unwarranted inferences.'").  Plaintiffs' allegations based on active registration rates are insufficient because they do not permit the court to do more than "infer . . . the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679 (citation omitted).

### 3. Plaintiffs' Active Registration Rate Calculations Do Not Reflect Current Reality

Plaintiffs rely on misleading calculations to allege a violation of the NVRA based on active voter registration rates.  Actual, real-time numbers establish Nevada's consistent position as a leader in list maintenance.

In the FAC, Plaintiffs primarily rely on the 2018–2022 CVAP data[5] to purportedly establish that certain counties' active registration rates are too high.  *See* FAC ¶¶ 58–60, 65.

---

[3] Nev. Sec'y of State, Voter Registration Statistics 03/01/2024, Active Voters by County & Party, https://tinyurl.com/28a5jee8.

[4] Nev. Sec'y of State, Voter Registration Statistics, 06/01/2024, Active Voters by County & Party, https://tinyurl.com/2syypme9.

[5] U.S. Census Bureau, CVAP Special Tabulation from the 2018–2022 5-Year American Community Survey, County Spreadsheet, https://tinyurl.com/y63a252y.

They compare the 2018–2022 CVAP data against active registration numbers from June 1, 2024 to calculate supposed active registration rates. *See id.* The CVAP data is derived from the U.S. Census Bureau's American Community Survey ("ACS").[6]   But registration rates calculated using ACS data, and specifically the ACS citizen population averages, have been found to be misleading and inaccurate, and insufficient to prove an NVRA violation, even when registration rates calculated using citizen population averages from the ACS exceeded 100% for a county. *Bellitto*, 935 F.3d at 1207–08.

There are two key problems with using the ACS data here. First, the ACS population data "significantly underestimate[s] the population." *See id.* at 1208. For instance, the ACS data excludes many individuals who may be eligible voters but do not reside in a county for the entire year, such as military personnel and college students. *Id.* Thus, using the ACS data as the denominator in an active registration rate calculation will yield a too-high active registration rate. Second, the ACS data "takes data drawn from the preceding five years and estimates the midpoint of that data." *Id.* The 2018–2022 CVAP data, therefore, estimates the population at the middle of 2020, *see id.*, and it does not take into account population growth after that.

Performing Plaintiffs' same active registration rate calculations over time would suggest that Nevada has, for years, been in violation of the NVRA. But real-time numbers show how misleading Plaintiffs' calculations are. The below table shows the active registration rates for 2017–2020 using (1) Plaintiffs' methodology and (2) a real-time comparison. For Plaintiffs' methodology, the rate is calculated by dividing active registration numbers from approximately four years after the year identified in the table by the 5-year CVAP data that estimates the midpoint of the year identified in the table. Thus, for example, the 2017 rate divides the total active registered voters in Nevada reported as of June 1, 2021 by the 2015–2019 CVAP estimate of Nevada's citizen voting age population, which estimates

---

[6] U.S. Census Bureau, Citizen Voting Age Population (CVAP) Special Tabulation From the 2017–2021 5-Year American Community Survey (ACS), at 1, https://tinyurl.com/3rbmcm8t; U.S. Census Bureau, Citizen Voting Age Population (CVAP) Special Tabulation From the 2018–2022 5-Year American Community Survey (ACS), at 1, https://tinyurl.com/5xd32exy; *see also* FAC. ¶ 58.

the population at the middle of 2017.  For the real-time comparison, the active registration rate is calculated by dividing active registration numbers from the midpoint of the year identified by the 5-year CVAP data that estimates the midpoint of the year identified.  Thus, for example, the 2017 rate divides the total active registered voters in Nevada reported as of July 5, 2017 by the 2015–2019 CVAP estimate of Nevada's citizen voting age population, which estimates the population at the middle of 2017.

| Year | Plaintiffs' Methodology | Real-Time Comparison |
|------|-------------------------|----------------------|
| 2017 | 90.37%[7] | 72.92%[8] |
| 2018 | 87.92%[9] | 70.58%[10] |
| 2019 | 89.50%[11] | 74.72%[12] |
| 2020 | 92.89%[13] | 75.36%[14] |

The misleading nature of Plaintiffs' calculations is put into sharp relief by other real-time data.  As shown by the EAC's Election Administration and Voting Survey Comprehensive Reports, Nevada has consistently maintained (1) an active registration rate

[7] See Nev. Sec'y of State, Voter Registration Statistics, May 2021, Active Voters by County and Party, https://tinyurl.com/5dtpaypa (last updated June 1, 2021) (1,824,418 active registered voters); U.S. Census Bureau, CVAP Special Tabulation from the 2015–2019 5-Year ACS, County Spreadsheet, https://tinyurl.com/5tsaazv4 ("2019 5-Year CVAP") (2,018,925 estimated citizen voting age Nevadans).

[8] See Nev. Sec'y of State, June 2017 Voter Registration Statistics, Active Voters by County and Party, https://tinyurl.com/yc3fmbj3 (last updated July 5, 2017) (1,472,259 active registered voters); 2019 5-Year CVAP.

[9] See Nev. Sec'y of State, Voter Registration Statistics, May 2022, Active Voters by County and Party, https://tinyurl.com/56t33p82 (last updated June 1, 2022) (1,821,058 active registered voters); U.S. Census Bureau, CVAP Special Tabulation from the 2016–2020 5-Year ACS, County Spreadsheet, https://tinyurl.com/yue9my3f ("2020 5-Year CVAP") (2,071,285 estimated citizen voting age Nevadans).

[10] See Nev. Sec'y of State, June 2018 Voter Registration Statistics, Active Voters by County and Party, https://tinyurl.com/2p8yzbrm (last updated July 2, 2018) (1,461,833 total active registered voters); 2020 5-Year CVAP.

[11] See Nev. Sec'y of State, Voter Registration Statistics, 06/01/2023, Active Voters by County & Party, https://tinyurl.com/mr47t498 (1,878,692 active registered voters); U.S. Census Bureau, CVAP Special Tabulation from the 2017–2021 5-Year ACS, County Spreadsheet, https://tinyurl.com/mth2dwdy ("2021 5-Year CVAP") (2,099,150 estimated citizen voting age Nevadans).

[12] See Nev. Sec'y of State, June 2019 Voter Registration Statistics, Active Voters by County and Party, https://tinyurl.com/ypvby7c3 (1,568,468 total active registered voters); 2021 5-Year CVAP.

[13] See Nev. Sec'y of State, Voter Registration Statistics, 06/01/2024, Active Voters by County & Party, https://tinyurl.com/2syypme9 (1,997,473 active registered voters); U.S. Census Bureau, CVAP Special Tabulation from the 2018–2022 5-Year ACS, County Spreadsheet, https://tinyurl.com/y63a252y ("2022 5-Year CVAP") (2,150,290 estimated citizen voting age Nevadans).

[14] See Nev. Sec'y of State, Voter Registration Statistics June 2020, Active Voters by County and Party, https://tinyurl.com/fh9ny72z (last updated July 1, 2020) (1,620,457 active registered voters; 2022 5-Year CVAP.

below national averages based on 1-year CVAP data; (2) rates of sending confirmation notices to active voters as part of its general program to remove voters who have changed residence above the national average; and (3) inactivation rates above the national average.

| Action | Year | Nevada | U.S. |
|---|---|---|---|
| Active Registrations (% of CVAP)[15] | 2022 | 83.9% | 85.4% |
| | 2020 | 86.9% | 88.1% |
| | 2018 | 77.0% | 82.5% |
| Inactive Registrations (% of Total Registrations[16] | 2022 | 16.3% | 11.1% |
| | 2020 | 10.0% | 9.1% |
| | 2018 | 11.8% | 11.3% |
| Confirmation Notices Sent (% of Active Voters)[17] | 2022 | 22.0% | 13.7% |
| | 2020 | 19.7% | 14.3% |
| | 2018 | 16.6% | 11.6% |

If Nevada has in fact been in violation of the NVRA for years, as Plaintiffs' methodology suggests, the EAC's real-time numbers would not show that Nevada has had consistently lower active registration rates than the national average, higher rates of sending confirmation notices than the national average, and higher rates of inactivation than the national average. There is, of course, an "obvious alternative explanation," *see Twombly*, 550 U.S. at 567–69, for why Plaintiffs' calculations result in high active registration rates. Nevada has a substantially growing population,[18] and the 2018–2022 CVAP data does not account for population growth over the past four years. *See Bellitto*, 935 F.3d at 1208. Plaintiffs offer nothing that "tend[s] to exclude the possibility that the alternative explanation is true." *See In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013).

---

[15] EAC, Election Administration and Voting Survey 2022 Comprehensive Report, at 164, 166, https://tinyurl.com/nhx86v7k ("2022 EAC Report"). The EAC uses 1-year CVAP estimates for its calculations as opposed to 5-year CVAP estimates. *See id.* at 166.

[16] *Id.* at 164, 166.

[17] *Id.* at 158, 182–83; EAC, Election Administration and Voting Survey 2020 Comprehensive Report, at 133, 159–60, https://tinyurl.com/y95rcm95 ("2020 EAC Report"); EAC, Election Administration and Voting Survey 2018 Comprehensive Report, at 52, 79, https://tinyurl.com/49bpuzym ("2018 EAC Report").

[18] *Compare, e.g.*, U.S. Census Bureau, Nevada 2019 Citizen, Voting-Age Population, https://tinyurl.com/4k3jxcn3 (estimating Nevada's voting population to be 2,111,932 in 2019) *with* U.S. Census Bureau, Nevada 2022 Citizen, Voting-Age Population, https://tinyurl.com/2p8x5b7j (estimating Nevada's voting population to be 2,227,239 in 2022).

Plaintiffs' active registrations rate calculations based on a comparison of citizen voting age estimates from the midpoint of 2020 against active voter registration numbers from June 1, 2024 do not support a plausible inference of an NVRA violation. "In assessing the plausibility of an inference, [courts] draw on [their] judicial experience and common sense and consider obvious alternative explanations." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1057 (9th Cir. 2011) (cleaned up); *see also Iqbal*, 556 U.S. at 679. Here, everything demonstrates the implausibility of Plaintiffs' allegations. No case brought on similar allegations has ever succeeded on the merits. There is an obvious alternative explanation. And common sense dictates that a state that performs better than the national average in every relevant metric is not in violation of the NVRA.

Finally, because Plaintiffs' active registration rate calculations are misleading, Plaintiffs' comparisons of those calculations to the CPS are irrelevant. *See* FAC ¶¶ 61–64. As shown above, Nevada's active registration rate comparing active registration numbers from the middle of 2020 against the 2018–2022 CVAP data is 75.36%, which is close to the nationwide CPS rate for 2020 (72.7%). *See* FAC ¶ 63. Further, comparing nationwide CPS registration rates for 2020 (72.7%) and 2022 (69.1%), FAC ¶¶ 62–63, against active voter registration rates reported by the EAC for the same years reveals that only one single state had an active voter registration rate below the national CPS average in 2022, and only three states had active voter registration rates below the national CPS average in 2020.[19] The CPS voter registration rates are crude estimates based on historical recall, obtained through personal or telephone interviews from approximately 54,00 households nationwide.[20] They are flatly untethered to reality and any inference of an NVRA violation based on them would be "unreasonable." *Daniels-Hall*, 629 F.3d at 998 (citation omitted).

In short, Plaintiffs do not plausibly allege an NVRA violation based on a grab bag of incompatible data; there is no basis "to infer more than the mere possibility of misconduct."

___

[19] *Compare* FAC. ¶¶ 62–63 *with* EAC 2022 Report at 162–65.

[20] U.S. Census Bureau, Methodology, https://www.census.gov/programs-surveys/cps/technical-documentation/methodology.html; U.S. Census Bureau, Current Population Survey, November 2022 Voting Supplement File, Technical Documentation CPS-22, at 2-1, https://www2.census.gov/programs-surveys/cps/techdocs/cpsnov22.pdf.

1   *Iqbal*, 556 U.S. at 679 (citation omitted).  Plaintiffs' allegations are, at absolute best, "merely

2   consistent with" liability and therefore "stop[] short of the line between possibility and

3   plausibility of 'entitlement of relief.'"  *Id.* at 678 (citation omitted).

4           **4.**      **Plaintiffs' New Allegations Do Not Establish that their Claim Is**

5                      **Plausible**

6       Plaintiffs' FAC is entirely devoid of any allegation about Nevada's efforts to maintain

7   its voter rolls, even though Plaintiffs were entitled to inspect Nevada's list maintenance

8   records, *see* 52 U.S.C. § 20507(i), and even though this is the precise type of information that

9   courts ultimately rely on in deciding whether a defendant has violated the NVRA, *see Bellitto*,

10   935 F.3d at 1206–07; *Pub. Int. Legal Found. v. Benson*, Case No. 1:21-cv-929, 2024 WL

11   1128565, at \*10–12 (W.D. Mich. Mar. 1, 2024) ("*PILF*").

12       In this vacuum, Plaintiffs allege supposed failures to use information for list

13   maintenance to suggest an NVRA violation.  They cite a lawsuit against Clark County

14   relating to voters being registered at non-residential addresses.  *See* FAC ¶ 74 (citing *Kraus*

15   *v. Portillo*, Doc. 1, No. A-24-896151-W (8th Judicial Dist. Court June 25, 2024)).  Plaintiffs'

16   allegations about this lawsuit do not support their claim.  Contrary to Plaintiffs' assertion, *see*

17   *id.*, voter registration does not require a residential address, *see* NRS 293.486(1) ("[F]or the

18   purposes of preregistering or registering to vote, the address at which the persona actually

19   resides is the street address assigned to the location at which the person actually resides.");

20   NRS 293.507(4)(c) (voter registration application must include "[a] notice that the applicant

21   may not list a business as the address required [for the address at which the applicant resides]

22   unless the applicant actually resides there").  Just because a voter might list a commercial

23   address as their residence for voter registration purposes, that does not suggest improper

24   voter registration or defective list maintenance.

25       Plaintiffs also allege that the Secretary of State sent postcards to voters in connection

26   with the presidential preference primary election.  *See* FAC ¶¶ 80–83.  They claim that the

27   Secretary of State should have given the county clerks information about those postcards

28   if they were returned undeliverable so the county clerks could use that information to

correct the voter rolls. *See id.* In essence, Plaintiffs are trying to impose their own view of what constitutes reasonable efforts to maintain the voter rolls under the NVRA. Without any allegation of how Nevada maintains its voter rolls, there is no basis to infer that Nevada's list maintenance processes are unreasonable. Under the NVRA, "[t]he failure to use duplicative tools or to exhaust every conceivable mechanism does not make [a defendant's] effort unreasonable." *Bellitto*, 935 F.3d at 1207; *see also PILF*, 2024 WL 1128565, at \*11 ("PILF's identification of areas for improvement does not serve to demonstrate that Michigan's multilateral process for the removal of deceased registrants from the QVF does not meet the threshold of a 'reasonable effort.'").

As set forth above, Nevada has been a leader in list maintenance, which clearly reflects the reasonableness of its efforts to maintain its voter rolls.

### 5. Plaintiffs' Inactive Voter Registration Allegations Are Meritless

Plaintiffs' allegations relating to inactive voter registrations are paradoxical and in fact undermine their claim. While, as described above, Plaintiffs claim that Nevada has too many active registered voters, they also appear to claim that Nevada and certain counties are *too aggressive* in inactivating voters because they have inactivation rates "well above" the national and state inactivation averages. *See* Compl. ¶¶ 75–76, 78. That Nevada and certain counties have inactivation rates "well above" national and state averages only further demonstrates that Nevada is in fact meeting its obligations under the NVRA. There is an "obvious alternative explanation" for Nevada's high inactivation numbers other than the one asserted by Plaintiffs: Nevada's robust compliance with its NVRA's obligations. *See Twombly*, 550 U.S. at 567–69.

The EAC data in the table below underscores that it is logical that Nevada and its counties would have higher-than-average inactivation rates because they undertake significant list maintenance activities.

///

///

///

| Action | Year | Nevada | U.S. |
|---|---|---|---|
| Confirmation Notices Sent (% of Active Voters)[21] | 2022 | 22.0% | 13.7% |
| | 2020 | 19.7% | 14.3% |
| | 2018 | 16.6% | 11.6% |
| Voters Removed (% of Registered Voters) [22] | 2022 | 18.0% | 8.5% |
| | 2020 | 7.7% | 8.2% |
| | 2018 | 11.1% | 8.2% |
| Voters Removed for Failure to Return Confirmation Notice (% of Removed Voters)[23] | 2022 | 41.3% | 25.4% |
| | 2020 | 41.3% | 32.1% |
| | 2018 | 56.9% | 35.3% |

Nevada sends confirmation notices to voters suspected of having moved at rates far higher than the national average. It follows, then, that Nevada would have higher-than-average inactivation rates. But Nevada's list maintenance activities don't stop at inactivation. Nevada generally removes voters at higher rates than the national average, and in fact the latest EAC data shows that only two states and one territory removed voters at rates higher than Nevada for 2022.[24] And of voters removed, Nevada's removal rates based on a failure to return a confirmation notice consistently far exceeded the national average.

Plaintiffs appear to try to confuse this issue by claiming that at least 4,684 on the inactive list should have been removed. *See* FAC ¶ 79. 4,684 voters represent a mere 0.20% of voters as of June 1, 2024 (2,339,496).[25] "[T]he NVRA requires only a 'reasonable effort,' not a perfect effort, to remove registrants . . . ." *See PILF*, 2024 WL 1128565, at *11. Furthermore, "[t]he NVRA does not require states to immediately remove every voter who may have become ineligible." *Id.* In *PILF*, the court concluded that even if 0.3% of the total number of registered voters in Michigan were ineligible and subject to removal, having

---

[21] 2022 EAC Report at 158, 182–83; 2020 EAC Report at 133, 159–60; 2018 EAC Report at 52, 79.
[22] 2022 EAC Report at 159–60, 188–89; 2020 EAC Report at 135–36, 165–66; 2018 EAC Report at 52–54, 83.
[23] *Id.*
[24] 2022 EAC Report at 188–89.
[25] Nev. Sec'y of State, *Voter Registration Statistics, 06/01/2024 All Voters by County & Party*, https://tinyurl.com/yckc3zed.

them still registered would not be unreasonable under the NVRA. *See id.* at *10. This was especially true where, as here, federally collected data shows that a state is among the most active in removing ineligible individuals. *See id.* The small number of inactive voters that allegedly should have been removed does not plausibly suggest a lack of reasonable effort to remove voters.

### 6. Relocation Rates Cannot Be Meaningfully Compared to Removal Rates

Plaintiffs compare relocation rates reported by the U.S. Census Bureau to removal rates. FAC ¶¶ 71–73. Relocations do not, however, account for individuals who might have moved within the state, or county, and who properly remain on Nevada's voter rolls. And individuals who relocated outside of the state may have been removed from voter rolls other than through the inactivation and cancelation process; for instance, they could have requested removal or confirmed a change of residence. *See Jud. Watch, Inc. v. Pennsylvania*, 524 F. Supp. 3d 399, 407 (M.D. Pa. 2021) (finding implausible the theory of failure to comply with the NVRA based on removal rates not matching or approaching estimated change-of-residence rate).

Moreover, cherrypicked snapshots from years ago say little about any supposed current NVRA violation. *See* Order, *Bellitto v. Snipes*, Case No. 16-cv-61474-BLOOM/Valle, ECF No. 244, at 24 (S.D. Fla. March 30, 2018) (explaining no removal of inactive voters for two years did not paint full picture and finding sufficient evidence to demonstrate ongoing list-maintenance program), *affirmed*, 935 F.3d 1192 (11th Cir. 2019). In any event, each of the counties cited have inactive voters,[26] and actively removed many voters over the same period cited by Plaintiffs.[27] Plaintiffs' allegations therefore do not support a plausible inference of an NVRA violation.

---

[26] Nev. Sec'y of State, Voter Registration Statistics, 07/01/2024, Inactive Voters by County & Party, https://tinyurl.com/365myjsv.

[27] EAC, EAVS Dataset Version 1.1 (released December 18, 2023), https://tinyurl.com/bdh6s3uh. Rows 2709–2725 contain Nevada's information. Removal data is in columns CU through DG, and the explanation of how to understand the removal data is on page 191 of EAC, Election Administration and Voting Survey 2022 Comprehensive Report, https://tinyurl.com/nhx86v7k.

C.     **This Action Is Not Prudentially Ripe**

This action should be dismissed because it is not prudentially ripe.  The prudential ripeness doctrine has "developed in order to 'prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements *over administrative policies*, and also to *protect the agencies* from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'"  *Golden v. Cal. Emergency Physicians Med. Grp.*, 782 F.3d 1083, 1086–87 (9th Cir. 2015) (emphasis in original and citation omitted).  It is animated by (1) concerns that a decision would have "consequences for many members of the public" and (2) "concerns over judicial entanglement in administrative agency actions before the agencies have had an opportunity to take actions or make decisions."  *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 670–71 (2005).  The two factors a court evaluates to determine whether a case is prudentially ripe are (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration."  *Ass'n of Irritated Residents v. EPA*, 10 F.4th 937, 944 (9th Cir. 2021) (citations omitted).  Neither factor weighs in favor of Plaintiffs here.

"The purpose of the 'fitness' test . . . is to delay consideration of the issue until the pertinent facts have been well-developed in cases where further factual development would aid the court's consideration."  *In re Coleman*, 560 F.3d 1000, 1009 (9th Cir. 2009) (citations omitted).  "A claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final."  *US West Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1118 (9th Cir. 1999) (citation omitted).  The issues raised by Plaintiffs are not fit for judicial decision.  They are highly fact intensive, and Nevada has not been offered an adequate opportunity to take any final action in response to the issues Plaintiffs raised in their pre-litigation notice letter.  As noted above, Nevada has been unable to implement its general program to remove voters who have changed residence since November 8, 2023, and between then and June 1, 2024, approximately
///

90,000 voters have been added to the active registration lists. Delaying adjudication will help define the factual issues.

With respect to the second prudential ripeness prong, delaying review would not cause Plaintiffs hardship. "To meet the hardship requirement, a litigant must show that withholding review would result in direct and immediate hardship and would entail more than possible financial loss." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009) (citation omitted). Where there is "no realistic, as opposed to chimeric, danger that [the plaintiffs] will sustain an injury if [a court] await[s] developments," there is no cognizable hardship. *Nat'l Res. Def. Council v. Abraham*, 388 F.3d 701, 707 (9th Cir. 2004) (citation omitted). Plaintiffs' alleged injuries relate to electoral activities, but the relief they request would be impossible to implement before the upcoming November 5, 2024 general election.[28] By the time briefing on this motion is completed, we will be on the cusp of the August 7, 2024 start of the next 90-day restriction period for implementation of a general program to remove voters who have changed residence. There is therefore no reason to adjudicate this case before Nevada has had an opportunity to complete further list maintenance activities that will better clarify the factual record.

///
///
///
///
///
///
///
///
///
///

---

[28] *See* Hr'g Tr. at 36:11–14 (Plaintiffs' counsel asserting Plaintiffs "haven't pressed the Court [for relief or remedy before the November election]."); *id.* at 36:23–25 (Plaintiffs counsel asserting "we're not trying to speed up the case for the sake of obtaining discovery before the November election.").

## V.      CONCLUSION

For the foregoing reasons, the Court should dismiss the FAC.

DATED this 16th day of July, 2024.

AARON D. FORD
Attorney General


By: /s/ Laena St-Jules
LAENA ST-JULES (Bar No. 15156)
 Senior Deputy Attorney General
Office of the Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717
T: (775) 684-1100
E: lstjules@ag.nv.gov

*Attorneys for Secretary of State*