1  David R. Fox (NV Bar No. 16536)
   Christopher D. Dodge (*pro hac vice*)
2  Marisa A. O'Gara (*pro hac vice*)
   **Elias Law Group LLP**
3  250 Massachusetts Ave NW, Suite 400
   Washington, DC 20001
4  (202) 968-4490
   dfox@elias.law
5  cdodge@elias.law
   mogara@elias.law
6
   Bradley S. Schrager (NV Bar No. 10207)
7  Daniel Bravo (NV Bar No. 13078)
   **Bravo Schrager LLP**
8  6675 South Tenaya Way, Suite 200
   Las Vegas, NV 89113
9  (702) 996-1724
   bradley@bravoschrager.com
10 daniel@bravoschrager.com

11 *Attorneys for Intervenor-Defendants*
   *Rise Action Fund, Institute for a Progressive Nevada, and Nevada Alliance*
12 *for Retired Americans*

13

14              IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEVADA
15

16

17 REPUBLICAN NATIONAL COMMITTEE,          Case No. 2:24-cv-00518-CDS-MDC
   NEVADA REPUBLICAN PARTY, and
18 SCOTT JOHNSTON,                          **INTERVENOR-DEFENDANTS'**
                                            **MOTION TO DISMISS PLAINTIFFS'**
19                    Plaintiffs,           **AMENDED COMPLAINT**

20         v.                               ORAL ARGUMENT REQUESTED

21 FRANCISCO AGUILAR, in his official
   capacity as Nevada Secretary of State;
22 LORENA PORTILLO, in her official capacity
   as the Registrar of Voters for Clark County;
23 WILLIAM "SCOTT" HOEN, AMY
   BURGANS, STACI LINDBERG, and JIM
24 HINDLE, in their official capacities as County
   Clerks,
25
                     Defendants.
26

27

28

1

## TABLE OF CONTENTS

POINTS AND AUTHORITIES ................................................................................................. 3

BACKGROUND ..................................................................................................................... 4

I.      Nevada's obligations under the National Voter Registration Act ....................................... 4

II.     Procedural History and Plaintiffs' Amended Complaint .................................................... 6

LEGAL STANDARD............................................................................................................... 7

ARGUMENT ........................................................................................................................... 8

I.      Plaintiffs have failed to plausibly allege standing. .......................................................... 8

        A.      Plaintiffs fail to allege an organizational injury...................................................... 8

        B.      The Court should again conclude that Plaintiffs' speculative concerns about election integrity and vote dilution fail to satisfy Article III. .............................. 10

                1.      Plaintiffs' concerns and fears about election integrity are speculative, generalized grievances that are not cognizable under Article III. ............ 11

                2.      Plaintiffs' generalized and speculative vote dilution fears are not actionable. ................................................................................................ 13

II.     Plaintiffs have failed to plausibly allege any violation of the NVRA. ............................. 15

CERTIFICATE OF SERVICE ............................................................................................... 23

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

INTERVENOR-DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

1    Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Intervenor-Defendants

2    Rise Action Fund ("RISE"), the Institute for a Progressive Nevada ("IPN"), and the Nevada

3    Alliance for Retired Americans (the "Alliance") (collectively, "Intervenors"), file this motion to

4    dismiss the Amended Complaint filed by Plaintiffs Republican National Committee ("RNC"),

5    Nevada Republican Party ("NVGOP"), and Scott Johnston (collectively, "Plaintiffs").

6                                **POINTS AND AUTHORITIES**

7        Plaintiffs' Amended Complaint does not resolve the problems with their original

8    complaint. Even with their amended allegations, Plaintiffs still rely on purported injuries—

9    concerns about the integrity of Nevada elections, the dilution of their votes, and the expenditure

10   of resources in response to those generalized grievances—that the Court previously held fell short

11   of what Article III demands. And while Plaintiffs allege a bit more detail about their activities and

12   expenditures, they fail to allege facts showing that their asserted injuries are traceable to Nevada's

13   alleged violations of the National Voter Registration Act of 1993 ("NVRA"), given that the NVRA

14   does not require, or even allow, the immediate removal of all voters who move or become

15   ineligible.

16       Plaintiffs' claims also fail on the merits. To plausibly allege a violation of the NVRA,

17   Plaintiffs must plead facts which, taken as true, suffice to show that Nevada is not making

18   "reasonable effort[s]" at list maintenance. *See* 52 U.S.C. § 20507(a)(4). Yet Plaintiffs do not

19   include a single factual allegation of what, specifically, it is about Defendants' list maintenance

20   efforts that they believe falls short of the NVRA's requirements. Plaintiffs instead focus

21   exclusively on the results, contending that the numbers of registered voters in some Nevada

22   counties are too high, or that too few voters have been removed. But Plaintiffs' statistical

23   comparisons are misleading, and they are, in any event, entirely consistent with Defendants'

24   compliance with the NVRA's discrete, balanced requirements for list maintenance, which do not

25   demand—and would not be expected to produce—immediate removal of all ineligible voters. *E.g.*,

26   *Pub. Int. Legal Found. v. Benson*, No. 1:21-CV-929, 2024 WL 1128565, at *11 (W.D. Mich. Mar.

INTERVENOR-DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

1, 2024) (explaining the NVRA does not require a "perfect effort[] to remove registrants") ("*PILF*"). If the Amended Complaint were enough, "pleading [an NVRA] violation against almost any [state] would be a sure thing." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 566 (2007). The Federal Rules require more than such a "naked assertion" devoid of "further factual enhancement," *id.* at 557, particularly where Plaintiffs could have, but chose not to, engage in pre-suit discovery under the NVRA to confirm what, exactly, Nevada did to comply with the statute.

The Court should dismiss the Amended Complaint for lack of subject matter jurisdiction and failure to state a claim. !

## BACKGROUND

### I.   Nevada's obligations under the National Voter Registration Act

The NVRA is a federal law that requires states to provide simplified, voter-friendly systems for registering to vote. Congress enacted the NVRA specifically to *increase* access to the franchise by establishing "procedures that will increase the number of eligible citizens who register to vote in elections for Federal office" and by making it "possible for Federal, State, and local governments to implement [the NVRA] in a manner that enhances the participation of eligible citizens as voters in elections for Federal office." 52 U.S.C. § 20501(b)(1)–(2). Congress also made a finding in the NVRA that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." *Id.* § 20501(a)(3).

To further those pro-voter purposes, the NVRA imposes strict restrictions on whether, when, and how a state may cancel a voter registration. *See id.* § 20507(a)(3)–(4), (b)–(d). Outside of a limited and carefully delineated list of exceptions, a state may not remove a voter from its rolls until that voter has (1) failed to respond to a notice and (2) not appeared to vote for two general elections—or roughly four years—following delivery of the notice. *Id.* § 20507(d)(1).[1]

---

[1] A state may immediately cancel a person's registration only where the voter requests to be removed from the rolls or if the voter is convicted of a disenfranchising felony under state law. *Id.* § 20507(a)(3)(A)–(B).

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

Congress therefore purposefully "limited the authority of states to encumber voter participation by permitting states to only remove registrants" in a carefully prescribed manner. *Am. C.R. Union v. Phila. City Comm'rs*, 872 F.3d 175, 182 (3d Cir. 2017).

Congress also mandated that states maintain a "general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters," 52 U.S.C. § 20507(a)(4). But Congress did not demand perfection from the states. The "NVRA requires only a 'reasonable effort,' not a perfect effort, to remove registrants," *PILF*, 2024 WL 1128565 at *11, and states need not "use duplicative tools or [] exhaust every conceivable mechanism" to comply with the NVRA's "reasonable effort" requirement, *Bellitto v. Snipes*, 935 F.3d 1192, 1207 (11th Cir. 2019). This balanced approach reflects the twin policy objectives of the NVRA—to "enhance[] the participation of eligible citizens as voters" and also "to protect the integrity of the electoral process." *See* 52 U.S.C. § 20501(b). And it further reflects Congress's judgment that it is better to tolerate some ineligible voters remaining on the rolls past their point of ineligibility than to permit the erroneous removal—and potential disenfranchisement—of eligible voters.

In an effort to comply with its list-maintenance obligations, Nevada has codified into state law the NVRA's requirement that—prior to having their registration cancelled—a voter must first (1) receive a written notice, (2) not respond to that written notice, and (3) subsequently fail to appear to vote in the following two general elections. *See* NRS 293.530(1)(c). It has also enacted a robust set of laws for identifying and removing registered voters who are no longer qualified to vote in a given county. Among other requirements, county clerks must update a voter's registration in the Secretary of State's database when they receive information that a voter has moved to a new jurisdiction, *id.* 293.527; remove voters from the rolls when they have personal knowledge of an individual's death or if an authenticated certificate of the death of the person is filed in the county clerk's office, *id.* 293.540; remove voters upon a determination that they have been convicted of a felony or upon receipt of a court order directing the cancellation to be made, *id.*; and use "any information regarding the current address of an elector . . . to correct information in the statewide voter registration list." *See id.* 293.525(4). Nevada also permits county clerks to enter into an

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

INTERVENOR-DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'AMENDED COMPLAINT

agreement to "obtain the data compiled by the United States Postal Service concerning changes of addresses of its postal patrons" so that clerks can update the statewide voter registration list when voters move, *id.* 293.5303, and was one of the first seven states to form the Electronic Registration Information Center ("ERIC"), which permits states to use motor vehicle registration and Social Security Administration data, among other sources, to maintain voter rolls.[2]

## II.    Procedural History and Plaintiffs' Amended Complaint

On March 18, the RNC, NVGOP, and Scott Johnston filed suit against the Secretary of State, the Registrar of Voters for Clark County, and the county clerks for Carson City and Douglas, Lyon, and Storey Counties ("Defendants"), alleging that Defendants have violated their list maintenance obligations under Section 8 of the NVRA. Compl. ¶¶ 93–97, ECF No. 1. Intervenors moved to intervene just a few days later on March 21. *See* ECF No. 7. Their motion was later granted on July 12. *See* ECF No. 99. On April 15, the State moved to dismiss, and the county defendants each filed joinders in the State's motion to dismiss in the days that followed. *See* Defs.' MTDs, ECF Nos. 26–28; 30–31; 38. Intervenors filed a proposed motion to dismiss earlier the same day. *See* ECF No. 21. After the motions were fully briefed, the Court held oral argument on the State's motion on June 18. At the conclusion of the hearing, the Court issued an oral ruling granting the State's motion to dismiss because Plaintiffs lacked standing. MTD Order, ECF No. 97. The Court allowed Plaintiffs to file an amended complaint, which they did on July 2. Am. Compl., ECF No. 98.

As with the original complaint, the assumption underlying Plaintiffs' Amended Complaint is that Defendants *must* be violating the NVRA because several Nevada counties have what Plaintiffs believe are "impossibly high registration rates." Am. Compl. ¶ 82. But nowhere does the complaint identify any specific example of Nevada improperly keeping someone on the voter rolls whom the NVRA required be removed, or any particular procedure that Nevada fails to use that the NVRA requires. Nor do Plaintiffs grapple with Nevada's numerous statutory provisions which

---

[2] *See* Nev. Sec'y of State, *Voter Registration List Maintenance*, https://www.nvsos.gov/sos/elections/voters/voter-record-maintenance.

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

describe, in detail, the state's "reasonable efforts" to comply with the NVRA. Plaintiffs just *assume* that Nevada must be violating the NVRA somehow.

Despite its additional allegations, the Amended Complaint also continues to say very little about how Nevada's current list-maintenance practices concretely injure Plaintiffs. Scott Johnston alleges that his fear that Defendants are violating their list maintenance obligations has injured him by undermining his confidence in Nevada elections and by causing him to worry that ineligible voters will dilute his legitimate vote. Am. Compl. ¶ 28. Plaintiffs RNC and NVGOP now allege that Nevada's inaccurate voter rolls require them to "spend resources on mailers, knocking on doors, and otherwise trying to contact voters who are ineligible to vote," which "impedes the RNC's core business objective to elect Republican candidates and turn out Republicans to vote." *Id.* ¶ 14. They further claim they must "spend more time and resources monitoring Nevada elections for fraud and abuse, mobilizing voters to counteract it, educating the public about election-integrity issues, and persuading elected officials to improve list maintenance." *Id.* ¶ 19. Based on these alleged harms, Plaintiffs ask this Court to enter far ranging relief: in addition to a declaratory judgment that Defendants are violating Section 8 of the NVRA, Plaintiffs demand an order instructing Defendants to develop "reasonable and effective" registration list-maintenance programs to cure the violations they believe must exist, and to enter a permanent injunction barring Defendants from violating the NVRA in the future. *Id.* at 21.

## LEGAL STANDARD

Standing is a "threshold matter central to [the court's] subject matter jurisdiction" under Rule 12(b)(1). *Bates v. United Parcel Serv., Inc.*, 511 F. 3d 974, 985 (9th Cir. 2007). To establish standing under Article III, a plaintiff must sufficiently allege (1) a "concrete" and "particularized" injury-in-fact, actual or imminent, (2) that is fairly traceable to the defendant's conduct, and (3) is likely to be redressed by a favorable decision from the court. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338–39 (2016). Plaintiffs, as "[t]he party invoking federal jurisdiction, bear[] the burden of establishing these elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Organizations, like individuals, may have standing to sue on behalf of their members, or "to sue on their own

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

behalf for injuries they have sustained." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982). However, "organizations cannot 'manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021) (quoting *La Asociacion de Trabajadores de Lake Forest v. Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010)).

"Rule 12(b)(6) permits dismissal on the basis of either (1) the 'lack of a cognizable legal theory,' or (2) 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Newlands Asset Holding Tr. v. SFR Invs. Pool 1, LLC*, No. 3:17-cv-00370-LRH-WGC, 2017 WL 5559956, at *2 (D. Nev. Nov. 17, 2017) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F. 2d 696, 699 (9th Cir. 1990)). To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Although a court must "take all of the factual allegations in the complaint as true," *id*. (citing *Twombly*, 550 U.S. at 555), "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

## ARGUMENT

### I.    Plaintiffs have failed to plausibly allege standing.

Plaintiffs have failed to plausibly allege any "concrete and particularized" injuries-in-fact that are "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560–61 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). The Amended Complaint should be dismissed for lack of subject-matter jurisdiction under Rule 12(b)(1).

### A.    Plaintiffs fail to allege an organizational injury.

Plaintiffs' Amended Complaint adds a handful of new allegations that Nevada's allegedly inaccurate voter list "impairs" Plaintiffs' ability to engage in get-out-vote and other campaigning

INTERVENOR-DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

activities by giving them a "false picture of Nevada's electorate." Am. Compl. ¶¶ 13-17. Accordingly, they suggest they must unnecessarily "spend resources on mailers, knocking on doors, and otherwise trying to contact voters who are ineligible to vote." *Id.* ¶ 14. Similarly, the NVGOP alleges that it "conducts residency discrepancy reports to mitigate the impediment to their business that inaccurate voter rolls cause." *Id.* ¶ 24. Plaintiffs seem to suggest they are harmed by the mere fact that some number of campaign mailers or volunteer canvassers may end up at an inaccurate address—an evergreen part of campaigning in the United States. Plaintiffs do not even try to explain how such ordinary campaign expenses "impede" their operations. Nor could they; after all, "[s]pending time and money on campaigning is an inevitable feature of running for office." *Bost v. Illinois State Bd. of Elections*, 684 F. Supp. 3d 720, 739 (N.D. Ill. 2023).

Plaintiffs fail, moreover, to show that these alleged injuries are traceable to the alleged violations of the NVRA that they challenge and redressable by the relief they seek. Campaigns and parties will never have access to a perfect picture of Nevada's electorate; nothing in the NVRA entitles them to that. Plaintiffs must plausibly allege their "injury-in-fact is . . . fairly traceable to the challenged action," here, a failure to engage in "reasonable efforts" at list maintenance. *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). But the fact that, for example, some voters who have moved remain on the rolls at an old address does *not* mean Nevada is violating the NVRA. In fact, the opposite is true: absent an express request from the voter for removal, Nevada *must* keep such a voter on the rolls for at least two election cycles. *See* 52 U.S.C. § 20507(d). Accordingly, the fact that the RNC or NVGOP may sometimes mail a campaign flyer to an out-of-date address—or that they take steps to narrow the voter list to limit such mailings—is not traceable to any alleged violation of the NVRA. Such misdirected campaign efforts happen as a matter of course under the NVRA's protections. The same is true of the NVGOP's so-called "residency discrepancy reports." Am. Compl. ¶ 24. NVGOP cannot plausibly allege its choice to prepare such reports is traceable to an alleged NVRA violation when the NVRA itself contemplates keeping voters who have moved on the voter rolls for two election cycles. This

INTERVENOR-DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'AMENDED COMPLAINT

purported injury fails to satisfy the redressability requirement for the same reason: regardless of any remedy afforded in this case, NVGOP will still have the same reasons to prepare "residency discrepancy reports" because some voters will invariably continue moving to new states, and nothing in the NVRA requires their immediate removal from Nevada's voter rolls. *See Humanitarian L. Project v. U.S. Dep't of Treasury*, 463 F. Supp. 2d 1049, 1072 (C.D. Cal. 2006) (finding no redressability where "Plaintiffs w[ould] be in the same position that they are in now" even if they win), *aff'd*, 578 F.3d 1133 (9th Cir. 2009).

The RNC's voluntary choice to "monitor . . . election officials' compliance with their NVRA list maintenance obligations," to "monitor[] Nevada elections for fraud and abuse, mobiliz[e] voters to counteract it, educat[e] the public about election-integrity issues, and persuad[e] elected officials to improve list maintenance," cannot confer standing either. Am. Compl. ¶¶ 18-19. Absent an actual injury that Plaintiffs seek to avoid, these activities amount to an effort to "spend [their] way into standing simply by expending money to gather information and advocate against the defendant's action." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 370 (2024).

This theory of standing thus fails.

### B.   The Court should again conclude that Plaintiffs' speculative concerns about election integrity and vote dilution fail to satisfy Article III.

The Amended Complaint continues to allege that Plaintiff Scott Johnston, a registered Republican voter in Nevada, "fears" that ineligible voters may cast ballots in Nevada, "undermin[ing] [his] confidence in the integrity of Nevada elections" Am. Compl. ¶ 28. The RNC and NVGOP assert the same concerns on behalf of their members and voters. *Id.* ¶¶ 18, 104.

At the June 18 hearing, this Court correctly determined that such allegations "are far too generalized and speculative to confer standing." 6/18/24 Tr. at 23:3-4. When asked if Plaintiffs could amend their pleadings to remedy this deficiency, counsel for Plaintiffs candidly acknowledged that he did not "think there's anything . . . we could bring" with respect to "allegations regarding voter confidence." *Id.* at 25:18-20. The Court was therefore "not convinced

that [Mr. Johnston] would be able to present additional allegations that would establish standing" and proposed to "dismiss [him] with prejudice." *Id.* at 71:2-4. And it further explained why Plaintiffs' vote dilution and election integrity theories of standing failed as a matter of law. *See id.* at 23:2-24:20. But after granting the Plaintiffs leave to amend their complaint, the Court extended this invitation to Mr. Johnston as well. *See id.* at 75:20-25.

True to their word, Plaintiffs have failed to meaningfully amend *any* of their pleadings related to vote dilution or election integrity. *Compare* Compl. ¶¶ 13, 19, 21, 90 *with* Am. Compl. ¶¶ 18, 19, 28, 104 (alleging nearly identical allegations as to vote dilution and election integrity in both complaints). They have therefore offered the Court no reason to disturb its earlier conclusion.

### 1. Plaintiffs' concerns and fears about election integrity are speculative, generalized grievances that are not cognizable under Article III.

Plaintiffs' subjective and unsubstantiated "concerns" or "fears" about Nevada's compliance with the NVRA—and their supposed impact on the integrity of Nevada's elections— are not cognizable harms. Instead, they are precisely the sort of "generally available grievance about government [that] does not state an Article III case or controversy." *Jewel v. NSA*, 673 F.3d 902, 909 (9th Cir. 2011) (quoting *Lujan,* 504 U.S. at 573–74). Such "common concern [about] obedience to law" is an "abstract and indefinite" harm that fails to supply an injury-in-fact. *Novak v. United States*, 795 F.3d 1012, 1018 (9th Cir. 2015) (quoting *Fed. Election Comm'n v. Akins,* 524 U.S. 11, 24 (1998)). There is nothing *particularized* about these fears—all Nevadans share a common desire for lawful elections, rendering Plaintiffs' concerns "plainly undifferentiated and common to all members of the public." *Lujan*, 504 U.S. at 575 (quoting *U.S. v. Richardson*, 418 U.S. 166, 171 (1974)) (cleaned up). Indeed, the Supreme Court has already held that mere concern about whether a federal election requirement "has not been followed" is "precisely the kind of undifferentiated, generalized grievance about the conduct of government that [courts] have refused to countenance." *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (dismissing case challenging Colorado law as violating the Elections Clause for lack of standing). Plaintiffs allege no more with respect to Johnston's "concern" about whether the NVRA is being followed and his "fear" about

INTERVENOR-DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

1    the ensuing consequences. In "seeking relief that no more directly and tangibly benefits [Plaintiffs]

2    than it does the public at large," the complaint "does not state an Article III case or controversy."

3    *Id.* at 439 (quoting *Lujan*, 504 U.S. at 573–74).

4         Plaintiffs' concerns about possible voter fraud stemming from the alleged NVRA violation

5    fail to supply an actionable injury for an entirely separate reason as well—they are purely

6    speculative. For example, the complaint alleges that Mr. Johnston and other Republican voters

7    "fear that their legitimate votes will be nullified or diluted by unlawful votes," Am. Compl. ¶ 104,

8    but such "highly speculative fear" does "not satisfy the requirement that threatened injury must be

9    certainly impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

10        Similarly, the complaint insists that "[v]oter fraud is very real in Nevada," Am. Compl.

11   ¶ 47, but it makes no effort to tie any alleged instance of voter fraud to Nevada's list-maintenance

12   efforts or compliance with the NVRA. Plaintiffs' original complaint relied upon two instances of

13   alleged double voting to support this claim, *see* Compl. ¶ 40, but wholly failed to connect those

14   alleged instances of wrongdoing to Nevada's list-maintenance practices, *see* MTD at 9. In the

15   Amended Complaint, Plaintiffs have withdrawn those allegations, and instead now point to the

16   fact that the Secretary of State's office has referred fourteen cases of "potential election fraud" for

17   prosecution. Am. Compl. ¶ 47. But their error remains the same: Plaintiffs *nowhere* explain how

18   any of these cases of "potential" fraud relate to Nevada's list maintenance practices, or how more

19   "reasonable" practices would have prevented such conduct. Indeed, the Amended Complaint does

20   not even allege that any of these referrals resulted in a conviction.

21        The Amended Complaint once more makes scattershot reference to outside circuit

22   decisions making generic statements about the importance of election integrity, as well as a single

23   line from the two-decade old Carter-Baker Commission report on elections. Am. Compl. ¶¶ 45–

24   46. But it fails to plausibly allege that voter fraud attributable to poor list-maintenance *presently*

25   exists in *Nevada*. Merely invoking "the possibility and potential for voter fraud," based only on

26   "hypotheticals, rather than actual events," does not suffice. *Donald J. Trump for President, Inc. v.

27   Boockvar*, 493 F. Supp. 3d 331, 406 (W.D. Pa. 2020); *cf. Thielman v. Fagan*, No. 3:22-CV-01516-

28

SB, 2023 WL 4267434, at *4 (D. Or. June 29, 2023) (explaining that "courts have universally concluded that an alleged injury related to a lack of confidence" in election administration "is 'too speculative to establish an injury in fact'") (quoting *Lake v. Hobbs*, 623 F. Supp. 3d 1015, 1028–29 (D. Ariz. 2022)), *aff'd sub nom. Thielman v. Griffin-Valade*, No. 23-35452, 2023 WL 8594389 (9th Cir. Dec. 12, 2023). Plaintiffs' "subjective fear" about the prospect of voter fraud "does not give rise to standing." *Clapper*, 568 U.S. at 418; *see also Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993, 1003 (D. Nev. 2020) (concluding Plaintiffs presented an "impermissibly speculative injury" where they "failed to allege a substantial risk of voter fraud"). Moreover, such a theory of standing raises serious traceability and redressability concerns, as there is no reason to think Plaintiffs' requested relief will resolve their groundless and speculative fears about voter fraud. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (explaining it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision"). That is particularly true here because, even "following a favorable decision," any future acts of voter fraud will "still depend on 'the unfettered choices made by independent actors not before the courts.'" *Novak*, 795 F.3d at 1020 (quoting *ASARCO Inc. v. Kadish,* 490 U.S. 605, 615 (1989)); *cf. Levine v. Vilsack*, 587 F.3d 986, 997 (9th Cir. 2009) (explaining that a "pleading directed at the likely actions of third parties . . . would almost necessarily be conclusory and speculative").

In sum, Plaintiffs cannot invoke this Court's jurisdiction based on nothing but fear and concern about whether Nevada is adhering to the NVRA. *See Allen v. Wright*, 468 U.S. 737, 754 (1984) ("This Court has repeatedly held that an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court."). !

### 2. Plaintiffs' generalized and speculative vote dilution fears are not actionable.

Mr. Johnston also alleges that Defendants' list maintenance practices "dilute his legitimate vote." Am. Compl. ¶ 28; *see also id.* ¶ 104 (similar on behalf of RNC and NVGOP supporters). This, too, offers nothing more than a generalized grievance: "Plaintiffs' purported injury of having

their votes diluted due to ostensible election fraud may be conceivably raised by any Nevada voter." *Paher v. Cegavske*, 457 F. Supp. 3d 919, 926 (D. Nev. 2020). "Such claimed injury therefore does not satisfy the requirement that Plaintiffs must state a concrete and particularized injury." *Id.*; *see also Wood v. Raffensperger*, 981 F.3d 1307, 1314–15 (11th Cir. 2020) ("Vote dilution in this context is a paradigmatic generalized grievance that cannot support standing.") (quotation marks omitted). Indeed, courts across the county have *uniformly* rejected such a vote dilution theory of standing in a "veritable tsunami" of decisions. *O'Rourke v. Dominion Voting Sys. Inc.*, No. 20-CV-03747-NRN, 2021 WL 1662742, at *9 (D. Colo. Apr. 28, 2021) (collecting cases), *aff'd,* No. 21-1161, 2022 WL 1699425 (10th Cir. May 27, 2022).[3] Such a theory fails to supply a *particularized* grievance because no single voter's ballot is "diluted" to any greater extent than another.[4] Decisions reaching that conclusion within this Circuit—and within this District— are legion. *See, e.g.*, *Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993, 1000 (D. Nev. 2020) ("Plaintiffs' alleged injury of vote dilution is impermissibly 'generalized' and "speculative'") (quoting *Drake v. Obama*, 664 F.3d 774, 783 (9th Cir. 2011)); *Paher*, 457 F. Supp. 3d at 926; *see also Wash. Election Integrity Coal. United v. Wise*, No. 2:21-CV-01394-LK, 2022

---

[3] *See, e.g.*, *Hall v. D.C. Bd. of Elections*, No. CV 23-1261 (ABJ), 2024 WL 1212953, at *4 (D.D.C. Mar. 20, 2024) ("At bottom, they are simply raising a generalized grievance which is insufficient to confer standing."); *Testerman v. N.H. Sec'y of State*, No. 23-CV-499-JL-AJ, 2024 WL 1482751, at *4 (D.N.H. Jan. 9, 2024) ("[C]ourts that have considered voters' standing in circumstances similar to those here have uniformly rejected individual standing claims based on allegations of dilution resulting from allegedly illegal votes being cast."); *Feehan v. Wis. Elections Comm'n*, 506 F. Supp. 3d 596, 608 (E.D. Wis. 2020) (noting several courts have concluded that similar claims of vote dilution are "generalized grievance[s]"); *Martel v. Condos*, 487 F. Supp. 3d 247, 253 (D. Vt. 2020) ("If every voter suffers the same incremental dilution of the franchise caused by some third-party's fraudulent vote, then these voters have experienced a generalized injury."); *Am. C.R. Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) ("[T]he risk of vote dilution[ is] speculative and, as such, [is] more akin to a generalized grievance about the government than an injury in fact.").

[4] Plaintiffs' generalized vote dilution theory differs from those cases recognizing an injury in the redistricting context, where a law *minimizes* a voter's or a group of voters' voting strength or ability to access the political process *as compared to other voters*. *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 207–08 (1962). In those cases, a vote dilution injury arises because of a "concern[] with votes being weighed *differently*." *Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 355 (3d Cir. 2020) (emphasis added); *see also Wood*, 981 F.3d at 1314 (explaining why vote dilution may be an injury "in the racial gerrymandering and malapportionment contexts" but not in the context raised here). No court has distorted that theory in the manner suggested by Plaintiffs here, where the alleged counting of "illegitimate" ballots dilutes the voting power of all Nevadans equally.

INTERVENOR-DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

WL 4598508, at *4 (W.D. Wash. Sept. 30, 2022) (collecting cases and concluding that similar allegations of vote dilution do not create standing); *Bowyer v. Ducey*, 506 F. Supp. 3d 699, 711 (D. Ariz. 2020) ("As courts have routinely explained, vote dilution is a very specific claim that involves votes being weighed differently and cannot be used generally to allege voter fraud."). On top of this legal deficiency, Plaintiffs' vote dilution theory is infirm because it rests upon the same speculation discussed above. Simply put, there is no reason to think their votes will in fact be diluted by "illegitimate" votes absent the relief they request. *See supra* I(B)(i). Plaintiffs have therefore also failed to plausibly allege standing on this basis.

## II. Plaintiffs have failed to plausibly allege any violation of the NVRA.

As Plaintiffs acknowledge, all the NVRA requires is that states "conduct a general program that makes a *reasonable effort* to remove the names of ineligible voters from the official lists of eligible voters" due to death or change of residence. Am. Compl. ¶ 38 (citing 52 U.S.C. § 20507(a)(4)) (emphasis added). To adequately allege a violation of this requirement, Plaintiffs must plausibly allege Defendants have been *unreasonable* in their list maintenance efforts. Yet Plaintiffs do nothing of the sort because they allege nothing at all about Defendants' actual list maintenance efforts. They do not allege, for example, that Nevada's statutory list-maintenance regimen fails to meet the floor set by the NVRA, nor do they anywhere allege that any of the Defendants is failing to adhere to these statutory requirements. Nothing in the Amended Complaint "permit[s] the court to infer more than the mere possibility of misconduct," *Iqbal*, 556 U.S. at 679, and accordingly the complaint "has not 'shown that the pleader is entitled to relief," *id.* (quoting Fed. R. Civ. P. 8(a)(2)) (cleaned up).

Plaintiffs' failure to allege anything tied to Defendants' actual list maintenance efforts is particularly striking because the NVRA entitles Plaintiffs to obtain exactly the sort of information that would enable Plaintiffs to make such allegations, were there any factual basis for them. States are required to "maintain for at least 2 years and . . . make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i). There

was therefore no need for Plaintiffs to *assume*, as the Amended Complaint does, that Nevada's efforts must have been unlawful—Plaintiffs could easily have requested access to the relevant records, determined what was actually done, and made allegations about why it violates the NVRA, if indeed it does. There is therefore even less of a reason in NVRA cases than in other cases to indulge the assumption that "discovery will reveal evidence" of illegality. *Twombly*, 550 U.S. at 556.

The gist of Plaintiffs' Amended Complaint is that Nevada *must* not be complying with the NVRA because, based on U.S. Census data, several counties "have more active registered voters than voting-eligible citizens, and three other counties have suspiciously high rates of active voter registration." Am. Compl. ¶ 58; *see also id.* ¶¶ 57–90 (similar). But that allegation merely assumes what Plaintiffs are obliged to plausibly allege—that the named election officials are not complying with the minimum requirements of the NVRA. The numbers Plaintiffs point to are "equally consistent with lawful conduct" and, "under *Twombly,* plaintiffs have not pleaded facts that would move their allegations from merely possible to plausible." *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007)**.**

The Amended Complaint nowhere accounts for the fact that Congress "designed [the NVRA] to protect voters from improper removal and only provide[d] very limited circumstances in which states may remove them" from the rolls. *Am. C.R. Union*, 872 F.3d at 182. The law *purposefully* "limits the methods which a state may use to remove individuals from its voting rolls and is meant to ensure that eligible voters are not disenfranchised by improper removal." *U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 381 (6th Cir. 2008). Most notably, the law forbids removing a voter due to possible change in residence until that voter has failed to vote in at least two federal general elections—a four-year lag period, incorporated directly into Nevada law, meant to protect against improper removal. *See* 52 U.S.C. § 20507(d); *see also* NRS 293.530(1)(c)(4). Congress therefore elected to permit some ineligible voters to remain on the rolls for several years while the statutorily-prescribed removal process occurs. Courts have thus recognized that "the NVRA requires only a 'reasonable effort,' not a perfect effort." *PILF*, 2024

INTERVENOR-DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

WL 1128565, at *11. "[T]he statute requires nothing more of the state." *Bellitto*, 935 F.3d at 1203, 1207 ("The failure to use duplicative tools or to exhaust every conceivable mechanism does not make [a state's] effort unreasonable.").

In view of the NVRA's requirements and limitations, and Nevada's own statutory requirements mirroring the NVRA, Plaintiffs' allegation that there are too many voters on the rolls in some counties fails to suggest anything "more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. The numbers Plaintiffs point to are equally consistent with Nevada simply adhering to the rigorous removal processes established by Congress and incorporated into Nevada law. *See* NRS 293.503(3)–(5); 293.525(4); 293.527; 293.530; 293.5303; 293.5307; 293.540. That is not enough to plead a violation of the NVRA. "[A]t the pleading stage," allegations must "plausibly suggest[]," and "not merely [be] consistent with," a legal violation. *Twombly*, 550 U.S. at 557; *see also Redlands Country Club Inc. v. Cont'al Cas. Co.*, No. CV-10-1905-GAF-DTBX, 2011 WL 13224843, at *3 (C.D. Cal. Jan. 28, 2011) ("Allegations that are equally consistent with lawful and unlawful conduct are insufficient under *Twombly*."). "To render their explanation plausible, plaintiffs must do more than allege facts that are merely consistent with both their explanation and defendants' competing explanation." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (concluding "Plaintiffs have not offered allegations of this nature here"). It is therefore not enough to point to the "sheer number of . . . registered voters [as] a hallmark of an unreasonable list maintenance program." *Pub. Int. Legal Found. v. Boockvar*, 495 F. Supp. 3d 354, 359 (M.D. Pa. 2020) (cleaned up). Under the NVRA, there is nothing "unreasonable" about having what appears to be an excessive number of voters on the rolls at one moment in time.

Moreover, as several courts have noted, there is good reason *not* to take Plaintiffs' numbers at face value, even at the pleading stage. Their data relies, in the first instance, upon 2022 American Community Survey ("ACS") data produced by the U.S. Census Bureau to estimate the current population of several Nevada counties. *E.g.*, Am. Compl. ¶ 59. The Eleventh Circuit in *Bellitto* observed that such ACS data may "significantly underestimate[] the population" of a county for a

INTERVENOR-DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

variety of reasons, including because it "asks who has resided in the household in the two-month period" preceding the survey, thereby "exclud[ing] many college students, military personnel" and others who may not reside in an area for the full year. 935 F.3d at 1208. The Census Bureau itself has cautioned that "[d]ue to the variance inherent in survey estimates," the Census Bureau "do[es] not recommend combining survey data from the [American Community Survey] with administrative record data, such as those produced as part of voter tallies."[5] Yet Plaintiffs do just that in their complaint, despite the Census Bureau's warning that "the margin of error could be around 90 percent." *Id.*

The Amended Complaint elsewhere relies upon the 2022 Election Administration and Voting Survey ("EAVS") produced by the U.S. Election Assistance Commission to show the number of inactive registrations in Nevada. *E.g.*, Am. Compl. ¶¶ 69–76. But federal courts have warned that an "EAVS snapshot"—which is all that Plaintiffs provide in the report—can "in no way be taken as a definitive picture of what a county's registration rate is, 'much less any indication of whether list maintenance is going on and whether it's … reasonable.'" *Bellitto,* 935 F. 3d at 1208 (alteration in original) (citation omitted). The 2022 EAVS Survey itself, incorporated by Plaintiffs into their complaint, warns that:

> [D]ata on registered and eligible voters as reported in the EVAS should be used with caution, as these totals can include registrants who are no longer eligible to vote in that state *but who have not been removed from the registration rolls because the removal process laid out by the NVRA can take up to two elections cycles to be completed.*

2022 EAVS at 140[6] (emphasis added) (citing examples in footnotes); *see also Jud. Watch, Inc. v. North Carolina*, No. 3:20-CV-211-RJC-DCK, 2021 WL 7366792, at *10 (W.D.N.C. Aug. 20, 2021) (observing this same cautionary note in 2018 EAVS survey). The EAVS thus advises that "states should expect to see high voter registration rates," meaning that "such information, without

---

[5] Kurt Hildebrand, *Republican National Committee names Douglas in voter roll lawsuit*, TAHOE DAILY TRIB. (Mar. 31, 2024), https://www.tahoedailytribune.com/news/republican-national-committee-names-douglas-in-voter-roll-lawsuit.

[6] U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2022 Comprehensive Report*, (June 2023), https://www.eac.gov/sites/default/files/2023-06/2022_EAVS_Report_508c.pdf ("2022 EAVS").

INTERVENOR-DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

more, does not" provide a meaningful inference of "non-compliance with the NVRA." *Jud. Watch*, 2021 WL 7366792, at *10. Accordingly, the data sources in the Amended Complaint are not fit for the purposes chosen by Plaintiffs, as both courts and the authors of such data have recognized.

To top it all off, Plaintiffs do not properly use the data from these sources, mixing and matching different numbers to self-servingly paint a misleading picture of Nevada's voter rolls. For example, Plaintiffs rely upon ACS data to calculate the baseline population of Nevada's counties—the denominator in their effort to show Nevada has bloated rolls. But as the Eleventh Circuit noted in *Bellitto*, this ACS population data "takes data drawn from the preceding five years and estimates the midpoint of that data." *Bellitto*, 935 F.3d at 1208. In other words, the 2022 ACS population data relied upon in the Amended Complaint, *see* Am. Compl. ¶¶ 58-64, reflects the estimated population of a county *in 2020*—the midpoint of the five years preceding 2022. Plaintiffs then compare this population figure to voter registration rates *in 2024*—not 2020—to generate exaggerated snapshots of the number of registered voters in a given county. *Id.* The Amended Complaint then baselessly asserts that "[t]he only explanation" for the ensuing high rates of voter registration "is substandard list maintenance." *Id.* ¶ 66. But in fact, a very obvious alternative explanation exists: the citizen voting-age population in Nevada *grew* between 2020 and 2024, undercutting Plaintiffs' cherrypicked reliance on stale population data. The Census Bureau itself warns against using ACS data in this manner for just this reason. *Supra* 16-17. Thus, as in *Bellitto*, the Plaintiffs here rely upon an "artificially low denominator" to reach "an inflated registration rate." 935 F.3d at 1208. Such an artificial representation of the state of Nevada's voter rolls fails to "plausibly suggest" any violation of the NVRA.

In addition to vaguely claiming that there are too many people on Nevada's voter rolls, Plaintiffs separately allege that there are 4,684 voters (1) listed as inactive in the 2019 voter file who are presently listed as inactive and (2) who also did not vote in the 2020 or 2022 federal elections. Am. Compl. ¶ 79. They suggest that these voters "should have been removed after the 2022 general election" and that "Defendants are failing to implement their list maintenance procedures." *Id.* But these allegations—noticeably absent from both Plaintiffs' original complaint

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

and notice letter—likewise fail to raise any inference that Nevada's list maintenance procedures are unreasonable.

For one, the NVRA does not *require* an inactive voter's removal immediately after they fail to vote in two consecutive federal general elections. *See* 52 U.S.C. § 20507(b)(2). Rather, the NVRA simply *prohibits* removal of an inactive voter before that has occurred. *Id.* Thus, the existence of inactive voters for more than two election cycles is entirely consistent with the NVRA, so long as the state's efforts, overall, constituted a "reasonable effort" to remove voters based on a change in residence. *Id.* § 20507(a)(4). Plaintiffs fail to explain how having a small number of voters who are inactive both in 2019 and 2024 falls short of that command, particularly given their failure to plausibly allege any misapplication of NRS 293.530(c)(4), which adopts the limitations of the NVRA into Nevada law.

Moreover, Plaintiffs' reliance on snapshots for their allegations means they fail to show that these 4,684 voters—an infinitesimal portion of the millions of registered voters in the state—were, in fact, continuously inactive for two full federal election cycles so as to be removable under the NVRA. A voter listed as inactive in 2019 could have later returned to active status by, for example, returning a confirmation postcard *more* than 30 days after its issuance, *see* NRS 293.530(g), or by re-registering to vote at a new address, and then become inactive again before Plaintiffs' latest voter list was pulled. After all, many voters, including students and younger voters, move frequently. In other words, the mere fact that these voters were listed as inactive in both 2019 and 2024 does not automatically require, or even allow, the cancellation of their voter registration, as Plaintiffs wrongly claim. *See* Am. Compl. ¶ 79 (suggesting such facts evince "a violation of state law"). Such facts are entirely consistent with the dutiful application of both the NVRA and NRS 293.530.

Plaintiffs point to nothing else to support any inference that Nevada is falling short of the NVRA's requirements. For example, Plaintiffs nowhere acknowledge Nevada's own comprehensive statutory removal procedures, *see* NRS 293.503(3)–(5); 293.525(4); 293.527; 293.530; 293.5303; 293.5307; 293.540, never mind "allege that this program itself is deficient" or

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

1    "point to a specific breakdown that makes the program 'unreasonable.'" *Boockvar*, 495 F. Supp.

2    3d at 359. "Without allegation, let alone proof," of such a breakdown, the court cannot infer "that

3    the many procedures currently in place are unreasonable." *Id.* The Amended Complaint notes that

4    a number of counties "currently have inactive registration rates . . . well above the state and national

5    averages." Am. Compl. ¶ 77. But it nowhere explains what inference the Court should draw from

6    this. That roughly half of Nevada's counties have inactive registration rates above the *state* average

7    is mere common sense yet, by Plaintiffs' strained reasoning, somehow supplies an inference that

8    these counties are violating federal law. No greater inference can be drawn from comparison to

9    national averages. And, tellingly, Plaintiffs point to Nevada counties that they have not even named

10   in this suit. *Compare* Am. Compl. ¶¶ 31–35 (naming officials in Clark, Douglas, Lyon, and Storey

11   Counties, as well as Carson City, as defendants) *with id.* ¶ 72 (pointing to removal rates in Mineral

12   and Esmerelda Counties) *and* ¶ 77 (pointing to inactive registration rates in Elko, Eureka,

13   Humboldt, Lincoln, Mineral, Nye, Washoe, and White Pine Counties). This shoddiness illustrates

14   the overreaching nature of Plaintiffs' Amended Complaint—its undergirding approach seems to

15   be to point to some stray pieces of data consistent with any number of factual scenarios, and let

16   the Court fill in the rest.

17          At bottom, the Amended Complaint offers no basis to infer that the named Defendants, or

18   any election official in Nevada, is not complying with the NVRA. The "naked assertion" that

19   Nevada's voter rolls are too high—a fact entirely consistent with the purposeful design of

20   NVRA—"stops short of the line between possibility and plausibility" of entitled to relief.

21   *Twombly*, 550 U.S. at 557. To hold otherwise would impermissibly lower the pleading bar

22   established in *Twombly* and *Iqbal*, and in effect eviscerate any pleading requirement for NVRA

23   claims. The Amended Complaint should be dismissed.

24   / / /

25   / / /

26   / / /

27   / / /

28

INTERVENOR-DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

ELIAS LAW GROUP
LLP
ATTORNEYS AT LAW
WASHINGTON, DC

**CONCLUSION**

For the reasons stated above, Plaintiffs' Amended Complaint should be dismissed.

Dated: July 16, 2024

Respectfully submitted,

**BRAVO SCHRAGER LLP**


By: */s/ Bradley S. Schrager*
David R. Fox (NV Bar No. 16536)
Christopher D. Dodge
(*pro hac vice*)
Marisa A. O'Gara (*pro hac vice*)
**Elias Law Group LLP**
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
(202) 968-4490
dfox@elias.law
cdodge@elias.law
mogara@elias.law

Bradley S. Schrager
(NV Bar No. 10217)
Daniel Bravo (NV Bar No. 13078)
**Bravo Schrager LLP**
6675 South Tenaya Way, Suite 200
Las Vegas, NV 89113
(702) 996-1724
bradley@bravoschrager.com
daniel@bravoschrager.com

*Attorneys for Intervenor-Defendants*

1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 16th day of July, 2024 a true and correct copy of INTERVENOR-DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT was served via the United States District Court's CM/ECF system on all parties or persons requiring notice.

By: */s/ Dannielle Fresquez*
Dannielle Fresquez, an employee of
Bravo Schrager LLP

INTERVENOR-DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'AMENDED COMPLAINT