Jeffrey F. Barr (NV Bar No. 7269)
8275 South Eastern Avenue, Suite 200
Las Vegas, NV 89123
(702) 631-4755
barrj@ashcraftbarr.com

Thomas R. McCarthy* (VA Bar No. 47145)
Gilbert C. Dickey* (VA Bar No. 98858)
Conor D. Woodfin* (VA Bar No. 98937)
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
gilbert@consovoymccarthy.com
conor@consovoymccarthy.com

Sigal Chattah (NV Bar No. 8264)
5875 S. Rainbow Blvd #204
Las Vegas, NV 89118
(702) 360-6200
sigal@thegoodlawyerlv.com

*Admitted pro hac vice

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE, NEVADA REPUBLICAN PARTY, and SCOTT JOHNSTON, <br><br> Plaintiffs, <br><br> v. <br><br> FRANCISCO AGUILAR, *in his official capacity as Nevada Secretary of State*; LORENA PORTILLO, *in her official capacity as the Registrar of Voters for Clark County*; WILLIAM "SCOTT" HOEN, AMY BURGANS, STACI LINDBERG, and JIM HINDLE, *in their official capacities as County Clerks*, <br><br> Defendants. | No. 2:24-cv-00518-CDS-MDC <br><br><br> **RESPONSE IN OPPOSITION TO SECRETARY'S MOTION TO DISMISS AMENDED COMPLAINT** |

1

## **INTRODUCTION**

2      The amended complaint contains more details on standing and Defendants' list-

3  maintenance failures. This time around, the Secretary doesn't dispute most of the

4  Plaintiffs' organizational injuries. And he admits that the claim is "highly fact inten-

5  sive." Sec'y Mot. (Doc. 101) 23. The Court can deny the motion on those grounds.

6      The Court dismissed the initial complaint on two grounds not raised in the Sec-

7  retary's first motion to dismiss. First, the Court ruled that the Plaintiffs lacked stand-

8  ing because the Court could not grant relief during the NVRA's 90-day blackout pe-

9  riod. The amended complaint doesn't trigger that concern, and no Defendant raises

10  the argument this time around.[1] Second, the Court ruled that the claims are not pru-

11  dentially ripe. But there's nothing to wait on. List maintenance under the NVRA is

12  an ongoing obligation. So a State can't avoid accountability by saying it will take ac-

13  tions in the future to comply with the statute. Moreover, prudential ripeness isn't a

14  get-out-of-jail-free card for fact-intensive cases. Defendants cannot *avoid* discovery by

15  saying the Plaintiffs *need* discovery.

16      In any event, the amended complaint contains detailed allegations of past and

17  present failures by Defendants. It explains how the Secretary recently eliminated a

18  key list-maintenance tool by absolving clerks of their duties in sending out postcards.

19  It explains how Clark County is failing to ensure applicants register with a residential

20  address. And it updates the other allegations with recent data. This Court should fol-

21  low the well-established caselaw before it, deny the Secretary's motion to dismiss, and

22  allow this case to proceed.

23

24  _____

[1] Plaintiffs preserve their objection to the Court's dismissal of the initial complaint on this basis. Plain-

25  tiffs request a declaration that Defendants are violating the NVRA by failing to make "reasonable" list-
maintenance efforts and an order instructing them to "develop and implement reasonable and effective

26  registration list-maintenance programs." Am. Compl. at 21. Nothing in the complaint demands that
Defendants conduct that program during the NVRA's 90-day blackout period. Whatever program the

27  State implements must be consistent with NVRA's other provisions, including the 90-day blackout pe-
riod. *See United States v. Bd. of Election Comm'rs for St. Louis*, Docs. 1, 4, No. 4:02-cv-1235 (E.D. Mo.

28  2002) (complaint and consent decree requiring various list-maintenance procedures filed within the 90
days before the November 2002 election).

Opposition to Secretary's Motion to Dismiss

**BACKGROUND**

Nevada has stopped maintaining clean and accurate voter rolls. Six of Nevada's seventeen counties have registration rates over 90%. Am. Compl. (Doc. 98) ¶¶59-61. Although registering 90% of eligible voters is a laudable goal, registration rates across the State and nation are closer to 70%. ¶¶62-64. Inflated rolls like these are a telltale sign that officials are failing to remove voters who have become ineligible. ¶65. In fact, three of the six counties with inflated rolls have registration rates over 100%—a mathematical impossibility. ¶59. The Justice Department and others have sued jurisdictions with similarly inflated registration rates, and those jurisdictions quickly admitted liability or agreed to clean up their rolls. ¶¶85-90.

The impossibly high registration rates are not the only indicators that Nevada is failing to maintain its rolls. Several counties have experienced high rates of residency changes in recent years, but they failed to remove voters for residency changes during that period. Am. Compl. ¶72. Some counties removed none at all. ¶73. In addition, the State as a whole reports far more inactive voters than the national average, suggesting that Nevada is keeping inactive voters on the rolls rather than removing them. ¶76. Individual counties have rates of inactive voters that are double or triple the national and state averages, which is strong evidence that they are not making a reasonable effort to remove outdated registrations. ¶¶75, 77-78. In fact, nearly 5,000 voters currently on the rolls have been listed as inactive for two full election cycles, which means they should have been removed after the 2022 election. ¶79. They weren't removed, which is direct evidence that Nevada is failing to fulfill its obligations under the NVRA.

Nevada is violating federal law. One of the NVRA's "main objectives" is to force States to "remov[e] ineligible persons from [their] voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1838 (2018). According to the bipartisan Carter-Baker Commission, inaccurate rolls are "the root" cause of "most problems encountered in U.S. elections." Compl. ¶38. Bloated rolls invite unlawful voting, dilute

2

lawful votes, and decrease voters' confidence in elections. ¶¶38-41. Fraud, in particular, "is a real risk" that "has had serious consequences" in various States. *Brnovich v. DNC*, 141 S. Ct. 2321, 2348 (2021). The NVRA thus requires States to "conduct" a program that makes a "reasonable effort" to "remove the names of ineligible voters" who move or die from the rolls. 52 U.S.C. §20507(a)(4). Congress created a private right of action that allows individuals who serve a pre-suit notice to sue States that violate the NVRA. *Id.* §20510(b). According to Congress, this scheme "ensure[s] that accurate and current voter registration rolls are maintained," which safeguards both the "fundamental right" to vote and the "integrity of the electoral process." *Id.* §20501(a)(1), (b)(3)-(4).

Plaintiffs—the Republican National Committee, the Nevada Republican Party, and Scott Johnston—brought this suit to remedy Nevada's violations. The RNC is the national committee of the Republican Party and represents over 30 million registered Republicans throughout the country. Am. Compl. ¶¶9-10. The Republican Party of Nevada is a political party in Nevada that represents over 550,000 registered Republicans in the State. ¶¶21-22. Together, the RNC and the NVGOP represent the interests of the Republican Party and its members throughout the country and the State.

The RNC and NVGOP rely on voter rolls daily. They use Nevada's rolls to determine the number of staff they need in the State and various counties, the number of volunteers needed to contact voters, and how much they will spend on paid voter contacts. Am. Compl. ¶14. They use the registration numbers to form their electoral strategies and to advise candidates. ¶¶15, 17. Inflated rolls cause the RNC and NVGOP to spend limited funds on those efforts, contacting voters who are not registered or eligible to vote. ¶¶14-15. Those wasted efforts divert resources from voter-registration and get-out-the-vote initiatives, which are essential to the organizations' mission to elect Republican candidates. ¶¶14-15. Inflated voter rolls also harm the RNC's ballot-chase efforts. Because Nevada automatically sends all active voters a mail ballot, inaccurate voter rolls result in more ineligible voters receiving mail

ballots. That means the RNC and the NVGOP must divert resources to ensure they are chasing mail ballots of eligible voters, rather than ballots mailed to voters who are no longer eligible to vote. ¶16. For example, the NVGOP conducts residency discrepancy reports to determine whether voters have moved to another State or are registered to vote in another State. ¶¶24-25. All of these injuries harm the electoral mission of the Republican Party.

The RNC and NVGOP are joined in this suit by Scott Johnston, a registered voter in Washoe County. Am. Compl. ¶27. Mr. Johnston is a resident of Nevada who votes in local and statewide elections. ¶27. He is also active in electoral politics and has held various leadership roles in the Republican Party. ¶29. Nevada's sloppy list maintenance undermines Plaintiffs' confidence in elections and risks diluting the votes of their members and individual voters such as Mr. Johnston. ¶28. To redress their injuries, Plaintiffs sued the Secretary of State—the chief election official responsible for list maintenance in Nevada. ¶30. Plaintiffs also sued the registrars and clerks of five counties with particularly problematic voter rolls. ¶¶31-35. Those county officials play a direct role in maintaining accurate voter registration records. ¶¶31-35.

Before suing, Plaintiffs served the Secretary with a pre-suit notice that identified the parties and addressed the curative steps needed to bring the state into compliance to avoid litigation. Am. Compl. ¶¶91-102. The Secretary moved to dismiss the initial complaint under Rules 12(b)(6) and 12(b)(1). *See* Sec'y Mot. to Dismiss Compl. (Doc. 26). He argued that the Plaintiffs did not allege a concrete injury, the notice letter was deficient, and the complaint failed to state a claim. After a hearing, this Court granted the motion to dismiss, ruling that Scott Johnston lacked Article III standing, the Court could not afford effective relief, and the claim was not prudentially ripe. *See* Hr'g Tr. (ECF No. 96) 23:2-4, 72:17-73:23. The Secretary now moves to dismiss the amended complaint on largely the same grounds.

## LEGAL STANDARDS

A motion to dismiss under Rule 12(b)(6) "tests" whether the complaint satisfies

Opposition to Secretary's Motion to Dismiss

1    Rule 8. *Thomson v. Caesars Holdings Inc.*, 661 F. Supp. 3d 1043, 1052 (D. Nev. 2023)

2    (Silva, J.). Rule 8 in turn requires only "a short and plain statement of the claim show-

3    ing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Courts must accept

4    the complaint's factual allegations as true, allow all reasonable inferences from those

5    allegations, and construe the complaint in the light most favorable to the plaintiff.

6    *Edwards v. Signify Health, Inc.*, No. 2:22-cv-95, 2023 WL 3467558, at *2 (D. Nev. May

7    12, 2023) (Silva, J.).

8    　　　After drawing all those inference in Plaintiffs' favor, the question is whether

9    the complaint states a claim that is "'plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S.

10   662, 678 (2009). Plausible means a "reasonable inference that the defendant is liable."

11   *Id.* It does not mean that liability is "probable," *id.*, or even that Plaintiffs are "likely

12   to succeed," *Produce Pay, Inc. v. Izguerra Produce, Inc.*, 39 F.4th 1158, 1166 (9th Cir.

13   2022). "If there are two alternative explanations, one advanced by defendant and the

14   other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives

15   a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir.

16   2011). To the extent the "parties proffer evidence" in their filings, "the court may not

17   weigh [that] evidence in deciding a motion to dismiss." *Neilson v. Union Bank of Cal.,*

18   *N.A.*, 290 F. Supp. 2d 1101, 1151 (C.D. Cal. 2003) (collecting cases).

19   　　　When assessing a claim's plausibility, courts generally "'may not consider any

20   material beyond the pleadings.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir.

21   2001). Courts can consider "'the face of the complaint [and] materials incorporated

22   into the complaint by reference,'" such as Plaintiffs' pre-suit notice. *See In re Sorrento*

23   *Therapeutics, Inc. Sec. Litig.*, 97 F.4th 634, 641 (9th Cir. 2024). Courts also can take

24   judicial notice of official documents for their "existence," but not for their "truth." *Lee*,

25   250 F.3d at 690. And in no event can the court take "judicial notice of *disputed* facts,"

26   *id.*, or use outside materials to contradict the factual allegations or inferences in the

27   complaint, *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003, 1014 (9th Cir.

28   2018). An outside document that "merely creates a defense to the well-pled allegations

1   in the complaint" cannot "defeat otherwise cognizable claims." *Id.*

2       The same rules apply to the Rule 12(b)(1) motion. "When 'standing is challenged

3   on the basis of the pleadings,'" the Court "must 'accept as true all material allegations

4   of the complaint' and 'construe the complaint in favor of the complaining party.'" *Cal.*

5   *Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1100 (9th Cir. 2024) (amended op.) (quot-

6   ing *Pennell v. City of San Jose*, 485 U.S. 1, 7 (1988)). At this stage, "general factual

7   allegations of injury resulting from the defendant's conduct may suffice," because the

8   court must "presume that general allegations embrace those specific facts that are

9   necessary to support the claim." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)

10  (cleaned up).

11                                   **<u>ARGUMENT</u>**

12  **I.   Plaintiffs have plausibly alleged Article III standing.**

13      Standing requires injury, causation, and redressability. Importantly, Congress

14  created a private right of action for violations of the NVRA, including section 8's list-

15  maintenance requirement. *See* 52 U.S.C. §20510(b). Courts evaluating Article III

16  standing "must afford due respect to Congress's decision." *TransUnion LLC v.*

17  *Ramirez*, 141 S. Ct. 2190, 2204 (2021) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340-

18  41 (2016)). Congress's judgment is "instructive and important" because the legislature

19  is "well positioned to identify intangible harms that meet minimum Article III require-

20  ments." *Spokeo*, 578 U.S. at 341. In fact, Congress can "'articulate chains of causation

21  that will give rise to a case or controversy where none existed before.'" *Id.* And Con-

22  gress can "'elevate to the status of legally cognizable injuries concrete, *de facto* injuries

23  that were previously inadequate in law." *TransUnion*, 141 S. Ct. at 2204-05.

24      Because all Plaintiffs here seek the same relief under the same claim, "the Ar-

25  ticle III injury requirement is met if only one plaintiff has suffered concrete harm."

26  *Juliana v. United States*, 947 F.3d 1159, 1168 (9th Cir. 2020). And once a court con-

27  cludes that at least one party has standing for each claim, it "err[s] by inquiring into

28  the … independent Article III standing" of other parties. *Little Sisters of the Poor*

1    *Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020). Plaintiffs

2    have standing under a variety of theories, any one of which is sufficient to deny the

3    Secretary's motion.

### A.    The RNC and the NVGOP have organizational standing.

5    Courts generally "have no difficulty concluding" that organizations suffer an

6    injury "attributable to the State" in NVRA cases when the Defendants' violations dis-

7    rupt the organizations' mission. *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032,

8    1041 (9th Cir. 2015). The amended complaint alleges that Defendants' violation of the

9    NVRA inflates the voter rolls, which directly injures the RNC and NVGOP's mission

10   to elect Republican candidates and turn out Republican voters. Am. Compl. ¶¶13-20,

11   23-26. "[T]here can be no question" that the disruption of the organizations' core mis-

12   sion is an "injury in fact." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982);

13   *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024).

14   The Secretary does not dispute that most of the organizational injuries alleged

15   in the amended complaint constitute injuries in fact. The Secretary doesn't dispute

16   that the RNC and NVGOP rely on registration numbers to form their electoral strat-

17   egies and to advise candidates. *See* Am. Compl. ¶¶15, 17. He doesn't dispute that in-

18   flated rolls cause the RNC and NVGOP to spend limited funds on those efforts, con-

19   tacting voters who are not registered or eligible to vote. ¶¶14-15. He doesn't dispute

20   that those resources are diverted from voter-registration and get-out-the-vote initia-

21   tives, which are essential to the RNC and NVGOP's mission to elect Republican can-

22   didates. *Id.* He doesn't dispute that inflated rolls harm the RNC and NVGOP's ballot-

23   chase efforts by resulting in more ineligible voters receiving mail ballots. ¶16. And he

24   does not dispute that all of these injuries harm "the core electoral missions" of the

25   RNC and NVGOP. ¶18, 25. It would thus be "improper" for this Court "to dismiss for

26   lack of standing." *Havens*, 455 U.S. at 379. The Secretary doesn't argue otherwise.

27   In fact, the only organizational injury that the Secretary disputes is the injury

28   caused by the "risk of voter fraud based on inaccurate voter rolls." Sec'y Mot. 8-9. Even

Opposition to Secretary's Motion to Dismiss

1   if the undisputed injuries weren't enough, "[t]o survive a motion to dismiss for lack of

2   constitutional standing," the Plaintiffs must merely allege a "'line of causation' be-

3   tween defendants' action and their alleged harm that is more than 'attenuated.'" *Maya*

4   *v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011). In *Maya*, home buyers had stand-

5   ing to sue real-estate developers on the theory that the developers marketed homes to

6   buyers who presented a high risk of foreclosure, which caused those buyers to abandon

7   their homes, which resulted in inflated prices, which harmed the plaintiff home buy-

8   ers. *Id.* If that chain of causation is sufficient, it is at least "plausible" that mass-

9   mailing ballots to ineligible voters increases the risk of fraud, which necessarily harms

10   the RNC and NVGOP, Am. Compl. ¶¶19, 37, 45. The Supreme Court has recognized

11   that "[f]raud is a real risk" in elections. *Brnovich*, 141 S. Ct. at 2348; *see also Crawford*,

12   553 U.S. at 193-94, 197 (op. of Stevens, J.). Nothing more is required at this stage. *See*

13   *Jud. Watch, Inc. v. King*, 993 F. Supp. 2d 919, 925 (S.D. Ind. 2012).

14   **B.    The RNC and NVGOP fall within the NVRA's "zone of interests."**

15   The Secretary doesn't dispute that most of the RNC and NVGOP's injuries sat-

16   isfy Article III. Instead, he pivots to a new argument: the Plaintiffs' organizational

17   injuries don't fall within the NVRA's "zone of interests." Sec'y Mot. 9-10. Though the

18   argument is new to this case, other courts have rejected it. *See ACORN v. Fowler*, 178

19   F.3d 350, 363 (5th Cir. 1999); *Pub. Int. Legal Found. v. Boockvar* [*PILF v. Boockvar*],

20   370 F. Supp. 3d 449, 456 (M.D. Pa. 2019). In fact, the Secretary cites no case holding

21   that private organizations fall outside the NVRA's zone of interests. This Court should

22   reject the argument for two independent reasons.

23   ***First***, the zone-of-interests test doesn't apply to the NVRA because "Congress

24   intended the NVRA's private-right-of-action provision to eliminate prudential limita-

25   tions on standing." *ACORN v. Fowler*, 178 F.3d 350, 363 (5th Cir. 1999). The zone-of-

26   interests test is "a matter of statutory interpretation," rather than constitutional or

27

28

Opposition to Secretary's Motion to Dismiss

statutory standing.[2] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014). It asks "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id.* at 127. "In other words," the Court asks whether the Plaintiffs have "a cause of action under the statute." *Id.* at 128.

The NVRA explicitly provides that any "person who is aggrieved by a violation" of the NVRA "may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation." 52 U.S.C. §20510(b)(1)-(2). As "used in the NVRA," that language is broad. *ACORN*, 178 F.3d at 365. Courts have thus interpreted the "person aggrieved" formulation "to have eliminated prudential standing requirements in the context of other federal laws, thus allowing any plaintiff meeting Article III standing requirements to sue under the law." *Id.* at 364. That broad phrase, plus the "legislative history, judicial interpretations of the specific language Congress used in the NVRA's private right of action, and the inclusion of a provision for attorneys' fees" led the Fifth Circuit to conclude "that Congress intended the NVRA's private-right-of-action provision to eliminate prudential limitations on standing." *Id.* Congress thus "extend[ed] standing under the [NVRA] to the maximum allowable under the Constitution." *Id.* at 363. And because the Secretary all but concedes that the RNC and NVGOP suffer a variety of constitutional injuries, *see supra* Section I.A, that should end the standing inquiry.

**Second**, even if this Court deviates from the Fifth Circuit's approach, the RNC and NVGOP's interests fall squarely within the NVRA's purposes. When Congress enacts a "detailed statement of the statute's purposes," courts ask only whether the Plaintiffs' injury falls within those purposes. *Lexmark*, 572 U.S. at 132. Plaintiffs have a cause of action "to ensure that accurate and current voter registration rolls are

---

[2] Before *Lexmark*, many courts framed the zone-of-interests test as one of "prudential standing" or subject-matter jurisdiction, as the Secretary does here. But whether Plaintiffs have a statutory cause of action "does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional power to adjudicate the case." *Lexmark*, 572 U.S. at 128 n.4 (cleaned up). Rather, the question is simply whether the plaintiffs have "a cause of action under the statute." *Id.* at 128. Courts evaluate that issue under the Rule 12(b)(6) standard. *See Leyse v. Bank of Am. Nat. Ass'n*, 804 F.3d 316, 320 (3d Cir. 2015).

Opposition to Secretary's Motion to Dismiss

maintained." 52 U.S.C. §20501(b)(4). Most of the RNC and NVGOP's injuries are the direct result of Defendants' failure to maintain "accurate and current voter registration rolls." *Id.* The Secretary doesn't even dispute that inaccurate registration lists harm "the RNC's electoral and campaign strategies," and that bloated rolls hurt the RNC and NVGOP's "voter turnout, voter registration, mail-voting campaigns, and in-person efforts." Am. Compl. ¶15. Instead, the Secretary argues that accurate voter rolls are really about "the public interest at large" rather than "private or partisan" interests. Sec'y Mot. at 9-10. But nothing in the statute limits the NVRA to "public" injuries, as opposed to "private" ones. Indeed, the very presence of the private right of action forecloses that arbitrary distinction. In other words, the Secretary puts statutory standing at odds with Article III standing. Every plaintiff must show a particularized "private" injury to satisfy Article III. But according to the Secretary, that private injury necessarily *removes* plaintiffs from a statute's zone of interests. That rule makes no sense, which is why the Secretary has no authority to support it.

In any event, Plaintiffs' interests align with the NVRA's other purposes, too. Congress sought to "increase the number of eligible citizens who register to vote" and to "enhance[] the participation of eligible citizens as voters." 52 U.S.C. §20501(b)(1), (2). So do Plaintiffs. They engage in "voter turnout, voter registration, mail-voting campaigns, and in-person efforts." Am. Compl. ¶15. An essential part of their mission is to "turn out Republican voters in local, state, and federal elections." ¶12. The Secretary denigrates these interests as "partisan." Sec'y Mot. 10. But neither the NVRA doesn't close the courts to political parties. Many voter organizations—including the RNC, NVGOP, and intervenors in this case, *see* Mot. to Interv. (Doc. 7) at 4-8—focus their voter-engagement on specific constituent groups. The NVRA's text doesn't prohibit such groups from invoking the private right of action. Creating such a rule would conflict with binding precedent applying the NVRA. *Nat'l Council of La Raza*, 800 F.3d at 1036, 1042 (holding that a "Latino civil rights and advocacy organization" had standing to sue for "systematic and ongoing violations" of the NVRA).

1   Finally, Congress enacted the NVRA "to protect the integrity of the electoral

2   process." 52 U.S.C. §20501(b)(3). Plaintiffs work to ensure that, as well. They spend

3   resources "monitoring Nevada elections for fraud and abuse, mobilizing voters to coun-

4   teract it, educating the public about election-integrity issues, and persuading elected

5   officials to improve list maintenance." Am. Compl. ¶19. And when an organization

6   "seeks to promote election integrity nationwide by ensuring that voter rolls are 'free

7   from ineligible registrants, noncitizens, individuals who are no longer residents[,] and

8   individuals who are registered in more than one location,'" it falls within "the zone of

9   interests protected by the NVRA." *PILF v. Boockvar*, 370 F. Supp. 3d at 456.

10   In sum, the NVRA's private right of action is broad enough "to have eliminated"

11   the zone-of-interests requirement. *ACORN*, 178 F.3d at 365. The Secretary might dis-

12   agree with the breadth of Congress's decision, but the Court "cannot limit a cause of

13   action that Congress has created" just because the Secretary disagrees with Con-

14   gress's policy. *Lexmark*, 572 U.S. at 126. Even if the test applied, the RNC and

15   NVGOP's interests are "not discordant with all of the NVRA's stated goals." *PILF v.*

16   *Boockvar*, 370 F. Supp. 3d at 456. The Secretary cites no authority holding otherwise.

17   **C.   Voters have standing under the NVRA.**

18   Mr. Johnston and Republican voters[3] have independent bases for standing. The

19   Defendants' violations undermine their confidence in the electoral process and will

20   dilute their votes through increased risk of invalid ballots. Those injuries are concrete,

21   particularized, and non-speculative. This Court disagreed and previously dismissed

22   Mr. Johnston as a plaintiff. Hr'g Tr. at 24:19-20. To do so again here would be error

23   for several reasons.

24

25

---

26   [3] Associational standing has three requirements, and the Secretary challenges only one: whether a
member would have standing to sue in their own right. *See Hunt v. Wash. State Apple Advert. Comm'n*,
27   432 U.S. 333, 343 (1977). The Secretary does not contest the other two requirements probably because
they are easily satisfied here. This suit is at the core of the organizational Plaintiffs' mission and mem-
ber participation is not necessary because Plaintiffs seek only injunctive and declaratory relief. *See*
28   *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004).

Opposition to Secretary's Motion to Dismiss

*First*, Congress created a private right of action in the NVRA, a decision to which this Court "must afford due respect." *TransUnion*, 141 S. Ct. at 2204. Voter confidence in the integrity of the election process has "'independent significance'" because it "'encourages citizen participation in the democratic process.'" *Jud. Watch, Inc. v. Griswold*, 554 F. Supp. 3d 1091, 1104 (D. Col. 2021) (quoting *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 197 (2008) (op. of Stevens, J.)); *accord Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). Congress has determined that inflated rolls undermine the "integrity of the electoral process." 52 U.S.C. §20501(b)(3)-(4). "When Congress 'elevates intangible harms into concrete injuries,' a plaintiff need not allege 'any additional harm beyond the one Congress has identified.'" *PILF v. Boockvar*, 370 F. Supp. 3d 449, 455 (M.D. Pa. 2019) (quoting *Spokeo*, 578 U.S. at 341; *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017)). In addition to the harm Congress has identified, undermining voter confidence burdens the right to vote, and "[t]here can be no question that a plaintiff who alleges that his right to vote has been burdened by state action has standing to bring suit to redress that injury." *King*, 993 F. Supp. 2d at 924.

Defendants' violations also injure Mr. Johnston by risking the dilution of his right to vote. Burdens on the right to vote are concrete, particularized injuries that support standing. *Id.* That right "'can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.'" *Id.* (quoting *Purcell*, 549 U.S. at 4). Courts thus recognize that "vote dilution can be a basis for standing." *Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020). Bloated voter rolls dilute the votes of eligible voters by facilitating fraudulent or otherwise ineligible votes. Am. Compl. ¶¶19, 90. This injury is not a generalized grievance, *contra* Mot. 6-7, even though it's suffered by many Nevada voters, and even though the amount of dilution might be relatively slight. *See Baker v. Carr*, 369 U.S. 186, 208 (1962); *Spokeo*, 578 U.S. at 339 ("The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable

1    generalized grievance."). And their injuries are "particularized because the Plaintiffs

2    allege that *their* votes are being diluted." *Green v. Bell*, 2023 WL 2572210, at *4

3    (W.D.N.C. Mar. 20, 2023). The "harm of vote dilution is concrete and actual or immi-

4    nent, not conjectural or hypothetical." *Kravitz v. Dep't of Com.*, 336 F. Supp. 3d 545,

5    558 (D. Md. 2018) (cleaned up).

6        Vote dilution is not "speculative." Mot. 8. The Secretary claims "there is no ba-

7    sis" for the Court "to revisit" its ruling that voter fraud is speculative. Mot. 7. But he

8    ignores the allegations in the amended complaint of registration-related fraud in Ne-

9    vada. *See* Am. Compl. ¶49. Those are precisely the kinds of fraudulent practices that

10   Defendants' NVRA violations facilitate. In any event, bloated voter rolls invite all

11   kinds of ineligible voting—fraudulent, intentional, accidental, and innocent—all of

12   which dilute Plaintiffs' lawful votes. And the link between bloated rolls and ineligible

13   voting is not overly speculative. *See Brnovich*, 141 S. Ct. at 2347-48; *Crawford*, 553

14   U.S. at 193-94, 197 (op. of Stevens, J.). Regardless, Plaintiffs are seeking "forward-

15   looking, injunctive relief," so Article III allows them to sue over not just actual dilu-

16   tion, but also the "risk of" dilution. *TransUnion*, 594 U.S. at 435. "Fraud is a real risk"

17   in Nevada and elsewhere. *Brnovich*, 141 S. Ct. at 2348; *see* Am. Compl. ¶¶47-49 (col-

18   lecting cases). The link between inflated voter rolls and increased risks of illegal vot-

19   ing is obvious and well established.

20       Even if these events would be too speculative in a vacuum, "'Congress has the

21   power'" to make it satisfy Article III, as it did here by enacting a private right of action

22   for violations of the NVRA. *Spokeo*, 578 U.S. at 341. This Court previously relied on

23   other, non-NVRA cases questioning vote dilution as speculative. *See* Hr'g Tr. at 24:4-

24   13 (citing *Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993 (D.

25   Nev. 2020); *Wood v. Raffensperger*, 981 F.3d 1307, 1310 (11th Cir. 2020)). The Inter-

26   venors collect more. *See* Interv. Mot. (Doc. 104) 14-15. But those cases did not "arise

27   under a situation like the National Voter Registration Act where Congress has artic-

28   ulated the private right of action." *Daunt v. Benson*, Doc. 376 at 20, No. 1:20-cv-522

13

Opposition to Secretary's Motion to Dismiss

1    (W.D. Mich. Nov. 3, 2020) (attached as Ex. A). Congress's judgment warrants "re-

2    spect," *TransUnion*, 141 S. Ct. at 2204, especially because harm to voters under the

3    NVRA bears "a close relationship to a harm traditionally recognized as providing a

4    basis for a lawsuit in American courts," *Green*, 2023 WL 2572210, at *4 (quoting

5    *TransUnion*, 141 S. Ct. at 2213). Plaintiffs "are asserting 'a plain, direct and adequate

6    interest in maintaining the effectiveness of their votes,' not merely a claim of 'the right

7    possessed by every citizen to require that the government be administered according

8    to law.'" *Baker*, 369 U.S. at 208 (quoting *Coleman v. Miller*, 307 U.S. 433, 438 (1939)).

9    Courts have long recognized that vote dilution and losses of voter confidence burden

10   the right to vote. And burdens on constitutional rights are classic examples of "intan-

11   gible injuries" that satisfy Article III. *Spokeo*, 578 U.S. at 340.

12       ***Second***, courts have held that individual voters have standing to sue under the

13   NVRA. Mr. Johnston's injury is not "generalized" because "there is no indication that

14   undermined confidence and discouraged participation are 'common to all members of

15   the public.'" *Griswold*, 2021 WL 3631309, at *7 (quoting *Lance v. Coffman*, 549 U.S.

16   437, 440 (2007)). Mr. Johnston is a registered voter in Nevada who votes in the very

17   local and statewide elections that are suffering from bloated rolls. *See* Am. Compl.

18   ¶¶27, 29, 60, 72. The RNC and the NVGOP represent other voters like him. ¶10, 22.

19   Their injuries are not "speculative or hypothetical": they "already exist[]" because

20   their "confidence is undermined now." *Griswold*, 2021 WL 3631309, at *7. Courts have

21   thus repeatedly recognized this injury as a basis for standing in section 8 cases. *E.g.*,

22   *Green*, 2023 WL 2572210, at *4; *Daunt*, Ex. A at 18-21; *Griswold*, 2021 WL 3631309,

23   at *7; *King*, 993 F. Supp. 2d at 924.

24       ***Third***, so long as the Court finds that at least one Plaintiff "has standing," it

25   "need not consider whether the [other parties] also have standing to do so." *Horne v.*

26   *Flores*, 557 U.S. 433, 446 (2009). In fact, to do so is legal error. *Little Sisters of the*

27   *Poor*, 591 U.S. at 674 n.6. Because all three Plaintiffs seek the same relief under the

28

Opposition to Secretary's Motion to Dismiss

1    same claim, and at least one has standing, "the Article III injury requirement is met."

2    *Juliana*, 947 F.3d at 1168. The Court should thus reach the merits.

3                                    *        *        *

4           Any of these theories demonstrates standing at the pleading stage. But the Sec-

5    retary's arguments would render the NVRA a dead-letter statute. Organizations don't

6    have standing, he says, because they don't fall within the NVRA's "zone of interests."

7    Voters presumably do fall within the NVRA's "zone of interests," but he argues that

8    their injuries are not concrete. Add up those arguments, and no plaintiff could ever

9    sue under the NVRA for a section 8 violation. Neither the NVRA nor the Constitution

10   tolerate that conclusion, which is why courts confronting similar NVRA claims have

11   approved every theory of injury suffered by Plaintiffs here. Those courts "afford[ed]

12   due respect to Congress's decision" to create a right to sue under the NVRA. *TransUn-*

13   *ion*, 141 S. Ct. at 2204. This Court should, too.

14   **II.    Plaintiffs have plausibly alleged NVRA violations.**

15          Section 8 of the NVRA "requires States to 'conduct a general program that

16   makes a reasonable effort to remove the names' of voters who are ineligible 'by reason

17   of' death or change in residence." *Husted*, 138 S. Ct. at 1838 (quoting 52 U.S.C.

18   §20507(a)(4)). The law makes the removal of dead or relocated voters "mandatory." *Id.*

19   at 1842. Plaintiffs plausibly alleged that Nevada is not complying with this duty. The

20   Secretary argues that "[n]o case brought on similar allegations has ever succeeded on

21   the merits." Sec'y Mot. 18. But that just concedes that *all of those cases* made it past

22   the pleading stage. After that, those cases largely settle. *See* Am. Compl. ¶¶85-90.

23   **A.    High active registration rates plausibly state a section 8 claim.**

24          The allegations of high registration rates alone raise a reasonable inference of

25   liability. The complaint alleges that at least six counties have registration rates that

26   are abnormally or impossibly high compared to the rest of the State and the rest of

27   the country. Am. Compl. ¶¶3-5, 59-65. These "unreasonably high registration rate[s]"

28   create a "strong inference of a violation of the NVRA" that is "sufficient," on its own,

                                          15

to survive a motion to dismiss. *ACRU*, 166 F. Supp. 3d at 805. "Other courts" agree that "a registration rate in excess of 100%" indicates that a jurisdiction is "not making a reasonable effort to conduct a voter list maintenance program in accordance with the NVRA." *Griswold*, 2021 WL 3631309, at *10; *Voter Integrity Proj. NC, Inc. v. Wake Cnty. Bd. of Elections*, 301 F. Supp. 3d 612, 620 (E.D.N.C. 2017); *Green*, 2023 WL 2572210, at *5; *ACRU*, 166 F. Supp. 3d at 793; *Daunt*, Ex. A at 16.

The Secretary deems these allegations insufficient for three main reasons. First, he claims that the NVRA permits States to rely on the U.S. Postal Service's change-of-address information as a "safe harbor." Sec'y Mot. 12-13. Second, the Secretary claims that, instead of poor list maintenance, the inflated rolls could be caused by population growth or the NVRA's limits on how fast voters can be removed. *Id.* 13-14. And third, the Secretary disputes the data. *Id.* 14-19. None of these arguments is a reason to dismiss a complaint at the pleading stage. Notably, the Secretary's primary authority is a case that was decided *at trial*, after the court received "extensive expert testimony." *Bellitto v. Snipes*, 935 F.3d 1192, 1207-08 (11th Cir. 2019). Earlier in the litigation, the district court *denied* the defendant's motion to dismiss, rejecting the same arguments the Secretary makes here. *Bellitto v. Snipes*, 221 F. Supp. 3d 1354, 1365 (S.D. Fla. 2016).

***First***, the so-called "safe harbor" for USPS data is not a reason to dismiss the complaint. The NVRA allows a State to "meet the requirement of subsection (a)(4)" by relying on "change-of-address information supplied by the Postal Service." 52 U.S.C. §20507(c)(1). The Secretary suggests the USPS data may be inaccurate, Sec'y Mot. 13, but courts have found that argument "unconvincing" at this early stage. *ACRU*, 166 F. Supp. 3d at 793-94. If the USPS data were the sole cause of inflated rolls, the counties named in the complaint would not be outliers among the rest of the State. Am. Compl. ¶¶64-66. Rather, "it is more likely that the Defendant's failure to maintain the voter rolls caused the registration rate to climb," which raises a "'strong inference'" that "is adequate to survive a motion to dismiss." *ACRU*, 166 F. Supp. 3d at 794.

Moreover, the Secretary doesn't even claim that the State or counties actually rely on USPS information. *See* NRS 293.530(1) (counties may "use any reliable and reasonable means" to determine whether a voter has moved residences). Even if some counties use USPS data, that would not prove that the Defendants consistently and accurately apply that data, or that they follow through in removing voters. The USPS data is meaningless unless States actually *use* it, and ensure that county officials are using it, too. *See* 52 U.S.C. §20507(c)(1)(A) (requiring that the change-of-address information "is used"). Whether the State is complying with "subsection (c)(1)" and whether that compliance "defeats Plaintiff[s'] claims" is a "fact-based argument more properly addressed at a later stage of the proceedings." *Bellitto*, 221 F. Supp. 3d at 1366; *accord Voter Integrity Proj. NC*, 301 F. Supp. 3d at 620 (similar); *Griswold*, 2021 WL 3631309, at *11 (similar).

The provision is also not a "safe harbor," at least not in the way that the Secretary means. The NVRA requires States to remove voters who have moved, 52 U.S.C. §20507(a)(4)(B), and restricts how States can remove those voters, *id.* §20507(d). The process in subsection (c)(1) is thus a "permissible" way to satisfy these "mandates and accompanying constraints." *A. Philip Randolph Inst. v. Husted*, 838 F.3d 699, 707 (6th Cir. 2016), *rev'd*, 138 S. Ct. 1833. It is not a *sufficient* way to satisfy section 8's list-maintenance requirements. A process that admittedly permits "a substantial number of voters who have moved out of the jurisdiction" to remain on the rolls and fails to reach "40 percent of people who move," Sec'y Mot. 13, is hardly a "reasonable effort" to conduct list maintenance, 52 U.S.C. §20507(a)(4)(B). Even if the provision were a safe harbor, it only pertains to a States' "obligations regarding change of address." *Bellitto*, 935 F.3d at 1210. Section 8 also requires States to remove voters who become ineligible due to "death," 52 U.S.C. §20507(a)(4)(A), and USPS data does not ensure Defendants are complying with that separate duty. *Bellitto v. Snipes*, 302 F. Supp. 3d 1335, 1356-57 (S.D. Fla. 2017).

*Second*, Plaintiffs do not have to disprove other possible explanations for Nevada's inflated rolls. *See Starr*, 652 F.3d at 1216. The Secretary relies on a case in which "only one" of two "possible explanations" could be true, and "only one of which results in liability," *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013). But the allegations here are "plausible," not merely "possible," and this case does not present two alternative scenarios, "only one of which can be true." *Id.* Even if the NVRA or population growth were responsible for some inflation of the rolls—and the Secretary does not say how much—that does not "exclude the possibility" that deficient list-maintenance is responsible for the rest. *Id.* To the extent there is "a potentially reasonable explanation for the high registration rate, … the validity of that explanation is not appropriate for determination at this early stage of the litigation, where the court views the factual allegations and inferences drawn therefrom in favor of [Plaintiffs]." *Voter Integrity Proj. NC*, 301 F. Supp. 3d at 619. The Secretary's alternative explanations are also contradictory. On one hand, he claims that the rolls *are* inflated because the NVRA does not allow counties to quickly remove ineligible voters. Sec'y Mot. 13-14. On the other hand, he claims that the rolls *are not* inflated because he reads the data differently. *Id.* at 14-19. These theories cannot render Plaintiffs' contrary inference of substandard list maintenance implausible.

*Third*, even if the Secretary's criticisms of Plaintiffs' methodology were correct, they are not proper at this early stage. Relying on the post-trial *Bellitto* case, the Secretary argues that census data is "insufficient to prove an NVRA violation." *Id.* at 15 (citing *Bellitto*, 935 F.3d at 1207-08). But at this stage, Plaintiffs don't need to "prove" anything. Even if the evidentiary disputes could be considered, they are unpersuasive. The Secretary disputes the census data, Sec'y Mot. 15-18, but the U.S. Election Assistance Commission uses the census numbers to estimate voter turnout and registration "because it provides a more accurate picture of the population covered by the [survey]." U.S. Election Assistance Comm'n, *Election Admin. and Voting Survey 2022 Comprehensive Report* 7 (June 2023), perma.cc/28SQ-T24L; *see also* Am. Compl. ¶¶69-71.

1       The Secretary next quibbles with Plaintiffs' use of the five-year census estimate

2   instead of the one-year estimate. Sec'y Mot. 16-17. But the Census Bureau says that

3   five-year estimate is the "[m]ost reliable" of the American Community Surveys.[4] The

4   one-year estimate is more "current" but "[l]less reliable," and it only has "[d]ata for

5   areas with populations of 65,000+," *id.*, which excludes *all but two* of Nevada's coun-

6   ties.[5] Next, the Secretary's use of old registration rates from 2017 through 2020 is self-

7   defeating. Sec'y Mot. 16.-17. Plaintiffs challenge the registration practices of today,

8   not those of five years ago. To the extent there is disagreement about which data best

9   measures those practices, "the fact-intensive dispute about the accuracy and signifi-

10  cance of the Plaintiffs' statistics must be resolved at the summary-judgment stage or

11  at trial." *Green*, 2023 WL 2572210, at *5.

12      Plaintiffs' methodology has been repeatedly upheld. Their "census data is reli-

13  able," *ACRU*, 166 F. Supp. 3d at 791, especially since Plaintiffs used "the most recent

14  census data available at the time of the filing of [their] complaint," *Voter Integrity*

15  *Proj. NC*, 301 F. Supp. 3d at 619. Regardless, this Court cannot dismiss the complaint

16  even if it suspects that the "registration numbers may not be unreasonably high in

17  context or there may be a reasonable explanation for them." *Griswold*, 2021 WL

18  3631309, at *11. At "the motion to dismiss stage, the Court does not 'weigh potential

19  evidence that the parties might present'" in this manner. *Id.* The Secretary's disputes

20  about "the reliability" and "significance" of "Plaintiffs' statistics" thus cannot defeat

21  "a 'reasonable inference' that the defendant is liable." *Green*, 2023 WL 2572210, at *5.

22   **B.    The many other allegations in the complaint plausibly allege an**
            **NVRA violation.**
23

24      Although courts have held that Plaintiffs' voter-registration data states a claim,

25  the complaint here does not rest on those numbers alone. The complaint documents

26  examples of six jurisdictions with similarly high registration rates who, after they

27

28  [4] U.S. Census Bureau, *When to Use 1-year or 5-year Estimates* (Sept. 2020), perma.cc/LJ8K-WJYQ.
    [5] Nev. Legislature Research Div., *Population of Counties in Nevada* (Aug. 2021), perma.cc/NY8M-RFP6.

Opposition to Secretary's Motion to Dismiss

1    were sued, essentially agreed that their rolls were inflated. *See* Am. Compl. ¶¶85-90.

2    The complaint also rules out alternative explanations for these inflated rolls. ¶¶66-

3    67. And it details even more data demonstrating that certain counties are not keeping

4    up with residency changes, ¶¶68-74, and not removing voters even after marking

5    them inactive, ¶¶75-78.

6       Start with residency discrepancies, which courts have held also allege an NVRA

7    violation. *Compare Griswold*, 554 F. Supp. 3d at 1108 ("the 2018 EAC Report shows

8    that 30 Colorado counties reported removing fewer than 3% of voters," even though

9    "18% of Coloradans were not living in the same house as a year ago"), *with* Am. Compl.

10   ¶¶72-73 (the 2020-2022 EAC Report shows that two counties "reported removing less

11   than 2% of their registration lists for residency changes" even though "more than 15%

12   of Nevada's residents were not living in the same house as a year ago"). The Secretary

13   obfuscates by changing the words of the statute: he claims the State can't "systemati-

14   cally act" on residence changes in the 90 days before an election. Sec'y Mot. 13. That's

15   false. The provision he cites says that the State cannot "systematically *remove*" voters

16   from the rolls 90 days before an election. 52 U.S.C. §20507(c)(2)(A). Nothing in the

17   NVRA prohibits Defendants from moving voters to inactive status before an election.

18   In any event, these alternative explanations are irrelevant, *see Starr*, 652 F.3d at

19   1216, and even the Secretary can't explain why some counties removed *no voters* for

20   failing to respond to an address-confirmation notice, Am. Compl. ¶73. The complaint

21   contrasts a highly mobile population with unusually stagnant list-maintenance for

22   those moves. ¶¶70-74. That data raises a plausible inference of a violation. *Griswold*,

23   554 F. Supp. 3d at 1108.

24      Even if Nevada had a "reasonable program" to maintain its rolls, Nevada's

25   treatment of inactive registrations shows that it is not *implementing* that program.

26   The amended complaint alleges that Nevada's rate of inactive registrations (16%) is

27   much higher than the national average (11%). Am. Compl. ¶¶75-76. The Secretary

28   argues that discrepancy shows that Nevada is aggressively canceling registrations,

Opposition to Secretary's Motion to Dismiss

1  Sec'y Mot. 20. But at most, it shows that Nevada is effective at *almost* canceling reg-

2  istrations but fails to actually remove those voters from the rolls. In other words, a

3  "high 'inactive registration rate'" is evidence that even if the State is "availing itself

4  of the NVRA's safe harbor," it may "not actually be implementing it." *Griswold*, 554

5  F. Supp. 3d at 1097, 1108. The NVRA requires States to "conduct" a list-maintenance

6  program, not to simply *have* a list-maintenance program. *Id.* §20507(a)(4); *see Bellitto*,

7  935 F.3d at 1205-06 (defendants must demonstrate as a "factual" matter that they

8  "reasonably used [the enacted] process"). Nevada's treatment of inactive registrations

9  shows it is failing to remove ineligible voters from the rolls.

10      The Secretary also suggests that the Plaintiffs must allege specifically how the

11  Defendants are falling short of their list-maintenance duties. *See* Sec'y Mot. 19-20.

12  The courts hold otherwise. The NVRA requires reasonable list maintenance, not spe-

13  cific policies, so identifying specific policies that the State must adopt or repeal cannot

14  be part of the plaintiff's pleading burden. *See King*, 993 F. Supp. 2d at 922. Similarly,

15  Plaintiffs' claim relies on an omission: that Defendants are failing to conduct proper

16  list maintenance. "[L]ittle factual detail is necessary or available when a plaintiff is

17  alleging that the defendant failed to act." *Arvizu v. Medtronic Inc.*, 41 F. Supp. 3d 783,

18  792 (D. Ariz. 2014); *accord Washington v. Baenziger*, 673 F. Supp. 1478, 1482 (N.D.

19  Cal. 1987); *Hobbs v. Powell*, 138 F. Supp. 3d 1328, 1343 (N.D. Ala. 2015).

20      Regardless, the amended complaint details many specific failures. Start with

21  the 4,684 voters who have been inactive for over two election cycles. Am. Compl. ¶79.

22  The Secretary doesn't dispute that state law requires their removal. *See* NRS 293.530.

23  But they haven't been removed. Relying on a summary-judgment case, the Secretary

24  argues that 4,684 voters is a relatively small number. Sec'y Mot. 21 (citing *PILF v.

25  Benson*, 2024 WL 1128565, at *11 (W.D. Mich. Mar. 1, 2024)). But the proper compar-

26  ator and the relative size of a particular failure are questions of fact, as that case

27  demonstrates. More to the point, the Secretary can't avoid a plausible inference of a

28  violation by arguing the violation "isn't that bad." The 4,684 voters are evidence that

1    the Defendants are failing to act on their own records that show thousands of improper

2    registrations. By not removing those voters, the Defendants are violating state law.

3    *See* NRS 293.530. At a minimum, that failure raises a reasonable inference that De-

4    fendants are not taking "reasonable efforts." *See PILF v. Benson*, 2022 WL 21295936,

5    at *9-10 (denying motion to dismiss complaint).

6        The amended complaint also details failures of residency maintenance. At least

7    part of the explanation for Clark County's bloated rolls is the significant number of

8    non-residential addresses listed on its voter rolls. *See Kraus v. Portillo*, Doc. 1, No. A-

9    24-896151-W (8th Jud. Dist., Clark Cty. June 25, 2024); Am. Compl. ¶74. The Secre-

10   tary claims that "voter registration does not require a residential address," Sec'y Mot.

11   19, but then contradicts that claim by citing state law that prohibits registrants from

12   listing a "business as the address … unless the applicant actually resides there," NRS

13   293.507(4)(c); *see also id.* 293.486(1). And *Kraus v. Portillo* contains evidence of several

14   locations where voters couldn't "actually reside[]," *id.*, such as empty parking lots,

15   demolished buildings, and a U.S. Post Office, *see Kraus*, Doc. 1 at 10-12, 24-25. "Clark

16   County's failure to use 'reliable and reasonable means' to confirm voters' residences

17   indicates a systemic failure to maintain the voter rolls." Am. Compl. ¶74.

18       Finally, the amended complaint provides at least one example of how the Sec-

19   retary in particular has been failing in his duties as the chief elections officer. When

20   clerks send out election postcards, state law requires them "to use any postcards which

21   are returned to correct the portions of the statewide voter registration list which are

22   relevant to the county clerk." NRS 293.530(1)(f). The Secretary recently took the re-

23   sponsibility for postcards onto himself, away from the clerks. *See* Am. Compl. ¶80. But

24   he did not take on the coordinate duty to use those postcards to correct "the statewide

25   voter registration." NRS 293.530(1)(f). The Secretary responds that the "Plaintiffs are

26   trying to impose their own view of what constitutes reasonable efforts." Sec'y Mot. 20.

27   But it's the view of the Nevada Legislature—not of Plaintiffs—that election postcards

28   should be used to correct "the statewide voter registration." NRS 293.530(1)(f). By

1  shifting the responsibility of election officials, the Secretary nullified a key list-

2  maintenance tool enacted by the Legislature.

3  **III.  This case, like other Section 8 cases, is ripe.**

4      The Secretary's desire to "clarify the factual record" has nothing to do with ripe-

5  ness and everything to do with discovery. Sec'y Mot. 23-24. "A proper ripeness inquiry

6  contains a constitutional and a prudential component." *Bishop Paiute Tribe v. Inyo*

7  *Cnty.*, 863 F.3d 1144, 1153 (9th Cir. 2017). The Secretary does not dispute that this

8  case is constitutionally ripe—that is, this case presents "issues that are 'definite and

9  concrete, not hypothetical or abstract.'" *Id.* (citation omitted). Notwithstanding those

10  concrete injuries, the Secretary argues that the Court should refuse jurisdiction on

11  prudential ripeness grounds "even though that jurisdiction is technically present." *In*

12  *re Coleman*, 560 F.3d 1000, 1006 (9th Cir. 2009) (citation omitted).

13      Dismissing this case on prudential-ripeness grounds would be novel and wrong.

14  When the Court has "already concluded that petitioners have alleged a sufficient Ar-

15  ticle III injury," dismissing the claim "on grounds that are 'prudential,' rather than

16  constitutional" is in "tension" with this Court's "'obligation to hear and decide' cases

17  within its jurisdiction." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014)

18  (citation omitted). That obligation "is virtually unflagging." *Id.* For this reason, "[t]he

19  Ninth Circuit has previously declined to reach prudential ripeness when constitu-

20  tional ripeness is satisfied." *State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015,

21  1031 (N.D. Cal. 2018). And because constitutional ripeness is undisputed, the Court

22  should "decline[]" the Secretary's request "to refuse to adjudicate this case on pruden-

23  tial grounds." *California v. Bernhardt*, 460 F. Supp. 3d 875, 893 (N.D. Cal. 2020) (col-

24  lecting cases).

25      Regardless, a case is ripe when the complaint "presents a detailed factual ac-

26  count of the underlying disputes in this case." *Bishop Paiute Tribe*, 863 F.3d at 1154.

27  The amended complaint here is one of the most "detailed factual account[s]" of NVRA

28

Opposition to Secretary's Motion to Dismiss

violations filed in federal court. *Id.* Plaintiffs' counsel is currently engaged in discovery over North Carolina's list-maintenance procedures in *Green v. Bell*, No. 3:20-cv-493 (W.D.N.C.). That complaint survived a motion to dismiss by comparing North Carolina's voter-registration rates to census data. The amended complaint here applies the same methodology to Nevada's voter rolls. And it includes far more: residency-discrepancy analysis, inactive-voter analysis, individual investigation of nearly 5,000 voters, and recent changes in the Secretary's top-down procedures, among other allegations. These issues are fit "for judicial decision," as the many summary-judgment and trial cases cited by the Secretary prove. *Ass'n of Irritated Residents v. EPA*, 10 F.4th 937, 944 (9th Cir. 2021).

The Secretary cites no case dismissing NVRA violations on prudential-ripeness grounds. In part, that's because the NVRA imposes on States an *ongoing* obligation to conduct "routine maintenance of voter lists." *United States v. Missouri*, 535 F.3d 844, 847 (8th Cir. 2008). That's different from the cases the Secretary relies on, which concern the ripeness of a discrete contract, *Golden v. Cal. Emergency Physicians Med. Grp.*, 782 F.3d 1083, 1086 (9th Cir. 2015), an individual agency rule, *Ass'n of Irritated Residents*, 10 F.4th at 941, or a particular loan in a bankruptcy petition, *In re Coleman*, 560 F.3d 1000, 1003 (9th Cir. 2009). The Secretary complains that "Nevada has been unable to implement its general program." Sec'y Mot. at 23. But that's not true. The NVRA has required Nevada to conduct list-maintenance programs for over three decades. If States could avoid accountability by pointing to "further list maintenance activities" in the future, *id.* at 24, no NVRA case could ever be ripe, because States are always on the cusp of running a new list-maintenance program. North Carolina, for example, announced list-maintenance just a few weeks before discovery began in *Green v. Bell. See Green*, 2023 WL 2572210, at *7 (W.D.N.C. Mar. 20, 2023); *County Boards of Elections Conduct Regular Voter List Maintenance*, N.C. State Bd. of Election (Feb. 27, 2023), perma.cc/U2L5-NZEM. And North Carolina's ongoing list-maintenance obligations didn't bar discovery and record development in that case.

Opposition to Secretary's Motion to Dismiss

## CONCLUSION

The Court should deny the Secretary's motion to dismiss.

Dated: July 30, 2024

Respectfully submitted,

*/s/ Jeffrey F. Barr*

Thomas R. McCarthy*
   VA Bar No. 47145
Gilbert C. Dickey*
   VA Bar No. 98858
Conor D. Woodfin*
   VA Bar No. 98937
Consovoy McCarthy PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
gilbert@consovoymccarthy.com
conor@consovoymccarthy.com

*admitted pro hac vice*

*Counsel for Plaintiffs*

Jeffrey F. Barr
   NV Bar No. 7269
Ashcraft & Barr LLP
8275 South Eastern Avenue
Suite 200
Las Vegas, NV 89123
(702) 631-4755
barrj@ashcraftbarr.com

*Counsel for the Republican National Committee and Scott Johnston*

*/s/ Sigal Chattah*

Sigal Chattah
   NV Bar No. 8264
Chattah Law Group
5875 S. Rainbow Blvd #204
Las Vegas, NV 89118
(702) 360-6200
sigal@thegoodlawyerlv.com

*Counsel for the Nevada Republican Party*

25

Opposition to Secretary's Motion to Dismiss