1   Jeffrey F. Barr (NV Bar No. 7269)
    8275 South Eastern Avenue, Suite 200
2   Las Vegas, NV 89123
    (702) 631-4755
3   barrj@ashcraftbarr.com

4   Thomas R. McCarthy* (VA Bar No. 47145)
    Gilbert C. Dickey* (VA Bar No. 98858)
5   Conor D. Woodfin* (VA Bar No. 98937)
    1600 Wilson Boulevard, Suite 700
6   Arlington, VA 22209
    (703) 243-9423
7   tom@consovoymccarthy.com
    gilbert@consovoymccarthy.com
8   conor@consovoymccarthy.com

9   Sigal Chattah (NV Bar No. 8264)
    5875 S. Rainbow Blvd #204
10  Las Vegas, NV 89118
    (702) 360-6200
11  sigal@thegoodlawyerlv.com

12  *Counsel for Plaintiffs*
    ***Admitted pro hac vice***
13

14                  UNITED STATES DISTRICT COURT
                          DISTRICT OF NEVADA
15

16  REPUBLICAN NATIONAL COMMITTEE,
    NEVADA REPUBLICAN PARTY, and SCOTT
17  JOHNSTON,                                       No. 2:24-cv-00518-CDS-MDC

                        Plaintiffs,
18
           v.
19                                                  **SECOND AMENDED**
    FRANCISCO AGUILAR, *in his official capacity*   **COMPLAINT FOR**
20  *as Nevada Secretary of State*; LORENA          **DECLARATORY AND**
    PORTILLO, *in her official capacity as the*     **INJUNCTIVE RELIEF**
    *Registrar of Voters for Clark County*; WILLIAM
21  "SCOTT" HOEN, AMY BURGANS, STACI
    LINDBERG, and JIM HINDLE, *in their official*
22  *capacities as County Clerks*,

                        Defendants.
23

24

25

Plaintiffs the Republican National Committee, the Nevada Republican Party, and Scott Johnston file this second amended complaint under the National Voter Registration Act of 1993 (NVRA), 52 U.S.C. §20507, against Defendants for declaratory and injunctive relief. Plaintiffs allege as follows:

## **INTRODUCTION**

1.    Section 8 of the NVRA requires States to maintain clean and accurate voter registration records.

2.    Nevada has failed to live up to the NVRA's requirements.

3.    At least eight counties in Nevada have inordinately high voter registration rates.

4.    At least three Nevada counties have more registered voters than they have adult citizens who are over the age of 18. That number of voters is impossibly high.

5.    An additional five counties have voter registration rates that exceed 90 percent of adult citizens over the age of 18. That figure far eclipses the national and statewide voter registration rate in recent elections.

6.    Based on this and other evidence, Defendants are failing to make a reasonable effort to conduct appropriate list maintenance as required by the NVRA.

## **JURISDICTION AND VENUE**

7.    The Court has subject-matter jurisdiction because this case alleges violations of the NVRA. *See* 28 U.S.C. §1331; *Ex parte Young*, 209 U.S. 123 (1908).

8.    Venue is proper because a substantial part of the events or omissions giving rise to the claims occurred in this District and because some Defendants "reside" here. 28 U.S.C. §1391.

2

Second Amended Complaint

**PARTIES**

9.    Plaintiff, the Republican National Committee (RNC), is the national committee of the Republican Party, as defined by 52 U.S.C. §30101(14), with its principal place of business at 310 First Street S.E., Washington, DC 20003.

10.    The RNC represents over 30 million registered Republicans in all 50 states, the District of Columbia, and the U.S. territories. It is comprised of 168 voting members representing state Republican Party organizations, including three members who are registered voters in Nevada.

11.    The RNC works to elect Republican candidates to state and federal office. In November 2024, its candidates will appear on the ballot in Nevada for numerous federal and state offices.

12.    The RNC has vital interests in protecting the ability of Republican voters to cast, and Republican candidates to receive, effective votes in Nevada elections and elsewhere. The RNC brings this suit to vindicate its own rights in this regard, and in a representational capacity to vindicate the rights of its members, affiliated voters, and candidates.

13.    The State's maintenance of voter rolls directly affects the RNC's ability to provide services to candidates and voters, and to accomplish its core activities of electing Republican candidates and turning out Republican voters in local, state, and federal elections.

14.    The RNC engages in daily voter registration services for candidates, voters, and local state parties. When a State fails to maintain clean voter rolls, the RNC cannot provide effective registration services for those groups. Failing to remove ineligible voters, failing to move voters to inactive status, and failing to remove voters who have been listed as inactive for two election cycles harm those efforts. That is, candidates and local state parties have interest in registering *eligible* voters. And only *eligible* voters have an interest in registering to vote. When a State fails to maintain

3

Second Amended Complaint

clean voter rolls, it harms the ability of candidates, voters, and local state parties to know who needs to be registered and who needs to update their registration.

15.    The State's maintenance of voter rolls also directly affects the RNC's ballot-chase programs and voter-turnout efforts. The number of voters registered in a State and locality drive the RNC's modeling efforts, providing a roadmap of voters who need to be contacted and driven out to vote. A false report of registered voters hinders the RNC's ability to effectively chase ballots and turn out voters in a given State or locality.

16.    The RNC's ballot-chase efforts are harmed in particular because Nevada automatically sends all active voters a mail ballot. Inaccurate voter rolls result in more ineligible voters receiving mail ballots, which results in the RNC chasing ballots of citizens who are not even eligible to vote.

17.    In addition, the RNC has limited time, employees, volunteers, and money. In each State and locality, the RNC must allocate these resources to elect Republican candidates and turn out Republican voters. For example, when a State or locality shows that few people are registered to vote, the RNC must focus on voter-registration services in that jurisdiction. Conversely, when a State shows a significant number of voters registered to vote, the RNC must focus instead on voter-turnout efforts. When a State has failed to maintain its voter rolls, it the RNC is unable to determine whether it needs to prioritize voter registration or voter turnout, which necessarily harms the RNC's ability elect Republican candidates and turn out Republican voters.

18.    The RNC also relies on state voter rolls for its voter contacts. The RNC contacts voters through mail and digital avenues, as well as both volunteer and paid in person contacts. These voter-contact efforts are essential to electing Republican candidates and turning out Republican voters. The RNC uses voter rolls to adjust the size, scope, and audience for these voter contacts. Inaccurate voter rolls harm the effectiveness of these voter-contact efforts by resulting in contacts with registered

4

Second Amended Complaint

1    voters who are no longer eligible to vote and resulting in mail pieces being printed and

2    sent but never properly delivered.

3        19.    The RNC also provides essential contact support to all Republican

4    candidates that win their respective primaries. That support includes knocking on

5    doors, making phone calls, sending text messages, registering voters, etc. Voter rolls

6    inform who should be contacted in that candidate's jurisdiction. When voter rolls

7    incorrectly report that those contacts are eligible to vote, it hinders the Republican

8    candidate's ability to effectively target eligible voters, which harms her chances of

9    winning that election.

10       20.    The RNC also relies on voter registration numbers to form its electoral

11   strategies. If a State's voter rolls show more active voters registered to vote than is

12   accurate, the RNC's electoral and campaign strategies will be based on a false picture

13   of Nevada's electorate. That inaccurate information impairs the RNC's ability to form

14   winning strategies around voter turnout, voter registration, mail-voting campaigns,

15   and in-person efforts.

16       21.    Finally, inaccurate voter rolls increase the likelihood of fraud and abuse

17   in the election system in a manner that harms the RNC. Nevada has, for example,

18   reported noncitizens on the voter rolls in the past. *See Press Release: Secretary*

19   *Cegavske Releases Details Regarding Ongoing Elections Investigation*, Nev. Sec'y of

20   State (Apr. 19, 2017), perma.cc/Y2LK-9JA9. Recent trends show that Nevada likely

21   has many more noncitizens on its voter rolls today. Over the past two years alone,

22   Oregon, Ohio, Georgia, Texas, Virginia, and Boston have removed thousands of

23   noncitizens from their voter rolls. Noncitizen voting favors Democratic candidates and

24   harms Republican candidates. And maintaining noncitizens' registrations facilitates

25   that injury.

26       22.    Because Defendants do not maintain accurate voter rolls, the RNC must

27   spend substantial time and resources monitoring Nevada elections for fraud and

28

Second Amended Complaint

abuse, mobilizing voters to counteract it, educating the public about election-integrity issues, and persuading elected officials to improve list maintenance.

23.    Each of these injuries harms the RNC's ability to turn out Republican voters and elect Republican candidates. The RNC works to mitigate each of these injuries by diverting substantial resources to counteract the effects of the State's failure to maintain clean rolls. But because the RNC has limited time, employees, volunteers, and money, it must divert resources from other efforts that are critical to its core activities, such as voter-registration efforts, voter-turnout efforts, election-integrity efforts, and voter education.

24.    Proper voter roll maintenance would redress each of these injuries.

25.    Plaintiff Nevada Republican Party (NVGOP) is a political party in Nevada with its principal place of business at 2810 West Charleston Blvd. #69, Las Vegas, NV 89102. The Nevada Republican Central Committee (NRCC) is the NVGOP's governing body. The NVGOP and NRCC exercise their federal and state constitutional rights of speech, assembly, petition, and association to "provide the statutory leadership of the Nevada Republican Party as directed in the Nevada Revised statutes," to "recruit, develop, and elect representative government at the national, state, and local levels," and to "promote sound, honest, and representative government at the national, state and local levels." NRCC Bylaws, art. II, §§1.A-1.C.

26.    The NVGOP represents over 550,000 registered Republican voters in Nevada.

27.    The NVGOP has the same interests in this case as the RNC and seeks to vindicate those interests in the same ways.

28.    The NVGOP also conducts residency discrepancy reports to mitigate the impediment to their business that inaccurate voter rolls cause. Relying on public records requests and other public sources of information, these residency discrepancy reports catalogue active voters who have permanently moved to another State, or who have submitted a change of address and have registered to vote in a new State.

6

Second Amended Complaint

29.    The residency discrepancy reports ensure that the NVGOP is accomplishing its core business of electing Republican candidates in Nevada and turning out Republican voters throughout the State. Voter rolls that list voters who no longer reside in Nevada and no longer vote in Nevada impede the NVGOP's efforts to engage active voters, conduct mail-ballot chase programs, and otherwise accomplish their core activities to elect Republican candidates and turn out Republican candidates.

30.    The NVGOP currently employs full-time staff to conduct the residency discrepancy reports. But for the inaccurate voter rolls caused by Defendants' NVRA violations, the NVGOP would spend those resources on other activities that further its organizational goals, such as get-out-the-vote efforts and voter registration. Those funds that the NVGOP would use for voter outreach are being diverted to mitigate Defendants' violations of the NVRA.

31.    Plaintiff Scott Johnston is a registered Nevada voter and 60-year resident of Nevada. He regularly votes in Nevada's primary and general elections. He plans to vote in Nevada's upcoming elections, including for U.S. President, U.S. Congress, and other federal, local, and statewide offices and ballot measures.

32.    Because Defendants do not maintain accurate voter rolls, Mr. Johnston reasonably fears that ineligible voters can and do vote in Nevada elections. Those votes will dilute his legitimate vote. And Nevada's inaccurate rolls undermine Mr. Johnston's confidence in the integrity of Nevada elections, which also burdens his right to vote.

33.    Mr. Johnston is an active member of the Republican Party. He works in Nevada to advance conservative policies and to help elect Republican candidates. He is a member of the Washoe Central Committee, which is the governing body of the Washoe County Republican Party. Mr. Johnston has served as a precinct captain for the Galena Forest Estates area since 2020, and a Nevada State Central Committee person since 2021.

Second Amended Complaint

34.     Defendant Francisco Aguilar is the Secretary of State of Nevada. He serves "as the Chief Officer of Elections" for Nevada and "is responsible for the execution and enforcement of the provisions of title 24 of NRS and all other provisions of state and federal law relating to elections in" Nevada. Nev. Rev. Stat. §293.124. He is sued in his official capacity.

35.     Defendant Lorena Portillo is the Registrar of Voters for Clark County. She is the county's chief election officer and plays a direct role in list maintenance. See Nev. Rev. Stat. §§244.164, 293.530. Defendant Portillo is sued in her official capacity.

36.     Defendant William "Scott" Hoen is the Clerk for Carson City. He is the county's chief election officer and plays a direct role in list maintenance. See Nev. Rev. Stat. §§293.503, 293.530. Defendant Hoen is sued in his official capacity.

37.     Defendant Amy Burgans is the Clerk for Douglas County. She is the county's chief election officer and plays a direct role in list maintenance. See Nev. Rev. Stat. §§293.503, 293.530. Defendant Burgans is sued in her official capacity.

38.     Defendant Staci Lindberg is the Clerk for Lyon County. She is the county's chief election officer and plays a direct role in list maintenance. See Nev. Rev. Stat. §§293.503, 293.530. Defendant Lindberg is sued in her official capacity.

39.     Defendant Jim Hindle is the Clerk for Storey County. He is the county's chief election officer and plays a direct role in list maintenance. *See* Nev. Rev. Stat. §§293.503, 293.530. Defendant Hindle is sued in his official capacity.

## **BACKGROUND**

### I.    **Federal law requires States to maintain accurate voter rolls.**

40.     Congress enacted the NVRA "to protect the integrity of the electoral process." 52 U.S.C. §20501(b)(3). Specifically, section 8 was enacted "to ensure that accurate and current voter registration rolls are maintained." *Id.* §20501(b)(4).

8

Second Amended Complaint

41.    Retaining voter rolls bloated with ineligible voters harms the electoral process, heightens the risk of electoral fraud, and undermines public confidence in elections. "Confidence in the integrity of our electoral processes is," in turn, "essential to the functioning of our participatory democracy." Purcell v. Gonzalez, 549 U.S. 1, 4 (2006).

42.    Section 8 obligates States to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" due to death or change of residence. 52 U.S.C. §20507(a)(4). "[F]ederal law makes this removal mandatory." Husted v. A. Philip Randolph Inst., 138 S. Ct. 1833, 1842 (2018).

43.    Each State's program for maintaining voter-registration lists must be "uniform, non-discriminatory, and in compliance with the Voting Rights Act." 52 U.S.C. §20507(b)(1).

44.    Specifically, section 8 requires States to "remove the names of ineligible voters from the official lists of eligible voters by reason of (A) the death of the registrant or (B) a change in the residence of the registrant" to outside her current voting jurisdiction. 52 U.S.C. §20507(4)(A)-(B).

45.    The Help America Vote Act (HAVA) also mandates that states adopt computerized statewide voter registration lists and maintain them "on a regular basis" in accordance with the NVRA. 52 U.S.C. §21083(a)(2)(A).

46.    States must "ensure that voter registration records in the State are accurate and are updated regularly," an obligation that includes a "reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." 52 U.S.C. §21083(a)(4).

47.    HAVA's list-maintenance requirements include coordination with "State agency records on death" and "State agency records on felony status" to facilitate the removal of individuals who are deceased or rendered ineligible under state law due to a felony conviction. 52 U.S.C. §21083(a)(2)(A)(ii)(I)-(II).

Second Amended Complaint

48.    State law also requires county clerks to "regularly maintain[]" their county's registration lists "to ensure the integrity of the registration process and the election process." Nev. Rev. Stat. §293.675(3)(i).

49.    According to the bipartisan Carter-Baker Commission, "registration lists lie at the root of most problems encountered in U.S. elections." Comm. on Federal Election Reform, Building Confidence in U.S. Elections 10 (Sept. 2005) (Carter-Baker Report). Inaccurate voter rolls that contain "ineligible, duplicate, fictional, or deceased voters" invite "fraud." *Id.* Although voter fraud is often difficult to detect, "the risk of voter fraud [is] real," and can "affect the outcome of a close election." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (op. of Stevens, J.). And regardless of whether fraud is detected, "the perception of possible fraud contributes to low confidence in the system." Carter-Baker Report, *supra*, at 18. The Supreme Court agrees. *See Crawford*, 553 U.S. at 193-97.

50.    Other courts and experts have likewise recognized that voter fraud is both real and notoriously "difficult to detect and prosecute." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 396 (5th Cir. 2020); *see also Griffin v. Roupas*, 385 F.3d 1128, 1130-31 (7th Cir. 2004) ("Voting fraud is a serious problem in U.S. elections … and it is facilitated by absentee voting."); *Veasey v. Perry*, 71 F. Supp. 3d 627, 641 (S.D. Tex. 2014) (finding broad "agreement that voter fraud actually takes place in abundance in connection with absentee balloting"); *Tex. Democratic Party*, 961 F.3d at 414 (Ho, J., concurring) ("[C]ourts have repeatedly found that mail-in ballots are particularly susceptible to fraud.").

51.    Voter fraud is very real in Nevada. The Nevada Secretary of State's Office has referred at least 14 cases of potential election fraud for criminal prosecution since 2020. *See* Nev. Sec'y of State, 2024 Election Security, perma.cc/8WMQ-TDKV.

52.    And several recent elections have suffered from voter fraud. *See, e.g.*, Nev. Att'y Gen., *Attorney General Ford Announces Guilty Plea of Las Vegas Man Charged with Voter Fraud* (Nov. 16, 2021), perma.cc/WN9D-T9V2; Nev. Att'y Gen.,

10

Second Amended Complaint

*Attorney General Ford Announces Guilty Plea of Las Vegas Man for Voting Twice in 2016 Election* (Feb. 17, 2021), perma.cc/XP2E-EDWE.

53.     Nevada has also experienced its fair share of registration-related fraud in particular. *E.g.*, Sean Whaley, *Illegal Voter Sentenced in Reno*, L.V. Review-Journal (Aug. 15, 2014), perma.cc/42BJ-HB9J (illegal immigrant pleaded guilty to registering to vote under false name); Laura Myers, *Las Vegas Woman Pleads Guilty in Voter Fraud Case*, L.V. Review-Journal (Sept. 9, 2014) (pleaded guilty to double registration under false name), perma.cc/AW97-6HD8.

54.     In addition, Nevada's "new system lacks safeguards meant to keep noncitizens off the voter rolls." Damon & Santa Cruz, *supra*. Nevada has admitted to problems with noncitizens on the voter rolls in the past. *See Press Release of Apr. 19, 2017*, *supra*. And when it comes to safeguards against noncitizens registering to vote, the Secretary claimed that "the new system is no different than the old system in that regard." Damon & Santa Cruz, *supra*.

55.     Maintaining accurate voter rolls is especially important given Nevada's recent transition to universal mail-in voting. Since the passage of Assembly Bill 321 in 2021, all active registered voters in Nevada receive a ballot by mail unless they submit an opt-out form to their respective county clerks. Mailing ballots based on inaccurate registration lists further damages the integrity of Nevada's elections.

56.     To help address voter fraud and ensure compliance with federal election law, the NVRA includes a private right of action. It empowers any "person who is aggrieved by a violation" to "provide written notice of the violation to the chief election official of the State involved." 52 U.S.C. §20510(b)(1). "If the violation is not corrected within 90 days after receipt of a notice, … the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief." *Id.* §20510(b)(2).

11

Second Amended Complaint

## II.     Defendants have specific obligations under the NVRA.

57.     Federal and state law make Nevada's Secretary of State primarily responsible for list maintenance.

58.     The NVRA requires each State to "designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under" the law. 52 U.S.C. §20509.

59.     Nevada law designates the Secretary of State as the State's chief election officer charged with overseeing and maintaining voter registration. *See* Nev. Rev. Stat. §293.124.

60.     Ultimate responsibility for coordinating and overseeing all list maintenance activities rests with the Secretary. A chief election official "may not delegate the responsibility to conduct a general program to a local official and thereby avoid responsibility if such a program is not reasonably conducted." *United States v. Missouri*, 535 F.3d 844, 850 (8th Cir. 2008).

61.     Indeed, "the NVRA's centralization of responsibility counsels against ... buck passing." *Scott v. Schedler*, 771 F.3d 831, 839 (5th Cir. 2014). Courts have rejected the view that, "once the state designates" a local entity to assist with complying with federal law, "her responsibility ends." *Harkless v. Brunner*, 545 F.3d 445, 452 (6th Cir. 2008). "[I]f every state passed legislation delegating" their responsibilities "to local authorities, the fifty states would be completely insulated from any enforcement burdens." *Id.*

## III.    Defendants have failed to comply with their list-maintenance obligations.

62.     Just a decade ago, "24 million voter registrations in the United States—about one in eight—[were] either invalid or significantly inaccurate." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 760 (2018) (citing Pew Center on the States, Election Initiatives Issue Brief (Feb. 2012)). Nevada is no exception, and the evidence underscores the *in*accuracy of Nevada's registration records.

12

Second Amended Complaint

63.     Based on data gathered from the U.S. Census Bureau's 2022 American Community Survey and the most up-to-date count of registered active voters available from the Nevada Secretary of State, three counties have more active registered voters than voting-eligible citizens, and five other counties have suspiciously high rates of active voter registration.

64.     Comparing the registered active voter count to the 2022 Census data reveals that these three counties have voter registration rates at or above 100 percent: Douglas (104%), Lyon (106%), and Storey (111%).

65.     An additional five counties have voter registration rates of 90 percent or greater: Carson City (93%), Churchill (90%), Clark (95%), Eureka (94%), and Washoe (96%).

66.     These voter registration rates are abnormally or, in the case of counties with greater than 100 percent registration, impossibly high.

67.     According to the U.S. Census Bureau, only 69.1% of the citizen voting-age population was registered nationwide in the November 2022 election.

68.     Similarly, only 72.7% of the citizen voting-age population was registered nationwide in the November 2020 election.

69.     The U.S. Census Bureau further reported that Nevada's statewide voter registration rates for the 2022 and 2020 elections were 65.1% and 66.2% of the citizen voting-age population, respectively.

70.     Thus, these six counties are significant outliers, touting voter registration rates 21 to 42 percentage points higher than the national figures from 2022 and 2020, and 25 to 46 percentage points above the State figures for the same period. Discrepancies on this scale cannot be attributed to above-average voter participation and instead point to deficient list maintenance.

71.     There is no evidence that these counties experienced above-average voter participation compared to the rest of the country or State. The only explanation for these discrepancies is substandard list maintenance.

13

Second Amended Complaint

72.    "[S]ignificantly high registration rates" such as these "give rise to the inference" that election officials are "not properly implementing a program to maintain an accurate and current voter registration roll, in violation of the NVRA." *Am. C.R. Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 791 (W.D. Tex. 2015).

73.    When Plaintiffs notified the Secretary about these unusually high registration rates in December 2023, the registration rates were similar. Douglas, Lyon, and Storey Counties all had registration rates in excess of 100% of the citizen voting-age population. And Carson City, Churchill, Clark, Eureka, and Washoe Counties had registration rates in excess of 90% of the citizen voting-age population.

74.    In July, these unusually high rates continued. Two of the smaller counties—Eureka and Churchill—dropped below 90%. But larger counties such as Clark and Washoe saw increases of at least two percentage points. *See* 1st Am. Compl., Doc. 98, ¶¶59-60.

75.    Despite the Secretary's assurances that the State would conduct list maintenance this summer, these counties have continued to report implausibly high registration rates for over a year.

76.    Nevada's maintenance efforts are especially deficient when it comes to removing voters who have changed residence. *See* 52 U.S.C. §20507(d)(1).

77.    In 2023, the U.S. Election Assistance Commission published its biannual report covering the registration period between the 2020 and 2022 general elections. *See* U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2022 Comprehensive Report* (June 2023), perma.cc/28SQ-T24L.

78.    Among other things, the EAC's survey requests data concerning the number of registrations removed for voters' failure to respond to an address confirmation notice.

79.    The most recent census data shows that more than 15% of Nevada's residents were not living in the same house as a year ago.

14

Second Amended Complaint

80.    In response to the EAC's survey for the 2020-2022 period, Mineral County and Esmeralda County reported removing less than 2% of their registration lists for residency changes during that period. That is, registrations removed because the voter moved away or failed to respond to an address confirmation notice represented just 2% of the total number of registrants in those counties. And those removals are spread out over a two-year period, which means that these counties removed on average less than 1% of their registration lists per year for residency changes. Larger counties such as Washoe experienced high relocation rates (16%) but relatively low removal rates (2%).

81.    In fact, Esmeralda, Lincoln, Mineral, and Storey Counties removed *no voters* for failing to respond to an address-confirmation notice and then not vote over two election cycles, and Elko and Pershing Counties removed only two voters for that reason. Those numbers are implausibly low.

82.    Growing evidence shows that Clark County in particular has a significant number of non-residential addresses listed on its voter rolls. *See Kraus v. Portillo*, Doc. 1, No. A-24-896151-W (8th Jud. Dist., Clark Cty. June 25, 2024). Voter registration requires a residential address, and clerks can use "any reliable and reasonable means available … to determine whether a registered voter's current residence is other than that indicated on the voter's application to register to vote." Nev. Stat. §293.530(1)(a). But many registrations on Clark County's rolls list addresses that are not a voter's residence, making it impossible to determine whether the voter currently resides in Nevada. Clark County's failure to use "reliable and reasonable means" to confirm voters' residences indicates a systemic failure to maintain the voter rolls.

83.    Several Nevada counties also have inordinately high inactive registration rates, indicating that Defendants do not make a reasonable effort to remove outdated registrations.

15

Second Amended Complaint

84.    According to the EAC report, in 2022 Nevada reported 359,403 inactive registrations, representing 16.3% of the total registrations. The number is well above the national average of 11.1%.

85.    In addition, several Nevada counties currently have inactive registration rates of 17% or greater, well above the state and national averages. Those counties are Clark (17%), Elko (27%), Eureka (18%), Humboldt (23%), Lincoln (21%), Mineral (22%), Nye (25%), and White Pine (18%).

86.    These counties have been reporting similarly high inactive registration rates for several months. *See* Compl., Doc. 1, ¶68; 1st Am. Compl., ¶77.

87.    Having a high percentage of inactive registrations is an indication that a state or jurisdiction is not removing inactive registrations after two general federal elections.

88.    Indeed, at least part of the explanation for high inactive registration rates is that state officials were "assigning voters to the wrong precincts and mislabeling voters as 'inactive.'" Anjeanette Damon & Nicole Santa Cruz, *Nevada Says It Worked Out the Kinks in Its New Voter System in Time for The Election, but Concerns Remain*, ProPublica (Nov. 2, 2024), perma.cc/KNP6-P7AS.

89.    Other evidence confirms that Defendants are failing to implement the list-maintenance procedures required by state law. For example, in July, the statewide voter rolls listed at least 4,684 inactive voters who should have been removed after the 2022 general election. Those voters were listed as inactive in the June 2019 voter file and had not voted in the prior two federal elections. State law required their removal. *See* Nev. Rev. Stat. §293.530. But the statewide voter file from June 17, 2024—following the Nevada primary election—still listed those 4,684 inactive voters as registered to vote. Defendants' failure to remove those inactive voters is both a violation of state law and evidence that they are failing to engage in reasonable list-maintenance efforts required by the NVRA.

Second Amended Complaint

90.     Finally, the Secretary's recent efforts confirm top-down problems with enforcing a general program. For example, the Secretary sent a postcard to voters before the presidential preference primary that occurred on January 6, 2024. Even though those postcards were official election mail, the Secretary did not catalogue the postcards that were returned as undeliverable.

91.     Even if information about undeliverable postcards is available to the Secretary, the Secretary failed to share that information with the counties. State law requires clerks to "use any postcards which are returned to correct the portions of the statewide voter registration list which are relevant to the county clerk." Nev. Rev. Stat. §293.530(1)(f). The Secretary's failure to gather and distribute information about undeliverable election mail is evidence of a failure to conduct a reasonable list-maintenance program.

92.     Nevada's impossibly high registration rates, large rates of inactive registered voters, low numbers of removals, lack of communication between Defendants, and inconsistent enforcement across counties indicate an ongoing, systemic problem with its voter-list maintenance efforts.

93.     Nevada recently moved to a centralized, top-down voter registration system. *See* Act Relating to Elections, 2021 Nevada Laws Ch. 554 (A.B. 422). The Secretary's tests of the new system confirmed Plaintiffs' claims. According to the Washoe County Registrar, "testing of the new system revealed errors affecting tens of thousands of voters in Washoe County, including voters assigned to the wrong precincts and active voters labeled as inactive or vice versa." Damon & Santa Cruz, *supra*. Washoe County also "missed [the] federal deadline to clean the rolls of inactive voters" before the election. *Id.*

94.     In addition to revealing existing errors, the new system has exacerbated problems. "[T]he launch, which involves transferring massive voter datasets from antiquated county systems to the new centralized one, has strained understaffed county clerk offices already contending with their routine general election

17

responsibilities." Damon & Santa Cruz, *supra*. Test runs revealed at least "20 issues" with the system. *Id.* In fact, there were "enough issues that clerks pressured Aguilar's office to delay the 'go-live' date until after the June primary." *Id.*

95.     The evidence shows that the new system is broken—the Secretary is not providing essential maintenance information the counties, and all Defendants are failing to implement basic list-maintenance procedures, even when required by state law.

96.     Despite the Secretary's assurances that problems have been fixed, a local registrar has told reporters that "shortcomings have not been fully addressed" and "incorrect voter data wound up in the new system." Damon & Santa Cruz, *supra*.

97.     Defendants' failure to maintain accurate voter rolls violates federal law and jeopardizes the integrity of the State's upcoming elections, including the next federal election on November 5, 2024.

**IV.  List-maintenance lawsuits in other States have remedied similar NVRA violations.**

98.     The United States sued Indiana for violating the NVRA in 2006, noting in its complaint that "25 counties had registration totals of 90-95%" of their voting-age population. Indiana quickly confessed to violating the NVRA in a consent decree.

99.     Private organizations sued Indiana in 2012, explaining that "26 counties … have voter registration rolls that contain between 90% and 100% of TVAP." The court denied the defendants' motion to dismiss, and Indiana agreed to conduct a significant, statewide process to clean up its voter rolls.

100.   Ohio was sued on the same grounds, and it ultimately agreed to implement heightened review of the accuracy of its voter rolls.

101.   In December 2019, another organization sued Detroit under the NVRA, alleging that "Detroit has more registered voters than adult citizens of voting age (106%)." The suit was dismissed on June 29, 2020, because Detroit removed substantial numbers of invalid registrations.

18

Second Amended Complaint

102.    In June 2020, a voter sued Michigan's Secretary of State and Direct of Elections for violating the NVRA. The complaint alleged that one county had more registered voters than adult citizens over the age of 18, and an additional 15 counties had voter registration rates that exceeded 90 percent of adult citizens over the age of 18. The court denied the defendants' motion to dismiss, and Michigan agreed to slate 177,000 erroneous registrations for cancellation and implement other list-maintenance reforms.

103.    In September 2021, voters sued North Carolina, alleging that "40 counties in North Carolina have registration rates that far eclipse the national and statewide voter-registration rate in recent elections." The district court denied the defendants' motion to dismiss, and the case is currently in discovery.

## V.    Plaintiffs provided Defendants notice of their statutory violations.

104.    Under the NVRA, "Plaintiffs have [statutory] standing assuming they provided proper notice within the meaning of 52 U.S.C. §20510(b)(1)." *Bellitto v. Snipes*, 221 F. Supp. 3d 1354, 1362 (S.D. Fla. 2016).

105.    On December 4, 2023, Plaintiffs mailed a statutory notice letter to Secretary of State Francisco Aguilar. *See* Exh. A.

106.    The December 4 letter notified the Secretary and the officials of the counties identified in the letter that they "are not conducting appropriate list maintenance to ensure that the voter registration roll is accurate and current, as required by federal law."

107.    The letter provided evidence of the violation by identifying three Nevada counties that have more registered active voters than voting-eligible citizens, and five other counties that have suspiciously high rates of voter registration, according to the most recent census data at the time.

108.    Plaintiffs have since received updated comparisons based on recently available data. Those numbers are reflected in the allegations above.

Second Amended Complaint

109.   The notice stated that Plaintiffs "hope[d] to avoid litigation and would welcome immediate efforts by your office to bring Nevada into compliance with Section 8."

110.   Plaintiffs asked that Defendants ensure they have a "comprehensive, nondiscriminatory" list maintenance program in place that complies with federal law, and to "identify and remove" several categories of ineligible individuals "from the official lists of eligible voters."

111.   Plaintiffs also asked that Defendants "respond in writing within 45 days of the date of this letter," "fully describ[ing] the efforts, policies, and programs [they] are taking, or plan to undertake before the 2024 general election to bring Nevada into compliance with Section 8," as well as when they "plan to begin and complete each specified measure and the results of any programs or activities [they] have already undertaken."

112.   Additionally, Plaintiffs asked Defendants to state "what policies are presently in place, or will be put in place, to ensure effective and routine coordination of list maintenance activities," and "a description of the specific steps [Defendants] intend to take to ensure routine and effective list maintenance on a continuing basis beyond the 2024 election."

113.   Finally, Plaintiffs requested that Defendants take steps to preserve documents as required by section 8(i) of the NVRA, 52 U.S.C. §20507(i)(1)-(2), and other federal law. *See, e.g.*, *In re Enron Corp. Sec., Derivative & Erisa Litig.*, 762 F. Supp. 2d 942, 963 (S.D. Tex. 2010) ("The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.").

114.   The notice letter stated that Plaintiffs would file a lawsuit under 52 U.S.C. §20510(b)(2) if the identified violations were not corrected within 90 days of receipt of the letter.

Second Amended Complaint

115.   Defendants have failed to correct the violations of the NVRA identified in the notice letter and this complaint.

116.   Plaintiff Scott Johnston and all individual members of the RNC and NVGOP who are lawfully registered to vote in Nevada have rights under both the U.S. Constitution and the Nevada Constitution to vote in federal and state elections, as well as statutory rights under both federal and state law to the safeguards and protections set forth in the NVRA.

117.   Defendants' failure to comply with their NVRA voter-list maintenance obligations burdens the right to vote of Mr. Johnston and the individual members of the RNC and NVGOP who are lawfully registered to vote in Nevada by undermining their confidence in the integrity of the electoral process, discouraging their participation in the democratic process, and instilling in them the fear that their legitimate votes will be nullified or diluted by unlawful votes.

118.   Defendants' failure to comply with their NVRA voter-list maintenance obligations also infringes the federal and state statutory rights of Mr. Johnston and the individual members of the RNC and NVGOP who are lawfully registered to vote in Nevada. These individuals have a statutory right to vote in elections for federal office that comply with the procedures and protections required by the NVRA.

### COUNT
### Violation of the NVRA

119.   Plaintiffs incorporate all their prior allegations.

120.   Defendants have failed to make reasonable efforts to conduct voter-list maintenance as required by 52 U.S.C. §20507(a)(4).

121.   Plaintiffs have suffered irreparable injuries as a direct result of Defendants' violation of section 8 of the NVRA.

122.   Plaintiffs will continue to be injured by Defendants' violations of the NVRA until Defendants are enjoined from violating the law.

123.   Plaintiffs have no adequate remedy at law.

Second Amended Complaint

1

2      **WHEREFORE,** Plaintiffs ask this Court to enter judgment in their favor and

3  provide the following relief:

4          A.      A declaratory judgment that Defendants are in violation of section 8 of

5                  the NVRA;

6          B.      A permanent injunction barring Defendants from violating section 8 of

7                  the NVRA;

8          C.      An order instructing Defendants to develop and implement reasonable

                   and effective registration list-maintenance programs to cure their

9                  failure to comply with section 8 of the NVRA and to ensure that

                   ineligible registrants are not on the voter rolls;

10         D.      Plaintiffs' reasonable costs and expenses of this action, including

11                 attorneys' fees; and

12         E.      All other further relief that Plaintiffs may be entitled to.

13  Dated: November 11, 2024                        Respectfully submitted,

14                                                  */s/ Jeffrey F. Barr*

15
   Thomas R. McCarthy*                     Jeffrey F. Barr (Bar No. 7269)
16  Gilbert C. Dickey*                      ASHCRAFT & BARR LLP
17  Conor D. Woodfin*                       8275 South Eastern Ave., Ste. 200
   CONSOVOY MCCARTHY PLLC                   Las Vegas, NV 89123
18  1600 Wilson Blvd., Ste. 700             barrj@ashcraftbarr.com
   Arlington, VA 22209
19  tom@consovoymccarthy.com                Sigal Chattah (Bar No. 8264)
20  gilbert@consovoymccarthy.com            CHATTAH LAW GROUP
   conor@consovoymccarthy.com              5875 S. Rainbow Blvd #204
21                                          Las Vegas, NV 89118
   *Admitted pro hac vice                  sigal@thegoodlawyerlv.com
22
23                              *Counsel for Plaintiffs*

24

25

26

27

28

                                      22