AARON D. FORD
  Attorney General
LAENA ST-JULES (Bar No. 15156)
  Senior Deputy Attorney General
Office of the Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717
T: (775) 684-1100
E:  lstjules@ag.nv.gov

*Attorneys for Secretary of State*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

REPUBLICAN NATIONAL COMMITTEE, NEVADA REPUBLICAN PARTY, and SCOTT JOHNSTON,

     Plaintiffs,

vs.

FRANCISCO AGUILAR, in his official capacity as Nevada Secretary of State; LORENA PORTILLO, in her official capacity as the Registrar of Voters for Clark County; WILLIAM "SCOTT" HOEN, AMY BURGANS, STACI LINDBERG, and JIM HINDLE, in their official capacities as County Clerks,

     Defendants.

Case No. 2:24-cv-00518-CDS-MDC

**DEFENDANT SECRETARY OF STATE'S MOTION TO DISMISS SECOND AMENDED COMPLAINT [ECF No. 131]**

Defendant Francisco Aguilar, in his official capacity as Nevada Secretary of State ("Secretary"), moves to dismiss Plaintiffs Republican National Committee ("RNC"), Nevada Republican Party (together with the RNC, the "Organizational Plaintiffs"), and Scott Johnston's (together with the Organizational Plaintiffs, "Plaintiffs") Second Amended Complaint for Declaratory and Injunctive Relief ("SAC"), [ECF No. 131].

## I.  INTRODUCTION

The National Voter Registration Act of 1993 ("NVRA") "was intended as a shield to protect the right to vote, not as a sword to pierce it." *Am. Civil Rights Union v. Philadelphia City Comm'rs*, 872 F.3d 175, 182 (3d Cir. 2017).  Yet Plaintiffs, through this lawsuit, are attempting to use it as a sword to pierce Nevadans' right to vote.  Plaintiffs claim, based on

mismatched, cherrypicked, and outdated data, that Nevada and certain counties are failing to make reasonable efforts to remove voters from voter rolls as required by the NVRA.

The Court dismissed Plaintiffs' initial Complaint for Declaratory and Injunctive Relief ("Complaint"), [ECF No. 1], because Plaintiffs had failed to establish standing and because the case was not prudentially ripe. *See* Reporter's Transcript of Proceedings, [ECF No. 96] at 23:2–4, 72:17–73:23 ("Hr'g Tr."). Plaintiffs amended their Complaint, but the Court again dismissed it for lack of standing. *RNC v. Aguilar*, Case No. 2:24-cv-00518-CDS-MDC, 2024 WL 4529358 (D. Nev. Oct. 18, 2024).

On their third go, Plaintiffs still lack standing. The Organizational Plaintiffs have failed to establish any direct interference with their core activities, and they also cannot invoke the NVRA's cause of action because their alleged injuries do not fall within the NVRA's zone of interests. Further, Plaintiffs fail to allege facts that plausibly state an NVRA violation. The inferences they ask the Court to draw based on misleading data are unwarranted, unreasonable, and implausible in the face of judicially noticeable data that shows that Nevada is a leader in list maintenance. The SAC should be dismissed.

## II.    BACKGROUND

### A.    List Maintenance Under the NVRA

Under the NVRA, states may only remove voters (1) at the voter's request; (2) if a voter becomes ineligible under state law "by reason of criminal conviction or mental incapacity"; (3) if the voter died; or (4) if the voter changed residence. 52 U.S.C. §§ 20507(a)(3)–(4). While states are permitted to remove registrants "at the request of the voter, by reason of criminal conviction or mental incapacity as provided in state law, or because of death or change of residence," the NVRA only requires states "to conduct a general program that makes a reasonable effort to remove the names of voters who have become ineligible on account of death or change of address." *Bellitto v. Snipes*, 935 F.3d 1192, 1199 (11th Cir. 2019); 52 U.S.C. § 20507(a)(4).

For the general program to remove voters based on a change of address, the NVRA imposes limitations on immediate removal. If a registrant moves outside of the jurisdiction,

a registrar will send a notice to the registrant for the registrant to respond to. 52 U.S.C. § 20507(d)(1)(B), (d)(2). A registrar cannot immediately remove a voter who does not respond to the notice; instead the registrar can only remove a non-responsive registrant if the registrant does not appear to vote in the next two federal general elections. 52 U.S.C. § 20507(d)(1)(B).

### B. Nevada's General List Maintenance Program for Voters Who Change Residence

Nevada's counties ensure maintenance of their respective voter lists when a voter changes residence pursuant to NRS 293.530. Counties can "use any reliable and reasonable means . . . to determine whether a registered voter's current residence is other than that indicated on the voter's application to register to vote." NRS 293.530(1). After identifying voters whose residences may have changed, the counties will then mail those voters a written notice with a postage guaranteed return postcard that has a space for the voter to write in his or her new address. NRS 293.530(1)(c)(1)–(2). If a voter returns the postcard with updated information, the county will correct the voter registration list. NRS 293.530(f). However, if a voter does not return the postcard within 33 days of its mailing, the county will designate the voter as inactive. NRS 293.530(1)(d), (g). And if an inactive voter fails to vote for two general elections after the mailing of the notice and postcard and the voter's registration information is not updated as specified in statute during that time, the county will cancel the voter's registration. NRS 293.530(1)(c)(4)–(5).

### C. Nevada's Safeguards Against Voter Fraud

Nevada has in place laws that safeguard against voter fraud, including, among others, the following five categories. First, votes cast by mail ballot and in person are subject to signature verification. NRS 293.269927(1) (mail ballots), 293.3075(1)(c) (ballots cast in person on election day), 293.3585(1)(c) (ballots cast early in person). Second, inactive voters are not sent mail ballots. *See* NRS 293.269911(1). Third, voter fraud is criminalized, NRS 293.775 (category D felony for voting or attempting to vote when not qualified or using another person's name), NRS 293.780 (category D felony for voting

or attempting to vote twice at same election), and as Plaintiffs note, is prosecuted in Nevada, SAC ¶¶ 51–53. Fourth, the results of each election are subject to risk-limiting audits designed to limit the risk of certifying incorrect election outcomes. NRS 293.394(2)–(3). And fifth, registered voters can, based on personal knowledge, challenge other voters' ability to cast votes or remain on the voter rolls. *See* NRS 293.303, 293.535, 293.547.

### D. This Lawsuit

Plaintiffs commenced this action on March 18, 2024, [ECF No. 1], and the Secretary moved to dismiss the Complaint on April 15, 2024, [ECF No. 26]. The Court held a hearing on the motion to dismiss on June 18, 2024 and dismissed the Complaint because the Plaintiffs lacked standing. *See* Hr'g Tr. at 73:24–25.

Plaintiffs then filed their First Amended Complaint for Declaratory and Injunctive Relief ("FAC") on July 2, 2024, [ECF No. 98]. Once again, the Court dismissed Plaintiffs' complaint for lack of standing. The Court found that the individual plaintiff's vote dilution and undermined confidence allegations did not satisfy Article III's standing requirements. *See Aguilar*, 2024 WL 4529358, at *3–6. Further, the Organizational Plaintiffs lacked standing because they failed to allege a cognizable injury-in-fact. *See id.* at *6–8. Plaintiffs filed their SAC on December 3, 2024. [ECF No. 131].

## III. LEGAL STANDARDS

### A. Lack of Subject-Matter Jurisdiction

Article III, § 2 of the U.S. Constitution limits federal court jurisdiction to "Cases" and "Controversies." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016). "'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (citations omitted). To establish the irreducible constitutional minimum of standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc.*, 578 U.S. at 338 (citations omitted). The injury in fact must be "'an invasion ///

of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (citation omitted).

### B.    Failure to State a Claim

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). It must also contain "more than labels and conclusions, and a formulaic recitation of a cause of action's elements." *Twombly*, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level" and "nudge[] [a plaintiff's] claims across the line from conceivable to plausible." *Id.* at 555, 570 (citations omitted). Factual allegations that "do not permit the court to infer more than the mere possibility of misconduct," and that do not actually "show[]" that the defendant acted unlawfully, cannot sustain a claim. *Iqbal*, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)). Accordingly, an "obvious alternative explanation" left unrebutted by the factual allegations will doom a complaint. *See Twombly*, 550 U.S. at 567–69.

## IV.    ARGUMENT

### A.    Plaintiffs Have Failed to Allege an Adequate Theory of Injury

Plaintiffs claim several purported injuries. The individual plaintiff claims vote dilution based on voter fraud and undermined confidence in elections as injuries. SAC ¶¶ 32, 117–18. The Organizational Plaintiffs allege direct organizational standing based on purported inaccuracies in the voter rolls making it more burdensome for them to ensure election of Republican candidates. *Id.* ¶¶ 13–30. Finally, the Organizational Plaintiffs claim associational standing on behalf of their members. *Id.* ¶¶ 12, 27. These theories of injury are insufficient as they do not each establish standing and a right to invoke the NVRA's cause of action.

#### 1.    The Individual Plaintiff Does Not Have Standing

This Court has now twice found that Plaintiff Johnston does not have standing. *See* Hr'g Tr. at 23:2–4; *Aguilar*, 2024 WL 4529358, at *3–6. Plaintiffs have not added any

allegation in their SAC that would change this law of the case. *See United States v. Jingles*, 702 F.3d 494, 499 (9th Cir. 2012) ("Under the 'law of the case' doctrine, a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case."). Further, Plaintiffs represented in their Motion for Leave to File Amended Complaint that they "are willing to forgo briefing Scott Johnston's standing in light of this Court's ruling that he lacks an Article III injury as alleged in the Amended Complaint" and "to accept this Court's previous ruling on that issue as final." [ECF No. 124, at 3]. The Secretary accepts Plaintiffs' offer and therefore does not re-brief Johnston's lack of standing.

### 2. The Organizational Plaintiffs Fail to Allege Direct Interference with Their Core Activities

In the wake of the Supreme Court's decision in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) and the Ninth Circuit's decision in *Arizona Alliance for Retired Americans v. Mayes*, 117 F.4th 1165 (9th Cir. 2024), this Court held that "neither RNC nor the [NVGOP] adequately allege organizational standing under Article III." *Aguilar*, 2024 WL 4529358, at *6. Plaintiffs do not add any allegation in their SAC that would change this result.

### a. The Organizational Plaintiffs Are Not Injured Because They Can Continue Their Core Activities

As has now been clarified, it is insufficient for an organization to claim that it "has diverted resources in response to government action that does not directly affect the organization's existing core activities." *Mayes*, 117 F. 4th at 1177. Instead, direct organizational standing requires a "direct[] injur[y to] the organizations' pre-existing core activities, apart from the plaintiffs' response to that provision." *Id.* at 1180. Plaintiffs cannot make this showing.

The Organizational Plaintiffs allege that their "core activities" are electing Republican candidates and turning out Republican voters. SAC ¶¶ 13, 25, 29. They add new allegations purporting to show injury to these core activities, but they are more of the

same allegations that this Court has already considered and rejected. *See Aguilar*, 2024 WL 4529358, at *7 ("The only way that the alleged failure to maintain voter lists affects the organizational plaintiffs' 'core activities' is by causing the organizational plaintiffs, in response to the failure to maintain the voter lists, to decide to shift some resources from 'one set of pre-existing activities in support of their overall mission to another, new set of such activities.'").

Plaintiffs add to their already rejected claim that if voter rolls are inaccurate, that will impact their ability to develop campaign strategies and contact, register, and turn out voters. *Compare* SAC ¶¶ 14–20 *with* FAC ¶¶ 14–17. But just because Plaintiffs might need to expend additional resources in support of their activities, that does not mean they have suffered a cognizable injury-in-fact. *See Mayes*, 117 F. 4th at 1175 (recognizing that there was no cognizable injury when a "voter advocacy organization . . . engag[ed] in additional voter advocacy"). The only harm alleged here is that the Organizational Plaintiffs do not have a convenient enough "roadmap of voters who need to be contacted and driven out." *See* SAC ¶ 15. There is no allegation that they cannot continue their outreach and strategizing activities, only that they have to engage in new activities because they cannot solely rely on voter rolls to determine what services to provide to their members.[1] *See id.* ¶ 29; *Mayes*, 117 F.4th at 1175 (direct organizational standing does not exist where an organization spends "resources on new activities *in response* to a challenged policy"). Stated simply, because the Organizational Plaintiffs can "continue their core activities that they have always engaged in," they have failed to allege a cognizable injury-in-fact. *Mayes*, 117 F.4th at 1178; *see also Aguilar*, 2024 WL 4529358, at *8 ("Even assuming, arguendo, that there has not been proper voter list maintenance, RNC can still carry on its mission and continue to register voters.").

---

[1] The RNC claims that because of supposedly inaccurate voter rolls, it "must spend substantial time and resources monitoring Nevada elections for fraud and abuse, mobilizing voters to counteract it, educating the public about election-integrity issues, and persuading elected officials to improve list maintenance." SAC ¶ 22. These allegations are an insufficient attempt for the RNC to "spend its way into standing simply by expending money to gather information and advocate against the defendant[s'] actions." *Mayes*, 117 F.4th at 1177 (citation omitted).

### b. Plaintiffs Fail to Allege that Any Injury Is Fairly Traceable to Supposed Improper List Maintenance

The Organizational Plaintiffs also fail to establish causation. When a party "challenge[s] a law that does not directly affect it, the chain of causation will be longer and inferences will be necessary." *Mayes*, 117 F.4th at 1177. A plaintiff cannot simply rely on "distant (even if predictable) ripple effects." *Id.* at 1173 (citation omitted). Instead, for direct organizational standing, the challenged activity must directly injure or interfere with an organization's pre-existing core activities. *Id.* at 1180. In *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), the direct interference was Havens' racial steering practices that led Havens to wrongfully lie to HOME's Black employees about housing availability. *Mayes*, 117 F.4th at 1174, 1180. This wrongful lie directly impacted HOME's pre-existing core activity of helping Black clients obtain housing. *Id.* at 1180. Plaintiffs' alleged harm lacks such a direct interference. Nevada's voter rolls accurately reflect who is registered to vote, and the voter rolls are not maintained for partisan purposes. The Organizational Plaintiffs choose to obtain and use the voter rolls to support their activities and there "is no sense in which" the maintenance of the voter rolls "can be said to directly injure the organizations' pre-existing core activities, apart from [their] response to" it. *Id.*

Indeed, Plaintiffs concede as much: they state that they are able, through additional efforts, to "ensure" accomplishment of their "core business of electing Republican candidates in Nevada and turning out Republican voters throughout the State." SAC ¶¶ 28–30. At bottom, the Organizational Plaintiffs' allegations "represent the same diversion-of-resources and frustration-of-mission injury that *Hippocratic Medicine* rejected" because they allege only that, in response to Nevada's list maintenance practices, they have "decide[d] to shift some resources from one set of pre-existing activities in support of their overall mission to another, new set of such activities." *Mayes*, 117 F.4th at 1180; *see also Aguilar*, 2024 WL 4529358, at *7.

Further, it is sheer speculation that alleged harm to the Organizational Plaintiffs' core outreach and strategizing activities is caused by inadequate list maintenance under

the NVRA. First, as discussed below, a state can satisfy the NVRA's minimum requirements for voters who have changed residence by relying on data that misses up to 40 percent of people who move. *See* § IV.B.2, *infra*; *Bellitto*, 935 F.3d at 1204–05. Second, under the NVRA, a voter can only be removed based on a change of address after failing to respond to a confirmation notice and not voting in two federal general elections. 52 U.S.C. § 20507(d)(B). This means that voters who moved can remain on the voter rolls, even after list maintenance activities, for at least just over two years and up to over four years later.[2] Taken together, this shows that simple reliance on voter rolls, even if maintained in compliance with the NVRA, would cause the same alleged injuries to the Organizational Plaintiffs' outreach and strategizing activities. Additional efforts, such as the ones the Organizational Plaintiffs already undertake, *see* SAC ¶¶ 28–30, would be necessary. The Organizational Plaintiffs' theory of causation rests on pure, implausible speculation that NVRA compliance means voter rolls would require no additional efforts for the purposes the Organizational Plaintiffs put them to, and their theory therefore does not "create[] enough of a causal chain to satisfy Article III." *Mayes*, 117 F.4th at 1178.

Plaintiffs also try to show a specific injury to Republican interests by alleging that supposed noncitizen voters may be on the voter rolls and may favor Democratic candidates. *See* SAC ¶ 21. But that allegation is untethered to the NVRA violation alleged here as the NVRA does not require any general list maintenance program relating to noncitizens. *See id.* ¶ 120 (alleging violation of 52 U.S.C. § 20507(a)(4)); 52 U.S.C. § 20507(a)(4) (requiring "a general program that makes a reasonable effort to remove the names of ineligible voters . . . by reason of" death or change of residence.). Further, the "links in the chain of causation" are "too speculative" to confer standing. *Hippocratic Medicine*, 602 U.S. at 383 (citations omitted). As this Court explained, an injury based on voter fraud is "too speculative, even under the NVRA" when it "requires three uncertain intervening events: (1) an ineligible voter must be afforded the opportunity to commit fraud; (2) the ineligible

---

[2] The NVRA does not require states to take the intermediate step of inactivating voters.

voter will in fact commit fraud; and (3) the fraud will not be prevented." *Aguilar*, 2024 WL 4529358, at \*5. Because voter fraud is speculative, there is no "direct[]" or "perceptible[] impair[ment]" of the Organizational Plaintiffs' core activities. *See Hippocratic Medicine*, 602 U.S. at 395 (citation omitted).

### 3. The Organizational Plaintiffs Do Not Have a Right to Sue Under the NVRA

#### a. Plaintiffs' Alleged Injuries Do Not Fall Within the NVRA's Zone of Interests

The Organizational Plaintiffs' claimed injury to their core activities is insufficient for the independent reason that it does not fall within the NVRA's zone of interests. The Organizational Plaintiffs are asserting a statutory cause of action based on the NVRA, and their interests must therefore "fall within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (citation omitted).

"[T]he breadth of the zone of interests varies according to the provisions of law at issue . . . ." *Id.* at 130 (citation omitted). Identifying the interests protected by the NVRA "requires no guesswork" because they are clearly defined in the NVRA itself. *See id.* at 131. The NVRA's stated purposes are:

> (1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;
> (2) to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;
> (3) to protect the integrity of the electoral process; and
> (4) to ensure that accurate and current voter registration rolls are maintained.

52 U.S.C. § 20501(b).

Each of these purposes fundamentally concerns the process of non-partisan, public participation in federal election—in service of the public interest at large, not the interest of any private or partisan entity. Moreover, as discussed in Section IV.B.2, *infra*, 52 U.S.C. § 20507's design allows for voter rolls to include a substantial number of voters who are no longer eligible, demonstrating that the purpose was not to give a private, partisan party a

roadmap to who to reach out to for electoral support. The Organizational Plaintiffs' use of voter rolls to advance their private purposes is entirely outside the zone of interests protected by the NVRA and any alleged injury lacks connection to the conduct the NVRA prohibits. Their use of the voter rolls is explicitly a private, partisan aim accruing to the benefit of a private, partisan entity.

Even if the Organizational Plaintiffs' injuries constituted an Article III injury, that would not be enough because "the injury that supplies constitutional standing must be the same as the injury within the requisite 'zone of interests.'" *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996); *see also Oberdorfer v. Jewkes*, 583 F. App'x 770, 773 (9th Cir. 2014) ("Western Radio could not file suit under the National Environmental Protection Act (NEPA) because its asserted injuries either cannot establish standing under Article III or do not fall within NEPA's zone of interests . . . ."); *Triumvirate, LLC v. Zinke*, Case No. 3:18-cv-0091-HRH, 2018 WL 2770634, at *5 (D. Ala. June 8, 2018) ("Article III standing and the NEPA zone of interests test must be satisfied by the same injury."); *Nw. Immigrant Rts. Project v. USCIS*, 325 F.R.D. 671, 687 (W.D. Wash. 2016) ("[T]he Ninth Circuit and several district courts therein equate a party's 'interests' with the 'injuries' that confer constitutional standing upon that party."); *Yount v. Salazar*, Nos. CV11-8171 PCT-DGC, CV12-8038 PCT DGC, CV12-8042 PCT DGC, CV12-8075 PCT DGC, 2014 WL 4904423, at *6 (D. Ariz. Sept. 30, 2014) ("Article III standing and the NEPA zone of interests test must be satisfied by the same injury."). Thus, Plaintiffs cannot rely on any alleged injury that does not satisfy Article III to claim an injury within the NVRA's zone of interests.

Because the Organizational Plaintiffs' alleged injuries do not both fall within the NVRA's zone of interests and satisfy Article III, they may not "invoke the [NVRA's] cause of action." *See Lexmark*, 572 U.S. at 130.

///

///

///

**b.    Plaintiffs' Alleged Injuries Are Not Sufficiently Connected to Nevada's List Maintenance Activities**

The Organizational Plaintiffs also fail to establish proximate causation in bringing their NVRA statutory cause of action. *See Lexmark*, 572 U.S. at 132 ("[W]e generally presume that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute."). For there to be proximate causation, there must be "a sufficiently close connection" between the Organizational Plaintiffs' alleged injuries and "the conduct the statute prohibits." *Id.* at 133. Harm that is "'too remote' from the defendant's unlawful conduct" is insufficient. *Id.*

Plaintiffs' alleged violations of law—that Nevada has kept too many people on the voter rolls—does no harm to the Organizational Plaintiffs' interests in turning out Republican voters and electing Republican candidates. The only way an alleged NVRA violation harms these interests is through the Organizational Plaintiffs' use of the voter rolls in ways that the voter rolls are not designed for. Like the Fair Housing Act addressed in *Bank of America Corp. v. City of Miami*, 581 U.S. 189 (2017), "[n]othing in the [NVRA] suggests that Congress intended to provide a remedy wherever . . . ripples [of alleged harm] travel." *Bank of Am. Corp.*, 581 U.S. at 202 (citation omitted).

**4.    The Organizational Plaintiffs Cannot Establish Associational Standing**

The Organizational Plaintiffs do not have associational standing here to bring suit on behalf of their members. *See* SAC ¶¶ 12, 27. They would have to have members who "would otherwise have standing to sue in their own right." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). But for the same reasons Johnston does not have standing, the Organizational Plaintiffs do not have associational standing.

**B.    Plaintiffs Do Not State a Claim**

Plaintiffs' SAC lacks plausible allegations of an NVRA violation.[3]

---

[3] The Court previously denied the Secretary's motion to dismiss the Complaint based on the argument that Plaintiffs' pre-litigation notice was deficient. *See* Hr'g Tr. at 71:5–13.

### 1.   The Court Can Consider the Data Cited in This Motion

Plaintiffs rely in their SAC on U.S. Census Bureau data, Secretary of State voter registration and voter roll data, and data from the U.S. Election Assistance Commission ("EAC") to purport to support their claim. *See* SAC ¶¶ 63–70, 77–81, 83–85, 89. This same data, as well as additional data and documentation from the same government agencies (i.e., the U.S. Census Bureau, the Secretary of State, and the EAC), is cited below. This data is all appropriate for judicial notice, and where relied on in the SAC to form a basis of Plaintiffs' claims, is incorporated by reference, and can be considered on this motion to dismiss without converting it to a motion for summary judgment. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999, 1002 (9th Cir. 2018); Fed. R. Evid. 201(b)(1)–(2).

Agency reports are "generally susceptible to judicial notice," and there can be no reasonable dispute as to what the data and documentation cited below establish. *See Khoja*, 899 F.3d at 1001 (citation omitted). This is particularly true here where Plaintiffs rely on similar data from the very same agencies to support their claim, thereby acknowledging the agencies' data is not subject to reasonable dispute. *See United States v. Esquivel*, 88 F.3d 722, 726–27 (9th Cir. 1996) (taking judicial notice of U.S. Census Bureau documents because they met the requirements of Fed. R. Evid. 201(b) and were "of the same type and taken from the same source" as the defendant's own data). The Court should therefore take judicial notice of data cited below. *See* Fed. R. Evid. 201(c).

### 2.   Active Voter Registration Rates Do Not Plausibly Suggest Non-Compliance with the NVRA

Key purposes of the NVRA include "establish[ing] procedures that will increase the number of eligible citizens who register to vote in elections for Federal office" and "mak[ing] it possible for Federal, State, and local government to implement [the NVRA] in a manner that enhances the participation of eligible citizens as voters in elections for Federal office." 52 U.S.C. § 20501(b)(1)–(2); *see also* 52 U.S.C. § 20501(a)(1)–(2) ("The Congress finds that the

---

Because that holding is law of the case at this stage, *see Jingles*, 702 F.3d at 499, the Secretary does not re-raise the notice's sufficiency here but preserves the issue on any appeal.

right of citizens of the United States to vote is a fundamental right" and "it is the duty of the Federal, State, and local governments to promote the exercise of that right . . . .").

In light of the NVRA's purposes, there is nothing nefarious about a state encouraging and having high active registration rates. While the NVRA requires states to conduct a general program that makes a reasonable effort to remove voters who become ineligible based on death or change of residence, the NVRA does not provide a numerical threshold to establish compliance or lack thereof. Use of active registration rates alone does not demonstrate a failure to comply with the NVRA; registration rates may far exceed the eligible voting pool without any violation. This is true for several reasons.

First, the NVRA creates a safe harbor for states who use U.S. Postal Service information to identify individuals who have become ineligible based on a change of residence address (the "NCOA Process"). *Bellitto*, 935 F.3d at 1205. If a state uses the NCOA Process, it meets the NVRA's minimum statutory requirements with respect to voters who have moved. *Id.* This process is sufficient even though it may not lead to the removal of some ineligible voters. In fact, "[a]s many as 40 percent of people who move do not inform the Postal Service." *Id.* at 1204 (quoting *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 765 (2018)). Thus, the NVRA itself establishes that it is acceptable for a substantial number of voters who have moved out of the jurisdiction to properly remain on the voter rolls.

Second, the NVRA only requires states to remove voters based on a change of address or death. *Bellitto*, 935 F.3d at 1195; 52 U.S.C. § 20507(a)(4). Under the NVRA, therefore, voters who are ineligible may properly remain on the voter rolls, resulting in higher registration numbers. The NVRA itself is, in fact, "partly responsible" for high voter registration rates. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 192 (2008).

Third, the NVRA prohibits a state from taking action in connection with certain ineligible voters through its general removal program during the 90-day period before a federal primary and general election. 52 U.S.C. § 20507(c)(2)(A). This can result in higher registration numbers because a state would be unable to systematically act on certain voters through its general programs, while new voters are still able to register. *See Bellitto*, 935 F.3d

at 1208. Plaintiffs rely here on voter registration numbers reported as of November 1, 2024. *See* SAC ¶ 58. These numbers come nearly three months after Nevada was no longer able to implement its general program to remove voters who changed residence in advance of the November 5, 2024 federal general election. While Nevada was unable to implement its general program to reduce registration numbers for those who had moved, Nevada was also adding newly registered voters before the highly consequential November 2024 general election.

Taken together, the NVRA's statutory scheme reflects that active registration rates may properly be significantly higher than the actual pool of eligible voters. It is also consistent with the conclusion that Congress recognized that the risk of voter fraud would not be materially increased if ineligible voters remained on voter rolls. A violation of the NVRA based on high registration rates is therefore an "unreasonable inference" and need not be accepted as true. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (citation omitted); *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 681 (9th Cir. 2009) ("We take a plaintiff's allegations in the complaint as true, but we are 'not required to indulge unwarranted inferences.'"). Plaintiffs' allegations based on active registration rates are insufficient because they do not permit the court to do more than "infer . . . the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679 (citation omitted).

### 3. Plaintiffs' Active Registration Rate Calculations Do Not Reflect Current Reality

Plaintiffs rely on misleading calculations to allege a violation of the NVRA based on active voter registration rates. Actual, real-time numbers establish Nevada's consistent position as a leader in list maintenance.

In the SAC, Plaintiffs primarily rely on the U.S. Census Bureau's 5-Year Citizen Voting Age Population ("CVAP") data for 2018–2022[4] to purportedly establish that certain counties' active registration rates are too high. *See* SAC ¶¶ 63–65, 70. They compare the 2018–2022

---

[4] U.S. Census Bureau, CVAP Special Tabulation from the 2018–2022 5-Year American Community Survey, County Spreadsheet, https://tinyurl.com/y63a252y.

CVAP data against active registration numbers from November 1, 2024 to calculate supposed active registration rates. *See id.* The CVAP data is derived from the U.S. Census Bureau's American Community Survey ("ACS").[5] But registration rates calculated using ACS data, and specifically the ACS citizen population averages, have been found to be misleading and inaccurate, and insufficient to prove an NVRA violation, even when registration rates calculated using citizen population averages from the ACS exceeded 100% for a county. *Bellitto*, 935 F.3d at 1207–08.

There are two key problems with using the ACS data here. First, the ACS population data "significantly underestimate[s] the population." *See id.* at 1208. For instance, the ACS data excludes many individuals who may be eligible voters but do not reside in a county for the entire year, such as military personnel and college students. *Id.* Thus, using the ACS data as the denominator in an active registration rate calculation will yield a too-high active registration rate. Second, the ACS data "takes data drawn from the preceding five years and estimates the midpoint of that data." *Id.* The 2018–2022 CVAP data, therefore, estimates the population at the middle of 2020, *see id.*, and it does not take into account population growth after that.

Performing Plaintiffs' same active registration rate calculations over time would suggest that Nevada has, for years, been in violation of the NVRA. But real-time numbers show how misleading Plaintiffs' calculations are. The below table shows the active registration rates for 2017–2020 using (1) Plaintiffs' methodology and (2) a real-time comparison. For Plaintiffs' methodology, the rate is calculated by dividing active registration numbers from approximately four years after the year identified in the table by the 5-year CVAP data that estimates the midpoint of the year identified in the table. Thus, for example, the 2017 rate divides the total active registered voters in Nevada reported as of June 1, 2021 by the 2015–2019 CVAP estimate of Nevada's citizen voting age population, which estimates

---

[5] U.S. Census Bureau, Citizen Voting Age Population (CVAP) Special Tabulation From the 2017–2021 5-Year American Community Survey (ACS), at 1, https://tinyurl.com/3rbmcm8t; U.S. Census Bureau, Citizen Voting Age Population (CVAP) Special Tabulation From the 2018–2022 5-Year American Community Survey (ACS), at 1, https://tinyurl.com/5xd32exy; *see also* SAC. ¶ 63.

the population at the middle of 2017. For the real-time comparison, the active registration rate is calculated by dividing active registration numbers from the midpoint of the year identified by the 5-year CVAP data that estimates the midpoint of the year identified. Thus, for example, the 2017 rate divides the total active registered voters in Nevada reported as of July 5, 2017 by the 2015–2019 CVAP estimate of Nevada's citizen voting age population, which estimates the population at the middle of 2017.

| Year | Plaintiffs' Methodology | Real-Time Comparison |
|------|------------------------|----------------------|
| 2017 | 90.37%[6] | 72.92%[7] |
| 2018 | 87.92%[8] | 70.58%[9] |
| 2019 | 89.50%[10] | 74.72%[11] |
| 2020 | 92.89%[12] | 75.36%[13] |

---

[6] *See* Nev. Sec'y of State, Voter Registration Statistics, May 2021, Active Voters by County and Party, https://tinyurl.com/5dtpaypa (last updated June 1, 2021) (1,824,418 active registered voters); U.S. Census Bureau, CVAP Special Tabulation from the 2015–2019 5-Year ACS, County Spreadsheet, https://tinyurl.com/5tsaazv4 ("2019 5-Year CVAP") (2,018,925 estimated citizen voting age Nevadans).

[7] *See* Nev. Sec'y of State, June 2017 Voter Registration Statistics, Active Voters by County and Party, https://tinyurl.com/yc3fmbj3 (last updated July 5, 2017) (1,472,259 active registered voters); 2019 5-Year CVAP.

[8] *See* Nev. Sec'y of State, Voter Registration Statistics, May 2022, Active Voters by County and Party, https://tinyurl.com/56t33p82 (last updated June 1, 2022) (1,821,058 active registered voters); U.S. Census Bureau, CVAP Special Tabulation from the 2016–2020 5-Year ACS, County Spreadsheet, https://tinyurl.com/yue9my3f ("2020 5-Year CVAP") (2,071,285 estimated citizen voting age Nevadans).

[9] *See* Nev. Sec'y of State, June 2018 Voter Registration Statistics, Active Voters by County and Party, https://tinyurl.com/2p8yzbrm (last updated July 2, 2018) (1,461,833 total active registered voters); 2020 5-Year CVAP.

[10] *See* Nev. Sec'y of State, Voter Registration Statistics, 06/01/2023, Active Voters by County & Party, https://tinyurl.com/mr47t498 (1,878,692 active registered voters); U.S. Census Bureau, CVAP Special Tabulation from the 2017–2021 5-Year ACS, County Spreadsheet, https://tinyurl.com/mth2dwdy ("2021 5-Year CVAP") (2,099,150 estimated citizen voting age Nevadans).

[11] *See* Nev. Sec'y of State, June 2019 Voter Registration Statistics, Active Voters by County and Party, https://tinyurl.com/ypvby7c3 (1,568,468 total active registered voters); 2021 5-Year CVAP.

[12] *See* Nev. Sec'y of State, Voter Registration Statistics, 06/01/2024, Active Voters by County & Party, https://tinyurl.com/2syypme9 (1,997,473 active registered voters); U.S. Census Bureau, CVAP Special Tabulation from the 2018–2022 5-Year ACS, County Spreadsheet, https://tinyurl.com/y63a252y ("2022 5-Year CVAP") (2,150,290 estimated citizen voting age Nevadans).

[13] *See* Nev. Sec'y of State, Voter Registration Statistics June 2020, Active Voters by County and Party, https://tinyurl.com/fh9ny72z (last updated July 1, 2020) (1,620,457 active registered voters; 2022 5-Year CVAP.

The misleading nature of Plaintiffs' calculations is put into sharp relief by other real-time data. As shown by the EAC's Election Administration and Voting Survey Comprehensive Reports, Nevada has consistently maintained (1) an active registration rate below national averages based on 1-year CVAP data; (2) rates of sending confirmation notices to active voters as part of its general program to remove voters who have changed residence above the national average; and (3) inactivation rates above the national average.

| Action | Year | Nevada | U.S. |
|---|---|---|---|
| Active Registrations (% of CVAP)[14] | 2022 | 83.9% | 85.4% |
| | 2020 | 86.9% | 88.1% |
| | 2018 | 77.0% | 82.5% |
| Inactive Registrations (% of Total Registrations)[15] | 2022 | 16.3% | 11.1% |
| | 2020 | 10.0% | 9.1% |
| | 2018 | 11.8% | 11.3% |
| Confirmation Notices Sent (% of Active Voters)[16] | 2022 | 22.0% | 13.7% |
| | 2020 | 19.7% | 14.3% |
| | 2018 | 16.6% | 11.6% |

If Nevada has in fact been in violation of the NVRA for years, as Plaintiffs' methodology suggests, the EAC's real-time numbers would not show that Nevada has had consistently lower active registration rates than the national average, higher rates of sending confirmation notices than the national average, and higher rates of inactivation than the national average. There is, of course, an "obvious alternative explanation," *see Twombly*, 550 U.S. at 567–69, for why Plaintiffs' calculations result in high active registration rates. Nevada has a substantially growing population,[17] and the 2018–2022 CVAP data does not account for

[14] EAC, Election Administration and Voting Survey 2022 Comprehensive Report, at 164, 166, https://tinyurl.com/nhx86v7k ("2022 EAC Report"). The EAC uses 1-year CVAP estimates for its calculations as opposed to 5-year CVAP estimates. *See id.* at 166.

[15] *Id.* at 164, 166.

[16] *Id.* at 158, 182–83; EAC, Election Administration and Voting Survey 2020 Comprehensive Report, at 133, 159–60, https://tinyurl.com/y95rcm95 ("2020 EAC Report"); EAC, Election Administration and Voting Survey 2018 Comprehensive Report, at 52, 79, https://tinyurl.com/49bpuzym ("2018 EAC Report").

[17] *Compare, e.g.*, U.S. Census Bureau, Nevada 2019 Citizen, Voting-Age Population, https://tinyurl.com/4k3jxcn3 (estimating Nevada's voting population to be 2,111,932 in 2019) *with* U.S. Census Bureau, Nevada 2022 Citizen, Voting-Age Population,

population growth over the past four years. *See Bellitto*, 935 F.3d at 1208. Plaintiffs offer nothing that "tend[s] to exclude the possibility that the alternative explanation is true." *See In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013). Instead, they offer only allegations that are "not only compatible with, but indeed [are] more likely explained by, lawful . . . behavior." *Election Integrity Project Cal., Inc. v. Weber*, 113 F.4th 1072, 1098 (9th Cir. 2024) (quoting *Iqbal*, 556 U.S. at 680). This is insufficient to state a claim. *Id.* In fact, the Ninth Circuit recently rejected a claim based on increases in voter rolls as this was "consistent with a growing electorate and same-day voter registration." *Id.*

Moreover, Plaintiffs' active registrations rate calculations based on a comparison of citizen voting age estimates from the midpoint of 2020 against active voter registration numbers from November 1, 2024 do not support a plausible inference of an NVRA violation. "In assessing the plausibility of an inference, [courts] draw on [their] judicial experience and common sense and consider obvious alternative explanations." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1057 (9th Cir. 2011) (cleaned up); *see also Iqbal*, 556 U.S. at 679. Here, everything demonstrates the implausibility of Plaintiffs' allegations. No case brought on similar allegations has ever succeeded on the merits. There is an obvious alternative explanation. And common sense dictates that a state that performs better than the national average in every relevant metric is not in violation of the NVRA.

Finally, because Plaintiffs' active registration rate calculations are misleading, Plaintiffs' comparisons of those calculations to the U.S. Census Bureau's Current Population Survey ("CPS") are irrelevant. *See* SAC ¶¶ 66–69. As shown above, Nevada's active registration rate comparing active registration numbers from the middle of 2020 against the 2018–2022 CVAP data is 75.36%, which is close to the nationwide CPS rate for 2020 (72.7%). *See* SAC ¶ 68. Further, comparing nationwide CPS registration rates for 2020 (72.7%) and 2022 (69.1%), SAC ¶¶ 67–68, against active voter registration rates reported by the EAC for

https://tinyurl.com/2p8x5b7j (estimating Nevada's voting population to be 2,227,239 in 2022).

the same years reveals that only one single state had an active voter registration rate below the national CPS average in 2022, and only three states had active voter registration rates below the national CPS average in 2020.[18]  The CPS voter registration rates are crude estimates based on historical recall, obtained through personal or telephone interviews from approximately 54,000 households nationwide.[19]  They are flatly untethered to reality and any inference of an NVRA violation based on them would be "unreasonable."  *Daniels-Hall*, 629 F.3d at 998 (citation omitted).

That Plaintiffs' allegations are insufficient is confirmed by *RNC v. Benson*, Case No. 1:24-cv-262, 2024 WL 4539309 (W.D. Mich. Oct. 22, 2024), *appeal filed* No. 24-1985. The *Benson* plaintiffs' allegations mirrored the allegations here, and the court concluded both that (1) the plaintiffs' factual inferences were "unwarranted" and that (2) "Plaintiffs' census data alone, even assuming its reliability, does not plausibly indicate that Michigan is violating the NVRA."  *Id.* at *14.  In short, Plaintiffs do not plausibly allege an NVRA violation based on a grab bag of incompatible data; there is no basis "to infer more than the mere possibility of misconduct."  *Iqbal*, 556 U.S. at 679 (citation omitted).  Plaintiffs' allegations are, at absolute best, "merely consistent with" liability and therefore "stop[] short of the line between possibility and plausibility of 'entitlement of relief.'"  *Id.* at 678 (citation omitted).

### 4.    Plaintiffs' Inactive Voter Registration Allegations Are Meritless

Plaintiffs' allegations relating to inactive voter registrations are paradoxical and in fact undermine their claim.  While, as described above, Plaintiffs claim that Nevada has too many active registered voters, they also appear to claim that Nevada and certain counties are *too aggressive* in inactivating voters because they have inactivation rates "well above" the national and state inactivation averages.  *See* SAC ¶¶ 83–87.  That Nevada and certain counties have inactivation rates "well above" national and state averages only further demonstrates that Nevada is in fact meeting its obligations under the NVRA.

---

[18] *Compare* SAC ¶¶ 67–68 *with* EAC 2022 Report at 162–65.

[19] U.S. Census Bureau, Methodology, https://www.census.gov/programs-surveys/cps/technical-documentation/methodology.html; U.S. Census Bureau, Current Population Survey, November 2022 Voting Supplement File, Technical Documentation CPS-22, at 2-1, https://www2.census.gov/programs-surveys/cps/techdocs/cpsnov22.pdf.

There is an "obvious alternative explanation" for Nevada's high inactivation numbers other than the one asserted by Plaintiffs:  Nevada's robust compliance with its NVRA's obligations.  *See Twombly*, 550 U.S. at 567–69.

The EAC data in the table below underscores that it is logical that Nevada and its counties would have higher-than-average inactivation rates because they undertake significant list maintenance activities.

| Action | Year | Nevada | U.S. |
|---|---|---|---|
| Confirmation Notices Sent (% of Active Voters)[20] | 2022 | 22.0% | 13.7% |
| | 2020 | 19.7% | 14.3% |
| | 2018 | 16.6% | 11.6% |
| Voters Removed (% of Registered Voters) [21] | 2022 | 18.0% | 8.5% |
| | 2020 | 7.7% | 8.2% |
| | 2018 | 11.1% | 8.2% |
| Voters Removed for Failure to Return Confirmation Notice (% of Removed Voters)[22] | 2022 | 41.3% | 25.4% |
| | 2020 | 41.3% | 32.1% |
| | 2018 | 56.9% | 35.3% |

Nevada sends confirmation notices to voters suspected of having moved at rates far higher than the national average.  It follows, then, that Nevada would have higher-than-average inactivation rates.  But Nevada's list maintenance activities don't stop at inactivation.  Nevada generally removes voters at higher rates than the national average, and in fact, the latest EAC data shows that only two states and one territory removed voters at rates higher than Nevada for 2022.[23]  And of voters removed, Nevada's removal rates based on a failure to return a confirmation notice consistently far exceeded the national average.

///

---

[20] 2022 EAC Report at 158, 182–83; 2020 EAC Report at 133, 159–60; 2018 EAC Report at 52, 79.

[21] 2022 EAC Report at 159–60, 188–89; 2020 EAC Report at 135–36, 165–66; 2018 EAC Report at 52–54, 83.

[22] *Id.*

[23] 2022 EAC Report at 188–89.

Plaintiffs appear to try to confuse this issue by claiming that at least 4,684 on the inactive list should have been removed. *See* SAC ¶ 89. That allegation is based on the voter rolls as of June 2024, suggesting that those voters have in fact since been removed. *Id.* In any event, 4,684 voters represent a mere 0.20% of voters as of June 1, 2024 (2,339,496).[24] "[T]he NVRA requires only a 'reasonable effort,' not a perfect effort, to remove registrants . . . ." *Pub. Int. Legal Found. v. Benson*, Case No. 1:21-cv-929, 2024 WL 1128565, at *11 (W.D. Mich. Mar. 1, 2024) ("*PILF*"). Furthermore, "[t]he NVRA does not require states to immediately remove every voter who may have become ineligible." *Id.* In *PILF*, the court concluded that even if 0.3% of the total number of registered voters in Michigan were ineligible and subject to removal, having them still registered would not be unreasonable under the NVRA. *See id.* at *10. This was especially true where, as here, federally collected data shows that a state is among the most active in removing ineligible individuals. *See id.* The small number of inactive voters that allegedly should have been (and likely were) removed does not plausibly suggest a lack of reasonable effort to remove voters.

### 5. Relocation Rates Cannot Be Meaningfully Compared to Removal Rates

Plaintiffs compare relocation rates reported by the U.S. Census Bureau to removal rates from 2020 to 2022. SAC ¶¶ 79–81. Relocations do not, however, account for individuals who might have moved within the state, or county, and who properly remain on Nevada's voter rolls. And individuals who relocated outside of the state may have been removed from voter rolls other than through the inactivation and cancelation process; for instance, they could have requested removal or confirmed a change of residence. *See Jud. Watch, Inc. v. Pennsylvania*, 524 F. Supp. 3d 399, 407 (M.D. Pa. 2021) (finding implausible the theory of failure to comply with the NVRA based on removal rates not matching or approaching estimated change-of-residence rate). Moreover, low removal rates compared to residence changes do not necessarily "offend the NVRA." *Benson*, 2024 WL 4539309,

---

[24] Nev. Sec'y of State, Voter Registration Statistics, 06/01/2024 All Voters by County & Party, https://tinyurl.com/yckc3zed.

at *14 ("[E]ven assuming certain Michigan counties canceled fewer that '2% of [registrations] for residency changes' from 2020 to 2022 despite population data showing that anywhere from 12 percent to 23.5 percent of residence changed house during that time . . . , that cancellation rate over a short period of time would not offend the NVRA.").

Cherrypicked snapshots from years ago also say little about any supposed current NVRA violation. *See* Order, *Bellitto v. Snipes*, Case No. 16-cv-61474-BLOOM/Valle, [ECF No. 244, at 24] (S.D. Fla. March 30, 2018) (explaining no removal of inactive voters for two years did not paint full picture and finding sufficient evidence to demonstrate ongoing list-maintenance program), *affirmed*, 935 F.3d 1192 (11th Cir. 2019). In any event, each of the counties cited have inactive voters,[25] and actively removed many voters over the same period cited by Plaintiffs.[26] Plaintiffs' allegations therefore do not support a plausible inference of an NVRA violation.

### 6. Plaintiffs' Other Allegations Do Not Establish That Their Claim Is Plausible

Plaintiffs' SAC is entirely devoid of any allegation about Nevada's efforts to maintain its voter rolls, even though Plaintiffs were entitled to inspect Nevada's list maintenance records, *see* 52 U.S.C. § 20507(i), and even though this is the precise type of information that courts ultimately rely on in deciding whether a defendant has violated the NVRA, *see Bellitto*, 935 F.3d at 1206–07; *PILF*, 2024 WL 1128565, at *10–12.

In this vacuum, Plaintiffs allege supposed failures to use information for list maintenance to suggest an NVRA violation. They cite a now-dismissed lawsuit against Clark County relating to voters being registered at non-residential addresses. *See* SAC ¶ 82 (citing *Kraus v. Portillo*, Doc. 1, No. A-24-896151-W (8th Judicial Dist. Court June 25, 2024)). Plaintiffs' allegations about this lawsuit do not support their claim. Contrary to Plaintiffs'

---

[25] Nev. Sec'y of State, Voter Registration Statistics, 12/01/2024, Inactive Voters by County & Party, https://tinyurl.com/mr34hj45.

[26] EAC, EAVS Dataset Version 1.1 (released December 18, 2023), https://tinyurl.com/bdh6s3uh. Rows 2709–2725 contain Nevada's information. Removal data is in columns CU through DG, and the explanation of how to understand the removal data is on page 191 of EAC, Election Administration and Voting Survey 2022 Comprehensive Report, https://tinyurl.com/nhx86v7k.

assertion, *see id.*, voter registration does not require a residential address, *see* NRS 293.486(1); NRS 293.507(4)(c). Just because a voter might list a commercial address as their residence for voter registration purposes, that does not suggest improper voter registration or defective list maintenance.

Plaintiffs also allege that the Secretary sent postcards to voters in connection with the presidential preference primary election. *See* SAC ¶¶ 90–91. They claim that the Secretary should have given the county clerks information about those postcards if they were returned undeliverable so the county clerks could use that information to correct the voter rolls. *See id.* In essence, Plaintiffs are trying to impose their own view of what constitutes reasonable efforts to maintain the voter rolls under the NVRA. Without any allegation of how Nevada maintains its voter rolls, there is no basis to infer that Nevada's list maintenance processes are unreasonable. Under the NVRA, "[t]he failure to use duplicative tools or to exhaust every conceivable mechanism does not make [a defendant's] effort unreasonable." *Bellitto*, 935 F.3d at 1207; *see also PILF*, 2024 WL 1128565, at *11 ("PILF's identification of areas for improvement does not serve to demonstrate that Michigan's multilateral process for the removal of deceased registrants from the QVF does not meet the threshold of a 'reasonable effort.'"). Further, as "the Supreme Court has instructed[,] '[r]equiring additional' processes not mandated by the NVRA 'not only second-guesses the congressional judgment embodied in [the NVRA's] removal process, but also' improperly 'second-guesses the judgment of' state legislatures." *Benson*, 2024 WL 4539309, at *13 (quoting *Husted*, 584 U.S. at 774).

Finally, Plaintiffs raise the state's implementation of a new top-down voter registration system. *See* SAC ¶¶ 54, 88, 93–94, 96 (citing Anjeanette Damon & Nicole Santa Cruz, *Nevada Says It Worked Out the Kinks in Its New Voter System in time for the Election, but Concerns Remain*, ProPublica (Nov. 2, 2024), perma.cc/KNP6-P7AS). That system has no impact on list maintenance processes under the NVRA and does not show any failure to use reasonable efforts to remove ineligible voters. Nor is there even an indication that the new system has been used in connection with any list maintenance activities. While there

may have been coding errors in voter data that were remedied in advance of the November 5, 2024 election, that is unrelated to Nevada's efforts to conduct list maintenance. *See* Damon & Santa Cruz, *supra*. And allegations relating to noncitizens, as discussed above, are inapposite given that the NVRA does not require list maintenance with respect to noncitizens. *See* SAC ¶ 54.

As set forth above, Nevada has been a leader in list maintenance, which clearly reflects the reasonableness of its efforts to maintain its voter rolls.

## V.    CONCLUSION

For the foregoing reasons, the Court should dismiss the SAC.

DATED this 17th day of December, 2024.

AARON D. FORD
Attorney General

By: */s/ Laena St-Jules*
LAENA ST-JULES (Bar No. 15156)
 Senior Deputy Attorney General
Office of the Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717
T: (775) 684-1100
E: lstjules@ag.nv.gov

*Attorneys for Secretary of State*